**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **URBAN OAKS BUILDERS LLC,** | § | **Case No. 18-34892** |
| | § | |
| Debtor. | § | **Chapter 11** |
| ──────────────────────── | § | ──────────────────────── |
| | § | |
| **URBAN OAKS BUILDERS LLC; HINES INTERESTS LIMITED PARTNERSHIP; 1662 MULTIFAMILY LLC; HINES 1662 MULTIFAMILY LLC; HINES INVESTMENT MANAGEMENT HOLDINGS LIMITED PARTNERSHIP; HIMH GP LLC; HINES REAL ESTATE HOLDINGS LIMITED PARTNERSHIP; JCH INVESTMENTS, INC.;** | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | **Adversary No. 4-19-CV-004211** |
| | § | |
| **GEMINI INSURANCE COMPANY; IRONSHORE SPECIALTY INSURANCE COMPANY; NAVIGATORS SPECIALTY INSURANCE COMPANY; GREAT AMERICAN ASSURANCE COMPANY; SOUTHSTAR CAPITAL GROUP I, LLC; COTTINGTON ROAD TIC, LLC; DURBAN ROAD TIC, LLC; COLLIS ROOFING, INC.; DA PAU ENTERPRISES, INC.; FLORIDA CONSTRUCTION SERVICES, INC.; STRUCTURAL CONTRACTORS SOUTH, INC.;** | § | |
| | § | |
| Defendants. | § | |

## FIRST AMENDED COMPLAINT

COME NOW, Plaintiffs Urban Oaks Builders LLC ("***UOB***"), Hines Interests Limited

Partnership, 1662 Multifamily LLC ("***1662 Multifamily***"), Hines 1662 Multifamily LLC, Hines

Investment Management Holdings Limited Partnership, HIMH GP LLC, Hines Real Estate Holdings Limited Partnership, and JCH Investments, Inc., and file this First Amended Complaint for turnover pursuant to 11 U.S.C. § 542, breach of contract, declaratory relief, violation of the Texas Insurance Code, violation of Florida statutory code, and bad faith conduct under Florida law against Defendants Gemini Insurance Company, Ironshore Specialty Insurance Company, Navigators Specialty Insurance Company, Great American Assurance Company (the insurer Defendants are also referred to herein individually as a "***Carrier***," and collectively as the "***Carriers***"), Southstar Capital Group I, LLC, Cottington Road TIC, LLC, Durban Road TIC, LLC, Collis Roofing, Inc., Da Pau Enterprises, Inc., Florida Construction Services, Inc., and Structural Constructors South, Inc. In support thereof, Plaintiffs respectfully show as follows:

## I.

## NATURE OF THE ACTION

1.      Plaintiffs are currently defendants in a construction defect lawsuit styled *Southstar Capital Group I, LLC, et al. v. 1662 Multifamily LLC, et al.*, Case No. 2018-CA-000415, originally filed in the Circuit Court of the Ninth Judicial Circuit in and for Osceola County, including *In re: Urban Oaks Builders LLC,* 18-34892, pending in the U.S. Bankruptcy Court for the Southern District of Texas, and *In re: Urban Oaks Builders LLC,* 6:19-mp-00001, pending in the U.S. Bankruptcy Court for the Middle District of Florida (collectively the "***Southstar Lawsuit***").

2.      Having previously acquired four insurance policies covering the claims made in the Southstar Lawsuit, Plaintiffs have requested defense and indemnity from the Carriers. However, while the Carriers happily accepted the premiums relating to those policies, they have flatly refused to fully comply with their contractual and common law obligations. Instead, the Carriers have elected to fight amongst themselves as to which Carrier should defend Plaintiffs and protect their

interests. This has had the effect of injecting needless uncertainty into both the Southstar Lawsuit and UOB's bankruptcy proceeding.

3.     The amounts sought by the underlying plaintiffs clearly reach the limits of all of the policies at issue as evidenced by the judgment entered against UOB in the Southstar Lawsuit, and the actions of the Carriers are potentially jeopardizing an amicable resolution of the underlying plaintiffs' claims. For these and other reasons, Plaintiffs file the instant proceeding to obtain clarity regarding the Carriers' obligations, as well as other relief.

## II.

## JURISDICTION AND VENUE

4.     This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

5.     This Court has jurisdiction over this matter under 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157.

6.     This adversary proceeding relates to *In re Urban Oaks Builders LLC*, Case No. 18-34892, under chapter 11 of the Bankruptcy Code, pending in the Houston Division of the United States Bankruptcy Court for the Southern District of Texas.

7.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.

## PARTIES

8.     Plaintiff Urban Oaks Builders LLC is a limited liability company organized under the laws of the state of Delaware.

9.     Plaintiff Hines Interests Limited Partnership is a limited partnership organized under the law of the state of Texas.

10.     Plaintiff 1662 Multifamily LLC is a limited liability company organized under the laws of the state of Delaware.

11.     Plaintiff Hines 1662 Multifamily LLC is a limited liability company organized under the laws of the state of Delaware.

12.     Plaintiff Hines Investment Management Holdings Limited Partnership is a limited partnership organized under the law of the state of Texas.

13.     Plaintiff HIMH GP LLC is a limited liability company organized under the laws of the state of Delaware.

14.     Plaintiff Hines Real Estate Holdings Limited Partnership is a limited partnership organized under the laws of the state of Texas.

15.     Plaintiff JCH Investments, Inc. is a corporation organized under the laws of the state of Texas.

16.     Defendant Gemini Insurance Company ("***Gemini***") is a corporation organized under the laws of the state of Delaware. Gemini can be served via the Commissioner of Insurance at Chief Clerk Office, 333 Guadalupe, MC 113-2A, P.O. Box 149104, Austin, Texas 78714-9104, because it is a surplus lines insurer. The Commissioner of Insurance may serve Gemini's President at 475 Steamboat Road, Greenwich, Connecticut 06830.

17.     Defendant Ironshore Specialty Insurance Company ("***Ironshore***") is a corporation organized under the laws of the state of Arizona. Ironshore may be served with process through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

18.     Defendant Navigators Specialty Insurance Company ("***Navigators***") is a corporation organized under the laws of the state of New York. Navigators is registered to do business as an insurance company in Texas with the Texas Department of Insurance. Navigators

4

can be served via the Commissioner of Insurance at Chief Clerk Office, 333 Guadalupe, MC 113-2A, P.O. Box 149104, Austin, Texas 78714-9104, because it is a surplus lines insurer. The Commissioner of Insurance may serve Navigators' President at One Penn Plaza, 55th Floor, New York, New York 10119.

19.    Defendant Great American Assurance Company ("**Great American**") is a corporation organized under the laws of the state of Ohio. Great American can be served through its registered agent, CT Corporation, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

20.    Defendant Southstar Capital Group I, LLC ("**SCG**") is a limited liability company organized under the laws of the state of Florida. SCG can be served through its registered agent, Baritz & Colman, 1075 Broken Sound Parkway, N.W., Suite 102, Boca Raton, Florida 33487.

21.    Defendant Cottington Road TIC, LLC ("**Cottington**") is a limited liability company organized under the laws of the state of Delaware. Cottington can be served through its registered agent, Southstar Capital Group I, LLC, 8230 210th Street South, Boca Raton, Florida 33433.

22.    Defendant Durban Road TIC, LLC ("**Durban Road**") is a limited liability company organized under the laws of the state of Delaware. Durban Road can be served through its registered agent, Southstar Capital Group I, LLC, 8230 210th Street South, Boca Raton, Florida 33433.

23.    Defendant Collis Roofing, Inc. ("**Collis**") is a corporation organized under the laws of the state of Florida. Collis can be served through its registered agent, Rinaldo J. Cartaya, Esq., 255 South Orange Avenue, Suite 900, Orlando, Florida 32801.

