United States District Court
Southern District of Texas
**ENTERED**
December 14, 2021
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

URBAN OAKS BUILDERS LLC, ET AL.      §
                                     §
         *Plaintiffs*,               §
                                     §
v.                                   §         Civil Action No. 4:19-cv-4211
                                     §
GEMINI INSURANCE COMPANY, ET AL.,    §
                                     §
         *Defendants*.               §


## MEMORANDUM AND RECOMMENDATION AND ORDER

Several dispositive and non-dispositive motions are currently pending in this multi-party insurance dispute.[1]  This case is currently stayed until the Court rules on the pending motions.  ECF 310.  In this Memorandum and Recommendation, the Court concludes that Plaintiffs' claims involve multiple occurrences under the Gemini Policy and makes recommendations on other pending motions.

### I.      Background

The facts set forth in this section are undisputed unless otherwise noted.  In July 2014, Urban Oaks Builders, LLC (UOB) contracted with 1662 Multifamily LLC to be the general contractor on the construction of six apartment buildings and a clubhouse in Celebration, Florida.  UOB entered into contracts with various subcontractors that in turn were enrolled in a controlled insurance program (CIP) to provide general liability insurance

---

[1] The District Judge referred this case to this Magistrate Judge for pretrial management.  ECF 64.

for the project.  As a result, the term "insureds" under the CIP policies includes UOB, the project owners/developers, and the subcontractors.

Defendants Gemini Insurance Company, Ironshore Specialty Insurance Company, Navigators Specialty Insurance Company, and Great American Assurance Company issued policies as part of the CIP.  Gemini issued "Commercial General Liability Policy" number VCWP001075 covering the period June 28, 2012 through July 31, 2017 (Gemini Policy). The Gemini Policy has limits of $2,000,000 each occurrence; $4,000,000 general aggregate; and $4,000,000 products-completed operations aggregate.  Ironshore issued "ExcessProtect Commercial Excess Liability Policy" number 001402500 covering the period from June 28, 2012 through July 31, 2017 (Ironshore Policy).  The Ironshore Policy "follows form" to the Gemini Policy.[2]  The parties dispute whether the Ironshore Policy contains a single occurrence limit of $10,000,000, but it is undisputed that the Ironshore Policy has limits of $25,000,000 general aggregate and $20,000,000 product/completed operations aggregate.

Navigators issued the next layer of insurance in excess of the Ironshore policy limits, which is "Follow Form Excess Liability Policy" number SE12FXS754225IC covering the period June 28, 2012 through July 31, 2017 (Navigators Policy).  The Navigators Policy has limits of $15,000,000 each event; $15,000,000 general aggregate; and $15,000,000 products-completed operations aggregate limit.  Finally, Great American

---

[2] ECF 241 at 9; ECF 241-3 at 24 (Ironshore Policy definition of "occurrence" is the same as the Gemini policy); *See Bayou Steel Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 642 F.3d 506, 509 (5th Cir. 2011) ("A 'following form' excess policy incorporates by reference all terms and conditions of the primary insurance policy.").

issued excess liability policy number EXC2101385 covering the period from June 28, 2012 through July 31, 2017 (Great American Policy).  The Great American Policy has limits of $25,000,000 each occurrence and $25,000,000 aggregate limit.

The construction project in Celebration, Florida was completed in February 2016. Southstar Capital Group I, LLC, as agent for Cottington Road TIC, LLC and Durban Road TIC, LLC, (collectively Southstar) purchased the project from 1662 Multifamily in July 2016.  Southstar subsequently asserted claims against Plaintiffs due to allegedly defective construction of the project. In June 2017, Southstar entered an agreement with UOB to perform warranty work at the project.  UOB made a claim on the Gemini Policy for the cost of the warranty work.  Gemini paid UOB $164,734.80 on October 10, 2017 and $935,005.43 on November 9, 2017.  On November 14, 2017, Southstar and UOB entered a "Standstill Agreement" pursuant to which UOB agreed to pay $2,050,398.72 (to be credited against any future judgment if Southstar prevailed in litigation).  On January 23, 2018, Gemini made its final payment to UOB in the amount of $900,259.77.

