Case 4:19-cv-04211 Document 435 Filed on 07/19/24 in TXSD Page 1 of 17

United States District Court
Southern District of Texas
**ENTERED**
July 19, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| URBAN OAKS BUILDERS LLC, *et al.*, | § § § | |
| *Plaintiffs,* | § § | |
| VS. | § § | CIVIL ACTION NO. 4:19-cv-4211 |
| GEMINI INSURANCE COMPANY, *et al.*, | § § § | |
| *Defendants.* | § § § | |

## ORDER

Before the Court is Defendant Ironshore Specialty Insurance Company's Additional Motion for Summary Judgment. (Doc. No. 360). Defendant Navigators Specialty Insurance Company responded in opposition. (Doc. No. 369). Plaintiffs, Urban Oaks Builders LLC ("UOB"), Hines Interests Limited Partnership, 1662 Multifamily LLC, Hines 1662 Multifamily LLC, Hines Investment Management Holdings Limited Partnership, HIMH GP LLC, Hines Real Estate Holdings Limited Partnership, and JCH Investments, Inc. (collectively, the "Plaintiffs") also responded in opposition. (Doc. No. 382).

## BACKGROUND

The following facts were previously laid out in a Memorandum and Recommendation (M&R) adopted by this Court. (Doc. Nos. 313, 328). For ease of reference, they are reproduced in part here. The facts in this section are undisputed unless otherwise noted.

In July 2014, Urban Oaks Builders, LLC (UOB) contracted with 1662 Multifamily LLC to be the general contractor on the construction of six apartment buildings and a clubhouse in Celebration, Florida. UOB entered into contracts with various subcontractors that in turn were enrolled in a controlled insurance program (CIP) to provide general liability insurance for the

1

project. As a result, the term "insureds" under the CIP policies includes UOB, the project owners/developers, and the subcontractors.

Defendants Gemini Insurance Company, Ironshore Specialty Insurance Company, Navigators Specialty Insurance Company, and Great American Assurance Company issued policies as part of the CIP. Gemini issued "Commercial General Liability Policy" number VCWP001075 covering the period June 28, 2012 through July 31, 2017 ("Gemini Policy"). The Gemini Policy has limits of $2,000,000 each occurrence; $4,000,000 general aggregate; and $4,000,000 products-completed operations aggregate. Ironshore issued "ExcessProtect Commercial Excess Liability Policy" number 001402500 covering the period from June 28, 2012 through July 31, 2017 ("Ironshore Policy"). The Ironshore Policy "follows form" to the Gemini Policy. The parties dispute whether the Ironshore Policy contains a single occurrence limit of $10,000,000, but it is undisputed that the Ironshore Policy has limits of $25,000,000 general aggregate and $20,000,000 "product/completed operations aggregate" ("products-completed operations aggregate limit").

Navigators issued the next layer of insurance in excess of the Ironshore policy limits, which is "Follow Form Excess Liability Policy" number SE12FXS754225IC covering the period June 28, 2012 through July 31, 2017 (Navigators Policy). The Navigators Policy has limits of $15,000,000 each event; $15,000,000 general aggregate; and $15,000,000 products-completed operations aggregate limit.

The construction project in Celebration, Florida was completed in February 2016. Southstar Capital Group I, LLC, as agent for Cottington Road TIC, LLC and Durban Road TIC, LLC, (collectively Southstar) purchased the project from 1662 Multifamily in July 2016. Southstar subsequently asserted claims against Plaintiffs due to allegedly defective construction of the

2

project. In June 2017, Southstar entered an agreement with UOB to perform warranty work at the project. UOB made a claim on the Gemini Policy for the cost of the warranty work. Gemini paid UOB $164,734.80 on October 10, 2017 and $935,005.43 on November 9, 2017. On November 14, 2017, Southstar and UOB entered a "Standstill Agreement" pursuant to which UOB agreed to pay $2,050,398.72 (to be credited against any future judgment if Southstar prevailed in litigation). On January 23, 2018, Gemini made its final payment to UOB in the amount of $900,259.77.

