**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

URBAN OAKS BUILDERS, LLC; HINES
INTERESTS LIMITED PARTNERSHIP; 1662
MULTIFAMILY LLC; HINES 1662
MULTIFAMILY, LLC; HINES INVESTMENT
MANAGEMENT HOLDINGS LIMITED
PARTNERSHIP; HIMH GP, LLC; HINES
REAL ESTATE HOLDINGS LIMITED
PARTNERSHIP; JCH INVESTMENTS, INC;

      Plaintiffs,

v.

GEMINI INSURANCE COMPANY;
IRONSHORE SPECIALTY INSURANCE
COMPANY; NAVIGATORS SPECIALTY
INSURANCE COMPANY; GREAT
AMERICAN ASSURANCE COMPANY;
SOUTHSTAR CAPITAL GROUP I, LLC;
COTTINGTON ROAD TIC, LLC; DURBAN
ROAD TIC, LLC; COLLIS ROOFING, INC.;
DA PAU ENTERPRISES, INC.; FLORIDA
CONSTRUCTION SERVICES, INC.;
STRUCTURAL CONTRACTORS
SOUTH, INC.

      Defendants.

Judge Andrew S. Hanen
Case No. 4:19-CV-04211

**NAVIGATORS SPECIALTY INSURANCE COMPANY'S
<u>POST-TRIAL CLOSING BRIEF</u>**

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ...........................................................................1

II. ISSUES PRESENTED........................................................................................2

III. SHORT ANSWER...............................................................................................3

    Issue 1 .................................................................................................................3

    Issue 2 .................................................................................................................3

    Issue 3 .................................................................................................................4

IV. NAVIGATORS POST-TRIAL ARGUMENT .....................................................7

    A. Navigators Is Entitled to Final Judgment on its Subrogation Claim
        Against Gemini ..............................................................................................7

    B. Gemini Has Not Yet Paid A $2 Million Per Occurrence Limit.........................8

        1. Defense Cost Payments to Baker Botts Do Not Erode
           Gemini's Policy Limits...........................................................................10

        2. Numerous Additional Gemini Payments Made By Gemini
           Do Not Erode Policy Limits ...................................................................11

           a. Gemini's Indemnity Payments Only Apply To Costs
               That The Insured Is Legally Obligated Pay ...................................12

           b. Investigative Costs are Defense Costs ...........................................14

           c. Overhead Costs, Inspection Costs, and Personnel Costs
               Are Properly Characterized As Defendant Costs...........................17

    C. Navigators Owes No Duty to Indemnify UOB for the BK Award..................20

        1. Plaintiffs Failed to Present Competent Evidence of
           Damages at Trial ....................................................................................21

         2. Plaintiffs' Failure to Segregate the Cost of Covered from
           Uncovered Damages is Fatal to its Coverage Claim..........................24

    D. Plaintiffs' Arguments That They Are Not Required To Segregate Their
        Damages Between Covered and Uncovered Costs Have No Merit.................26

        1. Navigators Provided Plaintiffs A Detailed Explanation As To The
           Importance of Allocating Damages ......................................................26

2.　The Draft Stops (and Shear Walls) Do Not Constitute Property Damage ....................................................................................27

3.　Removal of the Your Work Exclusion Does Not Create Coverage ..........................................................................................31

4.　Plaintiffs' Rip and Tear Cost Argument Ignores Plaintiffs' Burden to Segregate Covered and Uncovered Costs ...........................33

E.　The Shear Walls Are Not Covered Property Damage .....................................34

F.　In The Alternative Only, Plaintiffs Have Not Shown That The Costs Awarded to Southstar By the Bankruptcy Court Are Sufficient To Trigger the Navigators Excess Policy..............................................................41

G.　In the Alternative Only, Even if An Indemnity Duty is Owed, Navigators Has Not Breached Its Duty under the Navigators Excess Policy ....................46

H.　Neither UOB nor Southstar Are Entitled to Any Statutory and/or Supplemental Relief Against Navigators.........................................................48

I.　Southstar is Not Entitled to Post-Judgment Interest from Navigators.............50

# TABLE OF AUTHORITIES

**Cases**                                                                                 **Page(s)**

*Am. Guarantee & Liab. Ins. Co. v. United States Fire Ins. Co.,*
255 F. Supp. 3d 677 (S.D. Tex. 2017) ..................................................................... 5, 24

*Amegy Bank Nat'l Assoc. v. Brazos M&E, Ltd. (In re Bigler LP),*
458 B.R. 345 (Bankr. S.D. Tex. 2011) ........................................................................ 51

*Amerisure Mut. Ins. Co. v. Arch Specialty Ins. Co.,*
784 F.3d 270 (5th Cir. 2015) ..................................................................................... 8, 9

*Bldg. Specialties, Inc. v. Liberty Mut. Fire Ins. Co.,*
712 F. Supp. 2d 628 (S.D. Tex. 2010) .................................................................. 28, 32

*Brainard v. Trinity Universal Ins. Co.,*
216 S.W.3d 818 (Tex. 2006) ....................................................................................... 48

*Carmichael v. Balke (In re Imperial Petro. Recovery Corp.),*
84 F.4th 264 (5th Cir. 2023) .................................................................................. 50, 51

*Colony Ins. Co. v. First Mercury Ins. Co.,* No. A-20-CV-474-RP,
2022 U.S. Dist. LEXIS 227466 (W.D. Tex. Oct. 13, 2022) ...................................... 25

*Companion Prop. & Cas. Ins. Co. v. Opheim,*
92 F. Supp. 3d 539 (N.D. Tex. 2015) ......................................................................... 24

*Comsys Info. Tech. Servs. v. Twin City Fire Ins. Co.,*
130 S.W.3d 181 (Tex. App. 2003) .......................................................................... 5, 24

*Dis Invs., LLC v. Great Lakes Ins. Se.,* No. 23-23363-CIV-WILLIAMS/D'ANGELO,
2025 U.S. Dist. LEXIS 119007 (S.D. Fla. June 18, 2025) ........................................ 50

*Domtar, Inc. v. Niagara Fire Ins. Co.,*
563 N.W.2d 724 (Minn. 1997) .................................................................................... 15

*DPC Indus. v. Am. Int'l Specialty Lines Ins. Co.,*
615 F.3d 609 (5th Cir. 2010) ........................................................................................ 9

*Duke v. Hoch,*
468 F.2d 973 (5th Cir. 1972) ...................................................................................... 27

*Emscor Mfg. v. All. Ins. Grp.,*
879 S.W.2d 894 (Tex. App. 1994) .............................................................................. 47

*Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.,*
256 S.W.3d 660 (Tex. 2008) ....................................................................................... 48

iii

*Fed. Ins. Co. v. Srivastava*,
2 F.3d 98 (5th Cir. 1993) .................................................................................................. 46

*Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*,
197 F.3d 720 (5th Cir. 1999) ........................................................................................... 29

*Fiess v. State Farm Lloyds*,
392 F.3d 802 (5th Cir. 2004) ........................................................................................... 24

*Gelman Scis., Inc. v. Fireman's Fund Ins. Cos.*,
183 Mich. App. 445, 455 N.W.2d 328 (1990) .................................................................. 15

*Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*,
327 S.W.3d 118 (Tex. 2010) ...................................................................................... 32, 52

*Homeland Ins. Co. of N.Y. v. Clinical Pathology Lab'ys*, No. 1-20-CV-783-RP,
2022 U.S. Dist. LEXIS 127485 (W.D. Tex. July 19, 2022) ............................................... 9

*In re Missionary Baptist Found., Inc.*,
69 B.R. 536 (Bankr. N.D. Tex. 1987) ................................................................................ 51

*Lamar Homes v. Mid-Continent Cas.*,
242 S.W.3d 1 (Tex. 2007) ........................................................................................ 28, 33-34

*Lennar Corp. v. Great Am. Ins. Co.*,
200 S.W.3d 651 (Tex. App. 2006) .............................................................................. 12, 27

*Lennar Corp v. Markel Ins. Co.*,
413 S.W.3d 750 (2013) ...................................................................................................... 14

*Liberty Surplus Ins. Corp. v. Century Sur. Co.*, No. H-18-1444,
2019 U.S. Dist. LEXIS 116093 (S.D. Tex. July 12, 2019) ...................................... 27, 28, 31

*Lopez v. State Farm Mut. Auto.*,
139 So. 3d 402 (Fla. Dist. Ct. App. 2014) ....................................................................... 49

*MBM Fin. Corp. v. Woodlands Operating Co., L.P.*,
292 S.W.3d 660 (Tex. 2009) ............................................................................................. 48

*Mt. Hawley Ins. Co. v. JBS Parkway Apartments, LLC*, No. MO:18-CV-00092-DC,
2020 U.S. Dist. LEXIS 252528, at *25 (W.D. Tex. Dec. 30, 2020) ............................. 46-47

*Nat'l Union Fire Ins. of Pittsburgh v. Puget Plastics Corp*,
735 F. Supp. 2d 650 (S.D. Tex. 2010) ........................................................................ 24, 46

*Ocasek v. Manville Corp. Asbestos Disease Compensation Fund*,
956 F.2d 152 ....................................................................................................................... 51

*Price v. Tyler*,
890 So. 2d 246 (Fla. 2004) ............................................................................................ 49-50

iv

*QBE Specialty Inc. Co. v. Scrap Inc.*,
  806 F. App'x 692 (11th Cir. 2020) ................................................................ 25

*Royal Hosp. Corp. v. Underwriters at Lloyd's*, No. 3:18-CV-000102,
  2019 U.S. Dist. LEXIS 147657 (S.D. Tex. Aug. 20, 2019) ..................................46-47

*RSUI Indem. Co. v. Lynd Co.*,
  466 S.W.3d 113 (Tex. 2015) ................................................................32-33

*Satterfield & Pontikes Constr., Inc. v. United States Fire Ins. Co.*,
  898 F.3d 574 (5th Cir. 2018) ................................................................ 5, 24

*Smith Int'l, Inc. v. Egle Grp. LLC*,
  490 F.3d 380 (5th Cir. 2007) ................................................................ 47

*Tex. Farmers Ins. Co. v. Gerdes by & Through Griffin Chiropractic Clinic*,
  880 S.W.2d 215 (Tex. App. 1994) ................................................................ 48

*Tex. Farmers Ins. Co. v. McGuire*,
  744 S.W.2d 601 (Tex. 1988) ................................................................ 27

*N. Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co.*,
  541 F.3d 552 (5th Cir. 2008) ................................................................ 9

*United States Fire Ins. Co. v. J.S.U.B., Inc.*,
  979 So. 2d 871 ................................................................ 28

*USA Gymnastics v. Ace Am. Ins. Co. (In re USA Gymnastics)*,
  624 B.R. 443 (Bankr. S.D. Ind. 2021) ................................................................ 15

*Zurich Am. Ins. Co. v. Burlington N. & Santa Fe Ry. Co.*,
  No. 02-23-00245-CV, 2025 Tex. App. LEXIS 1741 (Tex. App. Mar. 13, 2025) ................................ 8, 18

**Statutes**

Florida Statute § 627.428 ................................................................ 49

Florida Statute § 57.041 ................................................................ 49

Florida Statute § 57.104 ................................................................ 49

Florida Statute § 626.9373 ................................................................49-50

Tex. Civ. Prac. & Rem. Code §38.001 ................................................................ 48

Tex. Ins. Code § 542 ................................................................ 48

**Rules**

F.R.E. 802 ................................................................ 22

Consistent with Judge Hanen's comments and orders at the conclusion of trial in this matter, Defendant/Cross-Plaintiff Navigators Specialty Insurance Company ("Navigators") hereby submits its Post-Trial Closing Brief and states as follows:

## I.    *Preliminary Statement*

At the close of trial, this Court directed the parties to submit post-trial briefs laying out what they believed was tried and their positions with respect to same.  As background to the Court's inquiry, it is undisputed that Navigators issued a third layer excess policy which has limits of liability of $15 million in excess of primary coverage issued by Gemini Insurance Company ("Gemini"), and a second layer of coverage issued by Ironshore Insurance Company ("Ironshore").  The available limits of the Gemini and Ironshore policies were the subject of various pre-trial rulings.  First, the Court determined that there were multiple occurrences.[1] Given the Court's ruling on that issue, the Gemini policy undisputedly has a $2 million per occurrence limit and a $4 million aggregate limit.[2]  Thus, to the extent damages are awarded to Plaintiffs, Gemini would be responsible for the first $4 million of those damages.

Second, the Court determined that the Ironshore Policy had a single $20 million aggregate limit for products/completed operations that would apply to any covered damages that

---

[1] *See* Dkt. 313, p. 18; *and see* Order Adopting Report and Recommendation at Dkt. 328. *See also* Dkt. 435, p. 7 ("As it stated on the record in the most recent hearing in this case, the Court has already determined the multiple occurrences issue and will not revisit that ruling unless some party raises some previously unknown fact or issue"). Here, no "previously unknown fact or issue" was introduced at trial to alter this Court's prior decision.  Indeed, the evidence at trial was entirely consistent with this Court's decision which found that  "this action involves multiple construction defects, at multiple locations [or at multiple buildings], constructed at different points of time, and attributable to the construction activities of multiple subcontractors, each performing different activities within, and among, the separately constructed buildings." Dkt. 313, p. 9.  Given no new facts or law, this Court should reject any efforts to reconsider its ruling as it has already done on at least three separate occasions.  *See* at Dkts. 328, pp. 1-2; 417; 435, pp. 7-8.

[2] *See* Dkt. 438, p. 10 ("This Court has already determined that Gemini had a duty to defend its insureds until it reached the aggregate limits of liability for multiple occurrences under the Gemini Policy").

1

Plaintiff proved up at trial that exceeded the Gemini Policy's limits of liability.[3]  Thus, the Navigators Excess Policy does not attach until Plaintiffs are able to demonstrate that it incurred covered damages exceeding $24 million in available underlying coverage provided by Gemini and Ironshore.   If Plaintiffs are unable to demonstrate as much, Navigators is entitled to a declaration that it owes no coverage to Plaintiffs.

Third, Gemini's failure to pay $4 million to indemnify payments for covered damages also resulted in this Court finding that Gemini breached its duty to defend.[4]   Instead of paying $4 million in covered damages, Gemini made three separate payments to Plaintiffs totaling $2 million, and provided spreadsheets outlining which invoices it was paying as part of its three separate indemnity payments.  Following the last of its three indemnity payments, Gemini asserted that it was exhausted and owed no further defense or indemnity obligation to Plaintiffs. After Gemini's refusal to defend, Navigators agreed to defend Plaintiffs subject to a complete reservation of rights.  Both Plaintiffs and Navigators sought reimbursement of the reasonable and necessary defense costs each paid as a result of this Court's pre-trial determination that Gemini breached its duty to defend.

## II.  *Issues Presented*

With this background, the trial presented three issues for Navigators:

1.  The amount of reasonable and necessary defense costs to be awarded to Navigators on its subrogation crossclaim[5] against Gemini?

---

[3] *See* Dkt. 435, pp. 12-13 and 15-16 (finding that endorsement #15 to the Ironshore Policy deleted the per occurrence limit and the $20 million products/completed operations aggregate limit applied to Plaintiffs claim).

[4] *See* footnotes 1, 3, *supra*.

[5] *See* Dkt. 122, pp. 27-28 (Count II).

2.  Whether Gemini's $2 million in pre-suit payments to Plaintiffs properly exhausted a single $2 million per occurrence limit of the Gemini Policy and, if not, how much of the $2 million payment was for defense costs that are paid outside of the Gemini Policy's limits?