24.    Defendant Da Pau Enterprises, Inc. ("**Da Pau**") is a corporation organized under the laws of the state of Florida. Da Pau can be served through its registered agent, Nancy L. Paul, 17641 E. Colonial Dr., Orlando, Florida 32820.

25.     Defendant Florida Construction Services, Inc. ("**FCS**") is a corporation organized under the laws of the state of Florida. FCS can be served through its registered agent, Rich R. McIntyre, 501 E. Kennedy, Suite 1900, Tampa, Florida 33602.

26.     Defendant Structural Contractors South, Inc. ("**Structural**") is a corporation organized under the laws of the state of Florida. Structural can be served through its registered agent, David Swetmon, 370 North Street, Longwood, Florida 32750.

27.     Collis, De Pau, FCS, and Structural shall each be referred to herein as a "**Subcontractor Defendant**," and collectively as the "**Subcontractor Defendants**."

## IV.

## BACKGROUND

### A.     The Construction Project

28.     In or about July 2014, 1662 Multifamily contracted with UOB for the construction of a 306-unit apartment project located at 1662 Celebration Blvd., Celebration, Florida 34747, then known as "Aviva at Celebration," and later re-branded as "Sola at Celebration" (the "**Project**").

29.     1662 Multifamily was the original owner of the Project, which consisted of six identical four-story residential apartment buildings and a clubhouse.

30.     UOB was retained by 1662 Multifamily to be the General Contractor and to construct the Project.

31.     UOB contracted with the Subcontractor Defendants on the Project. Each of the Subcontractor Defendants entered into a subcontract with UOB as to the Project. The subcontracts are attached as **Exhibits 1, 2, 3,** and **4** (collectively, "**Subcontracts**").

32.     Each of the Subcontracts contains requirements that the respective Subcontractor Defendant agrees to protect, defend, pay, indemnify, and hold 1662 Multifamily and UOB

harmless from all claims, demands, action, liabilities, losses, damages, or expenses which may arise from alleged or actual damage to any property.

33.    As part of the Subcontracts, the Subcontractor Defendants were enrolled in a controlled insurance program ("*CIP*") for the Project, which provided general liability insurance for UOB and the Subcontractor Defendants' work on the Project.

34.    CIPs are standard in the industry for large residential projects, including the Project at issue. Under a CIP, the owner/developer, general contractor, and all of the subcontractors typically become insureds under a single policy that covers a single construction project, or in some cases like here, multiple projects.

35.    The purpose of the CIP was to drive costs down as to defense obligations and streamline indemnity and risk transfer as to the Project. One of the primary understood purposes of this type of insurance program is to allow the parties to mount a "unified" defense, thus avoiding disputes between the developer, contractor, subcontractors and trades who are involved in the CIP. By providing for the unified defense of a matter through the general contractor and developer, the CIP is intended to avoid the necessity of the contractor and developer pursuing indemnity and defense claims against the subcontractors, which claims constitute covered contractual liabilities under the standard commercial general liability form. However, when any party to a CIP is required to pursue its defense pursuant to an indemnity claim, thus necessarily pursuing a contractual liability/insured contract claim, there is a threat of diminished limits.  The CIP Manual is attached as **Exhibit 5**.

36.    The Subcontractor Defendants were enrolled under the CIP and thus qualify as insureds under the CIP.

**B.      The Carriers' Insurance Policies**

37.     For the Project and other projects, each Carrier issued an insurance policy identifying UOB as a named insured.

38.     Gemini issued a "Commercial General Liability Policy" under policy number VCWP001075 with a policy period from June 28, 2012 through July 31, 2017 (the "***Gemini Policy***"). A copy of the Gemini Policy is attached as **Exhibit 6.**  To the extent the Gemini Policy is incomplete, Plaintiffs will be seeking a true and accurate copy of the Gemini Policy in discovery and the Gemini Policy will be filed separately in the Court records, to the extent necessary.

39.     The Gemini Policy provides the following limits: $2,000,000 each occurrence; $4,000,000 general aggregate; $4,000,000 products-completed operations aggregate limit.

40.     The Gemini Policy contains the following pertinent provisions, among others:

**SECTION I – COVERAGES**
**COVERAGE A BODILY INJURY AND PROPERTY**
**DAMAGE LIABILITY**
1. Insuring Agreement
   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and
      (2) Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period; and

(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

c. "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

(1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

*** 

**SUPPLEMENTARY PAYMENTS – COVERAGES A AND B**

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

[. . . .]

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

***

**SECTION II - WHO IS AN INSURED**

1. If you are designated in the Declarations as:

a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees

[. . . .]

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

10

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

\*\*\*

**SECTION V – DEFINITIONS**

[… ]

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

[. . .]

17**.** "Property damage" means**:**

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

\*\*\*

41.     The Gemini Policy contains the following endorsements:

**NAMED INSURED ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

NAMED INSURED:
First Named Insured and Mailing Address:
Hines Interests Limited Partnership
Urban Oaks Builders, LLC
2800 Post Oak Blvd, Suite 3300
Houston, TX 77056

Other Named Insured(s):
A.

i. Any partner, venture member or subsidiary company (including subsidiaries thereof) of the First Named Insured as now constituted or as may be hereinafter constituted; and

ii. Any Company, Partnership, Joint Venture, or other organization (and any partner or member thereof as respects his/her/its liability as such) coming under the First Named Insured active management control but only to the extent the First Named Insured is required by contract to provide such insurance; and

iii. The First Named Insured with respect to any company, partnership, joint venture, or other organization in which the First Named Insured has financial interest but does not exercise active managerial control to the extent of the First Named Insured interest only; and

iv. Any Employee Benefit Funds, Plans or Organizations under trusteeship or management of officers, directors or employees of the First Named Insured; and
v. Any organization acquired by the First Named Insured during the policy period through Consolidation, merger, purchase of assets, or assumption of control and active management.

vi. Any Special Purpose Entity (SPE) created to own a project or provide financing with the First Named Insured. Coverage under this policy for an SPE will terminate when Named Insured identified under i, ii, iii, iv, and v ceases to have a financial interest in said project.

All contractors, all tiers of subcontractors, each separate contractor of the First Named Insured, and others to whom the First Named Insured contracts to furnish insurance under this insurance program for the designated project(s). Evidence of an executed contract containing provisions

***

## EXTENDED PRODUCTS - COMPLETED OPERATIONS HAZARD ENDORSEMENT

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

SECTION 1 – COVERAGES
COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY
Paragraph 1. Insuring Agreement, Section b.(2) is deleted and replaced with the following:

2. The "bodily injury" or "property damage" occurs during the policy period, except for "bodily injury" or "property damage" included in the products-completed operations hazard. For "bodily injury" or "property damage" included in the "products-completed operation hazard" the "bodily injury" or "property damage" will be covered only if it occurs during the policy period or within the "extended products-completed operations period"; and

(a) "Extended products-completed operations period" means during the period of time allowed by the applicable law, in effect at the inception date of the policy, for claims or suits to be brought against the insured.

(b) The occurrence period described in this endorsement is considered part of the original policy period for purposes of determining the Limits of Insurance. The Products Completed Operation Aggregate Limit applies for the entire policy period including the "extended Products-Completed operations period".

This endorsement does not increase the policy limits.
All other terms, conditions and exclusions of this policy remain unchanged.

***

**AMENDMENT**
This endorsement modifies insurance provided under the following:
    Commercial General Liability Coverage Part
In consideration of an additional premium of $96,658., it is agreed that the following project has been added effective July 1, 2014.

The Lofts at Celebration
1662 Celebration Blvd
Celebration, FL 34747
[…]

It is further agreed that the Notification of Project Endorsement is amended to include the above project.