In February 2018, Southstar filed suit against UOB and others in state court in Florida asserting the following claims:  Count I—Piercing the Corporate Veil/Alter Ego; Count II—Fraudulent Non-Disclosure/Fraudulent Inducement; Count III—Breach of Contract—Intentional Withholding of Material Information; Count IV—Statutory Violations of Florida Statutes 553.84; and Count V—Negligence (Southstar Complaint). Although the Southstar Complaint alleges that all defendants are liable on all counts because they are alter egos, Counts I-III allege conduct by 1662 Multifamily and Counts IV-V allege conduct by UOB.  Gemini initially hired counsel to defend UOB against

Southstar's claims, but after tendering payments totaling $2,000,000, declared its policy limits were exhausted and that therefore its duty to defend terminated.

With the Southstar lawsuit pending in Florida and insurance coverage in dispute, UOB filed a petition for bankruptcy in the United States Bankruptcy Court for the Southern District of Texas.   Southstar's claims against UOB were transferred to the Bankruptcy Court and incorporated into a Proof of Claim.   Southstar's claims against other defendants remained pending in Florida state court.   UOB and others filed a lawsuit in Florida state court against the CIP insurers for coverage and indemnity.   When that suit became mired in a jurisdictional dispute, Plaintiffs voluntarily dismissed the Florida case and refiled their claims against the insurers and others as an adversary action in its bankruptcy case.[3]

Southstar filed a proof of claim in the bankruptcy action asserting over $45,000,000 in damages.   UOB objected.   The Bankruptcy Court held a hearing on UOB's objection and entered judgment against UOB in favor of Southstar in the amount of $26,103,717.38 (Southstar Judgment).[4]   Southstar did not appeal.   On the Bankruptcy Court's Recommendation, the District Court withdrew the reference to Bankruptcy Court for this adversary action.   ECF 1, 11

Plaintiffs filed a First Amended Complaint in this case asserting claims against the insurers for (1) turnover under 11 U.S.C.  § 542 (against Gemini and Ironshore); (2) breach

---

[3] The Southstar entities are also named Defendants in this lawsuit, as are subcontractors Collis Roofing, Inc., Da Pau Enterprises, Inc., Florida Construction Services, Inc., and Structural Contractors South, Inc.

[4] The Southstar Judgment includes "(i) $8,226,243.00 in lost profits; plus (ii) non-legal professional fees and costs in the amount of $732,262.00; plus (iii) restoration costs of $18,439,945.46; minus (iv) the Debtor's prepetition payments in the amount of $2,251,263.33," plus prejudgment interest.  ECF 228-11 at 2.

of contract; (3) declaratory relief; (4) violations of the Texas Insurance Code; (5) violation of Section 624.155, Florida Statutes; and (6) Florida common law bad faith.  ECF 78.  The Court previously dismissed the turnover claim with prejudice and all extracontractual claims without prejudice.  ECF 177, 178, 194.  The issue currently at the heart of this case is whether Plaintiffs' claims for defense and indemnity under the Policies involve a single occurrence or multiple occurrences as defined in the Gemini Policy.[5]

## II.    Summary Judgment Standards

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial.  *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001).  If the party moving for summary judgment bears the burden of proof on an issue he must "establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).  If a moving party who does not bear the burden of proof meets its initial burden, the nonmoving party must go beyond the pleadings and must present evidence such as affidavits, depositions, answers to interrogatories, and admissions on file to show "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the nonmoving party.  *Hyatt v. Thomas*, 843 F.3d

---

[5] The Court previously ruled that because no party showed that a conflict exists between Texas and Florida law the Court will apply Texas law to this issue.  ECF 217.

172, 177 (5th Cir. 2016). "An issue is material if its resolution could affect the outcome of the action." *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002).

The court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *R.L. Inv. Prop., LLC v. Hamm*, 715 F.3d 145, 149 (5th Cir. 2013). In ruling on a motion for summary judgment the court does not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." *Honore v. Douglas,* 833 F.2d 565, 567 (5th Cir. 1987). However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008) (quoting *Celotex*, 477 U.S. at 325).