In February 2018, Southstar filed suit against UOB and others in state court in Florida asserting the following claims: Count I—Piercing the Corporate Veil/Alter Ego; Count II—Fraudulent Non-Disclosure/Fraudulent Inducement; Count III—Breach of Contract—Intentional Withholding of Material Information; Count IV—Statutory Violations of Florida Statutes 553.84; and Count V—Negligence ("Southstar Complaint"). Although the Southstar Complaint alleges that all defendants are liable on all counts because they are alter egos, Counts I-III allege conduct by 1662 Multifamily and Counts IV-V allege conduct by UOB. Gemini initially hired counsel to defend UOB against Southstar's claims, but after tendering payments totaling $2,000,000, declared its policy limits were exhausted and that therefore its duty to defend terminated. With the Southstar lawsuit pending in Florida and insurance coverage in dispute, UOB filed a petition for bankruptcy in the United States Bankruptcy Court for the Southern District of Texas.

Southstar's claims against UOB were transferred to the Bankruptcy Court and incorporated into a Proof of Claim. Southstar's claims against other defendants remained pending in Florida state court. UOB and others filed a lawsuit in Florida state court against the CIP insurers for coverage and indemnity. When that suit became mired in a jurisdictional dispute, Plaintiffs

3

voluntarily dismissed the Florida case and refiled their claims against the insurers and others as an adversary action in its bankruptcy case.[1]

Southstar filed a proof of claim in the bankruptcy action asserting over $45,000,000 in damages. UOB objected. The Bankruptcy Court held a hearing on UOB's objection and entered an estimation judgment against UOB in favor of Southstar in the amount of $26,103,717.38 ("estimation judgment"). The estimation judgment includes "(i) $8,226,243.00 in lost profits; plus (ii) non-legal professional fees and costs in the amount of $732,262.00; plus (iii) restoration costs of $18,439,945.46; minus (iv) the Debtor's prepetition payments in the amount of $2,251,263.33," plus prejudgment interest. (Doc. No. 228-11 at 2). The Bankruptcy Court made no effort to apportion these charges between those covered by insurance and those that were not. Southstar did not appeal. On the Bankruptcy Court's Recommendation, the District Court withdrew the reference to Bankruptcy Court for this adversary action.

Plaintiffs filed a First Amended Complaint in this case asserting claims against the insurers for (1) turnover under 11 U.S.C. § 542 (against Gemini and Ironshore); (2) breach of contract; (3) declaratory relief; (4) violations of the Texas Insurance Code; (5) violation of Section 624.155, Florida Statutes; and (6) Florida common law bad faith. (Doc. No. 78). The Court previously dismissed the turnover claim with prejudice and all extracontractual claims without prejudice. (Doc. Nos. 177, 178, 194).

The M&R, which this Court adopted, considered whether Plaintiffs' claims for defense and indemnity under the Policies involve a single occurrence or multiple occurrences as defined in the

---

[1] The Southstar entities are also named Defendants in this lawsuit, as are subcontractors Collis Roofing, Inc., Da Pau Enterprises, Inc., Florida Construction Services, Inc., and Structural Contractors South, Inc.

Gemini Policy.[2] (Doc. No. 313). It found (and this Court agreed) that the Southstar claims involve multiple occurrences rather than a single occurrence. As a result, the Court determined that Gemini had a duty to defend its insureds until it reached the aggregate limits of liability for multiple occurrences under the Gemini policy. The Court did not rule on the precise number of occurrences because the issue to be decided at that point was whether the claimed damages resulted from "one proximate, uninterrupted, and continuing cause," rather than the number of defects or "effects" from the alleged accident. (Doc. No. 313 at 17). The Court accordingly declined to decide the exact number of occurrences. After the Court's ruling on the multiple occurrences issue, the parties filed various dispositive motions seeking rulings on the duties to indemnify and defend as both the primary carrier (Gemini) and the first and second level excess carriers (Ironshore and Navigators).[3]

The Court now considers Ironshore's Additional Motion for Summary Judgment. (Doc. No. 360). Ironshore takes the position that the Southstar claim only involves a single occurrence for the purposes of the duty to indemnify. Ironshore further argues that the Ironshore Policy contains a $10,000,000 per occurrence limit or that the Ironshore Policy should be reformed to include a $10,000,000 per occurrence limit. (Doc. No. 360 at 19). In the alternative, Ironshore argues that if an aggregate limit applies, it is the $20,000,000 products-completed operations aggregate limit in the Ironshore Policy rather than the $25,000,000 general aggregate limit. (*Id.*).

---

[2] The Court previously ruled that because no party showed that a conflict exists between Texas and Florida law the Court will apply Texas law to this issue. (Doc. No. 217).
[3] The Court previously granted the third level excess carrier Great American Assurance Company's Unopposed Motion for Summary Judgment on the claims against it without prejudice (to be reinstated in the event the Court's 2022 Order on the occurrences issue is withdrawn or reversed). (Doc. No. 419).