3.  Whether Plaintiffs satisfied their burden of properly allocating its damages between covered and uncovered costs and, if so, did Plaintiffs demonstrate that they had sufficient covered costs necessary to exceed the $24 million attachment point of the Navigators Excess Policy?

### III.  *Short Answer*

**Issue 1:**

The amount of reasonable and necessary defense costs to be awarded to Navigators on its crossclaim against Gemini.

Navigators is entitled to judgment on its crossclaim against Gemini in the amount of $699,569.38, plus interest.  The Court has already ruled that Navigators was entitled to subrogation against Gemini for the defense costs Navigators expended while Gemini was in breach of its duty to defend.[6]  The Court, however, found a fact question with respect to the amount of the reasonable and necessary attorneys' fees expended by Navigators.[7]  That issue was resolved by the parties through stipulation[8] and, as a result, Navigators is entitled to judgment on its crossclaim in the amount of the stipulated defense costs, plus interest.

**Issue 2:**

Whether Gemini's $2 million in pre-suit payments to Plaintiffs properly exhausted a single $2 million per occurrence limit of the Gemini Policy and, if

---

[6] *See* Dkt. 438, p. 10, 13.

[7] *Id.* at p. 13.

[8] *See* Navigators Trial Exhibit #4.

3

not, how much of the $2 million payment was for defense costs that are paid outside of the Gemini Policy's limits.

Navigators is entitled to judgment on its crossclaim against Gemini[9] that Gemini's $2 million payment to Plaintiffs did not exhaust a single per occurrence limit of the Gemini Policy. Defense costs are supplementary payments under the Gemini policy that are paid in addition to the Gemini Policy's limits (*i.e.*, they do not erode the limits of the Gemini Policy). At the very minimum, it is undisputed that Gemini paid a $2,565 Baker Botts law firm invoice as part of the overall $2 million payment Gemini made to Plaintiffs. Thus, at a minimum, Gemini was short of exhausting a single per occurrence limit by $2,565. At maximum, however, as will be discussed herein, Navigators contends that a total of $552,332.21 of the $2 million Gemini payment is also properly characterized as supplementary payments that do not erode the Gemini Policy's limits.

**Issue 3:**

Whether Plaintiffs satisfied their burden of properly allocating its damages between covered and uncovered costs and, if so, did Plaintiffs demonstrate that they had sufficient covered costs necessary to exceed the $24 million attachment point of the Navigators Excess Policy?

Navigators is entitled to a declaration that it owes no indemnity to Plaintiffs for three independent reasons. ***First***, Plaintiffs (and Southstar[10]) failed to present any competent evidence at trial of the ***actual*** costs incurred to repair any of the construction defects. Despite Mr. Colagiovanni's rather lively admission that Plaintiffs were prepared to present an expert in the underlying bankruptcy proceeding who had walked every inch of the property and had personal knowledge of every defect and the cost necessary to repair each defect, Plaintiffs elected to

---

[9] *See* Dkt. 122, pp. 26-27 (Count I).

[10] "Southstar" as used herein means defendants Southstar Capital Group I, LLC, Cottington Road TIC, LLC and Durban Road TIC, LLC.

present no testimony at trial regarding the ***actual*** cost of repairs necessary to bring the buildings back to habitability.  Instead, the only evidence Plaintiffs presented (which was not admitted) at trial in support of their indemnity claim was a table Mr. Del Vecchio prepared for the bankruptcy court, which merely set forth estimated costs to restore the project to its originally designed condition.  Indeed, when the Court asked Southstar whether they reached out to the property's current owner to obtain the actual costs of repair, Southstar counsel responded that the current owners were being difficult.[11]  That is hardly an excuse for Plaintiffs' and Southstar's failure to present competent evidence of ***actual*** damages.

*Second*, even assuming this Court accepted Mr. Del Vecchio's chart as "evidence" of the costs incurred to repair each of the category of defects (and it should not as such was never admitted into evidence for the truth of the matter asserted), under Texas law, Plaintiffs' claim fails in its entirety if it is unable to allocate its damages between those costs attributable to construction defects that are covered by the insurers' policies and those defects that are not covered by the insurers' policies.  *Am. Guarantee & Liab. Ins. Co. v. United States Fire Ins. Co.*, 255 F. Supp. 3d 677, 689-90 (S.D. Tex. 2017); *Satterfield & Pontikes Constr., Inc. v. United States Fire Ins. Co.*, 898 F.3d 574, 583 (5th Cir. 2018); *Comsys Info. Tech. Servs. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 198 (Tex. App. 2003).  Here, there were several categories of construction defects contained in Mr. Del Vecchio's table including, but not limited to, estimations to restore the sagging corner balconies, defective shear walls, and defective draft stops.  At a bare minimum, Plaintiffs stipulated prior to trial that the defective shear walls and draft stops did not cause ancillary damages at the project.[12]  Thus, under Texas law, Plaintiffs'

---

[11] Trial Proceedings, Vol. 2 – AM, 24:13-25:5.

[12] *See* Navigators Trial Exhibit #22, p. 3.  At trial, Plaintiffs sought to walk back their Stipulation regarding the shear walls by introducing conflicting evidence at trial between two experts -  their own expert Michael Horst and

failure to allocate damages attributable to the draft stops and shear walls from other potentially covered damages is fatal to Plaintiffs' claim as against any of the insurer defendants, including Navigators.

*Third*, and only if this Court accepts the Plaintiffs' and Southstar's argument that it can rely on Mr. Del Vecchio's *estimations* as proof of covered "damages" (and it should not), at least **$11,702,866.04** of Mr. Del Vecchio's cost estimations are either attributable to uncovered defects that caused no ancillary damage (draft stops and shear walls) or they are generic costs not allocated between covered or uncovered defects (such as the cost of insurance for the entire repair project and or an estimated 10% contingency on overall project costs). Once these costs are subtracted from the overall indemnity damages Plaintiffs are seeking in this case ($25,298,450.46), it is clear that Navigators has no exposure because its policy attaches excess of $24 million in underlying coverage.

In summary, it is undisputed that Navigators is entitled to judgment in its favor on its crossclaim against Gemini for subrogation in the amount of $699,569.38, plus interest. Navigators is also entitled to a declaration on its crossclaim that Gemini has failed to exhaust a single per occurrence limit of the Gemini Policy. Navigators is also entitled to a finding that it has not breached any duty to indemnify Plaintiffs or Southstar, including a declaration that Navigators owes no coverage, on the basis that Plaintiffs have failed to meet their burden of properly allocating covered and uncovered damages.

---

Southstar's expert Paul Del Vecchio. Mr. Horst testified that there were no ancillary damages while Mr. Del Vecchio testified that he visually observed building movement which he attributed, in part, to the shear wall defects. For reasons further set forth below, Mr. Del Vecchio's eleventh hour observation should be discounted relative to Plaintiffs' Stipulation and prior admissions, as well as Mr. Horst's testimony. Even if not, however, there is no dispute regarding the draft stops and this Court need look no further than that category of defect in ruling against Plaintiffs for their failure to allocate damages between covered and uncovered defects.

In the alternative, and only if this Court determines that Plaintiffs satisfied their burden of allocating between covered and uncovered damages (and it should not), Navigators asserts that Plaintiffs' covered damages do not exceed $24 million in underlying limits and therefore Navigators has not breached any duty to Plaintiffs or Southstar and it is entitled to a declaration that it owes no coverage to Plaintiffs or Southstar.

## IV.    *NAVIGATORS POST TRIAL ARGUMENT*[13]

### A. <u>Navigators Is Entitled To Final Judgment on its Subrogation Claim Against Gemini</u>

Navigators filed a Renewed Motion for Summary Judgment for Subrogation Against Gemini regarding Count II of Navigators' crossclaim. *See* Dkt. #353. This Court entered an order granting that summary judgment motion in part. Dkt. #438, p. 13. Specifically, this Court "grant[ed] in part Navigators' Motion for Summary Judgment for Subrogation as to Navigators' entitlement to seek reimbursement from Gemini for defense costs incurred after Gemini breached the duty to defend its insured." *Id.* However, the Court "denie[d] in part Navigators' motion as to the amount it is entitled to recover from Gemini in defense costs without prejudice pending the

---

[13] Plaintiffs claim that Florida law applies to three specific issues raised in their post-trial brief: (a) the trigger date for the duty to defend; (b) "interest calculations on damages" for Plaintiffs' claims against Gemini; and (c) allocation with respect to reservation of rights letters. Plaintiffs have waived their choice of law argument by failing to raise the issue until now, and Navigators incorporates the discussion in Ironshore's post trial brief regarding waiver of the issue. Dkt. 547, pp. 28-31. Even absent waiver, however, there is no conflict between Florida and Texas law on the only issue of the three which applies to Navigators, namely whether Navigators properly advised Plaintiffs that they should allocate damages between covered and uncovered damages. On that issue, Navigators issued a detailed reservation of rights letter that properly advised Plaintiffs as to allocation. With respect to the duty to defend trigger, the issue is moot as to Navigators because this Court has already determined that Navigators owes no defense obligation to Plaintiffs (Dkt. 438, p. 7). Finally, as to the pre- and post-judgment interest issue, for reasons more fully set forth herein, an award of interest is improper because Navigators has no indemnity obligations to Plaintiffs. Even if not, however, pre-judgment interest on indemnity has been awarded in a liquidated sum by the bankruptcy court, and to the extent that any post-judgment interest is awarded under federal statute (and it should not be), it would be a supplementary payment owed by Gemini.

outcome of trial in this matter" because Gemini objected on grounds of the reasonableness and necessity of the defense costs Navigators paid. *Id.*

The issue as to the reasonableness and necessity of the Navigators' defense costs was resolved via a joint Gemini/Navigators stipulation, which was admitted as Navigators Trial Exhibit #4. Exhibit 4 stipulated to the fact that Navigators paid $699,569.38 in reasonable and necessary defense costs to defend Plaintiffs following Gemini's breach of the duty to defend.[14] Consequently, Navigators is entitled to judgment in its favor with respect to Count II of its crossclaim against Gemini in the amount of $699,569.38, plus applicable interest.

**B.      Gemini Has Not Yet Paid A $2 Million Per Occurrence Limit**

One of the disputed fact questions raised at trial was whether Gemini's $2 million payment consisted entirely of indemnity payments which erode the Gemini Policy's limits of liability. The facts and testimony introduced at trial, along with well-established Texas law and the unambiguous terms of the Gemini Policy, demonstrate that Navigators (and Plaintiffs) are entitled to a declaration that Gemini has yet to exhaust even a single per occurrence limit of liability of the Gemini Policy.

Courts applying Texas law have recognized that defense costs paid under a general liability policy are typically paid in addition to policy limits, and do not count as "indemnity" payments which exhaust the applicable limits of liability. *See Amerisure Mut. Ins. Co. v. Arch Specialty Ins. Co.*, 784 F.3d 270, 274 (5th Cir. 2015) ("Most liability policies provide for defense costs to be paid in addition to policy limits"); *Zurich Am. Ins. Co. v. Burlington N. & Santa Fe Ry. Co.*, No. 02-23-00245-CV, 2025 Tex. App. LEXIS 1741, at *50-51 (Tex. App. Mar. 13, 2025) (finding that an insurer's payment of defense costs "in addition to the applicable limit of

---

[14] Navigators Trial Exhibit #4.

liability" meant that the insurer "could not use its cost of defense to erode what it potentially owed for liability; it owed for defense costs 'in addition' to what it owed for liability"); *Homeland Ins. Co. of N.Y. v. Clinical Pathology Lab'ys*, No. 1-20-CV-783-RP, 2022 U.S. Dist. LEXIS 127485, at *42 (W.D. Tex. July 19, 2022) (finding that defense costs do not erode policy limits because "[i]f [the insurer] wanted defense costs to erode policy limits, it could have written that into the Policy").[15]

The Gemini Policy is not an exception.  The relevant portions of the Gemini Policy's Supplementary Payment Section states as follows:

> **1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:
>
>     **a.** All expenses we incur.
>
> ***
>
>     **d.** All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit" …
>
> ***
>
> **These payments will not reduce the limits of insurance**[16] [emphasis added]

The term "expenses" includes the costs to defend an insured beyond simply attorney's fees. *See Amerisure*, 784 F.3d at 275 (finding that given the ordinary meaning of the term "expenses," "when an insurer pays costs of defense, including attorneys' fees, that is an 'expense' to the insurer").  As a result, costs that Gemini pays for the defense of its insured(s) are

---

[15] *Compare to N. Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co*., 541 F.3d 552, 559 (5th Cir. 2008) (contrasting liability policies where defense costs do not erode policy limits with "eroding" policies where, "by contrast, the insurer's payments to defense counsel to defend the liability suit count against the policy limits"); *DPC Indus. v. Am. Int'l Specialty Lines Ins. Co.*, 615 F.3d 609, 615 n.3 (5th Cir. 2010) ("Thus, unlike the typical comprehensive general liability policy where defense costs are excluded from the calculation of the policy limits, Coverage D was an eroding policy under which defense costs 'count' against and 'erode' the policy limits").

[16] Plaintiffs Trial Exhibit #7, Gemini Policy, p. 18 – Supplementary Payments – Coverages A and B(1).

9

supplementary payments that *do not* erode the Gemini Policy's limit of liability and instead are paid **outside** of (or in addition to) the Gemini Policy's limits of liability.  At trial, Gemini's claims handling witness (Ms. Canzone) agreed with this interpretation of the Gemini Policy, testifying that the supplementary payments provision of the Gemini Policy is what makes the insurer responsible for defense and investigation costs outside of limits, as compared to indemnity payments which erode limits.[17]

       1.   Defense Cost Payments to Baker Botts Do Not Erode Gemini's Policy Limits

Gemini stipulated prior to trial that it issued three checks to UOB totaling $2 million – including a $164,734.80 check to UOB on October 17, 2017 ("October Check").[18]  Ms. Canzone confirmed that one of the items encompassed in the October Check was a $2,565 law firm invoice for Baker Botts, which she testified "was an oversight" and should have been deducted from that payment.[19]  Ms. Canzone further agreed that Gemini sought to exclude legal fees from its indemnity payment.[20]  Ms. Canzone additionally conceded that Gemini never corrected its prior payments under the Gemini Policy to account for the $2,565 law firm invoice that was included within its $2 million payments.[21]

In this backdrop, it is undisputed that $2,565 of the $2 million Gemini paid to Plaintiffs was for defense costs which do not erode the Gemini Policy limits.  Thus, Navigators (and

---

[17] Trial Proceedings, Vol. 4 – AM, 101:21-102:5.

[18] *See* Joint Pre-Trial Order (Dkt. 487), Admissions of Fact #22, 24, 28.

[19] Trial Proceedings, Vol. 4 – AM, 83:3-15; Trial Proceedings, Vol. 4 – PM, 13:24-14:22; Plaintiffs Trial Exhibit #25, pp. 97-99 (Invoice #1547137); Plaintiffs Trial Exhibit #71, p. 2; *see also* Trial Proceedings, Vol. 2 – AM, 89:16-18 ("My involvement started essentially almost right away, February of 2017, correct"); Trial Proceedings, Vol. 2 – AM, 89:24-90:2; Trial Proceedings, Vol. 2 – AM, 91:1-12.

[20] Trial Proceedings, Vol. 4 – AM, 61:7-9; Trial Proceedings, Vol. 4 – PM, 44:15-18.