***

42.    Ironshore issued an "ExcessProtect Commercial Excess Liability Policy" under policy number 001402500 with a policy period from June 28, 2012 through July 31, 2017 (the "***Ironshore Excess Policy***"). A copy of the Ironshore Excess Policy is attached as **Exhibit 7.** To the extent the Ironshore Excess Policy is incomplete, Plaintiffs will be seeking a true and accurate

copy of the Ironshore Excess Policy in discovery and the Ironshore Excess Policy will be filed separately in the Court records, to the extent necessary.

43.    The Ironshore Excess Policy provides the following limits as modified by Endorsement No. 15: $10,000,000 each occurrence, per claim, or per loss; $25,000,000 general aggregate; and $20,000,000 product/completed operations aggregate.

44.    The Ironshore Excess Policy contains an "ExcessProtect Schedule of Underlying Insurance" Endorsement, Form CEL.END.001(10/11), which provides that the controlling underlying insurance is the Gemini Policy.

45.    The Ironshore Excess Policy contains the following pertinent provisions, among others:

**I. COVERAGE**

>   A. This Policy shall provide the Insured with Commercial Excess Liability Insurance coverage in accordance with the same warranties, terms, conditions, exclusions and limitations as are contained, on the Inception Date of this Policy, in the Controlling Underlying Policy, subject to the premium, limits of liability, retention, policy period, warranties, exclusions, limitations and any other terms and conditions of this Policy, including any and all endorsements attached hereto, inconsistent with or supplementary to the Controlling Underlying Policy.

**II. LIMITS OF LIABILITY**

>   A. Where an amount is shown for the aggregate limit of liability in Item 3 of the Declarations of this Policy, the amount stated is the most the Insurer will pay for all damages covered under this Policy with respect to coverage subject to an aggregate limit of liability in the Controlling Underlying Policy. The aggregate limit(s) of liability under this Policy apply in the same manner as the aggregate limit(s) of liability in the Controlling Underlying Policy.

>   B. Subject to A. above, the per occurrence, per claim, or per loss limit of liability stated in Item 3 of the Declarations of this Policy is the most the Insurer will pay for all damages arising out of any one occurrence, claim or loss as stated in the Controlling Underlying Policy.

C. Defense costs to which this Policy applies shall not reduce the limits of liability stated in A. and B. above, except to the extent defense costs covered under any Underlying Policy reduce the limits of liability of such Underlying Policy.

## III. RETENTION

A.   The Limits of Liability stated in Item 3 of the Declarations of this Policy apply in excess of:

1. The total of the limits of liability of the Underlying Policies applicable on a per occurrence, per claim or per loss basis, but in no event in an amount less than the total of the per occurrence, per claim or per loss limits of liability of the Underlying Policies stated in Item 4 of the Declarations of this Policy.

2. The total of the limits of liability of the Underlying Policies applicable on an aggregate basis, where an amount is shown in the aggregate limit of liability of the Underlying Policies stated in Item 4 of the Declarations of this Policy, but in no event in an amount less than the aggregate limits of liability of the Underlying Policies stated in Item 4 of the Declarations of this Policy.

B. This Policy will not apply in excess of any reduced or exhausted limits of liability of the Underlying Policies to the extent that such reduction or exhaustion is caused by:

1. Payment of amounts on account of occurrences, claims or loss that are not covered under this Policy; or

2. Uncollectibility in whole or in part of the limits of liability of an Underlying Policy.

C. Notwithstanding B.1. above, defense costs incurred by any Underlying Policy shall not reduce the limits of liability of such Underlying Policy, except to the extent defense costs reduce the limits of liability of an Underlying Policy, in which case they will reduce the limits of liability under this Policy.

## IV. DEFINITIONS

The following Definitions apply to this Policy:

A. Controlling Underlying Policy means the policy described in Item 5 of the Declarations of this Policy.

B. Underlying Policies means each of the policies that are scheduled in the Schedule of Underlying Policies in Item 4 of the Declarations of this Policy

and any other applicable underlying insurance, including any self-insured retentions or retained limits.

**V. CONDITIONS**

[. . . ]

C. ASSISTANCE AND COOPERATION

1. The Insurer shall have the right but not the duty to assume charge of the defense or settlement of any claim or suit against the Insured to which this Policy may apply upon exhaustion of the applicable limits of liability of the Underlying Policies. If the Insurer has exercised such right, it may withdraw from the defense and tender the defense to the Insured upon exhaustion of the applicable limits of liability under this Policy. If the Insurer does not exercise the right to assume charge of such defense or settlement, or if the applicable limits of liability of the Underlying Policies are not exhausted, the Insurer shall have the right and shall be given the opportunity to associate effectively with the Insured or the underlying insurer or both in the defense and control of any claim or suit likely to involve this Policy. In such events, the Insured, the underlying insurer and the Insurer shall cooperate in the defense of such claim or suit.

2. The Insured shall not, except at its own expense, settle any claim or suit or incur any defense costs for any an amount to which this Policy applies without the Insurer's written consent.

**EXCESSPROTECT AGGREGATE LIMITS OF LIABILITY (PER PROJECT)**

It is agreed and understood that Item 3: of the Declarations is deleted in its entirety and replaced as follows:

Item 3: Limits Of Liability

a. Per Occurrence, Per Claim or Per Loss
(as in Controlling Underlying Policy)
b. Aggregate, where applicable
(Per Schedule of Underlying Policies (See Endorsement No. 1))

The aggregate limit(s) of liability under this Policy apply in the same manner as the aggregate limit(s) of liability of the Controlling Underlying Policy including, if available, any:

1. Product-completed operations additional policy period as defined in the Controlling Underlying Policy,
or
2. Designated Project General Aggregate or Designated Project Products/Completed Operations aggregate limit attributed to operations at a single designated construction project and as defined in the Controlling Underlying Policy.

It is further agreed that, regardless of the number projects insured under the Controlling Underlying Policy, the following ultimate aggregate limit(s) of liability delineate the maximum amounts we will pay under this Policy:

a. $25,000,000 General Aggregate
b. $20,000,000 Products/Completed Operations Aggregate

46.     Navigators issued a "Follow Form Excess Liability Policy" under policy number SE12FXS754225IC with a policy period from June 28, 2012 through July 31, 2017 (the "***Navigators Excess Policy***"). A copy of the Navigators Excess Policy is attached as **Exhibit 8.** To the extent the Navigators Excess Policy is incomplete, Plaintiffs will be seeking a true and accurate copy of the Navigators Excess Policy in discovery and the Navigators Excess Policy will be filed separately in the Court records, to the extent necessary.

47.     The Navigators Excess Policy provides the following limits as modified by "Amendment – Aggregate Limits of Insurance" Endorsement, Form NAV-ECD-100 (3/05): $15,000,000 each event; $15,000,000 general aggregate; and $15,000,000 for products-completed operations aggregate.

48.     The Navigators Excess Policy contains an "Amendment-Schedule of Underlying" Endorsement, Form NAV-ECD-104 (05/10), which identifies the Ironshore Excess Policy as underlying insurance.

49.     The Navigators Excess Policy contains the following pertinent provisions, among others:

**SECTION I – COVERAGE**

1. Insuring Agreement
      a. We will pay those sums the insured becomes legally obligated to pay as damages for "loss" to which this insurance applies. This insurance only applies to:

            1. "loss" to which the "controlling underlying insurance" applies, or would apply but for the exhaustion of an Aggregate Limit; and

2. Damages that exceed the "underlying limits" paid by "underlying insurance" with our consent;

b. This insurance is subject to the provisions of the "controlling underlying insurance" in effect at the beginning of this policy period unless a conflicting provision is contained in, or endorsed to, this policy;

c. We have the right but not the duty to associate with the insured or any other insurer in the investigation of claims or defense of suits to which this insurance could be reasonably expected to apply. We will have the duty to investigate such claims or defend such suits only if the "controlling underlying insurance's" expressed duty to investigate or defend ends because it has paid the full limit of insurance in judgments or settlement of claims. We have the right, at our discretion, to settle any claim to which this insurance applies. Expenses we incur to investigate any claim or defend any suit will be paid in addition to the Limits of Insurance except when such costs reduce the limits of any "underlying insurance," in which case they will reduce our Limits of Insurance;

d. The amount we pay is limited. See SECTION III – LIMITS OF INSURANCE.