## III.    Analysis

### A.    The "Eight Corners" Rule

In determining whether an insurer has a duty to defend its insured, Texas follows the "eight-corners rule" under which the court must consider the allegations in the pleadings and the policy provisions, without regard to whether the allegations are true. *Trinity Univ. Ins. Co. v. Employers Mut. Cas. Co.*, 592 F.3d 687, 691(5th Cir. 2010) (citing *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 490-91 (Tex. 2008)); *Liberty Mut. Ins. Co. v. Graham*, 473 F.3d 596, 599-600 (5th Cir. 2006). An insurer must defend its insured if a plaintiff's factual allegations in a suit against the insured potentially support a covered claim. *Id.* The burden is on the insured to show that a claim is potentially within the scope

of coverage, but the insurer has the burden to establish that an exclusion applies. *Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*, 197 F.3d 720, 723 (5th Cir. 1999).

## B.     The "Cause" Test

The Gemini Policy provides coverage for bodily injury or property damage up to $2,000,000 for each occurrence and up to $4,000,000 in the aggregate.  ECF 231-1 at 9, 12.  The Gemini Policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  ECF 231-1 at 25. In order to determine when or if Gemini's duty to defend Plaintiffs ceased, the Court must first determine whether UOB's claims under the Gemini Policy are the result of a single occurrence or multiple occurrences.[6]  The interpretation of "occurrence" as used in the Gemini Policy is a question of law for the Court.  *U.E. Texas One-Barrington, Ltd. v. Gen. Star Indem. Co.*, 332 F.3d 274, 277 (5th Cir. 2003).  The insured bears the burden of demonstrating whether claims constitute multiple occurrences under an insurance policy. *Fina, Inc. v. Travelers Indem. Co.*, 184 F. Supp. 2d 547, 550 (N.D. Tex. 2002) (because the number of occurrences does not implicate an affirmative defense or a policy exclusion, the burden is on the insured).

In *Evanston Insurance Co. v. Mid-Continent Casualty Co.*, 909 F.3d 143, 148-50 (5th Cir. 2018), the Fifth Circuit thoroughly explained how, under Texas law, courts should determine whether a claim under an insurance policy involves a single occurrence or multiple occurrences:

---

[6] The parties dispute whether the $2,000,000 single occurrence limit has been met.  *See* ECF 230 at 24; ECF 260 at 17; ECF 241 at 6.  The Court does not resolve the question of exhaustion here.

> [T]he appropriate inquiry is whether there was one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage. If so, then there was a single occurrence. If the chain of proximate causation was broken by a pause in the negligent conduct or by some intervening cause, then there were multiple occurrences, even if the insured's negligent conduct which caused each of the injuries was the same kind of negligent conduct.

*Id.* at 150.  The Fifth Circuit clarified in *Evanston* that its prior decision in *H.E. Butt Grocery Co. v. National Union Fire Insurance Co. of Pittsburgh, Pa.*, 150 F.3d 526 (5th Cir. 1998), does not stand for the proposition that a single overarching cause can *never* constitute a single occurrence under an insurance policy.  *Id*. at 149.  Instead, it noted that "Texas law only prohibits courts from looking to the 'overarching cause' of the injuries when the overarching cause is not a 'proximate, uninterrupted, and continuing cause' of all the injuries.  *Id*. at 151 (citing *H.E. Butt*, 150 F.3d at 534).  "In other words, unless the proximate cause for the injuries is continuous and unbroken, there must be more than one occurrence."  *Id*. at 148.

### C.  Application of the Cause Test to the Eight Corners of the Southstar Complaint and the Gemini Policy

Southstar's Complaint filed in Florida state court alleges construction defects in seven separate buildings related to a variety of different products and systems.[7]  As

---

[7] Southstar alleges that the following negligent acts caused its damages:  (a) defective construction of structural elements not reflected in as-built drawings; (b) defective construction in violation of building codes; (c) defective construction of shear walls, including improper spacing of framing elements, improper fasteners and fastener spacing, failure to include support trusses and failure to install required strapping; (d) failure to certify tension rods to proper tension and failure to meet requirement for anchorage in foundation elements; (e) improper construction of columns, window jambs, door frames, and cantilevering for balconies; (f) improper installation of Zip Board sheathing as part of the building envelope, including over penetration of fasteners and improper installation of board tape; (g) improper water proofing and flashing at balconies, windows, and roofs, including failure to install weep screeds and failure to properly install flashing tape at balcony, roof, and windows.  ECF 228-1, ¶¶ 26, 64.  Southstar alleges these defects caused the buildings to be condemned and the balconies to be rendered unsafe for use and caused various other elements of damages, including repair work to multiple elements of the buildings, loss of rental