5

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

## ANALYSIS

Ironshore's primary argument—that it owes a maximum of $10,000,000 in indemnity payments—relies on two main assumptions. First, Ironshore argues that this Court's previous ruling on the multiple occurrences issues only applied to the duty to defend, so the multiple

6

occurrences issue is still "squarely before the Court" in the context of the duty to indemnify.[4] Next, Ironshore contends that its Policy in fact contains, by its plain language, a per-occurrence limit of $10,000,000, or that reformation is available to include the per-occurrence limit.

Plaintiffs and Navigators each filed a response in opposition.[5] Many of the arguments in the responses take issue with Ironshore's basic assumptions. Navigators argues that Ironshore should be barred from arguing the multiple occurrences issue because this Court already found that there were multiple occurrences in both the duty to defend and the duty to indemnify contexts. Navigators further contends that the Ironshore Policy "clearly and unambiguously eliminated any per occurrence limit by endorsement." (Doc. No. 369 at 7). Finally, Navigators argues that the time for reformation to include the per-occurrence limit "has long passed" under Texas law and that Ironshore's reformation claim is therefore time-barred. (*Id.*). Plaintiffs point to the M&R to argue that the existence of a per-occurrence limit in the Ironshore Policy has been mooted, and in either case Ironshore's general aggregate limit of $25,000,000 applies because the underlying Construction Defect Action constitutes five separate occurrences. (Doc. No. 382 at 6).

## A. Multiple Occurrences Issue

The Court will take up the multiple occurrences issue first. As it stated on the record in the most recent hearing in this case, the Court has already determined the multiple occurrences issue and will not revisit that ruling unless some party raises some previously unknown fact or issue. In

---

[4] *See* Doc. No. 360 at 4 n.1.

[5] Ironshore argues that Navigators lacks standing to contest the interpretation of the Ironshore policy because it was not a party to the contract. Nonetheless, as an excess insurer whose rights and liabilities may be affected by the Ironshore Policy, the Court finds that Navigators has standing to challenge the interpretation and application of the contract terms even if it is not a party to that contract. *See Acuity v. Johnson*, 776 F.3d 588, 594 (8th Cir. 2015). Moreover, UOB has standing to contest Ironshore's interpretation, as it is a party to the contract. The Court will therefore consider both Plaintiffs' and Navigators' responses in opposition to Ironshore's motion.

other words, the "multiple occurrences" analysis in the M&R applies with equal force here.[6] Anticipating this, Plaintiffs argue that the issue of whether the "per occurrence limit" remains in the Ironshore Policy has been mooted. The Court, however, will consider each question of contract interpretation presented by the parties: first, whether the per-occurrence limit was deleted by endorsement (and whether the contract can be reformed); and second, whether the $25,000,000 general aggregate limit or the $20,000,000 products-completed operations aggregate limit applies.

## B. Whether the Ironshore Policy contains a per-occurrence limit

Ironshore argues that its Policy is subject to a $10,000,000 per-occurrence limit that was originally stated in the Ironshore Policy as Declaration 3 ("Per Occurrence, Per Claim or Per Loss" equivalent to $10,000,000). (Doc. No. 358-2 at 2). Declaration 3 is reproduced below.

---

[6] At oral argument, counsel for Ironshore raised this issue and the Court ruled that the M&R covered both the duty to defend and the duty to indemnify. (Haralson: "Purely for the sake of clarification, Ironshore and the Plaintiff and Navigators had raised the potential question that maybe the underlying -- the original Magistrate ruling and reconsideration was limited to a duty-to-defend analysis. I'm understanding from the Court that it's a broader..." The Court: "I think it is broader."). (Doc. No. 431 at 54:1-8). This ruling, however, does not answer the question of whether Ironshore's duty to defend was ever triggered.