[21] Trial Proceedings, Vol. 4 – PM, 54:16-55:20.

Plaintiffs) are entitled to a declaratory judgment that Gemini has failed to exhaust even a single

$2 million per occurrence limit under its policy.

Gemini's "defense" to its erroneous payment is that it was presented with invoices well in

excess of its policy limits and there were easily an additional $2,565 in invoices that it could

have paid.[22]  Yet, Gemini never issued an additional $2,565 payment to Plaintiffs[23] despite Ms.

Canzone's candid acknowledgment that the Baker Botts payment should not have applied against

policy limits.  Nor did Gemini ever send a letter to Plaintiffs acknowledging its error and seeking

to substitute payment of the Baker Botts invoice with another of the many invoices Gemini

claims to have had in its possession at the time it paid the Baker Botts invoice.

Stated simply, Gemini did nothing to correct its error at any time before, during or after

this Court's trial.  Its claim that it could have paid other invoices is nothing more than a "Hail

Mary" to avoid the obvious conclusion that it never did pay any other invoice.  Under the

language of the Gemini Policy, Navigators (and Plaintiffs) are entitled to a declaration that

Gemini has not exhausted even one per occurrence limit.

2.      Numerous Additional Gemini Payments Made By Gemini Do Not Erode Policy
        Limits

The Baker Botts invoice is simply the low hanging fruit with respect to whether Gemini's

three separate payments totaling $2 million exhausted the Gemini Policy per occurrence limit.

There are additional reasons why Gemini failed to prove at trial that it paid $2 million in

indemnity payments.

---

[22] Trial Proceedings, Vol. 4 – PM, 54:16-55:17 ("the way we assessed it, there was still 1.7 million left in covered damages that we could not fund").

[23] Trial Proceedings, Vol. 4 – PM, 54:16-55:20.

11

a.   <u>Gemini's Indemnity Payments Only Apply To Costs That The Insured Is Legally Obligated to Pay</u>

The Gemini Policy agrees only to pay those sums that the insured becomes legally obligated to pay as damages because of property damage[24]:

**1. Insuring Agreement**

    **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

***

    No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

The Gemini Policy does not define the term "legally obligated to pay as damages." However, in *Lennar Corp. v. Great Am. Ins. Co.*, 200 S.W.3d 651 (Tex. App. 2006)[25], the court found that "… giving the phrase its ordinary meaning, it means an obligation imposed by law, such as an obligation to pay pursuant to a judgment, settlement, contract, or statute." *Id.* at 680-81.

Here, Ms. Canzone testified that the $2 million Gemini paid reflected amounts incurred by Plaintiffs to implement repairs under a warranty work agreement and standstill agreement[26], as well as a non-waiver agreement entered into by Gemini. Whether any of these agreements created a legal obligation for Plaintiffs to pay damages because of property damage is debatable. The Court need not consider this debatable issue, however, because what is not debatable is that

---

[24] Plaintiffs Trial Exhibit #7, Gemini Policy, p. 11 – Section I(1.)(a.).

[25] *Abrogated on other grounds by Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118 (Tex. 2010).

[26] Trial Proceedings, Vol. 4 – AM, 70:1-71:7.

12

Plaintiffs were not legally obligated to pay damages until, at the earliest, the first date of any of these agreements. The earliest date of any of these agreements was June 26, 2017.[27]

Here, Gemini made three separate claim payments to Plaintiffs for invoices that both pre-dated June 26, 2017, and post-dated June 26, 2017.[28] All of the invoices comprising the $162,734.80 of Gemini's first "Claim Payment" *predated* June 26, 2017.[29] Similarly, another $74,244.89 in invoices associated with Gemini's second "Claim Payment" were issued prior to the date that the earliest of the agreements became effective.[30] Thus, in total, Gemini improperly allocated $234,414.69 as indemnity payments under its own representation of how it reached exhaustion[31] (excluding the Baker Botts invoice referenced above). These payments were made for invoices that were issued prior to the time Plaintiffs were under any arguable legal obligation to pay damages because of property damage and, therefore, may not count against the Gemini Policy Limit. These payments are set forth in the table that follows:

**Amounts Paid for Invoices Pre-Dating Any Legal Obligation to Pay Damages Because of Property Damage (Claim Payments 1 + 2)**

| Claim Payment | Invoice Date | Vendor Description | Amount Gemini Paid | Note |
|---|---|---|---|---|
| 1 | 3/17/17 | Brek Management | $13,079.61 | |
| 1 | 3/31/17 | Brek Management | $12,485.48 | |
| 1 | 3/31/17 | HILP 3/17 WC - Rick Mercer ER | $676.19 | |
| 1 | 4/07/17 | Leading Edge | $5,584.75 | |
| 1 | 4/14/17 | Brek Management | $11,877.19 | |
| 1 | 4/17/17 | HILP 4/17 Working Capital | $23,900 | |

[27] The Warranty Work Agreement is dated June 26, 2017 (Plaintiffs Trial Exhibit #23), the Non-Waiver Agreement is dated July 17, 2017 (Gemini's Trial Exhibit #119, p. 2), and the Standstill Agreement is dated November 14, 2017.(Gemini's Trial Exhibit #67, p. 1.)

[28] *See* Joint Pre-Trial Order (Dkt. 487), Admissions of Fact #22, 24, 28.; Plaintiffs Trial Exhibit #71, pp. 1-5.

[29] *See* Gemini Trial Exhibit #66, p. 3 (chart) and pages 4-152 (invoices).

[30] *See* Gemini Trial Exhibit #76, p. 1 (chart) and pages 151-155, 156-176, 181-182, 183, 184, 185-208 (invoices).

[31] *See* Plaintiffs Trial Exhibit #71, pp. 1 (letter), 2-5 ("spreadsheet documenting each specific invoice that Gemini reimbursed under the policy to reach exhaustion"); Trial Proceedings, Vol. 4 – PM, 13:24-14:22.

| Claim Payment | Invoice Date | Vendor Description | Amount Gemini Paid | Note |
|---|---|---|---|---|
| 1 | 4/17/17 | HILP 4/17 WC - Rick Mercer ER | $1,810.27 | |
| 1 | 4/17/17 | HILP 4/17 WC – T Gable ER | $274.31 | |
| 1 | 4/17/17 | HILP 4/17 WC – J Wood ER | $36.94 | |
| 1 | 4/17/17 | HILP 4/17 WC – Legal Service – Post Sale | $2,285 | |
| 1 | 4/18/17 | Turning Leaf Construction | $14,691.38 | |
| 1 | 4/19/17 | KB Pcard Receipt – Sweet Escape | $38.90 | |
| 1 | 4/28/17 | Baker Botts | $2,565 | *Baker Botts Invoice Referenced Above* |
| 1 | 4/30/17 | Brek Management | $11,121.36 | |
| 1 | 5/12/17 | KB Expense Report – Expenses | $844.73 | |
| 1 | 5/13/17 | Brek Management | $13,217.42 | |
| 1 | 5/16/19 | Fox Windows & Glass | $13,220 | |
| 1 | 5/19/17 | HILP 5/17 WC - Rick Mercer | $21,600 | |
| 1 | 5/19/17 | HILP 5/17 WC - Rick Mercer - ER | $682.40 | |
| 1 | 5/27/17 | Brek Management | $12,743.87 | |
| 2 | 5/31/17 | HILP 5/17 WC – Tim Gable - ER | $246.10 | |
| 2 | 5/23/17 | Turning Leaf Construction | $23,195.90 | |
| 2 | 6/07/17 | Turning Leaf Construction | $24,725 | |
| 2 | 6/15/17 | Gator Door | $1,926 | |
| 2 | 6/10/17 | Brek Management | $12,000 | |
| 2 | 6/24/17 | Brek Management | $12,151.89 | |
| | | **Gross Total** | **$236,979.69** | |
| | | **Adjusted Total** (*Less the Baker Botts Invoice*) | **$234,414.69** | |

b.     Investigative Costs are Defense Costs

Gemini's supplementary payments include "[a]ll reasonable expenses incurred by the insured at our request[32] to assist us in the ***investigation or defense of the claim***…"[33]  Thus, by its very terms, the Gemini Policy agrees to pay defense costs ***or*** investigative costs as supplementary payments.  Even if these payments were not made at Gemini's request, the vast

---

[32] Whether defense or investigative costs were incurred at Gemini's request would only be a relevant issue if Gemini was arguing that it was prejudiced in paying such defense or investigative costs. *See e.g., Lennar Corp v. Markel Ins. Co.,* 413 S.W.3d 750, 754 (2013) (holding that a showing of prejudice was required to demonstrate whether costs incurred by the insured in settling claims without the insurers consent should be covered).

[33] Plaintiffs Trial Exhibit #7, Gemini Policy, p. 18 – Supplementary Payments – Coverages A and B(1).

14

majority of law nationally generally holds that defense costs also include investigative costs where such investigative costs are designed to minimize or defeat liability. *See e.g. USA Gymnastics v. Ace Am. Ins. Co. (In re USA Gymnastics),* 624 B.R. 443, 451 (Bankr. S.D. Ind. 2021) ("Indiana case law broadly defines 'defense costs' as expenses incurred to minimize liability and resolve claims"); *Domtar, Inc. v. Niagara Fire Ins. Co.,* 563 N.W.2d 724, 738 (Minn. 1997) ("We believe the better approach is to allow an insured to receive as defense costs those expenses reasonably necessary either to defeat liability or to minimize the scope or magnitude of such liability"); *Gelman Scis., Inc. v. Fireman's Fund Ins. Cos.,* 455 N.W.2d 328, 330 (Mich. Ct. App. 1990) ("defense costs are monies expended to develop and put forth a theory that the defendant is not liable or only partially liable for the plaintiff's injuries").

Mr. Colagiovanni, who described himself as the "quarterback" attorney for Plaintiffs' defense against the Southstar claims[34], testified that he initially retained WJE Associates (also known as Wiss, Janey, and Esltner) in August 2017[35] and directed their activities and scope, including to investigate the claims.[36] Consequently, costs associated with WJE are not indemnity costs to account for damages suffered by third parties, but supplementary payments paid by Gemini for the defense and investigation of Plaintiffs against the Southstar claims.

Similarly, Mr. Colagiovanni's trial testimony established that Brek Management was a "consultant" obtained *by UOB* through Rick Mercer to supervise the Celebration site[37] and that

---

[34] Trial Proceedings, Vol. 2 – AM, 85:6-86:6.

[35] Trial Proceedings, Vol. 2 – PM, 25:6-10, 25:4-7 ("The minute we became aware [that the building would be yellow-tagged], Judge, that's when we hired Wiss Janey").

[36] Trial Proceedings, Vol. 2 – PM, 67:3-21.

[37] Trial Proceedings, Vol. 2 – PM, 57:10-13; 143:13-15; *and see* Trial Proceedings, Vol. 4 – PM, 49:20-24. Gemini's claim handler Ms. Canzone also testified as to her understanding that Brek was the "construction manager consultant" Trial Proceedings, Vol. 4 – AM, 114:16-22. Despite their testimony, there is some conflicting testimony in the record regarding whether Brek Management's role as a "consulting firm" or "owners rep" was investigative in nature. For example, Mr. Horst (Plaintiffs' expert witness) provided his understanding that Brek

Ellinwood + Machado provided "investigative services on the project."[38]  As a result, the following line items totaling \$233,232.80 from Gemini's own representation of how it reached exhaustion[39] similarly relate to Plaintiffs' consulting costs for the investigation and defense of the Southstar claim (exclusive of those incurred prior to the Warranty Work Agreement).

*Amounts Paid for Consultants*

| Claim Payment | Invoice Date | Vendor Description | Amount Gemini Paid | Note |
|---|---|---|---|---|
| 1 | 3/17/17 | Brek Management | \$13,079.61 | *Pre-Agreement Expense* |
| 1 | 3/31/17 | Brek Management | \$12,485.48 | *Pre-Agreement Expense* |
| 1 | 4/14/17 | Brek Management | \$11,877.19 | *Pre-Agreement Expense* |
| 1 | 4/30/17 | Brek Management | \$11,121.36 | *Pre-Agreement Expense* |
| 1 | 5/13/17 | Brek Management | \$13,217.42 | *Pre-Agreement Expense* |
| 1 | 5/27/17 | Brek Management | \$12,743.87 | *Pre-Agreement Expense* |
| 2 | 6/10/17 | Brek Management | \$12,000 | *Pre-Agreement Expense* |
| 2 | 6/24/17 | Brek Management | \$12,151.89 | *Pre-Agreement Expense* |
| 2 | 7/17/17 | Ellinwood + Machado | \$29,178.91 | |
| 2 | 7/08/17 | Brek Management | \$10,000 | |
| 2 | 7/22/17 | Brek Management | \$13,160.64 | |
| 2 | 7/31/17 | Ellinwood + Machado | \$3,442.50 | |
| 2 | 8/05/17 | Brek Management | \$16,624.29 | |
| 2 | 8/19/17 | Brek Management | \$15,692.76 | |
| 2 | 9/02/17 | Brek Management | \$16,349.17 | |
| 2 | 9/15/17 | WJE Associates Inc. | \$22,918.94 | |
| 2 | 9/16/17 | Brek Management | \$13,039.18 | |
| 2 | 9/30/17 | Ellinwood + Machado | \$5,045 | |
| 2 | 9/30/17 | Brek Management | \$15,899.68 | |
| 3 | 7/18/17 | Ellinwood + Machado | \$626.06 | |
| 3 | 8/31/17 | Ellinwood + Machado | \$18,295 | |

Management was an "owners rep" and that an "owner's rep" coordinated construction activities.  Trial Proceedings, Vol. 5 – AM, 71:8-25.  His testimony, however, was based on his understanding of an "owners rep" role based on his personal experience as an "owners rep" in the Navy and not specifically to Brek in this case. *Id.*  Finally, UOB's financial officer (Borchardt) stated his general understanding that Brek Management was the "construction manager" responsible for schedules and oversight/initial management of the contractors "on the repair side of the equation" but there is no evidence that his understanding was based on first-hand knowledge similar to that of Mr. Colagiovanni.  Trial Proceedings, Vol. 3 – PM, 53:8-13.

[38] Trial Proceedings, Vol. 3 – PM, 48:9-10 ("they provide[d] some investigative services on the project"); 97:13-19 ("They were hired to investigate the issues related to the balconies, the deflection of the balconies").

[39] *See* Plaintiffs Trial Exhibit #71, pp. 1 (letter), 2-5 ("spreadsheet documenting each specific invoice that Gemini reimbursed under the policy to reach exhaustion"); Trial Proceedings, Vol. 4 – PM, 13:24-14:16.  *See also* Gemini Trial Exhibit #66, p. 3 (chart) and pages 4-6, 7-25, 34-48, 101-19, 120-33, 143-52; Gemini Trial Exhibit #76, p. 1 (chart) and pages 184, 185-208, 310-30, 331, 369-70, 374-87, 392-420, 421, 502-23, 526, 528-38, 641-42, 643-662.