## SECTION II – WHO IS AN INSURED

Any person or organization that is an insured in "controlling underlying insurance" is an insured in this insurance to the same extent

## SECTION V – DEFINITIONS

[. . .]
2. "Controlling underlying insurance" means the policy listed in item 4 of the Declarations, or its renewal or replacement.
3. "Event" means an accident, incident, occurrence, offense, wrongful act or other "loss" causing event defined by and to which the "controlling underlying insurance" applies.
4. "Loss" means bodily injury, property damage, personal and advertising injury or other loss defined by and to which the "underlying insurance" applies.
5. "Underlying insurance" means the "controlling underlying insurance" and its underlying insurance policies, if any, including their renewals or replacements.
6. "Underlying limits" means the amount shown in item 5 of the Declarations. This is the minimum amount which must be paid by "underlying insurance" before we pay anything.

50.     Great American issued an excess liability policy under policy number EXC

2101385 with a policy period from June 28, 2012 through July 31, 2017 (the "***Great American***

***Excess Policy***," and together with the Gemini Policy, the Ironshore Excess Policy, and the Navigators Excess Policy, the "***Policies***"). A copy of the Great American Excess Policy is attached as **Exhibit 9.** To the extent the Great American Excess Policy is incomplete, Plaintiffs will be seeking a true and accurate copy of the Great American Excess Policy in discovery and the Great American Excess Policy will be filed separately in the Court records, to the extent necessary.

51.    The Great American Excess Policy provides the following limits: $25,000,000 each occurrence; and $25,000,000 aggregate limit.

52.    The Great American Excess Policy contains a "Schedule of Underlying Insurance (Supplemental)," which identifies the Ironshore Excess Policy and the Navigators Excess Policy as underlying insurance.

53.    The Great American Excess Policy contains the following pertinent provisions, among others:

**INSURING AGREEMENTS**

**I. COVERAGE**

We will pay on behalf of the Insured the amount of "loss" covered by this insurance in excess of the "Underlying Limits of Insurance" shown in Item 5. of the Declarations, subject to INSURING AGREEMENT Section II., Limits of Insurance. Except for the terms, conditions, definitions and exclusions of this policy, the coverage provided by this policy will follow the "first underlying insurance."

**III. DEFENSE**

A. We will not be required to assume charge of the investigation of any claim or defense of any suit against you.
B. We will have the right, but not the duty, to be associated with you or your underlying insurer or both in the investigation of any claim or defense of any suit which in our opinion may create liability on us for "loss." If we exercise such right, we will do so at our own expense, but not after the limits of this policy are exhausted.

## VI. CONDITIONS

L. When "Loss" is Payable

Coverage under this policy will not apply unless and until the Insured or the Insured's "underlying insurance" is obligated to pay the full amount of the "Underlying Limits of Insurance." When the amount of "loss" has finally been determined, we will promptly pay on behalf of the Insured the amount of "loss" falling within the terms of this policy.

***

54.    The Great American Excess Policy contains the following endorsements:

### FOLLOWING FORM COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:
EXCESS LIABILITY COVERAGE FORM

INSURING AGREEMENTS I. COVERAGE of this policy is deleted in its entirety and is replaced with the following:

We will pay on behalf of the Insured the amount of "loss" covered by this insurance in excess of the "Underlying Limits of Insurance" shown in Item 5. of the Declarations, subject to INSURING AGREEMENT Section II., Limits of Insurance. Except for Items 1. through 9. listed below, the coverage provided by this policy shall follow form and be in accordance with the insuring agreements, exclusions, definitions and conditions contained in the "first underlying insurance" identified below.

Insurance Company: Ironshore Specialty Insurance Company
Policy Number: 001402500

1. Limits of Insurance
2. Policy Period
3. Premium
4. Schedule of Underlying Insurance
5. Pollution Exclusion
6. Asbestos Exclusion
7. Nuclear Energy Liability Exclusion
8. Any other exclusion agreed upon by us and the Named Insured, and endorsed to this policy
9. Cancellation provision

If any provisions of the "first underlying insurance" conflict with Items identified as 1. through 9. in this Endorsement, the provisions of this policy shall apply.

In addition, the coverage provided by this policy will follow form and be in accordance with the limitations, exclusions or restrictions of coverage in any other

20

"underlying insurance" to the extent coverage is further limited or restricted by a policy or endorsement of "underlying insurance."

In no event will this policy provide broader coverage in any respect than would be provided by any of the "underlying insurance".

This endorsement does not change any other provision of the policy.

\*\*\*

### GENERAL ENDORSEMENT
### LIMITATION OF COVERAGE TO DESIGNATED PROJECT

It is understood and agreed that the insurance provided by this policy shall apply only to the construction of new ground up apartment buildings as more fully described in the Gemini Insurance Company policy.
Policy Number: VCWP001075

## C.    The Southstar Lawsuit

55.    The original construction of the Project was completed in or about February 2016. On or about July 1, 2016, SCG, as manager and agent for Cottington and Durban Road, entered into an agreement with 1662 Multifamily to purchase the Project.

56.    SCG, Cottington, and Durban Road (collectively "***Southstar***") subsequently made claims against Plaintiffs on the Project, seeking damages for, among other things, allegedly defective construction. They contended that the cost of the repairs required due to the allegedly defective work and the resulting damages (including lost rent allegedly caused by the need to vacate the apartments as a result of the defective work) exceeded $45,000,000, which damages purportedly continued to escalate at over $451,000 each month for the lost rent claim alone.

57.    On or about February 13, 2018, Southstar filed the Southstar Lawsuit against UOB and the other Plaintiffs. In that case, Southstar asserted, *inter alia*, claims for damages proximately caused by alleged defects and deficiencies in the construction of the Project. A copy of the Southstar Complaint (as defined below) is attached hereto as **Exhibit 10.**

58.     The Southstar Lawsuit Complaint for Damages ("**_Southstar Complaint_**") contains

the following relevant allegations:

      a.      Defective construction of the structural elements;

      b.      Defective construction that constitutes Building Code Violations;

      c.      Defective construction of the shear walls as required by the original plans and specification for construction of the Project and Building Code, including, but not limited to, improper spacing of framing elements, improper fasteners and fastener spacing, failure to include support trusses and failure to properly install required strapping;

      d.      Tension Rods that were not certified as to proper tension, and failed to meet the requirement for anchorage in foundation elements;

      e.      Improper construction of structural members, including, but not limited to, columns, window jambs, door frames and cantilevering for the balconies;

      f.      Improper installation of structural Zip Board sheathing as part of the building envelope, including over penetration of the fasteners and improper installation of required board tape, resulting in deterioration of the Zip Board from water intrusion; and

      g.      Improper water proofing and flashing at balconies, windows, and roofs, including, but not limited to the failure to install required weep screeds to allow water to escape the drainage plane system, failure to properly install flashing tape at balcony, roof and windows.

_See_ **Exhibit 10**, pp. 6-7, ¶ 26(a)-(g).