Navigators points out, "[n]o party disputes that this action involves multiple construction defects, at multiple locations [or at multiple buildings], constructed at different points of time, and attributable to the construction activities of multiple subcontractors, each performing different activities within, and among, the separately constructed buildings." ECF 237 at 2 (changes added).  Plaintiffs (along with Navigators and Great American) argue the Southstar Complaint alleges at least five different covered occurrences:  1) improper construction of the shear walls; 2) failure to certify proper tension for tension rods; 3) improper construction of structural members; 4) improper installation of Zip Board; and 5) improper water proofing.  ECF 230 at 22.  Gemini, on the other hand, takes the position that Southstar's Complaint alleges only a single occurrence under the policy because the sale of the buildings is the single occurrence by which Plaintiffs became liable to Southstar.  ECF 260 at 5.  After reviewing the relevant case law applying the cause test, the Court concludes the Southstar Complaint alleges multiple occurrences under the Gemini Policy.

### 1. Cases applying the cause test support multiple occurrences under the Gemini Policy.

The Fifth Circuit found multiple occurrences under the insurance policy at issue in *U.E. Texas One-Barrington, Ltd. v. Gen. Star Indemnity Co.*, 332 F.3d 274 (5th Cir. 2003). *U.E. Texas One* involved claims resulting from foundation damage in 19 apartment buildings in a complex due to plumbing leaks.  In an attempt to pay only a single deductible, U.E. Texas One argued that although each of the 19 buildings was damaged by different

_____

income, and professional investigation and evaluation of defects and repair protocols.  *Id.*, ¶ 27.

plumbing leaks, there was only one occurrence under the insurance policy because "all the leaks can be traced back to defects in the materials and installation of the underground plumbing system."[8]  *Id.* at 277.  When interpreting the term occurrence, the Fifth Circuit noted that "[u]nder Texas law, the proper focus.. . . 'is on the events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious effects.'"  *Id.* at 277 (quoting *H.E. Butt*, 150 F.3d at 530).  The Fifth Circuit rejected the argument that the installation of the underground plumbing system constituted a single occurrence, holding that "Texas One's property experienced multiple leaks distinguishable in space and time" and each leak was responsible for damage to a separate building.  *Id.* at 278 and n.3.[9]  Importantly, the majority opinion rejected the argument made by the dissent that courts apply a "liability triggering test" under policies designed to protect the insured from liability to others (liability policies) as opposed to policies designed to protect the insured from damage or loss to property owned by the insured (loss policies).[10]  *Id.* at 277 n.2. Gemini's single occurrence argument focuses on the event that triggered liability to Southstar, which it contends is the sale of the property, as opposed to the cause of the damage to the property, which is alleged to be various acts of faulty construction.  As was the case in *U.E. Texas One*, the damages alleged by Southstar do not result from a single,

---

[8] The policy used the term "loss occurrence" which was defined as "the total loss by perils insured against arising out of a single event."  *U.E. Texas,* 332 F. 3d at 277.

[9] *Evanston* characterizes *U.E. Texas* as "finding nineteen occurrences where water leaks in nineteen apartment buildings were caused by nineteen separate negligent plumbing installations, not a single negligent plumbing installation."  909 F.3d at 151 n.2.

[10] In *Pennzoil-Quaker State Co. v. American Int'l Specialty Lines Ins. Co.*, 653 F. Supp. 690, 705, 707 (S. D. Tex. 2009), the court recognized that *U.E. Texas One* involved a loss policy but applied the same cause test used in *U.E. Texas One* to find multiple occurrences under the pollution liability policy at issue.

uninterrupted, continuing cause, but from multiple types of work, by multiple subcontractors, on multiple areas of multiple buildings.