**EXCESSPROTECT**[SM]
**COMMERCIAL EXCESS LIABILITY POLICY DECLARATIONS**

| | | | |
|---|---|---|---|
| **Policy Number:** | 001402500 | | **NEW/RENEWAL OF:** NEW |
| Item 1. | Named Insured & Mailing Address: | Urban Oaks Builders, LLC<br>5 Ravinia Drive<br>Atlanta, GA  30346 | |
| Item 2. | Policy Period: | Effective: June 28, 2012 | Expiration: June 28, 2017 |
| | | 12:01 a.m. time at your mailing address shown above | |
| Item 3: | **Limits Of Liability** | | |
| | a. Per Occurrence, Per Claim or Per Loss (as in Controlling underlying Policy) | | $10,000,000 |
| | b. Aggregate, where applicable | | $10,000,000 |
| | (Per Schedule of Underlying Policies (See Endorsement No. 1)) | | |
| Item 4. | **Limits Of Underlying Policy(ies)** | | |
| | a. Per Occurrence, Per Claim or Per Loss | | $2,000,000 |
| | b. Aggregate, where applicable | | $4,000,000 |
| | Per Schedule of Underlying Policies (See Endorsement No. 1) | | |
| Item 5. | **Controlling Underlying Policy** | | |
| | Company | | Gemini Insurance Company |
| | Policy Number | | VCWP001075 |
| | Insurer | | Gemini Insurance Company |
| | Coverage | | General Liability |
| | Policy Period | | June 28, 2012 to June 28, 2017 |
| | Limit of Liability | | $2,000,000 |

(Doc. No. 358-2 at 2).

Navigators and Plaintiffs argue that Endorsement 15, which is reproduced in relevant part below, deleted the per-occurrence limit in its entirety and that only the two aggregate limits explicitly listed in Endorsement 15 remain.

9

> **Endorsement # 15**
>
> Policy Number: 001402500                     Effective Date of Endorsement: June 28, 2012
> Insured Name: Urban Oaks Builders, LLC
>
> THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
> ### EXCESSPROTECT℠
> ### AGGREGATE LIMITS OF LIABILITY
> ### (PER PROJECT)
>
> It is agreed and understood that Item 3: of the Declarations is deleted in its entirety and replaced as follows:
>
> Item 3:   **Limits Of Liability**
>
> a. **Per Occurrence, Per Claim or Per Loss**
>    (as in Controlling Underlying Policy)
>
> b. **Aggregate**, where applicable
>    (Per Schedule of Underlying Policies (See Endorsement No. 1))
>
> The aggregate limit(s) of liability under this Policy apply in the same manner as the aggregate limit(s) of liability of the **Controlling Underlying Policy** including, if available, any:
>
> 1. Product-completed operations additional policy period as defined in the **Controlling Underlying Policy**, or
> 2. Designated Project General Aggregate or Designated Project Products/Completed Operations aggregate limit attributed to operations at a single designated construction project and as defined in the **Controlling Underlying Policy**.
>
> It is further agreed that, regardless of the number projects insured under the **Controlling Underlying Policy**, the following ultimate aggregate limit(s) of liability delineate the maximum amounts we will pay under this Policy:
>
> a.   $25,000,000 General Aggregate
> b.   $20,000,000 Products/Completed Operations Aggregate

(Doc. No. 358-2 at 27).

Ironshore argues that deposition testimony, including that of the wholesale insurance broker for Plaintiffs, shows that "the intent and agreement of Plaintiffs and Ironshore [in adding Endorsement 15] was to change only the aggregate limits and not the per occurrence limit." (Doc. No. 13). To further support its position, Ironshore points to previous statements by UOB in the underlying bankruptcy action and UOB's First Amended Complaint to argue that UOB has already conceded that a $10,000,000 per-occurrence limit applies. (Doc. No. 360 at 10). Navigators and Plaintiffs disagree. Plaintiffs argue that Endorsement 15 of the Ironshore Policy explicitly deleted the per-occurrence limit in Declaration 3.

10

Texas law governs the insurance contract interpretation issues in this case. "An insurance policy is a contract, generally governed by the same rules of construction as all other contracts." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113 (Tex. 2015) (citing *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). Texas courts begin the analysis with the language of the contract, "because it is the best representation of what the parties mutually intended." *RSUI*, 466 S.W.3d at 118. Unless the policy dictates otherwise, "[courts] give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage." *Id.* Where the parties have conflicting constructions of an endorsement, if only one party's construction is reasonable, the policy is unambiguous and the Court adopts that party's construction. *Id.* If, however, both constructions present reasonable interpretations of the policy's language, the Court must conclude that the policy is ambiguous and resolve the uncertainty by adopting the construction that most favors the insured (even if the construction urged by the insurer appears to be more reasonable). *Id.*; *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991). "This widely followed rule is an outgrowth of the general principle that uncertain contractual language is construed against the party selecting that language, and is justified by the special relationship between insurers and insureds arising from the parties' unequal bargaining power." *RSUI,* 466 S.W.3d at 119 (internal quotation marks omitted) (citations omitted).