16

| Claim Payment | Invoice Date | Vendor Description | Amount Gemini Paid | Note |
|---|---|---|---|---|
| 3 | 10/14/17 | Brek Management | $16,261.70 | |
| 3 | 10/28/17 | Brek Management | $15,031.03 | |
| 3 | 10/03/17 | Ellinwood + Machado | $8,927.50 | |
| 3 | 9/30/17 | Ellinwood + Machado | $3,240.44 | |
| 3 | 11/11/17 | Brek Management | $9,500 | |
| Gross Total | | | $331,909.62 | |
| Adjusted Total (*Less Pre-Agreement Expenses*) | | | $233,232.80 | |

     c.    Overhead Costs, Inspection Costs, and Personnel Costs Are Properly Characterized As Defense Costs

Finally, there are several line items associated with Gemini's claim payments which are also not "sums that the insured becomes legally obligated to pay as damages because of … 'property damage'", but instead represent Plaintiffs' own administrative internal costs associated with their investigation into the purported claims by Southstar, all of which are non-indemnity expenses properly considered to be outside of the Gemini policy limits. At a minimum, they cannot be found to be "sums that the insured becomes legally obligated to pay as damages," because they represent Plaintiffs' own internal costs and expenses, and are not "damages" foisted upon it by a third party.

The evidence adduced at trial is that the below entries related to "HILP"[40] or "HILP Capital" or Hines/UOB are nothing more than employees[41] incurring expenses. When questioned on some of these entries, Ms. Canzone could only offer that "these are the folks that were in charge of overseeing the project – I mean, they have the vested interest; so they were traveling out to the site to basically keep a handle on the scope of work" and that "they needed to

---

[40] "HILP" stands for Hines Interests Limited Partnership. Trial Proceedings, Vol. 4 – AM, 97:14-22.

[41] Rick Mercer and Mr. Gable were people from HILP. Trial Proceedings, Vol. 4 – AM, 120:17-20.

be there."[42]  Indeed, UOB's employee testified that Mr. Mercer was "designated to investigate the property because he had knowledge of the property."[43]  Such expenses are not indemnity dollars meant to compensate the claimant ("sums that the insured becomes legally obligated to pay as damages") which erode the limits of the Gemini Policy, but are in fact costs and expenses which Gemini paid for the furtherance of Plaintiffs' investigation of the claims being asserted by Southstar.  *See Burlington N.*, 2025 Tex. App. LEXIS 1741, at \*50-51 (finding the insurer "could not use its cost of defense to erode what it potentially owed for liability; it owed for defense costs 'in addition' to what it owed for liability").  Such administrative overhead costs incurred under Gemini's own representation of how it reached exhaustion[44] are as follows:

### *Amounts Paid for Administrative Overhead Costs*

| Claim Payment | Invoice Date | Vendor Description | Amount Gemini Paid | Note |
|---|---|---|---|---|
| 1 | 3/31/17 | HILP 3/17 WC - Rick Mercer ER | $676.19 | *Pre-Agreement Expense* |
| 1 | 4/17/17 | HILP 4/17 Working Capital | $23,900 | *Pre-Agreement Expense* |
| 1 | 4/17/17 | HILP 4/17 WC - Rick Mercer ER | $1,810.27 | *Pre-Agreement Expense* |
| 1 | 4/17/17 | HILP 4/17 WC – T Gable ER | $274.31 | *Pre-Agreement Expense* |
| 1 | 4/17/17 | HILP 4/17 WC – J Wood ER | $36.94 | *Pre-Agreement Expense* |
| 1 | 4/17/17 | HILP 4/17 WC – Legal Service – Post Sale | $2,285 | *Pre-Agreement Expense* |
| 1 | 4/19/17 | KB Pcard Receipt – Sweet Escape | $38.90 | *Pre-Agreement Expense* |
| 1 | 5/12/17 | KB Expense Report – Expenses | $844.73 | *Pre-Agreement Expense* |
| 1 | 5/19/17 | HILP 5/17 WC - Rick Mercer | $21,600 | *Pre-Agreement Expense* |
| 1 | 5/19/17 | HILP 5/17 WC - Rick Mercer – ER | $682.40 | *Pre-Agreement Expense* |

---

[42] Trial Proceedings, Vol. 4 – PM, 50:16-25.

[43] Trial Proceedings, Vol. 3 – PM, 46:6-17. *See also* Trial Proceedings, Vol. 3 – PM, 41:6-16 ("Tim Gable was an employee of the Hines Southwest Region").

[44] *See* Plaintiffs Trial Exhibit #71, pp. 1 (letter), 2-5 ("spreadsheet documenting each specific invoice that Gemini reimbursed under the policy to reach exhaustion"); Trial Proceedings, Vol. 4 – PM, 13:24-14:16.  *See also* Gemini Trial Exhibit #66, p. 3 (chart) and pages 26-32, 49-76, 96-97, 138-42; Gemini Trial Exhibit #76, p. 1 (chart) and pages 231-41, 242, 243-44, 245-47, 252-64, 371-73, 481-82, 483-87, 494-97, 524, 525, 622-29.

| Claim Payment | Invoice Date | Vendor Description | Amount Gemini Paid | Note |
|---|---|---|---|---|
| 2 | 5/31/17 | HILP 5/17 WC – Tim Gable – ER | $246.10 | *Pre-Agreement Expense* |
| 2 | 6/30/17 | HILP 6/17 Working Capital - Rick Mercer ER | $924.75 | |
| 2 | 6/30/17 | HILP 6/17 Working Capital – UOB Print | $390.46 | |
| 2 | 6/30/17 | HILP 6/17 Working Capital – Time Gable ER | $182.97 | |
| 2 | 6/30/17 | HILP 6/17 Working Capital – Jon Wood ER | $116.14 | |
| 2 | 6/30/17 | HILP 6/17 Working Capital | $19,200 | |
| 2 | 7/31/17 | HILP 7/17 Working Capital | $20,225.00 | |
| 2 | 8/31/17 | FedEx | $28.46 | |
| 2 | 8/31/17 | Kevin Tankersly – Expense Report | $339.96 | |
| 2 | 8/31/17 | HILP 8/17 Working Capital | $33,876.15 | |
| 2 | 9/14/17 | Kevin Tankersly – 8/17 Pcard | $45.80 | |
| 2 | 9/14/17 | Kevin Tankersly – 8/17 Pcard | $22.00 | |
| 2 | 9/14/17 | Rick Mercer – Expense Report | $555.58 | |
| 3 | 10/24/17 | FedEx | $14.36 | |
| 3 | 9/26/17 | Rick Mercer – Expense Report | $916.71 | |
| 3 | 10/27/17 | Tim Gable – Expense Report | $1,029.98 | |
| 3 | 11/28/17 | Rick Mercer – Expense Report | $4,251.40 | |
| **Gross Total** | | | **$134,514.56** | |
| **Adjusted Total** **(*Less Pre-Agreement Expenses*)** | | | **$82,119.72** | |

In total, the evidence undisputedly shows that Gemini failed to exhaust even a single per occurrence limit and Navigators is entitled to a declaration that Gemini has not exhausted a single occurrence limit.  At trial, the Court requested that Navigators provide specific detail of costs it contends are not properly characterized as indemnity.  The above charts show the costs paid by Gemini that Navigators believes are not properly characterized as indemnity.  The below chart is a summary of same and also provides the Court with a convenient way to determine Gemini's remaining aggregate limit in the event that this Court finds that some or all of Plaintiffs' damages are recoverable (and, for reasons set forth below, Plaintiffs are entitled to nothing on their indemnity claim from any of the insurers).

19

| Category | Gross Total | Adjusted Total |
|---|---|---|
| Baker Botts Invoice | $2,565.00 | **$2,565.00** |
| Pre-Agreement Expenses | $236,979.69 | **$234,414.69** |
| Consultants | $331,909.62 | **$233,232.80** |
| Administrative Overhead Costs | $134,513.56 | **$82,119.72** |
| **Total** | | **$552,332.21** |

## C.   Navigators Owes No Duty to Indemnify UOB for the Bankruptcy Award

There are three reasons why Navigators owes no indemnity obligation to Plaintiffs and/or Southstar.  First, UOB (and Southstar) have presented no competent evidence of the cost to repair the construction defects at issue.  Instead, they have presented the Court with cost estimations prepared by Mr. Del Vecchio to restore the buildings back to their original, as-designed condition *that were never admitted into evidence during trial*.  The fact they were never admitted as evidence is fatal to Plaintiffs' claim, as is the fact that these were estimations of costs that neither Plaintiffs nor Southstar Defendants have any idea were ever incurred.  For example, as the Court may recall from the testimony, the buildings were not restored in accordance to their original design as exemplified by the fact that the listing balconies were secured by attaching them to a pole running the height of the building.[45]  Thus, Mr. Del Vecchio's testimony (even if admissible) did not address the actual costs necessary to repair the defects, but instead what the hypothetical costs of work *could have been* had the buildings been restored to their original, as-designed condition.

Second, assuming the Court accepts Mr. Del Vecchio's hypothetical *estimations* as competent evidence of Plaintiffs' damages under Texas law (and it should not), neither Plaintiffs, Southstar, nor Mr. Del Vecchio made any effort to allocate the estimated damages between those

---

[45] Trial Proceedings, Vol. 5 – PM, 35:11-20 ("Q: So after the repair the balcony would be held up by a shoring pole, if you will?  A: A new column. Yeah. They changed the system from a cantilever balcony to a supported balcony").

defects that would be covered by the policies and those that would not.  Under Texas law, Plaintiffs' failure to allocate uncovered from covered property damage is fatal to its entire claim.

Third, even assuming this Court accepts the estimation, and even assuming Mr. Del Vecchio's chart and testimony setting forth the various estimations provided sufficient detail to allow this Court to allocate damages to certain categories of costs the Court may believe is covered (such as the balconies or water resistive barriers), the undisputed fact remains that Mr. Del Vecchio's estimations also include costs for uncovered damages (such as the draft stops and shear walls) as well as any number of other costs that are not allocated to any particular defect, but instead applied generally to all defects whether covered or uncovered (such as, for example, paint, drywall, fencing, insurance, overhead, and cost contingency).

In sum, Navigators, and all of the insurers, are entitled to judgment in their favor that Plaintiffs failed to satisfy their burden of allocating their damages between costs incurred to repair potentially covered defects and costs incurred to repair uncovered covered defects.  Even if this Court was to find that Plaintiffs satisfied that burden, however, at least $11,702,866.04 of Plaintiffs *estimations* are not covered by the policies and the Navigators Excess Policy would, therefore, never attach.  As a result, Navigators has no indemnity obligation to Plaintiffs and judgment should be entered in Navigators' favor.

1. <u>Plaintiffs Failed to Present Competent Evidence of Damages at Trial</u>

Plaintiffs' damages case relies exclusively on its contention that the bankruptcy court's damage award was based solely on Mr. Del Vecchio's expert testimony in that case.  More specifically, Plaintiffs apparently contend that the bankruptcy judge took a chart of cost estimations Mr. Del Vecchio prepared in order to estimate the cost to restore the building to its

21

originally intended design and then subtracted ten percent across the board from those estimated damages for some unknown reason, and entered judgment in that amount.[46]

In order for this argument to succeed, Plaintiffs and Southstar have argued that this Court is permitted to admit into evidence the *bankruptcy court's* proof of claim proceeding for use in this coverage action, including Mr. Del Vecchio's estimation chart.[47]  The underlying transcript and expert reports and materials therefrom, however, are the very definition of hearsay – an out of court statement submitted for the truth of the matter asserted.  Consistent therewith, this Court correctly agreed to allow Plaintiffs and Southstar to introduce the underlying transcript and reports for the limited purposes of the fact that it was in front of the bankruptcy judge.[48]  As hearsay, neither Plaintiffs nor Southstar may use these materials for the truth of the matter asserted.[49]

Plaintiffs' effort to have this Court admit the bankruptcy trial transcript as evidence is somewhat quizzical in any event because the Plaintiffs and Southstar Defendants acknowledged that the underlying bankruptcy court did not allocate damages.[50]  Because the underlying court did not allocate damages, the whole point of ***this trial*** was to have Plaintiffs present this Court

---

[46] *See* Plaintiffs' Post-Trial Brief (Dkt. 539), pp. 87-88 ("Even so, UOB provided significant additional evidence on the allocation of the Judgment during the two-week damages trial thereby meeting its allocation burden"); Trial Proceedings, Vol. 2 – AM, 23:8-24 (Southstar's Opening Argument); Trial Proceedings, Vol. 7 – PM, 35:22-36:3 (Plaintiffs' Closing Argument).

[47] Plaintiffs' Post-Trial Brief, pp. 64-66, 88; Southstar's Post-Trial Brief (Dkt. 538), pp. 6-7.

[48] *See* Trial Proceedings, Vol. 1 – AM, 36:18-37:20 ("Why isn't it hearsay?  We're holding a trial here, and it's a report that's offered in front of a different judge, in a different court").

[49] *See* F.R.E. 802.

[50] Southstar's Post-Trial Brief, p. 4 ("[The bankruptcy court] did not allocate damages into insurance categories…"); Plaintiffs' Post-Trial Brief, p. 82 ("…UOB requested the bankruptcy court provide detail to allocate the damages.  It was declined").

with evidence so that it could allocate between covered and uncovered property damage.[51]  Thus, even if the underlying transcript and materials were admitted into evidence, they do nothing to advance Plaintiffs' case except to demonstrate that Plaintiffs failed to allocate their damages between covered and uncovered property damage in both the bankruptcy trial and this trial.

Moreover, the irony of Plaintiffs' request to admit the underlying transcript into evidence should not be lost on the Court.  If the transcript was permitted into evidence, the evidence would show that Plaintiffs requested an allocation of covered versus uncovered costs and that Southstar's counsel objected to that request.[52]  This not only defeats Plaintiffs' claim they were not adequately advised on the allocation of damages issue, but this "fact" is contrary to the representation that Southstar's counsel made to this Court when, at trial, Southstar counsel stated they supported an allocation in the bankruptcy trial, but the bankruptcy judge refused.[53]

Southstar counsel's statement on this point was wholly inaccurate because they did object to a request to allocate damages during the bankruptcy trial.[54]  Counsel's misrepresentation to this Court not only highlights Southstar's obvious bias and the fact that Southstar has no one to blame but themselves for the predicament they (and Plaintiffs) find themselves in with respect to trying to prove up damages to this Court, but it also speaks to a larger credibility issue addressed

---

[51] Trial Proceedings, Vol. 1 – AM, 49:3-4 ("But he [the Bankruptcy Judge] didn't allocate damages, which really the primary purpose of why we're here").

[52] *See* Plaintiffs Trial Exhibit #131, p. 861 (56:17-23) ("The notion that this Court should conduct a finding of fact mission on subjects that really weren't tried before the Court, and distinguishing between negligence, building code violation, damages flowing from each, we don't think that is proper.  That's really for another court at another time").

[53] *See* Trial Proceedings, Vol. 7 – PM, 41:10-20 ("Certainly we would have joined in on a request for that [an allocation] because we think, on one hand, the damages estimate that we relied upon admitted of no other conclusion that it was all property damage as we understood the policy"); Trial Proceedings, Vol. 2 – AM, 24:1-9 ("I was not asked to weigh in. I would have said, certainly we'll take an allocation, but – that's speculation … Judge Jones ruled and that's how the case was tried").

[54] *See* footnote 52, *supra.*

in Section IV(E) below as to whether the shear walls caused ancillary damage, and whether testimony from Southstar's expert, Mr. Del Vecchio, is credible relative to the testimony of Plaintiffs' expert, Mr. Horst.  As will be discussed therein, neither Southstar nor Mr. Del Vecchio ever voiced disagreement with Mr. Horst's (and Plaintiffs') consistent position that the shear walls caused no ancillary damages prior to trial.