59.     The Southstar Complaint further contended that defects resulted in damage to other

work on the Project, including:

      a.      Water intrusion damaging other work elements of the buildings and work of other subcontractors, including, but not limited to, framing and interior finishes (i.e. drywall, wood molding, cabinetry, carpeting, flooring, and electrical components) and resulting in mold growth;

      b.      The need for extensive replacement of structural Zip Board sheathing due to deterioration from water damage;

      c.      Costs associated with removing drywall and stucco cladding to investigate and repair damage to various elements of the construction and defective

work identified during Southstar's investigation, as well as subsequent replacement of the drywall and stucco cladding;

d.   Costs associated with returning affected units to market ready condition and repair affected common areas;

e.   Loss of rental income due to the defective construction and resultant evacuation order, which remains ongoing; and

f.   Costs associated with various professionals engaged to perform a full evaluation of defects and damage and participate in the development of repair protocols.

*See* **Exhibit 10**, p. 8, ¶ 27(c)(i)-(vi).

**D.   The Carriers' Refusal to Provide a Defense and to Acknowledge their Indemnity Obligations**

60.   Plaintiffs previously demanded that the Carriers provide a defense in connection with the claims asserted in the Southstar Lawsuit, and requested the Carriers' participation with respect to indemnity issues. However, instead of properly responding to the claims alleged in Southstar Lawsuit, the Carriers failed to fulfill their contractual obligations.

61.   Gemini initially retained counsel to defend UOB in the Southstar Lawsuit. Gemini thereafter made payments totaling $2,000,000 in reimbursement for amounts UOB paid for the benefit of Cottington and Durban Road pursuant to a Standstill Agreement dated November 14, 2017. Having tendered the $2,000,000, Gemini took the position that it no longer had any defense or indemnity obligations to UOB under the Gemini Policy.

62.   According to Gemini, the Southstar Lawsuit involved a single "occurrence," and Gemini exhausted its obligations under its policy by paying the $2,000,000 to UOB. Gemini has since refused to provide any defense to UOB or the other Plaintiffs with respect to the Southstar Lawsuit, and is refusing to acknowledge any further obligations under the Gemini Policy. This includes a refusal to reimburse UOB for $2,984,674.24 in past defense expenditures (which

continue to incur), and a refusal to reimburse UOB for $1,392,351.64 in unreimbursed remediation expenses incurred in connection with addressing alleged defects in the Project.

63.    Ironshore, on the other hand, has taken the position that the Gemini Policy limits have not been exhausted, and that Gemini continues to owe a duty to defend UOB and the other Plaintiffs with respect to the Southstar Lawsuit. Among other arguments, Ironshore contends that the Southstar Lawsuit involves multiple "occurrences," and therefore Gemini's obligations to UOB and the other Plaintiffs will remain in force and effect until the Gemini Policy's general aggregate limit of $4,000,000 is exhausted.

64.    Notwithstanding this contention, Ironshore belatedly tendered a qualified defense to Plaintiffs with respect to the Southstar Lawsuit, but refused to reimburse UOB for the $2,984,674.24 in past defense expenditures or the $1,392,351.64 in additional amounts paid by UOB for the benefit of Cottington and Durban Road. Ironshore refused to accede to the continued retention of Plaintiffs' current counsel in the Southstar Lawsuit, even though Ironshore sat idly by while Plaintiffs were forced to defend that lawsuit at their own expense for several months.

65.    As a result of the Carriers' bad faith denial of a defense and indemnity, Plaintiffs filed Civil Remedy Notices ("CRNs") with the Florida Department of Financial Services against Gemini and Ironshore on April 25, 2018, attached as **Composite Exhibit 11.**

66.    Plaintiffs filed complaints against Gemini and Ironshore with the Texas Department of Insurance, attached as **Composite Exhibit 12.**

67.    Gemini and Ironshore did not cure any of the circumstances giving rise to the violations set forth in the CRNs and complaints.

68.    As a result, on August 31, 2018, UOB filed for bankruptcy under Chapter 11, from which this action stems.

69.     Subsequent to the filing of the bankruptcy, Navigators agreed to defend the Plaintiffs with respect to the Southstar Lawsuit in the related proof of claim proceedings described herein below. However, Plaintiffs have not been reimbursed their past defense fees or indemnity costs to date, and were required to spend significant sums to assist insurance counsel in connection with the defense of the proof of claim proceedings, which amounts have also not been reimbursed to the Plaintiffs.

70.     Southstar filed a proof of claim in the bankruptcy action, asserting over $45 million in damages. UOB objected to the proof of claim.

71.     On January 27, 2020, UOB's objection to Southstar's proof of claim proceeded to a hearing, which as noted was defended by counsel appointed by Navigators with the assistance of the Plaintiffs.

72.     On February 19, 2020, a judgment was entered against UOB in the Southstar Lawsuit in the amount of $26,103,717.38 ("the Judgment"). *See* **Exhibit 13**.

73.     Southstar did not file an appeal of the Judgment.  Likewise, UOB (after consultation with the Carriers and with their express consent) also did not file an appeal of the Judgment. As such, the Judgment is final against UOB.

74.     To date, the Judgment remains unpaid and the Carriers have not offered to pay it, nor have Carriers provided any reasons for their non-payment.

75.     The Carriers' failure to pay the Judgment has caused UOB to incur additional damages related to the bankruptcy.

76.     Plaintiffs filed CRNs against Navigators and Great American with Florida Department of Financial Services on March 24, 2020, as result of their failure to indemnify Plaintiffs. Attached as **Composite Exhibit 14.**

77.     Given the Carriers' breaches of their obligations to their insureds, Plaintiffs have been forced to initiate this action.

## V.

## CONDITIONS PRECEDENT

78.     Plaintiffs have complied with all conditions precedent to the filing of this lawsuit. Alternatively, to the extent that Plaintiffs have failed to comply with any conditions precedent, the failure of Plaintiffs to comply with same neither prejudiced nor represented a material breach of the Gemini Policy, the Ironshore Excess Policy, the Navigators Excess Policy, or the Great American Excess Policy, or compliance with said conditions precedent has been waived.

79.     Alternatively, Gemini, Ironshore, Navigators, and Great American are estopped from asserting any defenses related to conditions precedent. More specifically, Plaintiffs have plainly given notice of the claims which are the subject of the lawsuit to Gemini, Ironshore, Navigators, Great American, and/or their designated agents for receiving notice of the lawsuit and Gemini, Ironshore, Navigators, and Great American were plainly aware that Plaintiffs were under assault, and are entitled to a defense and indemnity under the Gemini Policy, Ironshore Excess Policy, Navigators Excess Policy, and/or the Great American Excess Policy.

## VI.

## COUNT 1 – TURNOVER – 11 U.S.C. § 542

80.     UOB incorporates the allegations set forth in paragraphs 1 through 79 as if set forth fully in this Section VI.

81.     Section 541(a) of the Bankruptcy Code states that property of the estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case" and

"any interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(1), (7).

82.    Section 542(b) of the Bankruptcy Code requires that "an entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee [or debtor-in-possession], and account for, such property or the value of such property . . . ." and any "entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order shall pay such debt to, or on the order of, the trustee [or debtor-in-possession], except to the extent that such debt may be offset under section 553 of this title against a claim of the debtor." 11 U.S.C. § 542(a), (b). The Bankruptcy Code defines "debt" as "liability on a claim." *Id.* at § 101(12).

83.    As described above, UOB has incurred (a) $2,984,674.24 in unreimbursed fees and expenses in connection with the defense of the Southstar Lawsuit; and (b) $1,392,351.64 in unreimbursed remediation expenses incurred in connection with addressing alleged defects in the Project.

84.    Pursuant to the applicable Policies, Gemini and/or Ironshore owe(s) these debts to UOB, which are matured and payable on demand. Nevertheless, Gemini and Ironshore have failed and refused to make payment despite repeated requests.

85.    Accordingly, pursuant to 11 U.S.C. § 542, Gemini and/or Ironshore should be compelled to turnover to UOB the aggregate sum of $4,377,025.88 plus interest.

## VII.

## COUNT 2 – BREACH OF CONTRACT

86.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 79 as if set forth fully in this Section VII.