The conclusion that the Southstar suit involves multiple occurrences under the Gemini policy is also supported by the holding in *Lennar Corp. v. Great American Insurance Co.,* 200 S.W.3d 651, 682 (Tex. App. 2006), abrogated on other grounds by *Gilbert Texas Construction, L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118 (Tex. 2010). In *Lennar*, the homebuilder plaintiff sought coverage under several commercial general liability (CGL) policies after being sued by multiple home buyers for the negligent application of defective stucco. *Id.* at 660. First, the Texas court held that defective construction can constitute an "occurrence" under a standard CGL policy. *Id.* at 675 ("Reading the standard CGL policy as a whole, we hold that negligently created, or inadvertent, defective construction resulting in damage to the insured's own work that is unintended and unexpected can constitute an "occurrence."). The court further addressed the argument of one of Lennar's primary insurers that the damage to each home constituted a separate occurrence and that Lennar could not recover under its policy until Lennar satisfied the $250,000 deductible applicable to each "occurrence." *Id.* at 681. Applying the "cause" test under Texas law, the court held that Lennar's claim constituted multiple occurrences. *Id.* at 682-83. The court reasoned that the application of defective stucco, which resulted in the entrapment of water, caused damage only to the particular home to which it was applied, thus the damage to each home constituted a separate occurrence under the policy. *Id.* Likewise, Southstar alleges that multiple contractors caused multiple (five)

types of construction defects in multiple buildings, and thus Southstar's claims constitute multiple occurrences under the Gemini policy.

Two non-Texas cases also inform the Court's determination that the Southstar Complaint alleges multiple occurrences under the Gemini Policy: *Liberty Mut. Fire Ins. Co. v. Bosa Dev. California II, Inc.*, No. 17-CV-0666-AJB-BGS, 2020 WL 1864645, at *8 (S.D. Cal. Apr. 13, 2020) and *Mid-Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1301 (S.D. Fla. 2010), aff'd, 477 F. App'x 702 (11th Cir. 2012).   The definition of "occurrence" at issue in both *Bosa* and *Basdeo* is similar to that contained in the Gemini Policy.[11]   Like Texas, California and Florida use a "cause" test to determine whether a claim represents a single occurrence or multiple occurrences under an insurance policy. *See Bosa*, 2020 WL 1864645, at *6 ("Under California law, the causation test states that the number of occurrences under an insurance policy depends on the cause of injury rather than the number of injurious effects or harms."); *Basdeo*, 742 F. Supp. 2d at 1346 (citing *Koikos v. Travelers Ins. Co.*, 849 So. 2d 263, 269 (Fla. 2003) in which the Florida Supreme Court "applied the 'cause theory,' which looks to the cause of the injuries, rather than the 'effect theory,' which looks to the number of injured plaintiffs.").

Like this case, the *Bosa* case involves multiple construction defects in a condominium project.   Bosa was the developer of the project and hired several subcontractors to perform the work.   The condominium homeowners' association sued

---

[11]  *Bosa*, 2020 WL 1864645, at *1 ("The Liberty Policy defines an 'occurrence' as 'an accident, including continuous repeated exposure to substantially the same general harmful conditions.'"); *Basdeo*, 742 F. Supp. 2d at 1340 ("'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.").

Bosa for property damages.  In the subsequent coverage action, Liberty Mutual alleged that Bosa's liability was based on multiple occurrences under the policy and therefore Bosa was responsible for paying a $500,000 deductible per occurrence.  Bosa asserted that its liability was based on a single occurrence—its negligent supervision of the condominium construction project.  The court held there were three occurrences: (1) negligent installation of concrete flatwork, balconies, and waterproofing; (2) defective installation of plumbing; and (3) improper selection of the inherently defective materials of cast iron piping and Eccoduct in-slab dryer vent systems.  *Bosa*, 2020 WL 1864645, at *8.  Rejecting Bosa's single occurrence theory, the court stated "there is no showing that the 'negligent supervision' of the waterproofing that allegedly caused the water damage is the same as the 'negligent supervision' that caused the improper installation of plumbing, or the improper selection of materials."  *Id.*

*Basdeo* also involves defective construction of a condominium building.  In that case, Mid-Continent sought to limit its liability under the insurance policy to $1,000,000, arguing that a single occurrence caused defendants' damages because the contractor performed the construction pursuant to a single contract.  742 F. Supp.2d at 1345.  The court concluded that three occurrences transpired: (1) damages caused in connection with the contractor's tarping work; (2) damages caused in connection with the contractor's work on the roofs; and (3) damages caused in connection with the contractors work on the mansards.  *Id.* at 1347.  Each of the three categories of damages was caused by "a separate force, distinguishable in time and space" and thus each was a separate occurrence.  *Id.*