In arguing that the per-occurrence limit applies despite the explicit language of Endorsement 15, Ironshore relies almost exclusively on evidence outside the contract. For example, Ironshore makes the argument that both Great American and Navigators issued their quotes and later bound coverage based on an express statement in the quotes that the Ironshore

Policy contained the $10,000,000 per occurrence limit. (Doc. No. 360 at 13).[7] Ironshore therefore argues that "Navigators and Great American were aware of the per-occurrence limit in the Ironshore Policy and underwrote, priced, and issued their upper-level excess policies based upon that limit." (*Id.* at 14). Despite Ironshore's assertion that any interpretation of the Ironshore Policy to exclude a per-occurrence limit would be "completely unreasonable," the Court cannot ignore the unambiguous contract language. As Navigators points out, Declaration 3 (which included the per-occurrence limit) was deleted "in its entirety" by Endorsement 15 and replaced with language that 1) did not list an amount for a per-occurrence limit and 2) explicitly listed new aggregate limits.

Ironshore points to the title of Endorsement 15, "Aggregate Limits of Liability (Per Project)" to support its interpretation of the contract because it "reflects the agreement between UOB and Ironshore to increase the aggregate limits for each construction project but not to change the per occurrence limit." (Doc. No. 360 at 14). However, as Navigators argues, "what title other than 'Aggregate Limits of Liability' would be more appropriate where, as here, the endorsement purports to delete the per occurrence limit and substitutes it for an aggregate limit intended to apply to all claims under the policy?" (Doc. No. 369 at 15-16).

The Court finds that the Ironshore Policy's Endorsement 15 unambiguously deleted the per-occurrence limit from the contract and replaced it with $25,000,000 general aggregate and the $20,000,000 products-completed operations aggregate limits. The Court reads the words "in [their] entirety" as listed in Endorsement 15 in context and "in light of grammar and common usage" and

---

[7] As supporting evidence, Ironshore points in part to the deposition testimony of Chad Hall, the wholesale broker for Plaintiffs (Doc. No. 360-1 at 137) and the deposition testimony of Tim Curran, Ironshore's corporate representative. (Doc. No. 360-1 at 368).

finds that this is the only reasonable interpretation of the contract. *See RSUI*, 466 S.W.3d at 118. As a result, the Court finds that there is no $10,000,000 per-occurrence limit in the Ironshore Policy. Ironshore's motion for summary judgment on that issue is denied.

### C. Whether the Ironshore Policy can be reformed to include a $10,000,000 per-occurrence limit

Ironshore next argues that its Policy can be reformed to include a $10,000,000 per-occurrence limit because "Texas law recognizes that when the parties to an insurance policy agree that the written policy does not reflect the true agreement of the parties, the contract may be enforced as intended without formal reformation of the contract" and that "even if formal reformation is required, such reformation is undeniably appropriate in this case." (Doc. No. 360 at 16-17). Navigators argues that Ironshore's attempt to seek to reform its policy is time barred. Navigators contends that that Texas statute of limitations is applicable to Ironshore's claim for reformation, and under Tex. Civ. Prac. & Rem. Code § 16.051, the statute of limitations for the reformation of contracts is four years. (Doc. No. 369 at 16). Navigators bases this argument on the assumption that Ironshore's reformation claim accrued under Texas law on August 30, 2012, the date that Endorsement 15 was issued and the date that Ironshore "should have known" there was an error. (*Id.*). Ironshore responds to the timeliness issue raised by Navigators by stating only that "the issue was clearly raised within four years of the time Navigators or Great American first contested the existence of a per occurrence limit." (Doc. No. 406 at 7).

Ironshore therefore appears to concede that the Texas statute of limitations for the reformation of contracts applies to this case. The main issue for the Court to decide, then, is the date of accrual. Ironshore appears to argue that the "discovery rule" applies to anchor the accrual

date.[8] "The discovery rule provides that the [statute of] limitations [begins to] run from the date the plaintiff discovers or should have discovered, in the exercise of reasonable care and diligence, the nature of the injury." *Harbor Ins. Co. v. Urb. Const. Co.*, 990 F.2d 195 (5th Cir. 1993) (citing *Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex.1988). The Fifth Circuit recently clarified, however, that in the context of insurance contracts under Texas law "the discovery rule applies only where the nature of the injury [is] inherently undiscoverable and…the injury itself [is] objectively verifiable[.]" *AIG Specialty Ins. Co. v. Tesoro Corp.*, 840 F.3d 205, 211 (5th Cir. 2016). In *AIG*, the Fifth Circuit found that where "the mistake is evidenced from the face of the document," the discovery rule does not apply to delay the accrual of the cause of action. *Id.* at 212 (citing *Cosgrove v. Cade*, 468 S.W.3d 32, 36–37 (Tex. 2015) (holding that the discovery rule does not apply to a reformation claim based upon plainly obvious and material omissions in an unambiguous deed, because such mistakes are not inherently undiscoverable)).