2.      <u>Plaintiffs' Failure to Segregate the Cost of Covered from Uncovered Damages is Fatal to its Coverage Claim</u>

Assuming this Court considers the underlying transcript or Mr. Del Vecchio's use of estimations to be evidence of the costs incurred to repair the defects, Mr. Del Vecchio testified as to both covered and uncovered defects.  Once the insurer shows that a noncovered source could have caused the damage, the burden shifts to the insured to provide "evidence that will allow the trier of fact to segregate covered losses from non-covered losses." *Fiess v. State Farm Lloyds*, 392 F.3d 802, 807 (5th Cir. 2004); *Am. Guarantee*, 255 F. Supp. 3d at 684.  The allocation "must … be based on credible evidence" and "must afford a reasonable basis for estimating the amount of damage or the proportionate part of damage caused by a risk covered by the insurance policy." *Nat'l Union Fire Ins. of Pittsburgh v. Puget Plastics Corp*, 735 F. Supp. 2d 650, 677 (S.D. Tex. 2010) (quoting *Travelers Indemnity Co. v. McKillip,* 469 S.W.2d 160, 163 (Tex. 1971)).  This is necessary because "the insured is only entitled to compensation for damages deriving from covered claims." *Companion Prop. & Cas. Ins. Co. v. Opheim*, 92 F. Supp. 3d 539, 548 (N.D. Tex. 2015).

Plaintiffs' failure to allocate their damages between covered and uncovered damages is fatal to their claim under well-established Texas law. *Satterfield*, 898 F.3d at 583; *Am. Guarantee*, 255 F. Supp. 3d at 684, 689-90; *Comsys Info.*, 130 S.W.3d at 198 (holding that the insured has the burden of allocating "damage attributable solely to the covered event" and that

24

"failure to segregate covered and noncovered perils is fatal to recovery"); *Colony Ins. Co. v. First Mercury Ins. Co.*, No. A-20-CV-474-RP, 2022 U.S. Dist. LEXIS 227466, at *7 (W.D. Tex. Oct. 13, 2022) *adopted at* 2022 U.S. Dist. LEXIS 246440, at *2 (W.D. Tex. Nov. 22, 2022).[55]

Here, the insurers easily satisfied their burden of proving that a portion of Plaintiffs' damages are not covered under the policies. Specifically, Plaintiffs stipulated to, and Mr. Horst testified that, the draft stops and shear walls caused no ancillary damages to the project. As discussed below, the Plaintiffs oddly directed testimony from Mr. Del Vecchio (Southstar's expert) at trial which they hope this Court will find contradicts their own expert's testimony (Mr. Horst) regarding the shear walls.

Regardless of the veracity or credibility of Mr. Del Vecchio's testimony regarding whether the shear walls caused ancillary damages (and for reasons discussed in Section IV(E) below, they do not), there is nothing in the record contradicting Mr. Horst's testimony that the draft stops caused no ancillary damages. Indeed, Plaintiffs conceded as much in their closing argument[56] and stipulated to as much prior to trial.[57]

---

[55] Plaintiffs have argued that Florida law should apply to certain of the issues presented at trial. Navigators disagrees that Florida law applies to any issue in this action. In any event, there is no conflict between Florida and Texas law on the issue of whether Plaintiffs' failure to allocate covered versus uncovered costs is fatal to its case. *See QBE Specialty Inc. Co. v. Scrap Inc*., 806 F. App'x 692, 695 (11th Cir. 2020) (unpublished) ("Under Florida law, the party claiming insurance coverage has the initial burden to show that a settlement or judgment represents damages that fall within the coverage provisions of the insurance policy" (citing *U.S. Concrete Pipe Co. v. Bould*, 437 So. 2d 1061, 1065 (Fla. 1983); *Keller Indus., Inc. v. Employers Mut. Liab. Ins. Co. of Wis*., 429 So. 2d 779, 780 (Fla. 3d DCA 1983)). "An insured's inability to allocate the amount of a judgment between covered and uncovered damages is therefore generally fatal to its indemnification claim." *Scrap Inc.*, 806 F. App'x at 695 (citing *Trovillion Constr. & Dev., Inc. v. Mid-Continent Cas. Co.*, 2014 U.S. Dist. LEXIS 6265, 2014 WL 201678, at *8 (M.D. Fla. Jan. 17, 2014)).

[56] *See* Trial Proceedings, Vol. 7 – PM, 35:9-20 ("So the only condition that's arguably not on its own face, physical damage, tangible property, or rip and tear, if we go back, are the draft stops")

[57] Navigators Trial Exhibit #22, p. 3 ("The failure to seal penetrations through draft stops by Urban Oaks Builders or those acting on its behalf did not physically cause different or additional property damage to any building in this case").

As a result, the insurers have undisputedly met their burden of demonstrating the existence of noncovered damages, thereby shifting the burden to the insured to provide evidence that will allow the trier of fact to segregate the insured's covered losses from its non-covered losses.  On this point, Plaintiffs and Southstar utterly fail.  In fact, the most that was ever said at trial regarding the amount of damages attributable to the draft stops was that they are "relatively minor" compared to the shear walls.[58]  A vague reference to the amount of uncovered damages simply does not cut it.  Texas law requires that Plaintiffs segregate the covered losses from uncovered losses, regardless of whether the amount of the uncovered loss is large or small relative to the cost of repairing other defects.  Plaintiffs have failed to meet that burden and the insurers are entitled to judgment in their favor.

**D.      Plaintiffs' Arguments That They Are Not Required To Segregate Their Damages Between Covered and Uncovered Costs Have No Merit**

Plaintiffs make several arguments in support of their contention that they are not required to segregate covered from uncovered costs, each one weaker than the last.

1.  Navigators Provided Plaintiffs A Detailed Explanation As To The Importance of Allocating Damages

Plaintiffs and Southstar argue that the carriers waived the ability to argue that Plaintiffs are required to allocate damages by failing to raise the issue in their reservation of rights letters. That argument has no merit as to any carrier, but it is especially frivolous as to Navigators. Navigators not only agreed to defend Plaintiffs subject to a reservation of rights, but Navigators' reservation of rights letter contained a ***single spaced, multi-page explanation*** as to the significance of allocating damages awarded in bankruptcy court that even included a citation to

---

[58] *See* Trial Proceedings, Vol. 2 – AM, 22:21-23 ("There's also an issue with something  called 'fire blocking.' And I didn't go into that because it is relatively minor compared to the shear wall issue").  Even that reference, however, was not evidence because it was stated by Southstar's counsel in its opening argument.

the very case Plaintiffs rely on[59] to make its waiver argument in the first place.[60]  Plaintiffs'

waiver argument as to Navigators (and all of the insurers generally) should fail.

    2.   <u>The Draft Stops (and Shear Walls) Do Not Constitute Covered Property Damage</u>

Plaintiffs argue that all of their damages are covered property damage.[61]  The Gemini

Policy on which Navigators follows form defines "property damage" to mean:

    a.     Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.     Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.[62]

Under Texas law, the cost to replace a construction defect is not property damage where

the defect itself caused no damage or created no loss of use.  *See e.g.*, *Lennar*, 200 S.W.3d at

679-80, 691 (noting coverage may be available to repair water damage resulting from the EIFS,

but not to simply replace defective EIFS as a preventative measure); *Liberty Surplus Ins. Corp. v.*

*Century Sur. Co*., No. H-18-1444, 2019 U.S. Dist. LEXIS 116093, at *21-22 (S.D. Tex. July 12,

2019) ("*Liberty Surplus"*) (rejecting costs for items which themselves were defective, as

opposed to being damaged because of other defective work).  Indeed, as the Southern District of

Texas previously explained, there can be no coverage for damages sought against the insured

---

[59] *Duke v. Hoch*, 468 F.2d 973 (5th Cir. 1972) ("*Duke v. Hoch*").

[60] *See* Navigators Trial Ex. #9, pp. 10-12 (citing to *Duke v. Hoch* (which Plaintiffs wrongly assert forecloses Navigators from asserting an allocation argument) and stressing the importance of allocation), pp. 9-10 (reminding Plaintiffs that, among other things, defective work is not "property damage" and neither are the costs associated with repairing same).  There is nothing in Florida law to support Plaintiffs' proposition that insurers must do anything more than Navigators did in its reservation of rights letter.  Further, under Texas law, Plaintiffs cannot create coverage where none otherwise exists.  *Tex. Farmers Ins. Co. v. McGuire*, 744 S.W.2d 601, 602-03 (Tex. 1988).

[61] Plaintiffs do not assert that there is a conflict between Texas and Florida law which requires a conflicts of law analysis on the issue of covered damages because of "property damage."  Therefore, Texas law must apply.

[62] Plaintiffs Trial Exhibit #7, Gemini Policy, p. 25 – Section V(17.).

when those damages did not result from covered "property damage."  *Bldg. Specialties, Inc. v. Liberty Mut. Fire Ins. Co*., 712 F. Supp. 2d 628, 645-46 (S.D. Tex. 2010) (no coverage existed to repair defective ducts that did not cause any resultant "property damage") ("*Bldg. Specialties*").

Plaintiffs post-trial brief cites extensively to *Lamar Homes*.[63]  Setting aside that *Lamar Homes* was decided twelve years before *Liberty Surplus supra* and three years before *Buildings Specialty supra,* and had no impact on those decisions rejecting coverage, Plaintiffs conveniently ignore that part of *Lamar Homes* which supports *Liberty Surplus and Bldg. Specialties* and sets forth Texas law on the issue of covered versus uncovered damages.  Specifically, *Lamar Homes* flatly states that "**faulty workmanship that merely diminishes the value of the home without causing physical injury or loss of use does not involve "property damage.**"  *Lamar Homes,* 242 S.W.3d. at 10.

In order to avoid black letter Texas law, Plaintiffs appear to contend that the draft stops (and shear walls) fall under the generic term "loss of use" without ever clearly articulating whether they are using the term loss of use as defined under subsection a. of the property damage definition or loss of use as defined under subsection b. of the definition.  Regardless of how they attempt to frame their argument, Plaintiffs' admission that the draft stops (at minimum[64]) did not cause ancillary damages is dispositive of the issue that there is no "property damage."[65]

---

[63] Plaintiffs' Post-Trial Brief, p. 72 (citing *Lamar Homes v. Mid-Continent Cas.*, 242 S.W.3d 1 (Tex. 2007)).  To the extent that this Court considers Florida law, page 71 of Plaintiffs' Post-Trial Brief similarly supports this point under *United States Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 889 ("If there is no damage beyond the faulty workmanship or defective work, then there may be no resulting 'property damage'").

[64] Navigators refers to the draft stops because there is no conflicting evidence in the record regarding whether the draft stops caused ancillary damages.  Limiting the discussion to draft stops is in no way intended to suggest that the defective shear walls caused ancillary damages. On the contrary, the overwhelming weight of the evidence is that the defective shear walls caused no ancillary damage.

[65] Mr. Horst's unopposed opinion was that the draft stops on the top floor of the building complex were not "sealed" and thus did not perform their intended function in keeping air or smoke from flowing from one part of the attic to the other. *See* Trial Proceedings, Vol. 5 – AM, 86:20-87:11; Trial Proceedings, Vol. 5 – PM, 15:23-16:3; 16:5-7. What should have been done, but wasn't, was that fire sealant should have been placed around the intentional

28

To fall under subsection a. of the property damage definition, there must be "Physical injury to tangible property, including all resulting loss of use of that property." Here, the draft stops (or shear walls) did not cause physical injury to tangible property much less result in any loss of use because of physical injury. Thus, there is no circumstance where subsection a. would apply to the draft stops (or shear walls).

Plaintiffs and Southstar also appear to contend that subsection b. of the definition applies to the draft stops (and shear walls) though they have never articulated any particularly good reason as to why. [66] In order to fall under subsection b., there must be loss of use of tangible property that is not physically injured. Here, Plaintiffs never presented evidence regarding the reason why the buildings were yellow tagged in the first instance, much less that the yellow tag was issued because of tangible property that was not physically injured. Absent a reason why the yellow tag was issued, Plaintiffs (and Southstar) have failed to meet their burden of demonstrating coverage for property damage under subsection b. as they are required to do under Texas law.[67]

Setting aside that dispositive shortcoming, the buildings could not possibly have been yellow tagged because of the draft stops (or shear walls). For example, the evidence in this case

---

penetrations made in those draft stops for plumbing or ductwork. *See* Trial Proceedings, Vol. 5 – AM, 88:5-11. In fact, Mr. Horst testified that draft stop defect issue would likely never have been discovered unless "there had been a fire and smoke had gone through." *See* Trial Proceedings, Vol. 5 – AM, 98:1-7. Mr. Horst used the term "ancillary damage" to mean that the defect at issue caused damage to another part of the building. *See* Trial Proceedings, Vol. 5 – PM, 12:17-13:14. In Mr. Horst's expert opinion, he *did not* find any ancillary damages associated with defective draft stop conditions. *See* Trial Proceedings, Vol. 5 – PM, 18:9-18. Instead, the remedy for "fixing" this category of defect is to access and then simply "seal" the draft stop. *See* Trial Proceedings, Vol. 5 – AM, 96:22-97:5; Trial Proceedings, Vol. 5 – PM, 18:9-15.

[66] *See* Trial Proceedings, Vol. 7 – PM, 13:2-22; Southstar's Post-Trial Brief, pp. 14-15; Plaintiffs' Post-Trial Brief, p. 68.

[67] *Federated Mut. Ins. Co. v. Grapevine Excavation Inc*., 197 F.3d 720, 723 (5th Cir. 1999) ("The burden is on the insured to show that a claim against him is potentially within the scope of coverage under the policies…"). Further, section (b) of the property damage definition requires that "All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it. "Occurrence," in turn, means an accident. Not only did Plaintiffs fail to demonstrate a loss of use of property that was not physically injured, but they also failed to present any evidence as

29

is undisputed that a defective draft stop would not be discovered absent fire or smoke in the building.[68]  Thus, even if Plaintiffs did satisfy their burden of proof of demonstrating that coverage existed because there was loss of use of tangible property that was not physically injured (and there is no such loss of use under the facts of this case), the draft stops could never have been the cause of the yellow tag and, therefore, the reason for any loss of use of tangible property that was not physically injured.

Finally, setting aside both of these dispositive arguments, the weight of the evidence cannot be ignored.  Assuming this Court would consider the issue of why the building was yellow tagged absent any testimony from anyone as to the specific reason, the overwhelming weight of the evidence is that the yellow tag was issued because of the defectively constructed balconies.  The parties' own filings and admissions reveal the uncontested proposition that the buildings at issue were replete with physical injuries due to balcony deflection and water intrusion therefrom.  *See*, *e.g.*, Southstar's Post-Trial Brief, p. 6 ("the record establishes that Urban Oaks' systematic negligence caused widespread property damage … and disintegration of multiple building components" which ultimately resulted in a Yellow Tag to close the buildings); Plaintiffs' Post-Trial Brief, p. 81 ("Due to severe issues with the corner balconies, the [County] 'yellow-tagged' the buildings", meaning that the buildings were "uninhabitable").[69]  Thus, even though Southstar claims a "loss of use" of the building, that "loss of use" cannot qualify under subsection b. of "property damage" because that subsection ***requires there be loss of use of***

---

to how the construction defects came to be during the course of the construction and, therefore, whether caused by an "occurrence" as required by the policy.  This is yet another reason why there is no coverage, including under subsection b of the property damage definition.

[68] *See* Trial Proceedings, Vol. 5 – AM, 98:1-7.