87.     Plaintiffs are insureds under each of the Policies. As such, the Policies constitute valid and binding contracts between Plaintiffs and the Carriers.

88.     Plaintiffs have performed or tendered performance under the Policies.

89.     The Policies cover the claims made against Plaintiffs in the Southstar Lawsuit, and one or more of the Carriers owe Plaintiffs, among other things, a full and complete defense pursuant to the allegations set forth in paragraphs 37-77 and payment of the Judgment that has now been entered pursuant to the proof of claim proceeding.   Notwithstanding this obligation, Gemini, Ironshore, and Great American have either refused to provide such a defense to Plaintiffs or have engaged in entirely inadequate and untimely attempts to provide a defense. The Carriers have also failed to pay or indemnify the Judgment.   This conduct constitutes breaches of the Policies attached as **Exhibits 6, 7 and 9.**

90.     Plaintiffs have suffered actual damages due to the Carriers' breaches, including expenses Plaintiffs have incurred thus far in defending themselves in the Southstar Lawsuit and failure to pay the Judgment.

91.     Plaintiffs are also entitled to an award of attorneys' fees pursuant to §§ 627.428, 57.104, 57.041, and/or 626.9373, Fla. Stat., and/or Tex. Ins. Code § 542.060 and Tex. Civ. Prac. & Rem. Code § 38.001, *et seq*.

## VIII.

## COUNT 3 – REQUEST FOR DECLARATORY RELIEF

92.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 79 as if set forth fully in this Section VIII.

93.     As discussed above, none of the Carriers have provided a full and complete defense to Plaintiffs, and all of them have generally failed to acknowledge their obligation to participate in good faith with respect to indemnification of Plaintiffs and/or resolution of the Southstar Lawsuit. This is of grave concern, particularly given the recent entry of the Judgment.

94.     At present, Plaintiffs believe that an amicable resolution of the Southstar Lawsuit can be achieved with the limits of the Policies, as evidenced by the Judgment. However, the Carriers' deliberate inaction may have the effect of jeopardizing such a potential resolution due to the lingering uncertainty they have caused and continue to cause. To resolve this uncertainty, Plaintiffs seek declaratory judgment as described below.

95.     Title 28, chapter 151 of the United States Code governs declaratory actions:

> In a case of actual controversy within its jurisdiction . . .  any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201. The Court further has the right to grant "[f]urther necessary or proper relief based on a declaratory judgment or decree . . . against any adverse party whose rights have been determined by such judgment." *Id.* § 2202.

96.     Plaintiffs have hired the undersigned to prosecute this action and are contractually obligated to compensate the undersigned for their services. Plaintiffs claim their attorneys' fees, legal assistant fees, and costs pursuant to §§ 627.428, 57.104, 57.041, and/or

626.9373, Fla. Stat., and/or Tex. Ins. Code § 542.060 and Tex. Civ. Prac. & Rem. Code §§37.009 and 38.001 which are/may be applicable to this litigation.

**A.    Request for Declaratory Relief against Gemini**

97.    Plaintiffs have made claims under the Gemini Policy for the claims in the Southstar Lawsuit, and Gemini has failed to honor its contractual and common law obligations. As such, there is an actual, present, and justiciable controversy between Plaintiffs and Gemini.

98.    Plaintiffs therefore seek declarations relating to the rights, duties, and obligations owed to them under the Gemini Policy, including, without limitation:

a.    That the Gemini Policy applies to the damages as alleged in the Southstar Lawsuit;

b.    To the extent applicable, that Gemini owes a duty to defend Plaintiffs from any and all claims in the Southstar Lawsuit;

c.    That Gemini owes a duty to indemnify Plaintiffs from any and all claims, including the Judgment, in the Southstar Lawsuit;

d.    That the damages alleged in the Southstar Lawsuit constitute "property damage;"

e.    That the damages alleged in the Southstar Lawsuit constitute an "occurrence;"

f.    That the damages alleged in the Southstar Lawsuit constitute more than one "occurrence;"

g.    Whether the damages sustained constitute a covered loss under the Gemini Policy;

h.    That the Gemini Policy provides coverage for Plaintiffs' liability in the Southstar Lawsuit;

i.    That the Subcontractor Defendants are insureds under the Gemini Policy;

j.    A determination of whether Florida or Texas law applies to the interpretation of the Gemini Policy;

k.    To the extent Gemini has a current duty to defend, that Plaintiffs have the right to control the defense in the Southstar Lawsuit due to the breach of the Gemini Policy;

l.    That the Gemini Policy provides coverage for Plaintiffs' legal expenses incurred in addressing the claims in the Southstar Lawsuit; and

m.    All other relief as this Honorable Court deems just and proper.

**B.    Request for Declaratory Relief against Ironshore**

99.    Plaintiffs have made claims under the Ironshore Excess Policy for the claims in the Southstar Lawsuit, and Ironshore has failed to honor its contractual and common law obligations. As such, there is an actual, present, and justiciable controversy between Plaintiffs and Ironshore.

100.    Plaintiffs therefore seek declarations relating to the rights, duties, and obligations owed to them under the Ironshore Excess Policy, including, without limitation:

a.    That the Ironshore Excess Policy applies to the damages as alleged in the Southstar Lawsuit;

b.    To the extent applicable, that Ironshore owes a duty to defend Plaintiffs from any and all claims in the Southstar Lawsuit;

c.    That Ironshore owes a duty to indemnify Plaintiffs from any and all claims, including the Judgment, in the Southstar Lawsuit;

d.    That the damages alleged in the Southstar Lawsuit constitute "property damage;"

e.    That the damages alleged in the Southstar Lawsuit constitute an "occurrence;"

f.    That the damages alleged in the Southstar Lawsuit constitute more than one "occurrence;"

g.    Whether the damages sustained constitute a covered loss under the Ironshore Excess Policy;

h.    That the Ironshore Excess Policy provides coverage for Plaintiffs' liability in the Southstar Lawsuit;

i.      That the Subcontractor Defendants are insureds under the Ironshore Excess Policy;

j.      A determination of whether Florida or Texas law applies to the interpretation of the Ironshore Excess Policy;

k.      To the extent Ironshore has a current duty to defend, that Plaintiffs have the right to control the defense in the Southstar Lawsuit due to the breach of the Ironshore Excess Policy;

l.      That the Ironshore Excess Policy provides coverage for Plaintiffs' legal expenses incurred in addressing the claims in the Southstar Lawsuit; and

m.      All other relief as this Honorable Court deems just and proper.

## C.    Request for Declaratory Relief against Navigators

101.      Plaintiffs have made claims under the Navigators Excess Policy for the claims in the Southstar Lawsuit, and Navigators has failed to honor its contractual and common law obligations. As such, there is an actual, present, and justiciable controversy between Plaintiffs and Navigators.

102.      Plaintiffs therefore seek declarations relating to the rights, duties, and obligations owed to them under the Navigators Excess Policy, including, without limitation:

a.      That the Navigators Excess Policy applies to the damages as alleged in the Southstar Lawsuit;

b.      That Navigators owes a duty to indemnify Plaintiffs from any and all claims, including the Judgment, in the Southstar Lawsuit;

c.      That the damages alleged in the Southstar Lawsuit constitute "property damage;"

d.      That the damages alleged in the Southstar Lawsuit constitute an "occurrence;"

e.      That the damages alleged in the Southstar Lawsuit constitute more than one "occurrence;"

f.      Whether the damages sustained constitute a covered loss under the Navigators Excess Policy;

g.      That the Navigators Excess Policy provides coverage for Plaintiffs' liability in the Southstar Lawsuit;

h.      That the Subcontractor Defendants are insureds under the Navigators Excess Policy;

i.      A determination of whether Florida or Texas law applies to the interpretation of the Navigators Excess Policy;

j.      That the Navigators Excess Policy provides coverage for Plaintiffs' legal expenses incurred in addressing the claims in the Southstar Lawsuit; and

k.      All other relief as this Honorable Court deems just and proper.