**2. The *Trammell Crow* case focuses on a liability triggering event, not the cause of the injury or damage.**

In support of its single occurrence argument in this case, Gemini relies primarily on two unpublished decisions from the Northern District of Texas—one of which is the pre-*Evanston* case of *Trammell Crow Residential Co. v. St. Paul Fire & Marine Inurance Co*., No. 3:11-CV-2853-N, 2014 WL 12577393, at *4-5 (N.D. Tex. Jan. 21, 2014).  Trammell Crow, the developer of a multi-family housing project, sued its CGL insurers to recover its contribution to the settlement of an underlying lawsuit in which Trammell Crow and the contractor of the project, a Trammell Crow affiliate, were sued for defective construction by residents and their property owners' association.  *Id.* at *2.

The issue before the court was whether the underlying lawsuit alleging defective construction involved a single occurrence such that the limits of the primary liability policies were exhausted and coverage under excess umbrella policies was triggered.  *Id.* at *2.  The definition of occurrence at issue in Trammel Crow mimicked that in the Gemini policy:  "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[12]  *Id*. at *4.  The district court declined to find that faulty construction was the single cause of injury because to do so "would be analogous to the installation of the plumbing in *Texas One* . . . and too overarching to be considered the cause."  *Id.* at *5.  Nonetheless, the court held there was a single occurrence under the

---

[12] One policy at issue in *Trammell Crow* used the term "event" rather than occurrence but defined it the same way. *Id.* at *4.

policy because "the event giving rise to the insured's liability here was the sale of the property." *Id.*

Although the *Trammell Crow* opinion purports to apply the cause test to determine the number of occurrences under the policy, this Court interprets the decision to have focused on the liability triggering event—the sale of the property—rather than the cause of the injuries insured against.  The Fifth Circuit affirmed in *Evanston* that "the appropriate inquiry is whether there was one proximate, uninterrupted, and continuing *cause* which resulted in all *of the injuries and damage*."  909 F.3d at 150 (emphasis added).

In *Trammel Crow*, the only plaintiff was the real estate developer who sold the property and sought coverage under the umbrella policies for its contribution to settlement of the underlying lawsuit.  The court found the sale of the property was the event that triggered the plaintiff's liability to the residents and homeowner's association and that therefore there was a single occurrence.  Here, Plaintiffs seeking coverage under the Gemini Policy include both the developer and UOB, a contractor who was not involved in the sale of the property, but whose losses arose from the purchasers' claims of negligent construction.  Therefore, this Court declines to follow *Trammell Crow* and concludes that under the cause test Southside's claims raise multiple occurrences under the Gemini policy.

### 3. The analysis in the *Liberty* opinion is too conclusory to support a single occurrence in this case.

The other case heavily relied upon by Gemini, *Liberty Insurance Underwriters Inc. v. First Mercury Insurance Co.*, No. 3:17-CV-3029-M, 2019 WL 7902961, at *2 (N.D. Tex. Aug. 2, 2019), also fails to persuade the Court that the Southstar Complaint raises

only a single occurrence under the Gemini Policy. The *Liberty* case arose out of the construction of a school performing arts center. The school district sued the construction contractor, which then made claims against its primary and excess insurers. The case settled for $3,000,000, with two primary insurers collectively paying $1,000,000 and the excess insurer paying $2,000,000 under a reservation of rights. The excess insurer, Liberty, sued the primary insurers arguing that the alleged construction defects constituted at least two "occurrences" and thus the primary insurers were required to pay the full amount of the settlement. The defendant insurers argued that the "defective construction of the building was the singular occurrence that was the continuous cause of property damage." *Id.* at *2. The district court, purporting to apply the "cause analysis" articulated in *H.E. Butt*, found that although there were various construction defects leading to different types of property damage "all of the property damage . . . was caused by a single event at a single facility—the defective construction by [the contractor], or its subcontractors, of the performing arts center." *Id.* at *3. Thus, the court found only a single occurrence under the terms of the primary policies and granted summary judgment to defendants. *Id.*