Here, the alleged "mistake" is evidenced from the face of the document. Endorsement 15 deleted Declaration 3 "in its entirety" and replaced it with only the $25,000,000 general aggregate and $20,000,000 completed operations aggregate limits. The Court finds that Ironshore's reformation claim accrued under Texas law on August 30, 2012, the date that Endorsement 15 was issued.[9] Ironshore did not assert a reformation counterclaim until October 7, 2020, which exceeds the four year statute of limitations for reformation under Texas law. Tex. Civ. Prac. & Rem. Code § 16.051. Ironshore's motion for summary judgment as to the reformation issue is therefore denied.

---

[8] *See* Doc. No. 406 at 7; *see also* Doc. No. 287 at 6.
[9] *See Cosgrove*, 468 S.W.3d at 37 ("parties are charged as a matter of law with knowledge of an unambiguous deed's material omissions from the date of its execution, and the statute of limitations runs from that date.").

### D. Whether Ironshore's obligations are limited to the $20,000,000 products-completed operations aggregate limit or the $25,000,000 general aggregate limit

The final issue for the Court to consider is whether Ironshore's obligations under the Policy are limited to the $20,000,000 products-completed operations aggregate limit. In its motion, Ironshore argues that the $20,000,000 products-completed operations aggregate limit applies because the Ironshore Policy's coverage agreement states that the Policy "will provide UOB with excess liability coverage 'in accordance with the same warranties, terms, conditions, exclusions and limitations as are contained' in the underlying Gemini Policy 'subject to the premium, limits of liability, retention, policy period, warranties, exclusions limitations and any other terms and conditions of this Policy, including any and all endorsements attached hereto, inconsistent with and supplementary to' the Gemini Policy." (Doc. No. 360 at 18-19; *see also* Doc. No. 358-2 at 10). The Gemini Policy defines "products-completed operations hazard" as follows:

> 16. "Products-completed operations hazard":
>
>> a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
>>
>> (1) Products that are still in your physical possession; or
>>
>> (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
>>
>>> (a) When all of the work called for in your contract has been completed.
>>>
>>> (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
>>>
>>> (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.
>>
>> **Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.**
>
>> b. Does not include "bodily injury" or "property damage" arising out of:

15

> (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;
>
> (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

(Doc. No. 360-1 at 63) (emphasis added).

In their briefing on this issue, Plaintiffs concede that the claims arose after construction was complete.[10] (Doc. No. 382 at 18). Plaintiffs also concede that "products completed operations hazard" is a defined term in the contract that applies to the products-completed operations aggregate limit. (*Id.*). Plaintiffs' only argument that the general aggregate limit applies is that "[Urban Oaks] performed warranty repair work after the claim…specifically, additional work was done in April 2017." (*Id.*). Thus, Plaintiffs argue that the products-completed operations aggregate limit "likely does not apply and the general aggregate limit applies." (Doc. No. 382 at 18). Plaintiffs point to no authority or otherwise support their argument that warranty work is somehow excluded from the plain language of the insurance agreement, which provides that "work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed." (Doc. No. 360-1 at 63). In fact, Plaintiffs agree with Ironshore that the claims arose after construction was complete. (Doc. No. 382 at 18). Therefore, the Court finds that the $20,000,000 products-completed operations aggregate limit applies. Ironshore's indemnity obligations are limited to satisfaction of the $20,000,000 products-completed operations aggregate limit.

---

[10] Navigators appears to take no position on which aggregate limit applies.

## CONCLUSION

The Court hereby **DENIES IN PART** Ironshore's Additional Motion for Summary Judgment (Doc. No. 360) as to the multiple occurrences issue, the existence of a per-occurrence limit in the Ironshore Policy, and reformation of the Ironshore Policy to include a per-occurrence limit.

The Court **GRANTS IN PART** Ironshore's Additional Motion for Summary Judgment (Doc. No. 360) to find that Ironshore's indemnity obligations are limited to satisfaction of the $20,000,000 products-completed operations aggregate limit.

Signed at Houston, Texas, on this the 1st day of July 2024.

Andrew S. Hanen
United States District Judge