[69] *See also* Trial Proceedings, Vol. 5 – PM, 13:7-14 (the cantilever balconies caused broken windows, damage to waterproofing, and other items); 35:6-14 (the corner balconies in all six buildings were deflected to the degree that they required a shoring pole).

***property that is not physically injured.***  Here, the loss of use was clearly for property that was physically injured.

Plaintiffs similarly complain that the insurers have not explained how subsection b. "could ever afford coverage."[70]  This complaint is meritless because (1) it is the *insured's* burden to prove coverage under the insuring agreement[71]; and (2) regardless, the insurers have no such obligation where subsection b. is unambiguous and inapplicable *as applied to the facts in this case*.

In short, with respect to loss of use, and assuming this Court is satisfied Plaintiffs met their burden of showing that the yellow tag was caused by the balconies (and they have not), the weight of the evidence goes full circle back to subsection a. of the property damage definition – namely, if Plaintiffs can establish physical injury to tangible property caused by the defective balconies, they can recover for that physical injury as well as any loss of use resulting therefrom. Those are the facts of the case as presented at trial and that is the coverage provided by the policies.  Unfortunately for Plaintiffs, any such recovery is barred because they have failed to allocate the cost of their covered defects from those defects that are clearly not covered.

3.  Removal of the Your Work Exclusion Does Not Create Coverage

Plaintiffs contend that all of its damages are covered because the insurers eliminated the "Your Work" exclusion from the policies.  This is simply a nonsensical argument.  The exclusion's removal does not change the policy's definition of "property damage" and nor does it modify the insuring agreement's requirement that there must be "property damage" in order for coverage to exist.  In essence, Plaintiffs and Southstar are attempting to rewrite the policy

---

[70] Plaintiffs' Post-Trial Brief, p. 68.

[71] *Liberty Surplus*, No. H-18-1444, 2019 U.S. Dist. LEXIS 116093, at *11 (citing *Dall. Nat'l Ins. Co. v. Calitex Corp.*, 458 S.W.3d 210, 222 (Tex. App. 2015)).

31

language so that it reads "all claims of defective work are covered."  Such a reading of the policies would be contrary to black-letter Texas law on contract interpretation.  *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010) ("The principles courts use when interpreting an insurance policy are well established. … First, we look at the language of the policy because we presume parties intend what the words of their contract say …")

Indeed, *Bldg. Specialties supra* is dispositive on this point.  *Bldg. Specialties* considered whether defective duct work was a covered defect.  In doing so, the court considered several arguments including whether the defective duct work constituted property damage and, ***separately,*** whether a "Your Work" exclusion  barred coverage.  After a thorough review of Texas law, that court held that the defective duct work did not constitute property damage.  *Bldg. Specialties*, 712 F. Supp. 2d at 646 ("…the record does not provide evidence of 'property damage' that shows Liberty Mutual had a duty to indemnify Building Specialties").

Despite this finding, *Building Specialties* then went on to ***separately*** address "Liberty Mutual's alternative grounds for summary judgment, the 'your product' and 'your work' exclusions ….".  *Id.*  The court's separate consideration of the "your work" exclusion conclusively demonstrates that coverage still would have been barred in its absence.  There is no merit to Plaintiffs' argument that all construction defects are covered defects where the "your work" exclusion is deleted from the policy.  *See RSUI Indem. Co. v. Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) (holding that an insurance policy is interpreted according to the language of the contract and that "[w]e strive to give effect to all of the words and provisions so that none is rendered meaningless").

4. <u>Plaintiffs' Rip and Tear Cost Argument Ignores Plaintiffs' Burden to Segregate Covered and Uncovered Costs</u>

Finally, Plaintiffs allege that they are entitled to coverage for all damages because they constitute "rip and tear" costs.  Specifically, Plaintiffs argue that "Florida and Texas law squarely holds that this type of rip and tear work is covered when it is necessary to repair covered property damage."  Plaintiffs' Post-Trial Brief, p. 78.  This point, however, is not in dispute.

What is disputed is whether Plaintiffs are entitled to "rip and tear" costs to repair defective work which is not covered property damage.  On that point, Plaintiffs have introduced no evidence regarding how much it actually cost to remedy the uncovered defective components identified in this case.  Mr. Horst testified that in order to fix the shear walls, one would have to remove the non-defective drywall, install new sheathing and/or correct the missing or misaligned components, and then install new drywall.[72]  A similar process would be necessary to remedy the draft stops, in order to seal the penetrations.[73]  However, no expert witness, fact witness, or document was introduced at trial which identified how much it would cost to actually seal the draft stops or fix the missing/misaligned defective shear walls components themselves, such that they were no longer defective.  And, under Texas law, these costs of fixing defectively installed components clearly fall outside the scope of coverage because they did not result in "property damage" as defined in the policies.  *See Lamar Homes*, 242 S.W.3d at 10 ("faulty workmanship that merely diminishes the value of the home without causing physical injury or loss of use does not involve 'property damage'").

---

[72] Trial Proceedings, Vol. 5 – PM, 19:8-20:7.

[73] Trial Proceedings, Vol. 5 – PM, 18:9-15.

**E.      The Shear Walls Are Not Covered Property Damage**

Per above, Plaintiffs' failure to allocate the costs related to the uncovered draft stops, in and of itself, is fatal to Plaintiffs' claim because it is undisputed that the draft stops are an uncovered defect and it is undisputed that Plaintiff failed to segregate the costs of the draft stops from those of covered defects.  None of that is to suggest, however, that the shear walls are also not a covered defect.  There is conflicting expert testimony on this issue and this Court will be required to weigh the evidence in making its finding of fact (to the extent one is necessary given that Plaintiffs are not entitled to indemnity coverage if the Court agrees that the draft stops are not a covered defect and Plaintiffs have failed to meet their burden of segregating covered from uncovered damages).

As this Court may recall, Navigators filed for summary judgment in 2023 based on Plaintiffs' expert report (Mr. Horst) which conceded that there were no ancillary damages created by the draft stops and the shear walls.[74]  The Horst expert report also contained a breakdown of costs associated with each of the defect categories.  Specifically, expert Horst took Southstar's expert Del Vecchio's estimation chart (which is identical to the estimation chart Mr. Del Vecchio testified to at trial), and added up all of the costs associated with each of the defect categories.[75]  Mr. Horst then took all of the unallocated costs in the Del Vecchio chart (*i.e.*, those that could not be identified as a cost specific to any defect such as paint, dry wall, insurance, contingencies, etc….) and attempted to apply them to allocate a portion of those costs to each

---

[74] *See*, *e.g.*, Navigators' Summary Judgment Brief (Dkt. 355), pp. 11-15 (quoting from Mr. Horst's expert report); *see also* Plaintiffs' Renewed Motion for Summary Judgment (Dkt. 358), pp. 4-8 (summarizing Mr. Horst's expert report), pp. 13-16 (asserting "resulting damage" for all categories of defects except the draft stops and shear walls).

[75] Dkt. 357-3, pp. 7, 13.

defect as he believed appropriate.[76]  He then added those costs and subtracted ten percent of the costs from each defect category.[77]

This Court struck Mr. Horst's opinion, in part on the premise that the 10% deduction does not require an expert to so opine.[78]  The Court then gave the Plaintiffs and Southstar approximately six months to retain new experts and/or do discovery necessary to allocate its damages.  Instead, in that period, Plaintiffs issued no discovery beyond taking the 30(b)(6) depositions of the insurers.  Southstar reintroduced Del Vecchio's report, which remained unchanged from the report used in the bankruptcy trial.  And Plaintiffs submitted a revised report from Mr. Horst with the only differences being the date and elimination of cost estimates.

As a result, Navigators re-filed its summary judgment motion asserting, once again, that the draft stops and shear walls caused no ancillary damages.[79]  The insurers additionally argued that Plaintiffs' claim failed in its entirety because they presented no evidence segregating their costs between covered and uncovered damages.[80]  The Court never ruled on these motions, instead finding them moot in light of the trial.[81]

In light of this background, Mr. Del Vecchio's testimony that the shear walls caused racking should be discounted relative to Mr. Horst's testimony for any number of reasons.  ***First***, Plaintiffs stipulated at trial that the shear wall defects caused no ancillary damage.[82]  ***Second,***

---

[76] *Id.*, pp. 13, 25-28.

[77] *Id.*, p. 13.

[78] *See* Dkt. 433, pp. 3-4.

[79] Dkt. 465, pp. 6-7.

[80] *See Id.* at 6-8; Dkt. 461, pp. 16-19, 22-24; Dkt. 462, pp. 8-10.

[81] *See* Dkt. 541.

[82] Navigators Trial Exhibit #22, p. 3 ("The improper installation of the shear resisting components (nailing of walls, continuity of shear walls, and tension/shear rods) by Urban Oaks Builders or those acting on its behalf did not physically cause different or additional property damage to any building in this case").

prior to his trial testimony, Mr. Del Vecchio never offered an opinion in any report that the draft stops or shear walls caused ancillary damage to the properties. *Third,* prior to trial, neither Mr. Del Vecchio nor any other witness offered an affidavit or testimony in opposition to the insurers' summary judgment motions stating that the shear walls caused ancillary damage to the property, despite the obvious benefit to Plaintiffs' coverage case and Southstar's potential recovery resulting therefrom. *Fourth,* Mr. Del Vecchio's 200-plus page expert report (which speaks for itself), spoke almost exclusively about the listing balconies and the damage caused by the listing balconies. *Fifth,* the Del Vecchio report included 133 pages of photos of the buildings' exterior highlighting damages from the balconies and none of the building's interior. *Sixth*, there are zero pictures in his report speaking to, or even showing, the shear walls. *Finally,* there is no reference in his report to him observing listing of the buildings due to the shear walls.

Unlike Mr. Del Vecchio, Mr. Horst's testimony that the shear walls caused no ancillary damages has been consistent throughout this case, including at trial. Mr. Horst is a licensed structural engineer from the firm WJE.[83] WJE itself is a firm that specializes in forensic and diagnostic engineering.[84] Furthermore, Baker Botts attorney Joseph Colagiovanni, whose firm retained Mr. Horst[85], testified that WJE was retained "to do forensic engineering assessment of the defect issues that had been raised by Southstar"[86] and a "structural engineering review."[87] According to Mr. Colagiovanni, WJE "literally walked every inch of that building," and was working on a report "that was going to literally go floor by floor, spot by spot, issue by issue,

---

[83] Trial Proceedings, Vol. 5 – AM, 40:7-18; 45:6-12.

[84] Trial Proceedings, Vol. 5 – AM, 40:10-22.

[85] Trial Proceedings, Vol. 5 – AM, 48:25-49:6.

[86] Trial Proceedings, Vol. 2 – PM, 24:18-25.

[87] Trial Proceedings, Vol. 2 – PM, 145:15-25.

through every claim" asserted by Southstar to identify whether it was defective work and whether it needed to be repaired, so that each defect (including shear walls) would be discussed separately.[88]  Clearly, Mr. Horst's qualifications are not only superior to that of Mr. Del Vecchio in determining whether the shear walls caused ancillary damages, but it stretches credibility to believe that a structural engineer who walked every inch of the building was unable to visually see racking, let alone ancillary damages caused by the shear walls.

Mr. Horst's testimony with respect to the shear wall defects was clear and simple.  He testified that the shear walls in the buildings are the "lateral load resisting system" for the buildings, which serve the purpose of resisting wind forces by transferring the wind force down to the building foundations.[89]  Mr. Horst testified that there were several defects associated with the shear walls, because some places, the wrong material was installed or missing or the fasteners or CLP rods installed too far apart, with the result that they didn't have the same capacity as the designed components.[90]  These defects normally would not have been found unless "there was a wind force that exceeded the capacity of the as-built shear walls."[91]  In other words, the shear wall defects represented "framing deficiencies" and were not built according to the drawings,[92] but otherwise those defects **did not** cause any ancillary damage to the buildings.[93]  Instead, like the draft stops, the fix required for the shear wall defect was to correct spacing and

---

[88] Trial Proceedings, Vol. 2 – PM, 146:3-22; 147:15-148:6.

[89] Trial Proceedings, Vol. 5 – AM, 97:9-13.

[90] Trial Proceedings, Vol. 5 – AM, 97:14-25; 98:15-21; Trial Proceedings, Vol. 5 – PM, 18:1-4; Trial Proceedings, Vol. 5 – PM, 27:7-12.

[91] Trial Proceedings, Vol. 5 – AM, 98:1-9.

[92] Trial Proceedings, Vol. 5 – PM, 17:20-25.

[93] Trial Proceedings, Vol. 5 – PM, 18:5-8.

composition of the shear wall components.[94]  Finally, when asked if the defects to the shear walls would have been found absent the balcony issues, Mr. Horst testified that that "neither one [the draft stops or shear walls] ever would have been found if not for the other problems.  You know the draft stops would have been found if there had been a fire and smoke had gone through.  The shear walls would have been found if there was a wind force that exceeded the capacity of the as-built shear walls."[95]

In contrast to Mr. Horst, Mr. Del Vecchio testified that he actually saw building racking which he attributed to the shear wall defects.[96]  Mr. Del Vecchio's testimony was allowed over the insurers' objections that there was nothing in his report to suggest that he had any opinion on the shear walls beyond those of Mr. Horst.  For example, his report is broken down into "observations" he made at each building and what the subsequent "destructive investigations" revealed as parts of the buildings were subsequently exposed in order to understand the extent of the damage from the defective balconies.[97]  Not surprisingly, all visual observations at each building related to the balconies, while the destructive observations related to findings that resulted from what Southstar counsel framed in his opening argument as the "peeling of the onion" that resulted from the balcony issues.[98]

---

[94] Trial Proceedings, Vol. 5 – PM, 19:8-20:2.

[95] Trial Proceedings, Vol. 5 – AM, 98:1-9.  This is yet another reason why Southstar/Plaintiffs' argument that shear walls caused any loss of use in this case is nothing more than grasping at straws.

[96] See Southstar's Post-Trial Brief, p. 10; Plaintiffs' Post-Trial Brief, p. 76 (citing trial testimony).

[97] See Dkt. 463-13, pp. 71-80.  The Del Vecchio report was used in summary judgment practice but never admitted into evidence at trial.  Nevertheless, its contents weigh on the credibility of Mr. Del Vecchio's testimony.

[98] Id.

Mr. Del Vecchio's 2019 report contained 133 pictures of the exterior of the building[99] and not a single picture of the interior hallways or walkways, including any picture of the hallways or walkways that would corroborate a visual observation that any of the buildings were racking because of the shear walls. Let there be no mistake, Mr. Del Vecchio's testimony was trial by ambush. In fact, this Court allowed Mr. Del Vecchio to speak on the subject over the insurers' objection based on one paragraph (section 9.2) in Mr. Del Vecchio's 200-plus page report. When read in conjunction with the rest of the report, that paragraph clearly speaks to the defective balconies at the buildings and the damages they caused, and not some visual observation that the buildings showed signs of racking as a result of defective shear walls. Moreover, when weighing credibility, it is odd that Plaintiffs presented Mr. Del Vecchio for testimony despite the fact that (a) he is Southstar's expert; (b) his testimony contradicted Plaintiffs' own expert; (c) his testimony contradicted Plaintiffs' own stipulation; and (d), Mr. Horst is a licensed, structural engineer while Mr. Del Vecchio is not.