**D.      Request for Declaratory Relief against Great American**

103.    Plaintiffs have made claims under the Great American Excess Policy for the claims in the Southstar Lawsuit, and Great American has failed to honor its contractual and common law obligations. As such, there is an actual, present, and justiciable controversy between Plaintiffs and Great American.

104.    Plaintiffs therefore seek declarations relating to the rights, duties, and obligations owed to them under the Great American Excess Policy, including, without limitation:

a.      That the Great American Excess Policy applies to the damages as alleged in the Southstar Lawsuit;

b.      To the extent applicable, that Great American owes a duty to defend Plaintiffs from any and all claims in the Southstar Lawsuit;

c.      That Great American owes a duty to indemnify Plaintiffs from any and all claims, including the Judgment, in the Southstar Lawsuit;

d.      That the damages alleged in the Southstar Lawsuit constitute "property damage;"

e.      That the damages alleged in the Southstar Lawsuit constitute an "occurrence;"

f.      That the damages alleged in the Southstar Lawsuit constitute more than one "occurrence;"

g.      Whether the damages sustained constitute a covered loss under the Great American Excess Policy;

h.      That the Great American Excess Policy provides coverage for Plaintiffs' liability in the Southstar Lawsuit;

i.      That the Subcontractor Defendants are insureds under the Great American Excess Policy;

j.      A determination of whether Florida or Texas law applies to the interpretation of the Great American Excess Policy;

k.      To the extent Great American has a current duty to defend, that Plaintiffs have the right to control the defense in the Southstar Lawsuit due to the breach of the Great American Excess Policy;

l.      That the Great American Excess Policy provides coverage for Plaintiffs' legal expenses incurred in addressing the claims in the Southstar Lawsuit; and

m.      All other relief as this Honorable Court deems just and proper.

## IX.

## COUNT 4 – VIOLATIONS OF TEXAS INSURANCE CODE

105.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 79 as if set forth fully in this Section IX.

106.    The actions of the Carriers, each of them, constitute unfair settlement practices in violation of §541.060 of the Texas Insurance Code. Those violations of their statutory obligations includes but are not limited to:

a.      Misrepresenting to Plaintiffs a material fact or policy provision relating to coverage;

b.      Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the claim with respect to which each Carriers' liability had become reasonably clear;

c.  Failing to promptly provide Plaintiffs a reasonable explanation of the basis in the Policies, in relation to the facts or applicable law, for each Carrier's denials of the claim or offer of a compromise settlement of the claim;

d.  Failing within a reasonable time to affirm or deny coverage of the claim to Plaintiffs and submit a reservation of rights to all the Plaintiffs;

e.  Refusing, failing, or unreasonably delaying a settlement offer under applicable coverage on the basis that other coverage may be available for the damages suffered, except as may be specifically provided in the Policies; and/or

f.  Refusing to pay a claim without conducting a reasonable investigation with respect to the claim and unreasonably withholding monetary payment of the defense.

107.  The Carriers, each of them, violated §541.061 of the Texas Insurance Code by, among other things:

a.  The Carriers made untrue statements of material facts as to the coverages provided under the Policies and the applicable law;

b.  The Carriers failed to timely settle the claims against the Plaintiffs. The Carriers instead denied a defense and indemnity when they should have acknowledged their coverage obligations;

c.  This failure to timely settle the claims against the Plaintiffs resulted in the Judgment against UOB and potential exposure to the other Plaintiffs; and

d.  Once the Judgment was entered and not appealed by Southstar or Plaintiffs, the Carriers failed to act promptly on these determinations by paying the amounts due, or by providing a reasoned explanation in writing of their failure to pay any amount at all.

108.  The actions of the Carriers, each of them, as set out in the paragraphs above, constitute a violation of the Texas Insurance Code, and were and continue to be a producing cause of damages to Plaintiffs, their insureds. Because those acts were knowingly committed, the trier of fact may award an amount not to exceed three times the amount of actual damages.  Plaintiffs are also entitled to recover their reasonable attorneys' fees incurred in pursuing these claims against the Carriers.

109.    The actions of the Carriers in failing to promptly reimburse and pay defense costs and pay the Judgment in the Southstar Lawsuit also violates Texas Insurance Code, Chapter 542, *et seq.*, Prompt Payment of Claims, entitling Plaintiffs to recovery of the statutory penalty of 18 percent, together with their reasonable attorneys' fees incurred in pursuing these claims against the Carriers. Those violations of their statutory obligations include, but are not limited to:

a.    Causing Plaintiffs financial hardship, including forcing UOB into bankruptcy, by refusing to defend;

b.    Failing to give a reasonable interpretation to the provisions of the Policies, failing to reasonably apply provisions of the Policies to the claims, and unreasonably refusing to acknowledge that the claims asserted against Plaintiffs in the Southstar Lawsuit were and are potentially covered, and failing to timely, promptly and without delay, pay for the reasonable and necessary defense costs incurred after the tender;

c.    Failing to provide Plaintiffs with any reasonable or justifiable basis for the decision to deny and/or delay the actual participation of the defense of the Southstar Lawsuit;

d.    Interpreting the provisions of the Policies and the factual circumstances so as to resolve ambiguities and uncertainties against Plaintiffs and to favor their own economic interests;

e.    Embarking on a course of conduct and pattern and practice, whereby Gemini, Ironshore and Great American would fail and/or refuse to respond to tenders made by or on behalf of Plaintiffs and/or to acknowledge the defense obligation owed to Plaintiffs and/or to participate in the mounting and funding of the defense of the Plaintiffs with respect to the Southstar Lawsuit;

f.    Continuing to pursue such course of conduct and patterns and practice after Texas law established the immediacy of the defense obligation owed and where the duty to defend is based on the potentiality of coverage arising. Gemini, Ironshore and Great American have disobeyed clear legal precedent in a known manner in clear and conscious disregard to Plaintiffs' rights;

g.    Unreasonably failing to agree and/or refusing to pay their indemnity obligations arising from the Southstar Lawsuit and Judgment entered in the Southstar Lawsuit, which damages the Carriers are required to pay, in violation of the Article 542.051 *et seq.* of the Texas Insurance Code; and/or

h.    Refusing to provide proper settlement authority owed to the Plaintiffs under the Policies, even though it was reasonably clear that the claims in the Southstar Lawsuit are covered by the Carriers' Policies, thereby compelling the Plaintiffs to engage legal counsel and to initiate this action to recover such indemnity benefits owed and to compel the Carriers to honor their obligations under the Policies.

110.    As a result of the above conduct of the Carriers, Plaintiffs have incurred substantial attorneys' fees, cost and expenses in defense, repair, loss adjustment, mitigation, investigation and settlement and other costs and expenses in response to the Southstar Lawsuit and have been required to bring this action to enforce their rights insureds under the Policies mentioned herein.  Plaintiffs are entitled to recover as damages against each of the Carriers all the aforementioned fees, costs and expenses which they have incurred as a result of the Southstar Lawsuit and the instant action, together with interest thereon, including without limitation attorneys' fees as set forth in Article 542.060 of the Texas Insurance Code and pursuant to the section 38.001 of the Texas Civil Practice and Remedies Code.  Plaintiffs have suffered damages and will continue to suffer damages within the jurisdiction of this Court.

111.    Plaintiffs are further entitled to recover as damages against each of the Carriers all fees, expenses, and costs incurred in this action to enforce their rights under the respective insurance Policies, plus interest thereon, according to proof and are entitled to 18% interest and attorneys' fees as set forth in Article 542.060 of the Texas Insurance Code.