This Court finds the analysis in the *Liberty* opinion too conclusory to provide much guidance. In light of the various construction defects that led to different types of property damage, it is difficult to reconcile the *Liberty* court's finding of a single overarching cause of damage with Fifth Circuit precedents. *See Evanston*, 909 F.3d at 151 (Texas law prohibits looking to the "overarching cause" of injuries unless the overarching cause is the "proximate, uninterrupted, and continuing cause" of all the injuries); *see also Trammell Crow,* 2014 WL 12577393, at *5 (relying on *U.E. Texas One* when rejecting the

overarching claim of faulty construction as the single cause of injury). In addition, the *Liberty* opinion was based on the specific factual allegations of the underlying complaint at issue in that case. Here, the Court must apply the cause test specifically to the eight corners of the Southstar Complaint and the Gemini Policy. Looking at the eight corners of the documents, the Court finds that *Liberty* provides no support for finding a single occurrence of negligent construction under the Gemini policy.[13]

### 4.    The precise number of construction defects is irrelevant here.

Finally, Gemini's argument that the Court must find a single occurrence because it is impossible to establish the precise number of construction defects is irrelevant. The issue to be decided is whether the claimed damages result from "one proximate, uninterrupted, and continuing cause," not the number of defects or "effects" from the alleged accident. *See H.E. Butt*, 150 F.3d at 530 (the proper focus is on the events that cause the injuries, not the number of injurious effects). Additionally, the Court at this time is tasked only with determining whether Plaintiffs are seeking coverage for a single occurrence or multiple occurrences; the Court need not decide the exact number of occurrences or effects from those occurrences. It is undisputed that if multiple occurrences are at issue, the limits of the Gemini Policy have not been exhausted and Gemini's duty to defend Plaintiffs has not terminated. Likewise, the Court finds it unnecessary to address at this time the existence of a single occurrence limit in the Ironshore Policy.

---

[13] Moreover, *Liberty* does not support Gemini's theory of this case, which is that the *sale of the property*, not *construction negligence*, is the one proximate cause of Plaintiffs' injuries.

## IV.    Conclusion and Recommendation

For the reasons discussed above, the Court concludes Gemini had a duty to defend its insureds until it reached the aggregate limits of liability for multiple occurrences under the Gemini Policy.  Therefore, the Court RECOMMENDS as follows:

- Plaintiffs' Motion for Partial Summary Judgment on the Duty to Defend Against Gemini Insurance Company (ECF 230) be GRANTED;

- Navigators' Motion for Summary Judgment Against Gemini and Joinder to Plaintiffs' Motion for Partial Summary Judgment as to the Duty to Defend Against Gemini (ECF 237) be GRANTED;

- Great American's Motion for Summary Judgment Against Gemini and Joinder to Plaintiffs' Motion for Partial Summary Judgment as to Duty to Defend Against Gemini (ECF 244) be GRANTED;

- Gemini Insurance Company's Motion for Summary Judgment (ECF 233) be DENIED;

- Ironshore's Motion for Summary Judgment (ECF 241) be DENIED as to the number of occurrences and DENIED as moot as to the single occurrence limit of the Ironshore Policy;

- Plaintiffs' Motion for Partial Summary Judgment on the Duty to Defend and Limits of the Ironshore Policy Against Ironshore Specialty Insurance Company, Navigators Specialty Insurance

Company, and Great American Assurance Company (ECF 231), Navigators' Motion for Partial Summary Judgment Regarding Ironshore's Limits of Liability (ECF 238), and Navigator's Motion to Strike Ironshore's Evidence (ECF 297) be DENIED as moot.[14]

It is further ORDERED as follows:

- Plaintiffs' Motion to Exclude Expert Testimony of Nicholas Bradford (ECF 221) and Motion to Exclude Expert Testimony of Christopher Martin (ECF 222) are DENIED WITHOUT PREJUDICE because the motions are largely rendered moot by the Court's legal ruling that multiple occurrences are at issue in this case.  The motions may be refiled in the event any claims in this case proceed to trial.

- Within 30 days of any Order of Adoption regarding this Memorandum and Recommendation the parties shall file a joint status report setting forth the remaining motions or issues that require further rulings from the Court and the status of settlement negotiations between the parties.

The Clerk of the Court shall send copies of the Memorandum and Recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th

---

[14] These Motions address the parties' dispute as to whether the Ironshore Policy has a single occurrence limit of $10,000,000, as Ironshore contends, or no single occurrence limit at all.

Cir. 1996) (en banc), superseded by statute on other grounds.

Signed on December 14, 2021, at Houston, Texas.

Christina A. Bryan
United States Magistrate Judge