In short, right up to the time he provided his trial testimony, Mr. Del Vecchio never offered any opinion that contradicted Mr. Horst despite the fact that offering such an opinion would have greatly assisted Plaintiffs' coverage case and Southstar's recovery with respect to the summary judgment motions filed prior to the trial. The report Mr. Del Vecchio referred to at trial was identical to that used in the bankruptcy court trial and his discussion of the shear walls in the report was limited to discovering the shear walls during "destructive investigation" as opposed to any visual observation of ancillary damages purportedly caused by the shear walls. Unlike Mr. Horst, Mr. Del Vecchio is not a licensed professional engineer, let alone a structural

---

[99] *Id.*, pp. 127-259.

engineer.[100]  Mr. Del Vecchio did not perform any load calculations on the shear walls, either as designed or constructed, did not perform any calculations to measure the effective surface area of the shear walls, and did not perform any calculations to the measure the dynamic pressure that the shear walls were going to be exposed to.[101]  Mr. Del Vecchio's testimony that the shear walls[102] caused "racking" of the building hallways is not corroborated by any photograph, any design drawing, or any engineering analysis of the building.  Neither Plaintiffs nor Southstar – who had access to Mr. Del Vecchio – ever cited his report or offered testimony at any time prior to trial for the proposition that the shear wall defects caused structural damage to the buildings.

For all of the above reasons, and only to the extent this Court even finds it necessary to consider whether the shear walls caused ancillary damage, Navigators submits that Mr. Horst is the far more credible witness on the issue.  He is a licensed engineer, a structural engineer and at the end of the day, as Mr. Colagiovanni emphasized, Mr. Horst walked every inch of the building, was prepared to go defect by defect to address the cost of repairs.  Moreover, Mr. Horst as Plaintiffs' expert does not have the same motivation to embellish his observations beyond those set forth in his report and, in fact, given his credentials and work experience, it is almost impossible to believe that Mr. Horst (or any other witness) would not have visually observed racking caused by the shear walls if, in fact, it existed.

---

[100] Trial Proceedings, Vol. 6 – PM, 16:23-25.

[101] Trial Proceedings, Vol. 6 – PM, 17:6-17.

[102] Somewhat confusingly, Mr. Del Vecchio refers to some of the shear wall defects as "fireblocking."  Trial Proceedings, Vol. 6 – PM, 10:15-24.  This is different than the draft stop penetration defects identified by Mr. Horst, which were limited to the fourth floor and attic of the buildings.  *See* Trial Proceedings, Vol. 5 – PM, 15:18-16:11.

**F.      In The Alternative Only, Plaintiffs Have Not Shown That The Costs Awarded to Southstar By the Bankruptcy Court Are Sufficient to Trigger the Navigators Excess Policy**

It is clear based on the competent evidence admitted for all purposes at trial that the insurers are entitled to judgment in their favor because Plaintiffs failed to properly allocate their damages between covered and uncovered costs.  Even, however, if this Court determined that some part of the judgment is the result of covered damage which can be allocated (which this Court should not rule) Navigators would still be entitled to judgment in its favor if Plaintiffs' covered damages fail to exceed $24 million in underlying coverage.  Clearly, they do not.

Prior to addressing this issue, however, Plaintiffs' Post-trial Brief claims that on their best day Navigators would owe UOB $3,395,885.46 as follows:[103]

| Insurer | Products-Completed Operations Aggregate Limit | Amount Owed |
|---|---|---|
| Gemini | $4 million | **$2,002,565.00** |
| Ironshore | $20 million | **$20,000,000.00** |
| Navigators | $25 million | **$3,395,885.46** |
| TOTAL | | **$25,398,450.46** |

UOB reached this number from the following table:[104]

| Final Judgment | | Covered because…. |
|---|---|---|
| Lost Profits | $8,226,243.00 | Covered because both "property damage" and "because of property damage" – reduces the products-completed operations aggregate ("PCOH")  limits |
| Non-Legal Professional Costs | $732,262.00 | Covered "because of property damage" – reduces the PCOH limits |
| Restoration Costs | $18,439,945.46 | Covered because of both "property damage" and "because of property damage" – reduces PCOH limits |

[103] Plaintiffs' Post-Trial Brief, p. 89.

[104] *Id.* at p. 88.

41

| UOB's Prepetition payments | $251,263.33 | Covered because both "property damage" and "because of property damage" – reduces PCOH limits |
|---|---|---|
| Reduction of Prepetition Payment by UOB | (-$2,251,263.33) | |
| ***Total Principal Claim*** | **$25,398,450.46** | |

The highlighted row above (Non-Legal Professional Costs) is discussed in detail on pages 81-82 of Plaintiffs' Post-Trial Brief.  There, Plaintiffs argue that "[t]his amount is covered under the Supplementary Payment provision and does not reduce the limits of liability under the Policies."[105]  Assuming Plaintiffs' argument is accurate, the prior chart assigning indemnity to each insurer is erroneous because the $732,262.00 would be owed by Gemini as a supplementary payment as opposed to by Navigators.[106]  Thus, given Plaintiffs' own argument, this amount should be subtracted from the $3,395,885.46 that Plaintiffs assert would be owed by Navigators on its worst day.  As a result, under a worst case scenario, Navigators' liability could not exceed $2,663,623.46 ($3,395,885.46 minus $732,262.00).

Further, if Navigators is correct that defense costs do not erode limits, there is yet an additional $549,767.21[107] in Gemini limits available to Plaintiffs (see Section IV(B), above) beyond what Plaintiffs assign to Gemini.  In total therefore, Navigators' worst case outcome would be $2,113,856.25.  Of course, this also means that if $2,113,856.25 of Plaintiffs' damages are either attributable to noncovered costs or costs that Plaintiffs failed to demonstrate were attributable solely to covered damages, then the Navigators Excess Policy does not attach.

---

[105] *Id.* at p. 81-82.

[106] In the alternative, Plaintiffs and Southstar have failed to allocate these unspecified costs between those which addressed uncovered defects, and those caused by covered damages because of "property damage."

[107] $552,332.21 in defense costs that Gemini is inappropriately claiming reduce the limits of its policy, less the additional $2,565 that Plaintiffs assign to Gemini in their indemnity damages table.

At the close of trial, Navigators argued that this Court should not treat Mr. Del Vecchio's testimony as evidence of allocation, but that even if it did, and strictly in the alternative, Plaintiffs have still not shown that the Navigators Excess Policy will attach.  After Navigators concluded its closing argument, the Court requested that the parties be "specific" and "line by line" if necessary.  Navigators now sets forth that line by line analysis as requested by the Court.

Plaintiffs' inability to allocate costs between covered and non-covered damages is perhaps best illustrated by Mr. Del Vecchio's "Division 1 – General Conditions" category, which encompasses numerous costs associated with no particular defect at all.  For example, lines 1 and 2 of Division 1 are titled "Project Manager/Estimator" and "Superintendent (2)."[108]  Mr. Del Vecchio testified that the former would serve as "manager of the entire project" and the latter would "supervise[] the work in the field on the ground."[109]  No effort is made to segregate the cost of these projected staffs between their work on uncovered defective components which caused no "property damage" (the shear walls or draft stops) versus the cost that may be incurred to repair covered defective work.  Indeed, except for three line items in Division 1[110] all of the items listed under the heading Division 1 – General Conditions suffer the same infirmity because each relates to the general, administrative oversight cost of the project as a whole,[111] without any

---

[108] Plaintiffs Trial Exhibit #128, p. 83.  Navigators acknowledges that Plaintiffs Trial Exhibit #128 was admitted only for the limited purpose of it being in front of the bankruptcy court and was not admitted into evidence for allocation purposes.  *See* Trial Proceedings, Vol. 6 – AM, 41:13-19 ("Well, I don't know what was presented [in the underlying bankruptcy trial]. There's no way I could tell that sitting here").  However, to the extent the Court is willing to consider the chart, or Mr. Del Vecchio's testimony regarding it (which Navigators objects to), Navigators is merely pointing to this chart in an effort to comply with the Court's request to be specific.

[109] Trial Proceedings, Vol. 6 – AM, 42:24-43:4.

[110] Lines 12-14 on Plaintiffs Trial Exhibit #128, p. 83.  As noted in a preceding footnote, this exhibit was admitted only for the limited purpose of it being in front of the bankruptcy court.

[111] Trial Proceedings, Vol. 6 – PM, 21:18-22:1.

explanation as to how those costs would be split amongst the various defects identified by Mr. Horst.[112]  Together, these *unallocated* general Division 1 costs total ***$903,063.60***.

Division 1 is not unique in this respect.  Numerous line items in other divisions suffer from the same faults, or set forth costs solely attributable to an uncovered defect, or are "allowances" not based on any specific figure or number, but based simply by using a placeholder number.[113]  For ease of reference, Navigators has prepared a chart below of those various components on which Mr. Del Vecchio testified, as seen on pages 83-87 of Plaintiffs Trial Exhibit #128[114]:

| Division | Lines | Description | Defect | Estimated Cost |
|---|---|---|---|---|
| 1 | 1-11, 15 | Division 1 – General Conditions | *Unallocated* | $903,063.60 |
| 2 | 19 | Temp Protection Labor - Appliances, Cabinets & Units[115] | *Unallocated* | $55,500 |
| 2 | 25 | Demolition (Building Interior - Shear wall Sheathing) | Shear Wall | $125,377.20 |
| 2 | 24 | Demolition 4th Floor Breezeway Ceiling[116] | Draft Stops | $10,361.52 |
| 2 | 27 | General Laborer (Material Handling)[117] | *Unallocated* | $879,840 |
| 5 | 56 | Added CLP Tension Rods[118] | Shear Wall | $74,430 |
| 6 | 67 | Shear wall - Framing Material[119] | Shear Wall | $120,000 (**allowance**) |
| 6 | 68 | Shear wall - Sheathing Material Interior[120] | Shear Wall | $114,210 |

---

[112] Trial Proceedings, Vol. 6 – AM, 42:6-46:13.

[113] Trial Proceedings, Vol. 6 – PM, 23:2-24:3 (conceding that "AL" stood for "allowance," which is just a placeholder number, as compared to a specific "take-off" figure based on square footage); *Id.* at 28:3-6 (agreeing that purpose of "allowance" placeholder is to address unknown conditions).

[114] As noted in a preceding footnote, this exhibit was admitted only for the limited purpose of it being in front of the bankruptcy court.

[115] Trial Proceedings, Vol. 6 – AM, 47:24-48:3.

[116] Trial Proceedings, Vol. 6 – AM, 49:9-16.

[117] Trial Proceedings, Vol. 6 – AM, 49:18-25; Trial Proceedings, Vol. 6 – PM, 21:9-15.

[118] Trial Proceedings, Vol. 6 – AM, 54:7-55:5.

[119] Trial Proceedings, Vol. 6 – AM, 57:11-17; Trial Proceedings, Vol. 6 – PM, 29:21-30:9.

[120] Trial Proceedings, Vol. 6 – AM, 57:11-17.

| | | | | |
|---|---|---|---|---|
| **6** | 69 | Shear wall - Labor (4 Carpenters)[121] | Shear Wall | $96,163.20 |
| **7** | 87 | Attic Fire Stops & Gaps between Framing Material[122] | Draft Stops | $60,000 (**allowance**) |
| **7** | 88 | [Firestopping] (Penetrations approx. 80 per fl)[123] | Draft Stops/ Shear Walls | $45,000 (**allowance**) |
| **9** | 114 | Interior Drywall (5/8" typ. X) - Ceilings, Labor & Mat'l[124] | Shear Walls | $419,551.01 |
| **9** | 115 | Interior Wall insulation[125] | Shear Walls | $264,184.80 |
| **9** | 119 | Interior Paint[126] | *Unallocated* | $1,115,133.78 |
| **9** | 120 | Interior Flooring - Remediate Vinyl flooring in Living Room(s)[127] | Shear Walls/ *Unallocated* | $1,050,333.60 |
| **9** | 121 | Interior Flooring - Remove & Replace Carpet in Bedroom(s)[128] | Shear Walls/ *Unallocated* | $740,013.12 |
| **N/A** | N/A | Contingency (10%)[129] | *Unallocated* | $1,578,301.07 |
| **N/A** | N/A | Contractor Fee[130] | *Unallocated* | $1,736,131.18 |
| **N/A** | N/A | Liability Insurance[131] | *Unallocated* | $276,912.92 |
| **N/A** | N/A | Office Overhead[132] | *Unallocated* | $1,065,589.57 |
| **N/A** | N/A | Builders Risk[133] | *Unallocated* | $101,011.27 |
| **N/A** | N/A | Permit Fees[134] | *Unallocated* | $410,819.13 |
| **N/A** | N/A | Bond[135] | *Unallocated* | $460,939.07 |
| | | **TOTAL** | | **$11,702,866.04** |

[121] Trial Proceedings, Vol. 6 – AM, 57:11-17.

[122] Trial Proceedings, Vol. 6 – AM, 60:21-61:6; Trial Proceedings, Vol. 6 – PM, 24:16-25:12.

[123] Trial Proceedings, Vol. 6 – PM, 25:13-26:5.

[124] Trial Proceedings, Vol. 6 – AM, 72:2-7.

[125] Trial Proceedings, Vol. 6 – AM, 72:2-7.

[126] Trial Proceedings, Vol. 6 – AM, 73:8-20; Trial Proceedings, Vol. 6 – PM, 27:10-18.

[127] Trial Proceedings, Vol. 6 – AM, 73:8-20.

[128] Trial Proceedings, Vol. 6 – AM, 73:8-20.

[129] Trial Proceedings, Vol. 6 – AM, 75:20-76:1; Trial Proceedings, Vol. 6 – PM, 28:7-14.

[130] Trial Proceedings, Vol. 6 – AM, 76:2-13.

[131] Trial Proceedings, Vol. 6 – AM, 76:14-19.

[132] Trial Proceedings, Vol. 6 – AM, 76:20-23.

[133] Trial Proceedings, Vol. 6 – AM, 76:24-77:4.

[134] Trial Proceedings, Vol. 6 – AM, 77:5-6.

[135] Trial Proceedings, Vol. 6 – AM, 77:7-13.

Tabulating those line item costs together, at least **$11,702,866.04** of the Restoration Award provided by the bankruptcy court is not for covered "property damage," but instead for uncovered defective work that did not cause "property damage," or for work that was allocated to a mix of covered and uncovered "property damage."   This includes $8,583,241.59 in estimated costs to address multiple defects which have *never* been broken down or allocated between various defects (including general conditions or expenses which affect the entire project), $1,213,916.21 for shear walls, $70,361.52 for draft stops, and $1,835,346.72 for a mix of uncovered defects (draft stops/shear walls) and unallocated costs.  When an insured fails to properly allocate its costs, as is the case here, the Court is left with an incomplete factual record on which to make its indemnity determinations, and thus must eliminate the unallocated judgment (and/or portions thereof) from the insurers' indemnity obligations.  *Puget Plastics*, 735 F. Supp. 2d at 677.

### G.    In the Alternative Only, Even if An Indemnity Duty is Owed, Navigators Has Not Breached Its Duty under the Navigators Excess Policy

UOB and Southstar have asserted that Navigators has breached its duty to indemnify them and claim that, as a result, they are entitled to statutory and/or supplemental relief and/or attorneys' fees, paralegal fees, or costs against Navigators.