112.    The above-described conduct of the Carriers has been and continues to be intentional, unreasonable, capricious, and arbitrary, and constitutes violations of the Texas Insurance Code as to each and every one of the insurance Policies referred to above in this First Amended Complaint. The above-described conduct further constitutes intentional, malicious, oppressive, despicable, grossly negligent, and knowing conduct, and conscious disregard of the

Plaintiffs' rights, and stems from improper motives, including the Carriers' desire to reduce or avoid their obligation to Plaintiffs, so as to justify an award of punitive and exemplary damages.

**X.**

**COUNT 5 – VIOLATIONS OF SECTION 624.155, FLORIDA STATUTES**

113.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 79 as if set forth fully in this Section X.

114.    The Policies constitute enforceable contracts under Florida law, imposing certain express and implied obligations upon the Carriers.

115.    Liability and damages under the Policies was established in the Judgment.

116.    As a result of the foregoing allegations and those described herein, whether taken separately or together, the Carriers violated Sections 624.155(1)(a) and (b) and the incorporated provisions of Section 626.9541(1)(i)(3) as set forth herein.

a.    Section 624.155(1)(b)(1): The Carriers must attempt to settle Southstar's claims against the Plaintiffs in good faith when, under all the circumstances, they could and should have done so, had they acted fairly and honestly toward their insureds and with due regard for their interests. Although the allegations for the Southstar Complaint clearly fall within the coverages provided by the Policies, the Carriers made no effort to settle the claims and continue now to refuse to the pay the Judgment that has been entered on these claims. The Carriers instead denied a defense and indemnity when they should have acknowledged their coverage obligations.

b.    Section 626.9541(1)(i)(3)(b): The Carriers must not misrepresent facts or insurance policy provisions to the Plaintiffs. At all material times, the Carriers misrepresented both the language of their Policies and Florida law to the Plaintiffs, including their representation as to the available limits under the Policies.

c.    Section 626.9541(1)(i)(3)(c): The Carriers must acknowledge and act promptly on communications with respect to claims. Once the Judgment was entered and not appealed by Southstar or UOB, the Carriers failed to act promptly on these determinations by paying the amounts due, or by providing a reasoned explanation in writing of their failure to pay any amount at all.

d.    Section 626.9541(1)(i)(3)(d): The Carriers must conduct a reasonable investigation based on information available to them before denying claims. The Carriers did not conduct a reasonable investigation. Had the Carriers conducted a reasonable investigation of the facts and the law, they would have discovered that they had no basis to deny defense and fail to pay the Judgment.

e.    Section 626.9541(1)(i)(3)(g): The Carriers must communicate with the Plaintiffs and to notify them of any need for additional information necessary for the processing or handling of their claims. The violations described in sub-section (c) of this paragraph equally to the violation of this sub-section.

117.    The Carriers are liable for the acts and omissions of the Carriers' agent, employees and/or representatives in the handling of the claims against the Plaintiffs.

118.    As a direct and proximate result of the foregoing actions, the Plaintiffs have suffered and continue to suffer damages.

## XI.

## COUNT 6 – FLORIDA COMMON LAW BAD FAITH

119.    Plaintiffs incorporate the allegations set forth in paragraphs 1 through 79 as if set forth fully in this Section XI.

120.    Pursuant to the subject insurance contracts and Florida law, the Carriers owe good faith duties to the Plaintiffs, including but not limited to the following:

a.    to fully investigate and determine enough facts to evaluate the claims against the Plaintiffs;

b.    to adequately investigate, evaluate, and attempt to settle the claims against the Plaintiffs;

c.    to use toward the Plaintiffs the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business;

d.    to exercise such control in handling the claims of Southstar against the Plaintiffs and in making decisions with regard to both settlement and litigation in good faith and with due regard for the interest of the Plaintiffs;

      e.      to timely and properly investigate the claims of Southstar against the Plaintiffs;

      f.      to timely and properly evaluate the claims of Southstar against the Plaintiffs and the risk to the Plaintiffs;

      g.      to timely offer the respective policy limits to Southstar in view of the liability and significant damages sustained by Southstar;

      h.      to settle the Southstar claims against the Plaintiffs within the Carriers' policy limits when, under all of the circumstances, they could and should have done so, had they acted fairly and honestly toward the Plaintiffs and with due regard for the Plaintiffs' interests;

      i.      to settle if at all possible, the Southstar claims, where a reasonably prudent person, faced with the prospect of paying the total recovery would do so;

      j.      to attempt to settle the claims of Southstar within the available policy limits to discharge the potential liability; and

      k.      pay covered indemnity amounts, including unreimbursed cost and the Judgment.

121.      The foregoing duties are fiduciary in nature and non-delegable.

122.      The Carriers are liable for the acts and omissions of their agents, employees, and/or representatives in the handling of the claims against the Plaintiffs.

123.      As a result of the Carriers' breach of their duties of good faith and the Carriers' failure to settle the claims against the Plaintiffs when the Carriers could have and should have done so, UOB faces the Judgment entered against it and the other Plaintiffs remain exposed.

124.      As a direct and proximate result of the above breaches of the duties of good faith which the Carriers owed to the Plaintiffs, the Plaintiffs have retained the undersigned and are obligated to pay them reasonable fees for their services, and as such, the Plaintiffs' claim attorneys' fees and legal assistant fees pursuant to § 627.428 and § 57.104 of Florida Statutes, respectively, and costs pursuant to § 57.041 of Florida Statutes.

## XII.

## <u>PRAYER</u>

For these reasons, Plaintiffs ask for judgment against the Defendants for the following:

a.      Actual damages as provided herein;

b.      Declaratory judgments as detailed above;

c.      Attorneys' fees as provided herein;

d.      Pre- and post-judgment interest;

e.      Costs of court;

f.      Supplemental relief including but not limited to any determinations relative to coverage for indemnification for the claim and/or the scope of coverage available for the damages alleged in the Southstar Lawsuit and pursuit of extra-contractual damages;

g.      Damages pursuant to Section 541.061 of the Texas Insurance Code;

h.      Punitive damages pursuant to Section 624.155(5), Florida Statutes;

i.      Extra-Contractual Damages; and

j.      All other legal and equitable relief to which Plaintiffs may be justly entitled.

Respectfully submitted,

**BOYLE, LEONARD & ANDERSON, P.A.**

By: __/s/ Mark A. Boyle_____
    Mark A. Boyle
    Florida Bar No. 0005886
    eservice@insurance-counsel.com
    mboyle@insurance-counsel.com
    Molly Chafe Brockmeyer
    mbrockmeyer@insurance-counsel.com
    Florida Bar No. 105798
    2050 McGregor Blvd.
    Fort Myers, Florida 33901
    Tel: (239) 337-1303
    Fax: (239) 337-7674

**ATTORNEYS FOR THE PLAINTIFFS**

**OKIN ADAMS LLP**

By: __/s/ *Matthew S. Okin*_____
    Matthew S. Okin
    Texas Bar No. 00784695
    Email: mokin@okinadams.com
    James W. Bartlett, Jr.
    Texas Bar No. 00795238
    Email: jbartlett@okinadams.com
    David L. Curry, Jr.
    State Bar No. 24065107
    Email: dcurry@okinadams.com
    1113 Vine St. Suite 240
    Houston, Texas 77002
    Tel: (713) 228-4100
    Fax: (888) 865-2118

**ATTORNEYS FOR THE DEBTOR UOB**

## **CERTIFICATE OF SERVICE**

This will certify that on May 19, 2020, a true and correct copy of this document was electronically filed with the US District Court, Southern District of Texas, Houston Division, and copy of the same will be served via the CM/ECF filing system on all parties appearing in the case and registered to receive such service.

By: /s/ Mark A. Boyle
Mark A. Boyle
Florida Bar No. 0005886