Under long-settled Texas law, as an excess carrier Navigators has no coverage obligations until underlying insurance has exhausted.  *See Fed. Ins. Co. v. Srivastava*, 2 F.3d 98, 102 (5th Cir. 1993) ("[a]n excess policy's coverage usually begins when all of the underlying insurers have exhausted their policies by paying to their policy limits"); *Royal Hosp. Corp. v. Underwriters at Lloyd's*, No. 3:18-CV-000102, 2019 U.S. Dist. LEXIS 147657, at *6 (S.D. Tex. Aug. 20, 2019) ("it is well-settled that Texas law dictates that primary policies' limits must be exhausted before excess insurers become liable"); *Mt. Hawley Ins. Co. v. JBS Parkway*

*Apartments, LLC*, No. MO:18-CV-00092-DC, 2020 U.S. Dist. LEXIS 252528, at \*25 (W.D. Tex. Dec. 30, 2020) (collecting cases and noting that under Texas law "excess insurers do not contribute until the primary policies are exhausted"); *Emscor Mfg. v. All. Ins. Grp.*, 879 S.W.2d 894, 903 (Tex. App. 1994) ("In a situation in which there are primary and excess insurance coverages, the limits of the primary insurance must be exhausted before the primary carrier has a right to require the excess carrier to contribute to a settlement").

In this case, the aggregate limits of both the Gemini Policy and the Ironshore Policy remain unexhausted.[136]  The terms of the Navigators Excess Policy provide that it only applies to (among other limitations) "damages that exceed the 'underlying limits' ***paid by*** 'underlying insurance with our consent"[137] (emphasis added).

As a result, Navigators cannot have breached any duty to indemnify under the Navigators Excess Policy, because the limits of underlying insurance have not yet been exhausted.  A breach of contract claim must be supported by facts establishing that one party has failed to live up to the terms of that contract.  *See Royal Hosp. Corp.*, No. 3:18-CV-000102, 2019 U.S. Dist. LEXIS 147657, at \*6 (finding that the "core element of a breach of contract claim" is "an actual breach"); *Smith Int'l, Inc. v. Egle Grp. LLC*, 490 F.3d 380, 387 (5th Cir. 2007) ("A breach occurs when a party fails to perform a duty required by the contract").

It is a basic proposition of Texas law that an excess insurer cannot have breached any duty to indemnify its insured unless and until the underlying insurance has been exhausted

---

[136] *See* Dkt. 487 (Joint Pretrial Order), p. 9, Admission of Fact #45 ("Ironshore has not made any indemnity payments towards the Bankruptcy Court's judgment"); Order on Navigators Motion for Summary Judgment on Subrogation (Dkt. 438), p. 10 ("This Court has already determined that Gemini had a duty to defend its insureds until it reached the aggregate limits of liability for multiple occurrences under the Gemini Policy"); Trial Proceedings, Vol. 4 – PM, 33:9-14.

[137] *See* Navigators Trial Exhibit #3 at p. 27 (Section I(1.)(a.)(2.).

through payments of judgments or settlements.  Furthermore, the Navigators Excess Policy's own policy language establishes that it has no duty to indemnify its insured until underlying insurance has exhausted.  Thus, even if Navigators is determined to owe some part of the judgment against Plaintiffs (and it should not be), Navigators is entitled to final judgment in its favor that it has no present indemnity obligations to UOB or Southstar[138], and all breach of contract claims against Navigators should be dismissed.

**H.     Neither UOB nor Southstar Are Entitled to Any Statutory and/or Supplemental Relief Against Navigators**

As an additional result of the fact there is no breach of contract, neither UOB nor Southstar are entitled to any statutory and/or supplemental relief and/or attorneys' fees, paralegal fees, or costs against Navigators under Tex. Ins. Code § 542 or Tex. Civ. Prac. & Rem. Code §38.001.  Additionally, Tex. Ins. Code § 542 only applies to first-party claims by the insured for its own loss, and not (like here) third-party claims against the insured for a loss purportedly suffered by a third party.  *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 674-75 (Tex. 2008).  In addition, Tex. Civ. Prac. & Rem. Code §38.001 requires a successful breach claim as a condition for relief.  *See Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 818 (Tex. 2006) ("Chapter 38 … permits an insured to recover attorney's fees incurred in a successful breach of contract suit against the insurer…"); *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 666 (Tex. 2009) (recovery requires a prevailing breach of contract claim and recovery of damages).

---

[138] The indemnity claims asserted by Southstar are derivative of UOB's claims for indemnity, and therefore similarly fail for the same reasons.  *Tex. Farmers Ins. Co. v. Gerdes by & Through Griffin Chiropractic Clinic*, 880 S.W.2d 215, 219 (Tex. App. 1994) (holding that third-party beneficiaries to an insurance contract "may not claim greater rights than those afforded to the named insured").

Plaintiffs also make a request for attorneys' fees and costs under Florida Statutes §§ 627.428, 57.104, 57.041, and/or 626.9373.[139]  However, Plaintiffs have not argued that Florida law should apply to its breach of contract and declaratory judgment claims against Navigators, nor have they met their burden of establishing a "true conflict" that would result in a different outcome pursuant to Texas choice of law principles.  Indeed, Plaintiffs have already been granted relief on their breach of contract claims against Gemini under Texas law.  *See* Dkts. 313 and 328. Thus, this Court should reject Plaintiffs' request for Florida statutory relief against Navigators.

To the extent this Court is inclined to accept Plaintiffs' argument for Florida law on this issue, however, Plaintiffs would still not be entitled to the fees and costs sought under these Florida statutes for a number of reasons.  First, Florida Statute § 627.428 doesn't apply because the Navigators Excess Policy was issued for delivery in Texas and because there has been no judgment against Navigators by a Florida court.  *See Lopez v. State Farm Mut. Auto*., 139 So. 3d 402, 404-05 (Fla. Dist. Ct. App. 2014) (finding that § 627.428 doesn't apply to an insurance policy issued for delivery and delivered in Texas); *see also* Fla. Stat. § 627.428(1) (repealed Mar. 24, 2023) ("…upon the rendition of a ***judgment or decree by any of the courts of this state*** against an insurer and in favor of any named or omnibus insured…") (emphasis added).  Next, Florida Statute § 57.104 doesn't independently authorize attorney's fees or costs, but specifies how such awards are to be calculated under Florida law, and thus provides no basis for relief to Plaintiffs.  *See* Fla. Stat. § 57.104(1) ("In any action in which attorney fees are to be determined or awarded by the court, the court shall consider, among other things …").  Florida Statute § 57.041 doesn't apply because it only authorizes court costs (not attorney's fees), and even then only to prevailing parties (and Plaintiffs should not prevail against Navigators).  *Price v. Tyler*,

---

[139] See Plaintiffs' Post-Trial Brief, pp. 89-90.

890 So. 2d 246, 252-53 (Fla. 2004). Finally, Florida Statute § 626.9373 also doesn't apply because there has been no judgment against Navigators by a Florida court. *See* Fla. Stat. § 626.9373(1) (repealed Mar. 24, 2023) ("…upon the rendition of a ***judgment or decree by any court of this state*** against a surplus lines insurer in favor of any named or omnibus insured…") (emphasis added).[140]

For all of the above reasons, Navigators is entitled to final judgment in its favor with respect to all breach of contract claims by UOB (Count II) and Southstar (Count I), and UOB is not entitled to any attorney's fees and/or costs related to same.

## I.     Southstar is Not Entitled to Post-Judgment Interest from Navigators

Finally, Southstar has asserted that it is entitled to post-judgment interest on the bankruptcy award.[141] There is a very simple reason why this relief is not available to Southstar – the bankruptcy award never ruled that UOB (the insured) was liable for any post-judgment interest, only pre-judgment interest under Florida law. At no point has UOB become "legally obligated" to pay any post-judgment interest to Southstar because no order was ever issued awarding such relief.

Southstar cites various cases concerning the concept that post-judgment interest may be awarded in district courts, but not one single case in which an insurer was held liable for post-judgment interest *which was never awarded against the insured debtor in a bankruptcy action*. In fact, the cases cited by Southstar do not support relief in such a unique factual situation as presented here. For example, in *Carmichael v. Balke (In re Imperial Petro. Recovery Corp.)*, 84

---

[140] *See also Dis Invs., LLC v. Great Lakes Ins. Se.*, No. 23-23363-CIV-WILLIAMS/D'ANGELO, 2025 U.S. Dist. LEXIS 119007, at *24 (S.D. Fla. June 18, 2025) ("When interpreting a statute, courts begin with its text").

[141] Southstar also asserts that the insurance proceeds should be payable to them, and not the UOB bankruptcy estate. *See* Southstar Post-Trial Brief, pp. 20-22. Navigators disagrees that this is the case.

F.4th 264 (5th Cir. 2023), the Fifth Circuit determined that post-judgment interest applies to adversary proceedings *against a non-debtor* in bankruptcy (in that case, a violation of the automatic stay which resulted in a 2018 order) – not the main bankruptcy case. *Id.* at 272. Southstar's other cases are similarly unhelpful. *See Amegy Bank Nat'l Assoc. v. Brazos M&E, Ltd. (In re Bigler LP)*, 458 B.R. 345, 353 (Bankr. S.D. Tex. 2011) (awarding post-judgment interest against a non-debtor over the administration of a confirmed Chapter 11 bankruptcy plan); *Ocasek v. Manville Corp. Asbestos Disease Compensation Fund*, 956 F.2d 152, 154 (finding that the terms of a reorganization plan did not afford post-judgment interest); *In re Missionary Baptist Found., Inc.*, 69 B.R. 536, 537 (Bankr. N.D. Tex. 1987) (finding, in the context of a successful adversary action by the Trustee against a non-debtor bank for fraudulent conveyances, the Trustee was entitled to post-judgment interest following its post-petition transfer).

Instead, Southstar is left only with the meaningless assertion that the bankruptcy court did not explicitly deny them post-judgment interest when it issued its findings. *See* Southstar Post-Trial Brief, p. 18 ("Nothing in the bankruptcy record supports the assertion that the Bankruptcy Court *precluded* post-judgment interest") (emphasis added). Yet even this claim is inaccurate, as the BK Award explicitly identified the claims it was allowing and stated that "[a]ll other claims against the Debtor are ***disallowed***" (emphasis added).[142]

To the extent that Southstar is now requesting that this Court award post-judgment interest on the bankruptcy award from January 2020, a ruling issued under Florida law in which this Court had no hand, Navigators objects that such a procedure would be improper. Even if this Court desired to award post-judgment interest on a ruling in bankruptcy court, Southstar has

---

[142] Plaintiffs Trial Exhibit #137, p. 2.

never asserted any counter-claim against UOB seeking that relief in this action. Simply put, the time and place for Southstar to litigate for post-judgment interest was back in the Proof of Claim Hearing at the time the bankruptcy award was issued – not now, in the context of an insurance coverage action.

Finally, and only to the extent that Southstar is somehow entitled to post-judgment interest even though Navigators owes no coverage and even though no post-judgment interest has been awarded against UOB by any court, such interest could never be Navigators' responsibility. The plain language of the Gemini Policy provides that "[a]ll interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance."[143]

As a result, any post-judgment interest awarded to Southstar against UOB would be due by Gemini under Supplementary Payments – Coverages A and B, Section 1.g. of the Gemini Policy. *See Gilbert Tex. Constr., L.P.*, 327 S.W.3d at 126 (noting that insurance policy interpretation requires looking first to the words in the policy). And, as noted above, supplementary payments made under the Gemini Policy "will not reduce" the limits of insurance.[144] Thus, because Gemini has not exhausted its aggregate limit of $4 million, Gemini alone would be obligated to pay for "all interest" on that the bankruptcy award (again, assuming any such interest is available to Southstar).[145] And even if Gemini was not liable for the full

---

[143] Plaintiffs Trial Exhibit #7, Gemini Policy, p. 18 – Supplementary Payments – Coverages A and B(1)(g).

[144] *Id.* at Supplementary Payments – Coverages A and B(1).

[145] Navigators notes that while Gemini initially (and improperly) moved to interplead $2 million with this Court before later withdrawing that motion (Dkt. 354, p. 2), $2 million *is not* "the part of the judgment that is within the applicable limit of insurance," given that Gemini owed and owes well in excess of an additional $2 million before it exhausts its $4 million aggregate limit. *See* Section IV(B), *supra*.

amount of the post-judgment interest, the Ironshore Policy is "next up" and would pay the "full amount" of that interest.[146]  Consequently, there is no situation in which Navigators can possibly be held liable for payment of any post-judgment interest awarded to Southstar.

       **WHEREFORE**, Navigators Specialty Insurance Company respectfully requests that this Court enter a judgment against Gemini, Plaintiffs, and Southstar as follows:

    a.  Finding that Navigators is entitled to final judgment on Count II of its cross-claim for subrogation against Gemini, and Gemini owes Navigators $699,569.38 plus applicable interest (and reserving jurisdiction for all applicable interest associated with same);

    b.  Finding that Navigators is entitled to a declaration on Count I of its cross-claim against Gemini that Gemini has not properly exhausted a single $2 million per occurrence limit by payment of indemnity damages because as much as $552,332.21 of its indemnity payments should be properly characterized as defense costs that do not erode the Gemini Policy limits;[147]

    c.  Finding that Plaintiffs have failed to establish a conflict of law on the only issue relevant to Navigators (allocation), and therefore, Texas law must apply;

    d.  Finding that the draft stop defects did not cause any covered "property damage" at the buildings in question;

    e.  Finding that the shear wall defects did not cause any covered "property damage" at the buildings in question;

    f.  Finding that Plaintiffs and Southstar have failed to allocate the bankruptcy award between covered and uncovered damages, meaning that their claims for coverage must fail as a matter of Texas law;

    g.  Finding that Navigators has no duty to indemnify or reimburse Plaintiffs or Southstar, and that Plaintiffs' and cross-claim plaintiffs Southstar's direct/cross-claims for breach of contract and declaratory judgment should be denied as to Navigators;

    h.  Finding that Plaintiffs and the cross-claim plaintiffs Southstar's direct/cross-claims

---

[146] There is no dispute that Ironshore has never "paid, offered to pay, or deposited in court the part of the judgment" within the $20 million aggregate limit of insurance in the Ironshore Policy.

[147] Count III of Navigators cross-claim was directed at Ironshore and the Court has ruled in Navigators' favor on the issues related to the per occurrence in the Ironshore Policy and the availability of a $20 million products-completed operations aggregate.  *See* Dkt. 435, pp. 12-13, 15-16.

for supplemental relief, attorneys' fees, paralegal fees and/or court costs should be denied as to Navigators;

i.  Finding, in the alternative, and only if necessary, that even if there are covered damages because of "property damage" which reach the Navigators Excess Policy, Navigators has not breached any duty to indemnify given the absence of underlying exhaustion;

j.  Finding that Plaintiffs and Southstar are not entitled to post-judgment interest, or in the alternative, that Navigators owes no duty to pay any such post-judgment interest;

k.  Any other and further relief that this Court deems equitable, just and proper.

Respectfully submitted on this 10th day of April 2026.

By: /s/ Wayne S. Karbal

Wayne S. Karbal (admitted *pro hac vice*)
Illinois Bar No. 6207190
wkarbal@karballaw.com
Thomas D. Ferguson (admitted *pro hac vice*)
Illinois Bar No. 6312788
tferguson@karballaw.com
Karbal, Cohen, Economou, Silk & Dunne, LLC
200 S. Wacker Drive, Suite 2550
Chicago, IL 60606
Tel:    (312) 431-3610
*Counsel for Navigators Specialty Insurance Company*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on April 10, 2026, a true and accurate copy of Defendant Navigators Specialty Insurance Company's Post-Trial Brief was served by ECF transmission on all parties receiving ECF service in this case.

/s/ Thomas D. Ferguson
Thomas D. Ferguson

54