United States District Court
Southern District of Texas
**ENTERED**
August 19, 2026
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| URBAN OAKS BUILDERS LLC, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:19-CV-04211 |
| | § | |
| GEMINI INSURANCE COMPANY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The parties and their counsel appeared before this Court for a bench trial for the determination of their claims in the above-styled and numbered case. After considering the evidence presented at trial and the arguments of counsel, this Court makes the following findings of fact and conclusions of law. In doing so, the Court will first give a brief background and set out some facts to which the parties have agreed. The Court will then address the issues raised by the parties at trial and in their post-trial submissions. While the trial before the Court concerned insurance issues, many of these issues are intertwined with the construction problems at the project in question so the Court by necessity will, to a certain degree, address both. The Court will, in this Order, recount various key facts that were proven, but it will not attempt to discuss all of the evidence proffered at trial. Except where noted, all factual statements are to be considered findings of fact and all legal conclusions are to be considered conclusions of law regardless of the fact that they are contained in paragraph/opinion form.

## I. BACKGROUND

The Plaintiffs in this case are Urban Oaks Builders, LLC ("UOB"), Hines Interests Limited Partnership ("HILP"), 1662 Multifamily LLC, Hines 1662 Multifamily LLC, Hines Investment Management Holdings Limited Partnership, HIMH GP LLC, Hines Real Estate Holdings Limited Partnership, and JCH Investments, Inc. (collectively, "Hines"). Hines is a large developer headquartered in Houston, Texas. While a separate legal entity, UOB was formed as an in-house construction group for Hines. UOB and Hines entered into an Operational Services Agreement in July 2011, whereby Hines agreed to provide certain services for UOB, including insurance services, cash management services, and other services. *See* (Doc. No. 523-5, Dep. of Richard Mercer at 65:17–25, 66:4–8, 71:2–11, 74:9–23) (former UOB president).

In July 2014, UOB contracted with 1662 Multifamily LLC to be the general contractor on the construction of six four-story apartment buildings and a clubhouse located at 1662 Celebration Boulevard, Celebration, Florida 34747 known as "Sola at Celebration" (the "Project"). UOB subsequently entered into contracts with various subcontractors. Hines hired Willis Towers Watson ("WTW") to procure the Project's insurance coverage for UOB and others. WTW contacted RT Specialty, which served as the surplus lines broker. Chad Hall of RT Specialty submitted information to Gemini Insurance Company ("Gemini") to inquire about Gemini's interest in providing a quote for insurance coverage regarding UOB's construction projects. UOB and its subcontractors, as well as certain Hines entities, were subsequently enrolled in a Controlled Insurance Program ("CIP") to provide general liability insurance for the Project. As a result, the

term "insureds" under the CIP includes UOB, Hines Interests Limited Partnership ("HILP"),[1] and the subcontractors.

The CIP involved multiple insurance companies. Defendants Gemini, Ironshore Specialty Insurance Company ("Ironshore"), Navigators Specialty Insurance Company ("Navigators"), and Great American Assurance Company[2] all issued policies as part of the CIP. Gemini, the primary carrier, issued "Commercial General Liability Policy" number VCWP001075 covering the period from June 28, 2012 through July 31, 2017 ("Gemini Policy"). The Gemini Policy contains a limit of $2,000,000 for each occurrence with $4,000,000 as the general aggregate and $4,000,000 as the products-completed operations aggregate. Ironshore, who provided the first level of excess coverage, issued "ExcessProtect Commercial Excess Liability Policy" number 001402500 covering the period from June 28, 2012 through July 31, 2017 ("Ironshore Policy"). The Ironshore Policy "follows form" to the Gemini Policy. This Court previously held that the Ironshore Policy does not contain a single occurrence limit of $10,000,000 as it was deleted by Endorsement 15 in the policy. *See* (Doc. No. 435). The applicable policy contains a $25,000,000 limit for general aggregate and a $20,000,000 limit for products-completed operations aggregate.

Navigators issued the next layer of insurance in excess of the Ironshore policy limits. Its policy is "Follow Form Excess Liability Policy" number SE12FXS754225IC covering the period from June 28, 2012 through July 31, 2017 ("Navigators Policy"). As the name implies, the Navigators Policy also follows form. The Navigators Policy has limits of $15,000,000 for each

[1] Endorsement 6 – "Named Insured Endorsement" of the Gemini Policy lists "Hines Interests Limited Partnership" and "Urban Oaks Builders, LLC" as the "First Named Insured." The Endorsement goes on to state that "Other Named Insured(s)" includes partners, venture members, subsidiary companies, joint ventures, and other organizations/entities of the "First Named Insured."

[2] The Court previously granted the third level excess carrier Great American Assurance Company's Unopposed Motion for Summary Judgment on the claims against it. (Doc. No. 419).

event with $15,000,000 as the general aggregate limit, and a $15,000,000 products-completed operations aggregate limit.

The construction on the Project was completed in February 2016. While it was "built" by UOB, it was actually owned at that point by 1662 Multifamily—a different Hines entity. Southstar Capital Group I, LLC, as agent for Cottington Road TIC, LLC and Durban Road TIC, LLC, (collectively "Southstar") purchased the Project from 1662 Multifamily in October 2016. Even at the time of purchase, some problems with the construction of the Project were apparently known. Throughout 2017, several investigations concerning the building defects took place as the parties sought to identify all the problems, come up with a repair plan, and figure out who was going to pay for the repairs and how.

On or about February 17, 2017, Southstar formally notified UOB that there were some defects with the Project. On February 21, 2017, Gemini and Ironshore received a notice of claim. UOB then entered into a Warranty Work Agreement with Southstar to perform warranty work at the Project on June 26, 2017. On June 30, 2017, Gemini sent Hines and UOB a Reservation of Rights letter. Gemini, UOB, and Hines subsequently entered into a Non-Waiver Agreement on July 17, 2017. On July 21, 2017, UOB sent correspondence to Gemini, seeking reimbursement of certain defect-related expenses in the amount of $162,734.80.

Despite the efforts to identify the problems and/or come up with a strategy to repair them, on August 14, 2017, the Osceola County Building Department posted a "yellow tag" at the Project, declaring that the premises were "unsafe." (Plaintiffs' Trial Ex. 28). The notice stated that nobody was to access the Project other than authorized construction personnel. As a result, Southstar subsequently issued a letter to all tenants stating that the tenants may continue to reside at the apartment complex at their own risk for only the next 30 days, after which they must vacate the

premises. Southstar also informed them that it would issue a refund of the security deposit and any August rent, as well as a credit for moving expenses. (Plaintiffs' Trial Ex. 31).

As of September 26, 2017, defect-related cost estimates for the Project totaled a projected $4,657,000, a sum that did not include any lost rents incurred by Southstar. On September 27, 2017, UOB advised Gemini that Southstar demanded over $734,000 for August 2017 alone. On October 4, 2017, UOB sent correspondence to Gemini alleging that "Gemini ha[d] violated the Texas Prompt Payment Statute (Texas Insurance Code Chapter 542) for its inaction relating to Urban Oaks' claim on July 21, 2017" and "[i]f Urban Oaks files suit against Gemini, Urban Oaks will be seeking such interest and attorneys' fees, along with any other remedies to which it is entitled."[3] (Gemini's Trial Ex. 21 at GIC 002219). On October 5, 2017, UOB sent correspondence to Gemini, attaching an expense sheet and invoices, seeking reimbursement in the amount of $1,253,856.91. (Plaintiffs' Trial Ex. 42). The letter also reiterated that "Gemini ha[d] already violated Chapter 542 of the Texas Insurance Code for its failure to timely pay Urban Oaks' claim of $162,734.80, which was submitted on July 21, 2017." (Gemini's Trial Ex. 21).

On October 10, 2017, Gemini paid $164,734.80 to UOB. (Plaintiffs' Trial Ex. 41). Part of that $164,734.80 check included payment of a $2,565.00 Baker Botts invoice reflecting work as defense counsel against the Southstar claims. *See* (Doc. No. 537, Day 4-AM Trial Tr. at 83:3–15) (Bettyann Canzone, the corporative representative of Gemini, testified that including the $2,565 payment to Baker Botts in the October check was "an oversight."); (Plaintiffs' Trial Ex. 25 at 98–100) (the Baker Botts invoice). On October 16, 2017, UOB and Hines forwarded a purported "558

[3] The Court points out that long before this dispute arose, UOB was already applying Texas law to its insurance relationship with the Defendants multiple times in October of 2017, contrary to its post-trial choice-of-law arguments. *See infra* Section IV.

notice letter"[4] that they had received from Southstar to Gemini. Gemini issued another check to UOB in the amount of $935,005.43 on November 9, 2017. On November 14, 2017, Southstar and UOB entered into a "Standstill Agreement" pursuant to which UOB agreed to pay Southstar $2,050,398.72 (to be credited against any future judgment if Southstar prevailed in litigation). On November 16, 2017, counsel for UOB sent documentation to Gemini, Ironshore, and Navigators that had attached invoices supporting the $2,050,398.72 figure contained in the Standstill Agreement.

On or about January 10, 2018, Southstar provided a draft Repair Work Agreement and draft Guaranty for Repair Work Agreement to UOB and demanded that Hines guaranty UOB's obligations under the Repair Work Agreement.[5] On January 23, 2018, Gemini made what would be its final payment to UOB in the amount of $900,259.77. This payment meant that overall Gemini had paid UOB $2,000,000.

Nevertheless, on February 13, 2018, Southstar filed suit against UOB and others in Florida state court (the "Construction Defect Action") asserting the following claims: Count I—Piercing the Corporate Veil/Alter Ego; Count II—Fraudulent Non-Disclosure/Fraudulent Inducement; Count III—Breach of Contract—Intentional Withholding of Material Information; Count IV—Statutory Violations of Florida Statutes 553.84 (which involves a statutory cause of action for

[4] The parties dispute whether this notice letter constituted the first written notice from Southstar under Florida's Chapter 558 process. Fla. Stat. Ann. § 558.004 (West); *see* (Doc. No. 537, Day 2-PM Trial Tr. at 9:25–10:6) (Colagiovanni testified: "I'm going to call [it] the 558 Demand Letter, which you know, [it] is not titled that way, but we treated it that way."). Ultimately, the Court finds that Plaintiffs did not invoke Florida's Chapter 558 process because neither Southstar nor UOB provided evidence that they followed the procedural requirements of the process. Additionally, UOB provided no evidence that Gemini consented to UOB's submission to this alternative dispute process, as required under the Gemini Policy. Further, UOB and Southstar later agreed to forgo the 558 process in their Standstill Agreement. (Plaintiffs' Trial Ex. 51 at 1). Therefore, the Chapter 558 process is not an issue in this case. *See infra* Section V.A.

[5] UOB had earlier represented to Southstar that between Hines and UOB, "to the extent not recovered from insurance," it could pay the costs for whatever it had "responsibility." (Gemini's Trial Ex. 65).

violation of the Florida Building Codes Act); and Count V—Negligence ("Southstar Complaint"). Although the Southstar Complaint alleged that all defendants were liable on all counts because they were alter egos, Counts I-III alleged conduct by 1662 Multifamily and Counts IV-V alleged conduct by UOB.

On March 2, 2018, UOB and Hines sent correspondence to Gemini and Ironshore, enclosing a copy of the Southstar complaint served against them in the Construction Defect Action, noting that their answers to the complaint were due on March 18, 2018. Considering its prior payments totaling $2,000,000 (discussed above), on March 21, 2018, Gemini declared its policy limits were exhausted by its prior payments and therefore its duty to defend did not exist.[6] According to Gemini, the Construction Defect Action only involved a single "occurrence," and Gemini had exhausted its obligations under the Policy by paying the $2,000,000 to UOB.

Ironshore, on the other hand, took the position that Gemini's policy limits had not been exhausted because "[a] mere payment by an underlying carrier of its limits without procurement of a release is not payment of loss." (Plaintiffs' Trial Ex. 75). Notwithstanding this contention, on July 18, 2018, Ironshore sent correspondence to UOB agreeing to provide a defense to Plaintiffs in the Construction Defect Action. (Gemini's Trial Ex. 47). Ironshore, in fact, lined up a lawyer, Peter Befera, to act as defense counsel for Plaintiffs. (Gemini's Trial Ex. 48).

After months of litigation in Florida state court, on August 21, 2018, UOB filed for Chapter 11 bankruptcy relief in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Action"). *See In re: Urban Oaks Builders LLC*, Bankruptcy Case No. 4:18-34892. Baker Botts, LLP, the law firm serving as the primary counsel for UOB in its defense against the

[6] *See infra* footnote 14.

Southstar claims, hired Matthew Okin, and his law firm, Okin Adams, as bankruptcy counsel to UOB. Based upon the Bankruptcy Action, on September 6, 2018, UOB removed the Construction Defect Action to federal court in the Orlando Division of the Middle District of Florida. *See Southstar Capital Group I, LLC, et al. v. 1662 Multifamily LLC, et al.*, Case No. 6:18-cv-01453-ACC-DCI.[7]

Meanwhile, in October of 2018, Ironshore sent correspondence to Plaintiffs as a follow-up to a telephone conversation between Ironshore's lawyers and Plaintiffs' lawyers regarding Befera serving as their defense counsel. In the correspondence, Ironshore stated that Plaintiffs' response to Ironshore's defense offer was "that while [Plaintiffs] understood Ironshore's offer to defend Urban Oaks and all the Hines entities, [Plaintiffs] would not agree to Ironshore's defense now until **all four insurance carriers** (Gemini, Ironshoe [sic], Navigators and Great American) agree to withdraw their reservations, and commit that they would be responsible for the full value of any judgment entered against those entities." (Gemini's Trial Ex. 48) (emphasis in original). Ultimately, this did not occur. Therefore, Ironshore's offer of defense was rejected by Plaintiffs.

On January 4, 2019, the Construction Defect Action was transferred to the United States Bankruptcy Court for the Middle District of Florida, Orlando Division ("Florida Bankruptcy Court"). *See Southstar Capital Group, I, LLC et al v. 1662 Multifamily LLC et al*, Bankruptcy Case No. 6:19-mp-00001-KSJ. On May 7, 2019, the Florida Bankruptcy Court entered an order transferring the case to the United States Bankruptcy Court for the Southern District of Texas, where UOB's bankruptcy was pending. On May 21, 2019, however, Southstar appealed this transfer order to the Orlando Division of the Middle District of Florida. *See Southstar Capital*

---

[7] For clarity, any citations to a docket entry in the related cases will include the cause number and the corresponding docket number.

*Group I, LLC, et al. v. 1662 Multifamily LLC, et al.*, Case No. 6:18-cv-01453-PGB-DCI (Doc. No. 72). The Florida Bankruptcy Court stayed the transfer order pending the outcome of Southstar's appeal.

On November 26, 2019, the Florida District Court reversed the Florida Bankruptcy Court's transfer order to the Texas Bankruptcy Court and remanded the Construction Defect Action to the Florida Bankruptcy Court for consideration on the merits. *See* (No. 6:18-cv-01453-PGB-DCI, Doc. No. 75). UOB appealed the Florida District Court's remand order to the United States Court of Appeals for the Eleventh Circuit. *See* (No. 6:18-cv-01453-PGB-DCI, Doc. No. 79). The Florida District Court granted a stay of the remand order pending appeal to the Eleventh Circuit.

Southstar's claims against UOB were eventually reconstituted in the Bankruptcy Court located in Houston in July of 2019 as a Proof of Claim. Southstar's Proof of Claim against UOB in the Bankruptcy Action asserted over $45,000,000 in damages.[8] UOB objected to that Proof of Claim. On October 24, 2019, Navigators agreed to defend Hines and UOB in both the Florida Construction Defect Action and the Bankruptcy Adversary Action under a reservation of rights. Navigators eventually paid $742,069.38 in defense costs to defend Hines in the ongoing Construction Defect Action in Florida and UOB in the claim objection hearing over Southstar's claim.

On April 30, 2020, the Bankruptcy Court for the Southern District of Texas entered a Consent Order, setting forth an agreement that UOB would dismiss its appeal to the Eleventh

[8] Southstar Capital Group I, LLC was acting as the administrative agent for Cottington Road TIC, LLC, and Durban Road, TIC, LLC. Although for ease of reference the claimants are referred to as "Southstar" here, Southstar Capital Group I, LLC seemingly had no direct claim against UOB. The claim based primarily upon a negligence theory was on behalf of Cottington Road, TIC, LLC and Durban Road TIC, LLC.

Circuit and the automatic stay would be modified so that Southstar could continue to litigate against the non-debtor defendants (Hines) in Florida state court. *See* (Bankruptcy Case No. 4:18-34892, Doc. No. 503). The Consent Order required that UOB would be dismissed with prejudice from the Florida state court action and Southstar would only pursue its claims against UOB in UOB's Texas bankruptcy case. In accordance with this Consent Order, UOB voluntarily dismissed its appeal to the Eleventh Circuit. On May 28, 2020, the Florida Bankruptcy Court remanded Southstar's case against Hines and some "unknown John Does"[9] to the Circuit Court in the Ninth Judicial Circuit in Osceola County, Florida, for full and final resolution.

Meanwhile, Southstar made the business decision to sell the apartment complex rather than repair it. Southstar sold the Project to Cohen Goldstein Investment Strategies ("CGI") for $43,000,000 in February 2019. Southstar claims, based upon its original purchase price of $67,000,000 and the amount it sold the Project for, it lost $39,000,000 in the value of the Project. In its Proof of Claim, Southstar sought to recover this lost value plus lost profits (rents) in addition to various fees and costs. These were its primary claims for damages when it litigated the dispute in the Texas Bankruptcy Court. Alternatively, Southstar sought the cost of repair/restoration, despite the fact that it never effectuated the repairs. Southstar's buyer, CGI, eventually hired Turning Leaf Construction ("TLC") to repair the complex. No evidence was presented to this Court about the extent and cost of any of the actual repairs.

In the action over Southstar's claims in the Texas Bankruptcy Court, the Bankruptcy Court held a four-day claim objection hearing on Southstar's claims against UOB. Ultimately, the

[9] Southstar brought suit against "unknown John Does" to recover a portion of the sales proceeds from unknown investors in the Project who allegedly received funds when 1662 Multifamily sold the Project to Southstar.

Bankruptcy Court rejected Southstar's loss of value damage theory. On February 19, 2020, the Bankruptcy Court entered Judgment on Debtor's Objection to Southstar Capital Group I, LLC, Durban Road TIC, LLC, and Cottington Road TIC, LLC's Proof Claim against UOB in favor of Southstar in a representative capacity, allowing a claim in the amount of $26,103,717.38 ("Bankruptcy Judgment"). This judgment includes: "(i) $8,226,243.00 in lost profits; plus (ii) non-legal professional fees and costs in the amount of $732,262.00; plus (iii) restoration costs of $18,439,945.46; minus (iv) the Debtor's prepetition payments in the amount of $2,251,263.33,"[10] plus prejudgment interest in the amount of $956,530.25. (Plaintiffs' Trial Ex. 134).[11] The Bankruptcy Judgment did not apportion any of the sums described above as being caused by those repairs that were covered by insurance from those that were not, nor did the Bankruptcy Court pinpoint what individual repair costs made up the $18,439,945.46 figure. No party appealed the Bankruptcy Judgment.

At some point, UOB and the Hines entities filed a lawsuit in Florida state court against the CIP insurers and others, seeking coverage for defense costs and indemnity for the Bankruptcy Judgment. When that suit became mired in a jurisdictional dispute, Plaintiffs voluntarily dismissed the Florida case and refiled their claims against the insurers and others as an adversary action in

---

[10] The Bankruptcy Judgment was adjusted to give credit for UOB's payments to Southstar pursuant to the Warranty Work Agreement and Standstill Agreement. As such, the judgment includes a credit of $2,251,263.33 for UOB's prepetition payments, of which $2,000,000 was presumably paid by Gemini. UOB admitted in previous briefing before this Court that "Gemini paid $2,000,000 of this prepetition." (Doc. No. 463 at 9). Ironshore has not made any indemnity payments towards the Bankruptcy Judgment, nor has it paid any defense costs.

[11] The Bankruptcy Court found that Southstar was acting in a representative capacity and so it actually did not award Southstar any recovery. Instead, the claim of the two principals (Durban Road TIC, LLC, and Cottington Road TIC, LLC) were the ones actually recognized. The Court here continues to refer to the recovery as Southstar's for purposes of continuity.

its Texas bankruptcy case. On the Bankruptcy Court's Recommendation, this Court withdrew the reference to Bankruptcy Court as to this adversary action.[12]

Plaintiffs filed a First Amended Complaint in this case asserting claims against the insurers for (1) turnover under 11 U.S.C. § 542 (against Gemini and Ironshore); (2) breach of contract; (3) declaratory relief; (4) violations of the Texas Insurance Code; (5) violation of § 624.155, Florida Statutes; and (6) Florida common law bad faith. (Doc. No. 78).[13] For relief, Plaintiffs seek actual damages, declaratory judgments (as described in their request for declaratory relief), attorneys' fees, pre- and post-judgment interest, costs of court, supplemental relief, damages pursuant to § 541.061 of the Texas Insurance Code, punitive damages pursuant to § 624.155(5), Florida Statutes, extra-contractual damages, and "[a]ll other legal and equitable relief to which Plaintiffs may be justly entitled." (*Id.* at 41). This Court previously dismissed Plaintiffs' turnover claim with prejudice and all extracontractual claims without prejudice. (Doc. Nos. 177, 178, 194).

In 2021, the Court adopted a Memorandum and Recommendation ("M&R") by Magistrate Judge Christina A. Bryan. *See* (Doc. No. 313, adopted by Doc. No. 328). Among other issues, the M&R considered whether Plaintiffs' claims for defense and indemnity under the insurance policies involve a single occurrence or multiple occurrences as defined in the Gemini Policy. (Doc. No. 313). Judge Bryan found (and this Court agreed) that the Southstar claims involve multiple occurrences rather than a single occurrence. As a result, the Court determined that Gemini had a

[12] The parties in the adversary claim actions originally requested a jury trial which no doubt contributed to the Bankruptcy Court's recommendation for a withdrawal of the reference. Ultimately, after having been in this Court for some time, all of the parties agreed on a trial to the Bench.

[13] The Plaintiffs in this action are Urban Oaks Builders, LLC ("UOB"), Hines Interests Limited Partnership, 1662 Multifamily LLC, Hines 1662 Multifamily LLC, Hines Investment Management Holdings Limited Partnership, HIMH GP LLC, Hines Real Estate Holdings Limited Partnership, and JCH Investments, Inc (collectively, "Hines"). It is important to note that, before trial, they claimed Texas law applied to their policy-based claims against the insurers.

duty to defend its insureds until it reached the aggregate limits of liability for *multiple* occurrences under the Gemini Policy, rather than a single occurrence. Gemini's Policy limits had, thus, not been exhausted, and its duty to defend had not terminated.[14] Judge Bryan did not rule on the precise number of occurrences because the issue to be decided was whether or not the claimed damages resulted from "one proximate, uninterrupted, and continuing cause," rather than the number of defects or "effects" from the alleged accident. (*Id.* at 17). This Court accordingly had no need to decide the exact number of occurrences at that time.

After the Court's ruling on the multiple occurrences issue, the parties filed various dispositive motions seeking rulings on the duties to indemnify and defend as to the primary carrier (Gemini) and the first and second level excess carriers (Ironshore and Navigators). As a result, the Court made several rulings in the time leading up to trial: (1) Ironshore's indemnity obligations are limited to satisfaction of the $20,000,000 products-completed operations aggregate limit, (Doc. No. 435); (2) the costs related to "core" bankruptcy proceedings are not recoverable as direct damages but may be recoverable as consequential damages for breach of the duty to defend, (Doc. No. 437); (3) defense costs related to the adversarial proof of claim hearing held in the Texas Bankruptcy Court may be recoverable as direct damages if they were reasonable, necessary, and expended for the purpose of defending against Southstar's claims, (*Id.*); and (4) Navigators did not have a duty to defend Plaintiffs because Gemini's duty to defend had not terminated, meaning Navigators is entitled to seek reimbursement for its defense costs from Gemini, (Doc. No. 438).

---

[14] The Gemini Policy had a single occurrence limit of $2,000,000. Attorneys' fees, according to the Policy, do not count against this two million dollar coverage. In reaching the conclusion that it had exhausted its single occurrence limit, Gemini wrongfully deducted from UOB insurance limits a $2,565 payment to the law firm of Baker Botts. Thus, at the time in question, it arguably had not even exhausted its single occurrence limit. This issue, while of some significance, is not of critical importance given this Court's finding of multiple occurrences.

The Court then instituted a new scheduling order so that the parties had adequate time to amend their pleadings if needed, complete any outstanding discovery, and have their experts ready to address the construction defect and insurance coverage issues. (Doc. No. 441). It later, at the request of the parties, extended those deadlines. (Doc. No. 456). A bench trial was held in December of 2025.

At trial, and in post-trial briefing, Plaintiffs argued that they are entitled to damages from the insurers based on their claims for (1) breach of the duty to defend, and (2) breach of the duty to indemnify. The Court first discusses the construction defects themselves and to what extent they are covered under the insurers' policies before delving into Plaintiffs' claims.

## II. THE DEFECTS

In order to understand the ultimate legal issues, one must have at least a basic understanding of the Project's construction problems. All parties seem to concede that the design of the Project was good, and that the problems resulted from a failure to build the project as it was designed. Throughout this case, the parties, and their experts, have generally agreed that the Project suffered from multiple construction defects related to the following: (1) the corner balconies; (2) the shear walls; (3) the stucco flashings and water resistive barrier; (4) the draft stop penetrations; and (5) the miscellaneous roofing conditions. *See* (Doc. No. 537, Day 5-AM Trial Tr. at 51:15–52:2) (Plaintiffs' expert, Michael Horst's, testimony); *see also* Dep. Designations of Keith Borchardt at 28:7–22 (Controller and corporate representative of UOB) (testifying to the 5 categories he saw in Horst's report). According to multiple experts, nearly all of the ancillary damage caused by some of the select defects manifested in every building of the Project. *See* (Doc. No. 537, Day 5-PM Trial Tr. at 34:18–35:5) (Horst's testimony) ("the conditions were consistent"); *see also* (Doc. No. 537, Day 6-AM Trial Tr. at 28:1–5) (Del Vecchio's testimony) ("All six of the four-story buildings

had the same issues, some more severely than others based on their exposure, but they all had the same issues. And when we did the investigation, they all had the same lack of compliance with the design documents.").

Several professionals were hired to investigate and evaluate the Project defects. Michael Horst, a structural engineer, testified at trial that his engineering firm, Wiss, Janney, Elstner Associates, Inc. ("WJE"), was hired by Hines/UOB to provide its opinion regarding the construction defects; identify additional damages resulting from those defects; identify the work required to address the defects, including the ancillary damages[15] and removal; and identify additional work required to facilitate repair. *See* (Doc. No. 537, Day 5-AM Trial Tr. at 76:20–24). Michael Del Vecchio, a contractor and real estate development professional, testified that Southstar hired his consulting firm, PJDCCI, LLC, to conduct a visual investigation of the Project in August of 2017 after Southstar received the "yellow tag" from the Osceola County Building Department. *See* (Doc. No. 537, Day 6-AM Trial Tr. at 8:12–17, 14:24–16:16, 16:23–25). Lastly, the parties stipulated to several facts from Southstar's expert, Michael Rimoldi, who attested to the "yellow tag," and the process to cure the building violations under the Florida Building Code. *See* (Doc. No. 529).

**A. The Corner Balconies**

Horst testified that when he first went out to view the Project, he immediately noticed how the corner balconies were "slanted" and "sagging down." (Doc. No. 537, Day 5-AM Trial Tr. at 50:2–9). He testified that all six of the apartment buildings showed this condition. *See* (*id.*, Day 5-

[15] Horst testified that an "ancillary defect" is a defect that results when a construction defect damages a different building component, an example being the cantilever balconies caused "broken windows" and "damage to the waterproofing." (Doc. No. 537, Day 5-PM Trial Tr. at 13:5–9).

AM Trial Tr. at 63:17–22). Del Vecchio similarly testified that the "first sign of visible distress" that he noticed at the Project was the "excessive slopes on the corner balconies on each end of the buildings." (*Id.*, Day 6-AM Trial Tr. at 17:5–8). Richard Mercer, the former president of UOB, also testified that he observed that the balconies were "sagging." *See* (Doc. No. 523-6, Dep. Designations of Richard Mercer at 96:18–25).

Horst testified that the cause of this condition was that the corner balconies had not been built according to the engineer's drawings. Essentially, the engineered lumber columns required to support the cantilevered beams at the corner balconies were too short when installed. Two, nominal two-inch thick wood pieces ("lumber blocking") were installed above and below the lumber columns to support the cantilevered beams. As the structure was loaded, however, the lumber blocking was crushed by the weight of the cantilevered beams/balcony, causing the deflections in the balconies. To make matters worse, the backside of the cantilevered beams were meant to have straps that held them down, but some straps and clips were not installed, allowing the end of the beams within the wall assembly to rotate upwards.

As a result of this construction defect, Horst identified the following ancillary damages: broken windows, racked balcony doors, damaged waterproofing membrane on the balcony, and damaged roofing over the corner balconies, causing water intrusion at the balcony wall to the balcony interface. *See* (Doc. No. 537, Day 5-AM Trial Tr. at 94:24–95:19). Del Vecchio testified that the corner balcony doors were "out of square," or had become "trapezoids," binding the door leaves to the frames, meaning they could not be opened. (Doc. No. 537, Day 6-AM Trial Tr. at 21:17–21). The water intrusion also led to decayed sheathing and decayed balcony joists, as well as water damage to the wall framing. *See* (Doc. No. 537, Day 5-AM Trial Tr. at 95:20–24). Del

Vecchio testified that the door assemblies leading out onto the internal unit balconies had to be replaced due to water intrusion. *See* (Doc. No. 537, Day 6-AM Trial Tr. at 65:7–18).

**B. The Stucco Flashings and Water Resistive Barrier**

Proper stucco flashings and a water resistive barrier are essential for preventing water leakage into the buildings and thereby protecting the stucco from water damage. One of the primary elements of Southstar's claim regarding issues with the building envelope (the physical barrier between the Project's interior and exterior) were defects in the water resistive barrier and the stucco flashings. Specifically, Horst testified that he observed missing flashings at the roof-to-wall interfaces and in the stucco assembly (the multi-layered stucco wall). Flashings are typically waterproof materials installed at joints and intersections in a building's exterior to prevent water from seeping into the building. Horst explained that stucco itself is porous, meaning it will allow water to travel through it. As such, flashings must be installed to collect that water and redirect it back to the exterior. *See* (Doc. No. 537, Day 5-AM Trial Tr. at 83:20–24).

Horst noticed that at the balcony edge beams, basically "a box of stucco" was built without any flashings to remove water which caused water to come in and just sit underneath the beams, ultimately decaying them. (*Id.*, Day 5-AM Trial Tr. at 83:24–84:2). While they were present on the balconies, the stucco and water resistive barrier problems were not confined to just the balconies. There were also missing stucco flashings at the balcony edge beams, the garage door headers, and the breezeway openings. Del Vecchio testified that there were "no kickout flashings" where the roof edges met the exterior walls and "no head flashings at windows or doors." (*Id.*, Day 6-AM Trial Tr. at 63:8–9). Horst testified that the flashings missing between the roof membrane and the stucco led to water intrusion that caused extensive decay of the wood framing supporting decorative, vertical fins located outside the building. The decayed wood behind the decorative fins

led to coping issues and cracking in the stucco covering the fins. *See* (*id.*, Day 5-AM Trial Tr. at 60:23–24, 84:3–7, 21–24).

Additionally, the exterior walls of the Project were engineered to be sheathed in a proprietary oriented strand board ("OSB") structural panel with an integral weather resistive barrier overlay, known as Zip System Wall Sheathing. The sheathing and proprietary seam tape provided the weather resistive barrier for the exterior walls of the buildings. Del Vecchio testified that there was "missing [waterproof, sealing] tape at the ZIP board, which is the sealant at the joints." (*Id.*, Day 6-AM Trial Tr. at 30:9–12). He also testified that nail heads were overdriven, penetrating the waterproofing applied to the OSB. (*Id.*, Day 6-AM Trial Tr. at 30:12–16). Horst additionally confirmed that the overdriven nails and fasteners in the Zip System sheathing punctured the coating of the sheathing and caused a "breach" in the water resistive barrier. (*Id.*, Day 6-AM Trial Tr. at 85:3–8). The holes in the water resistive barrier allowed water to penetrate the sheathing, causing the sheathing to decay. Water was also able to reach the framing, causing decay of some framing members. (*Id.*, Day 6-AM Trial Tr. at 68:1–7).

Ultimately, the missing flashings at the roof-to-wall interfaces caused ancillary damage in the form of decayed wood sheathing and framing on the fins. (*Id.*, Day 6-AM Trial Tr. at 67:11–25). The missing stucco assembly flashings caused water to be trapped against the wood sheathing, leading to decayed sheathing, balcony edge beams, and header beams. (*Id.*, Day 6-AM Trial Tr. at 100:16–25; 101:1–9). The combination of these two defects in the building envelope also reportedly led to decay of the floor joists supporting the interior balconies. (*Id.*, Day 6-AM Trial Tr. at 100:16–23, 101:10–17).

**C. The Miscellaneous Roofing Problems**

Horst testified that WJE was not hired to independently review the roofing conditions and so WJE relied on Bracken Engineering's report[16] and Michael Del Vecchio's bankruptcy claim objection hearing testimony as a source of information regarding the roofing. *See* (Doc. No. 537, Day 5-PM Trial Tr. at 6:6–13). Del Vecchio testified that the framing of the Project was not in compliance with the design documents or the building code, causing movement in the building that damaged the roofing. (*Id.*, Day 6-AM Trial Tr. at 26:21–24). Del Vecchio stated that the roof was a "single ply membrane roof" and the building movement "tore the membrane seams apart." (*Id.*, Day 6-AM Trial Tr. at 61:20–21).[17] He testified that some membrane seams were torn open, allowing water in. (*Id.*, Day 6-AM Trial Tr. at 26:16–18). Del Vecchio further testified that removal of all the roofing was necessary for two reasons: (1) so that the owner of the Project could get a roof warranty because the warranty was voided by the damage; and (2) because building codes in Florida at the time required a roof to be replaced if more than 25% of the roof required remediation. (*Id.*, Day 6-AM Trial Tr. at 18:6–11, 63:1–2).

In contrast, Horst testified that it was unclear to him what specific defect necessitated removal of all the roofing, which Del Vecchio contended was needed. *See* (Doc. No. 537, Day 5-PM Trial Tr. at 7:2–9). Additionally, Horst testified that the roofing issues were somewhat related to the stucco issues, in that there were flashings missing between the roof membrane and the stucco, leading to water damage. *See* (*id.*, Day 5-AM Trial Tr. at 60:20–61:1); *see also* (*id.*, Day

[16] Bracken Engineering's Report was admitted at trial for the limited purpose of it being before the Bankruptcy Court. *See* (Doc. No. 537, Day 1-AM Trial Tr. at 44:15–17).

[17] The Court does not find that the preponderance of the evidence demonstrated that the buildings were "moving" or "racking" as Del Vecchio maintains. Instead, the Court finds Horst's testimony that he did not see any defects that required the removal of all the roofing to be more persuasive.

6-AM Trial Tr. at 22:6–13) (Del Vecchio similarly testified that the roofing was not properly tied to the stucco, allowing water in the building). Horst and Del Vecchio also pointed out that there was no secondary emergency overflow drainage provided on the roof, which was required by code. *See* (*id.*, Day 5-AM Trial Tr. at 89:2–4); *see also* (*id.*, Day 6-AM Trial Tr. at 62:11–12). Generally, secondary roof drainage functions as a backup system to safely remove water if the main roof drains get blocked or overwhelmed by water. Horst stated that secondary drainage was needed, especially on a wood structure, because if the primary roof drains get clogged, the building was likely to get "ponding water" on the roof, which leaves the wood susceptible to collapse. (*Id.*, Day 5-PM Trial Tr. at 7:7–16). Horst did not identify any ancillary damage as a result of the drainage issues on the roof.

**D. The Shear Walls**

Shear walls were part of the Project's lateral load resisting system meant to withstand and safely transfer horizontal forces like severe winds and seismic activity. According to the construction drawings, certain walls in the Project were designated as shear walls consisting of either wood or gypsum sheathing fastened to wood-framed wall studs with nails placed at specified spacings along the edges and intermediate framing members. The shear walls were meant to have a specified type and spacing of nails connecting the bottom of the walls to the floor diaphragm below. The two ends of each shear wall were intended to perform as tension and compression chords to resist overturning, and a proprietary continuous load path ("CLP") rod system was designated for the tension chords.

Per various investigations of the Project conducted by Horst, Rimoldi (a former Florida building code inspector), and Del Vecchio, the shear walls were not constructed in accordance with the design documents. *See* (*id.*, Day 6-AM Trial Tr. at 25:9–10) (Del Vecchio's testimony).

The as-built shear walls did not have the correct sheathing material and/or the specified fastener spacing. Del Vecchio testified that the "end connections to the exterior wall were not in place"; "[t]he stud spacing was off"; "[t]here were no connectors"; and "[t]he nailing pattern for the sheathing, or the fastening pattern for the sheathing, was inconsistent with the design documents." (*Id.*, Day 6-AM Trial Tr. at 25:13–16). Additionally, the CLP rod system included loose connection nuts installed in incorrect locations with incorrect spacings between adjacent framing and rods. Further, the adjacent framing members did not match the specified sizes. Horst did not identify any ancillary damage as a result of the shear wall defects.

**E. The Draft Stop Penetrations**

Horst testified that the purpose of the draft stops was to prevent gases or smoke from going from one section of a building to another. He explained that draft stops "basically make it so it's almost like segmented portions of the building instead of one continuous run across the attic." (*Id.*, Day 5-PM Trial Tr. at 15:18–16:11). At the Project, a gypsum draft stop stretched the length of the breezeway on the fourth floor above the ceiling in between units, and three perpendicular draft stops segregated the attic into four spaces. All penetrations in a draft stop are required to be sealed to prevent air flow from one section to another. The Project, however, included unsealed draft stop penetrations, which would "allow air to go between, and smoke to go between, the two areas." (*Id.*, Day 5-AM Trial Tr. at 86:24–87:4) (Horst's testimony). Horst testified that plumbing and ductwork was run through penetrations in the draft stops, but fire sealant was not used to prevent air from flowing through them. (*Id.*, Day 5-AM Trial Tr. at 88:1–11). Built as such, the draft stops

are defective. Horst did not identify any ancillary damage as a result of the failure to seal the draft stop penetrations.

## III. THE GEMINI POLICY

For ease of reference, the Court lays out the relevant provisions of the Gemini Policy. It is important to remember that the excess carriers all have policies that "follow form" so, to a great extent, their coverage obligations are triggered by Gemini's. As amended by the Extended Products-Completed Operations Hazard Endorsement, Section I – Coverages of the Policy states:

> **1. Insuring Agreement**
>
> **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:
>
> **(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and
>
> **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.
>
> No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.
>
> **b.** This insurance applies to "bodily injury" and "property damage" only if:
>
> **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
>
> **(2)** The "bodily injury" or "property damage" occurs during the policy period, except for "bodily injury" or "property damage" included in the products-completed operations hazard. For "bodily injury" or "property damage" included in the "products-completed operation hazard" the "bodily injury" or "property damage" will be covered only if it occurs during the policy period or within the "extended products-completed operations period"; and

> **(a)** "Extended products-completed operations period" means during the period of time allowed by the applicable law, in effect at the inception date of the policy, for claims or suits to be brought against the insured.
>
> **(b)** The occurrence period described in this endorsement is considered part of the original policy period for purposes of determining the Limits of Insurance. The Products-Completed Operation Aggregate Limit applies for the entire policy period including the "extended Products-Completed operations period".

(Gemini's Trial Ex. 1 at 1) (emphasis added). The Supplementary Payments – Coverages A and B section of the Policy, which controls Gemini's duty to defend obligations, provides:

> **1**. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:
>
> **a**. All expenses we incur.
>
> * * *
>
> **e**. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.
>
> **f**. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.
>
> **g**. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.
>
> <u>These payments will not reduce the limits of insurance.</u>

(*Id.* at 8) (emphasis added). Section IV – Commercial General Liability Conditions states:

> **2. Duties In The Event Of Occurrence, Offense, Claim or Suit**
>
> * * *
>
> **b**. If a claim is made or "suit" is brought against any insured, you must:
>
> **(1)** Immediately record the specifics of the claim or "suit" and the date received; and
>
> **(2)** Notify us as soon as practicable.
>
> You must see to it that we receive written notice of the claim or "suit" as soon as practicable.
>
> **c**. You and any other involved insured must:
>
> **(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";
>
> **(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

(*Id.* at 10–11).

Section V – DEFINITIONS of the Gemini Policy defines the relevant terms as follows:

> **13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>
> * * *
>
> **17.** "Property damage" means:
>
> **a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> **b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
>
> * * *
>
> **18.** "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:
>
> **a.** An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or
>
> **b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

(*Id.* at 14–15) (emphasis added). The Gemini Policy also contains the "Named Insured Endorsement" which lists "Hines Interests Limited Partnership and Urban Oaks Builders, LLC" as named insureds. Further, Endorsement 28 of the Policy, "Amendment – Damage to Your Work," removed the "your work" exclusion from the Policy, which stated that "'Property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard'" was excluded from Coverage. (*Id.*) (Endorsement 28).

Under the Gemini Policy (and, by extension, the Ironshore and Navigators Policies), the insurers "will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage.'" (*Id.* at 1). The Policy specifically states that this insurance applies to "'property damage' only if . . . 'property damage' is caused by an 'occurrence.''' (*Id.*). As indicated by the definitions of "property damage" and "occurrence" quoted above, covered "property damage" includes "physical injury to tangible property" or "loss of use of tangible property" "caused by" "an accident." (*Id.* at 1, 14–15).

The key to determining Gemini's (and the other insurers') liability is discerning what losses are covered under the Policy. Gemini's Policy obligates Gemini to pay only for "property damage" caused by an "occurrence." It does not automatically cover the cost to repair defective construction. Accordingly, the Court must determine whether disputed construction defects actually caused "property damage."

**A. Coverage for the Construction Defects**

The parties dispute which construction defects are covered by the Policy, and which are not. Plaintiffs generally contend that all of the defects are covered as "property damage" under the Policy, while the insurers argue that at least two, if not more of the identified defects at the Project—the shear walls and the unsealed penetrations in the draft stops—do not constitute property damage and did not cause property damage, meaning they are not covered under the Policy.

**1. Does elimination of the "Your Work" exclusion in the Policy create coverage for *all* the defects?**

First, Plaintiffs argue that, as a result of the elimination of the "your work" exclusion in the Policy, *see supra* Section III., "all 'property damage' is covered [by the Gemini Policy]: physical

damage, resulting damage, costs to repair defective work, 'rip and tear,' and loss of use." (Doc. No. 539 at 85). As such, Plaintiffs contend, all the construction defects are covered. The insurers maintain that this is not the case. They argue that elimination of the "your work" exclusion "does not create coverage for every failure of UOB to comply with its contractual obligations" and that "[t]here must first be covered 'property damage.'" (Doc. No. 546 at 86). In short, Defendants claim, contrary to Plaintiffs' assertions, that elimination of the "your work" exclusion in the Gemini Policy does not create coverage for all of the construction defects.

The Gemini Policy initially contained the following exclusion:

> **l. Damage To Your Work**
>
> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

(Gemini's Trial Ex. 1 at 5). A "your work" exclusion identical to the one that was previously included in the Gemini Policy typically precludes coverage for the cost of repairing and replacing the insured's own defective work. *See, e.g.*, *Wilshire Insurance Co. v. RJT Construction, LLC*, 581 F.3d 222, 226 (5th Cir. 2009); *Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 655 (Tex. 2009) ("[C]laims of faulty workmanship by [the insured] are excluded from coverage under the 'your work' exclusion."); *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 11 (Tex. 2007); *Bldg. Specialties, Inc. v. Liberty Mut. Fire Ins. Co.*, 712 F. Supp. 2d 628, 647–648 (S.D. Tex. 2010).

UOB, however, paid an additional premium for an endorsement deleting the "your work" exclusion in the Gemini Policy. *See* (Gemini's Trial Ex. 1) (Endorsement 28 – Amendment –

Damage to Your Work) ("exclusion I. Damage To Your Work . . . is deleted in its entirety.") (emphasis removed). Thus, the live Gemini Policy no longer contains a "your work" exclusion (and the other policies follow form). Since the excess policies follow form, this deletion also carries through to Ironshore and Navigators' policies. Based upon this endorsement, Plaintiffs claim all of the construction defects are covered under the Policy.

An exclusion, however "does not define the initial scope of the grant of coverage, it excludes damages that would otherwise be covered . . . . Only once coverage is established under the insuring language would a court examine what exclusions may be relevant." *Liberty Surplus Ins. Corp. v. Century Sur. Co.*, 2019 WL 3067504, at *11 (S.D. Tex. July 12, 2019). The removal of the exclusion, thus, does not change the Policy's definition of "property damage," which defines what is covered, nor does it modify the Policy's requirement that there must be "property damage" in order for coverage to exist. Therefore, the elimination of the "your work" exclusion is only relevant for a defect/damage arising from the insured's work that is, in fact, actually covered by the Gemini Policy. As such, the Court next addresses which defects are covered.

**2. What Defects are Covered Under the Policy?**

As established above, under the Policy, covered "property damage," only includes "physical injury to tangible property" or "loss of use of tangible property" "caused by" "an accident," or "occurrence." The resolution of the parties competing arguments requires multiple steps. The Court first analyzes what constitutes an "occurrence" and which of the defects, if any, are "occurrences" under the Policy. Then, the Court discusses whether such occurrences resulted in "property damage" to determine whether the Policy provides coverage.

*a. Occurrences*

While Gemini argues in its post-trial brief (as it has in earlier briefing) that this matter involves a single occurrence, the Court, in ruling on a pretrial motion, previously determined that there are multiple occurrences at issue in the Project (as that term is defined in the Gemini Policy). *See* (Doc. No. 313, adopted by Doc. No. 328). The remaining parties seem to concur with the Court's earlier analysis, and the evidence adduced at trial confirms this Court's earlier opinion.

The Fifth Circuit has explained how courts should determine whether a claim under an insurance policy involves a single occurrence or multiple occurrences:

> [T]he appropriate inquiry is whether there was one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage. If so, then there was a single occurrence. If the chain of proximate causation was broken by a pause in the negligent conduct or by some intervening cause, then there were multiple occurrences, even if the insured's negligent conduct which caused each of the injuries was the same kind of negligent conduct.

*Evanston Insurance Co. v. Mid-Continent Casualty Co.*, 909 F.3d 143, 150 (5th Cir. 2018). When interpreting the term "occurrence," "[u]nder Texas law, the proper focus . . . 'is on the events that cause the injuries and give rise to the insured's liability, rather than on the number of injurious effects.'" *U.E. Texas One-Barrington, Ltd. v. Gen. Star Indemnity Co.*, 332 F.3d 274, 277 (5th Cir. 2003). Importantly, the majority in *U.E. Texas One* also rejected an argument by the dissent that a "liability triggering test," instead of a "cause test," applies to liability policies (policies, like those at issue here, that pay for damages the insured causes to other people).[18] *Id.* at 277 n.2. Gemini's single-occurrence argument, therefore, improperly focuses on the event that triggered UOB's

[18] Additionally, in *Pennzoil-Quaker State Co. v. American Int'l Specialty Lines Ins. Co.*, the court recognized that *U.E. Texas One* involved a loss policy (not a liability policy) but applied the same "cause test" used in *U.E. Texas One* to find multiple occurrences under the liability policy at issue. 653 F. Supp. 690, 705, 707 (S.D. Tex. 2009).

liability to Southstar—the "[s]ingle [s]ale of a [s]ingle [p]roject" (Doc. No. 546 at 70)—rather than the events that caused the damage to the Project and gave rise to UOB's liability—the construction defects.

Ultimately, this Court found that "the damages alleged by Southstar [did] not result from a single, uninterrupted, continuing cause, but from multiple types of work, by multiple subcontractors, on multiple areas of multiple buildings." (Doc. No. 313 at 10–11, adopted by Doc. No. 328). Cases applying the "cause test" described above support this finding. *See, e.g., U.E. Texas One-Barrington, Ltd.*, 332 F.3d 274, 277 (5th Cir. 2003); *Lennar Corp. v. Great American Insurance Co.*, 200 S.W.3d 651, 682 (Tex. App.—Houston [14th Dist.] 2006, pet. denied), *abrogated on other grounds by Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118 (Tex. 2010).

In its previous order, the Court did not rule on (or even describe) the precise number of occurrences, stating that the issue to be decided on the earlier motion was merely "whether the claimed damages result[ed] from 'one proximate, uninterrupted, and continuing cause,' not the number of defects or 'effects' from the alleged incident." (Doc. No. 313 at 17).[19]

That being the case, the Court briefly discusses the number of occurrences here. Pursuant to the Policy, an "occurrence" is defined as "an accident." The parties do not dispute whether the defects described above, *see supra* Section II, were "accidents," or unintentional. Indeed, testimony at trial confirmed that each of the construction defects were the result of construction

---

[19] The Court's earlier finding that Plaintiffs seek coverage for multiple occurrences means that the limits of the Gemini Policy were undisputedly not exhausted, even if Gemini did reach its $2,000,000 single occurrence limit (which, as previously noted, Gemini arguably did not reach due to its accidental inclusion of the aforementioned Baker Botts payment). Given the multiple occurrences, Gemini had a duty to defend its insured until it paid the aggregate limits of liability for multiple occurrences under the Policy—$4,000,000. As such, Gemini could be liable for up to $4,000,000 in covered losses, plus attorneys' fees and costs, before the excess carriers' policies come into play.

mistakes whereby aspects of the building were not built in accordance with design specifications. *See* discussion *supra* Section II. For example, the lumber columns required to support the cantilevered beams at the corner balconies were installed too short and straps/clips were not installed to hold them, resulting in the deflection and sloping of the corner balconies. Additionally, insufficient flashings were installed in the stucco and overdriven nails and fasteners punctured the water resistive barrier of the exterior walls at the Project. These construction defects, and the others (the roofing, shear walls, and draft stop penetrations), resulted from various accidents made by UOB (or its subcontractors) during the construction of the Project. No party provided any evidence that such construction mistakes were intentional.

Even if UOB's (or its subcontractor's) "negligent conduct which caused each of the [defects] was the same kind of negligent conduct" (failure to meet the design specifications), the chain of proximate causation for the damage to the Project was broken up by different construction defects completed by different subcontractors at different areas of the Project. *Evanston Insurance Co.*, 909 F.3d at 150. Like the apartment complex in *U.E. Texas On*e, the Project here experienced multiple injuries "distinguishable in space and time." 332 F.3d at 278. Indeed, *Evanston* characterizes *U.E. Texas One* as "finding nineteen occurrences where water leaks in nineteen apartment buildings were caused by nineteen separate negligent plumbing installations, not a single negligent plumbing installation." 909 F.3d at 151 n.2.

Accordingly, the Court finds that the preponderance of the evidence and Texas law demonstrates that there were up to 5 separate accidents, or "occurrences," at the Project: (1) the corner balcony defects; (2) the shear wall defects; (3) the stucco flashing and water resistive barrier defects; (4) the draft stop penetration defects; and (5) the roofing condition defects. Each defect was caused by separate acts or omissions. None were caused by the same uninterrupted cause. The

Court notes, however, that there are instances (or areas) where some of the damages/defects overlapped. For example, the defective construction at the corner balconies was a spiraling defect situation. It resulted in physical damage to the waterproofing membrane on the balcony, the sheathing, the wall framing, *and* the roofing over the balconies. Thus, the balcony defects appear to overlap with the roofing conditions, at least in some of the areas over the balconies. This, however, is separate and apart from other defective construction that impacted the roofing such as: (1) the framing of the Project not being built in accordance with the design documents, *see* (Doc. No. 537, Day 6-AM Trial Tr. at 26:21–24); and (2) the missing secondary overflow emergency drainage on the roof, *see* (*id.*, Day 5-AM Trial Tr. at 89:2–4); *see also* (*id.*, Day 6-AM Trial Tr. at 62:11–12). These defects identified at trial are discrete occurrences specifically related to the roofing and unrelated to the balconies. As such, the Court finds that the probative evidence supports that there are 5 distinct occurrences at the Project. Each of the 5 categories of defects are separate "occurrences" under the Policy.

*b. Property Damage*

Given that each of the construction defect situations constitute a separate "occurrence," the Court must then determine whether these occurrences caused "physical injury to tangible property" or "loss of use of tangible property," qualifying them for coverage under the Policy. Again, the Policy only covers defective construction if it is an "occurrence" that results in "property damage." It does not cover all defective construction *per se*. *See, e.g.*, *Lennar Corp.*, 200 S.W.3d at 673–74 ("[A]lthough defective construction may constitute an 'occurrence,' the insurer indemnifies the insured only for resulting 'property damage' arising after the project is completed."). Since the insurers do not dispute in their post-trial briefing whether the corner balcony defects and the stucco flashing and water resistive barrier defects caused "property damage" (as evidence supports that

these occurrences caused ancillary damage, *see supra* Section II.A.–B.),[20] the Court only discusses the disputed occurrences: the shear wall defects and the draft stop penetration defects.

**1. The Shear Wall Defects**

**a. Do the shear wall defects qualify as "property damage"?**

First, to be clear, the shear wall defects themselves do not constitute "property damage" under the Policy. Texas law is clear that "replacement of an initially defective product is not 'property damage.'" *Lennar Corp.*, 200 S.W.3d at 678. "[P]roperty damage" under the Policy includes property that changes "from a satisfactory state into an unsatisfactory state, or [is] otherwise physically altered." *Id.* Here, the shear walls were "already in an unsatisfactory state when applied to the [Project] because [they were] inherently defective." *Id.* at 679.

**b. Did the shear wall defects cause "property damage"?**

As such, the shear wall construction defects are only covered under the Policy if they caused, or resulted in, "property damage" to the Project. The Court finds by a preponderance of the evidence that the shear wall defects, while being an occurrence, did not cause "property damage" as defined in the Gemini Policy.

Horst confirmed at trial that his investigation did not reveal any ancillary property damage resulting from the improperly constructed shear walls. *See* (Doc. No. 537, Day 5-PM Trial Tr. at 18:5–8). Instead, Horst testified that there were merely some "framing deficiencies" in the walls and they were not built "according to drawings." (*Id.*, Day 5-PM Trial Tr. at 17:20–25). Further,

[20] While the insurers contended in previous pleadings that the "miscellaneous roofing conditions" were not covered under the Policy, *see* (Doc. No. 461 at 21), this argument is not mentioned in the parties' joint pretrial order or in the parties' post-trial briefing. Since the resolution of this contention ultimately has no impact on the insurers' broader allocation argument (considering they argue that the draft stop and shear wall defects are not covered property damage), the Court does not address the roofing conditions here.

Horst concluded that "[t]he shear wall framing deficiencies . . . were not related to water damage." (*Id.*, Day 5-PM Trial Tr. at 38:15–16). Horst testified that the shear wall defects would not have even been found "if not for the other problems." (*Id.*, Day 5-AM Trial Tr. at 98:1–9). Additionally, in the Admissions of Fact agreed to in the Joint Pretrial Order, the parties stipulated that: "[t]he improper installation of the shear resisting components (nailing of shear walls, continuity of shear walls, and tension/shear rods) by Urban Oaks Builders . . . did not physically cause different or additional property damage to any building in this case." (Doc. No. 487 at ¶ 46).

Southstar's post-trial briefing, however, argues that their expert, Del Vecchio, testified that "as a result of the shear walls not being constructed in accordance with the design documents, they allowed the building to rack." (Doc. No. 538 at 10). Del Vecchio testified at trial: "What was ascertained is the shear walls were not constructed in accordance with the design documents. In doing so, they failed to perform their intended task, which allowed the building to rack." (Doc. No. 537, Day 6-AM Trial Tr. at 89:10–13). UOB's post-trial briefing also argues that, generally, all of the defects contributed to systemic building failures, meaning the shear wall defects contributed to the overall "property damage" to the buildings. *See* (Doc. No. 539 at 87–89).

The Court does not find this evidence to be credible. Del Vecchio is not a licensed professional engineer, *see* (Doc. No. 537, Day 6-PM Trial Tr. at 16:23–25), and he did not perform any "load calculations on the shear walls" (as designed or as constructed), any "calculations to measure the effective surface area of the shear walls," or any "calculations to measure the dynamic pressure that the shear walls were going to be exposed to." (*Id.*, Day 6-PM Trial Tr. at 17:6–17). In contrast, Horst *is* a structural engineer, and he testified that his investigation did not reveal any ancillary damage from the shear wall defects. *See* (*id.*, Day 5-PM Trial Tr. at 18:5–8).

Thus, the more credible evidence strongly supports the finding that the occurrence of the shear wall defects did not cause any "physical injury to tangible property" or "loss of use of tangible property." Plaintiffs did not produce any evidence of ancillary damage *directly* caused by the shear wall defects. Further, Plaintiffs did not produce any evidence that the shear wall defects themselves led to "loss of use" of the Project. The improper installation of the shear walls, therefore, is merely an "occurrence" under the Policy that did not cause any "property damage." As such, this Court finds that the shear wall defects are not covered "property damage" and they did not result in any covered "property damage" under the Policy.

**2. The Draft Stop Penetration Defects**

**a. Do the draft stop penetration defects qualify as "property damage"?**

Like the shear wall defects, the draft stop penetration defects themselves do not constitute "property damage." The initial failure to seal the penetrations in the draft stops means the draft stops were "inherently defective" from the start. *Lennar Corp.*, 200 S.W.3d at 679. The unsealed draft stop penetrations were not "physically altered"—they were installed in the Project without proper fire sealant around the penetrations and they remained that way until being discovered. *Id.* at 678. Thus, the draft stop penetrations do not qualify as "property damage." *See Bldg. Specialties, Inc.*, 712 F. Supp. 2d at 645 (rejecting argument that damages incurred solely for the cost of repairing defective duct work could qualify as "property damage").

**b. Did the draft stop penetration defects cause "property damage"?**

Additionally, the preponderance of the evidence demonstrates that the draft stop penetration defects did not cause "property damage." Plaintiffs provided no credible testimony at

trial that the draft stop defects caused any "physical injury to tangible property" or "loss of use of tangible property." (Gemini's Trial Ex. 1 at 14–15).

Horst testified that he did not find any ancillary damage caused by the failure to seal the draft stop penetrations. *See* (Doc. No. 537, Day 5-PM Trial Tr. at 18:16–18). He testified that the draft stop defects would not have damaged any other portion of the Project. *See* (*id.*, Day 5-PM Trial Tr. at 19:1–7). Lastly, he admitted that the draft stop defects would not have even been found "if not for the other problems." *See* (*id.*, Day 5-AM Trial Tr. at 98:1–9). Additionally, the parties stipulated in their Joint Pretrial Order that "[t]he failure to seal penetrations through the draft stops by Urban Oaks Builders . . . did not physically cause different or additional property damage to any building in this case." (Doc. No. 487 ¶ 47).

As such, the probative evidence supports the finding that the draft stop penetrations were merely improperly installed. They did not cause any "property damage" to the rest of the Project. Thus, there is *no* covered "property damage" "caused by" this "accident." The draft stop penetration defects are not "property damage"—they are merely an "occurrence" that did not result in covered "property damage" under the Policy. The Court finds that the draft stop penetration defects are not covered "property damage" and they did not result in any covered "property damage" under the Policy.

Since neither the shear wall defects nor the draft stop penetration defects caused any physical injury or loss of use to other aspects of the Project, they are not (and did not cause) any covered "property damage." *See Lamar Homes, Inc.*, 242 S.W.3d at 10 ("[F]aulty workmanship that merely diminishes the value of the home without causing physical injury or loss of use does not involve 'property damage.'"). Therefore, UOB's improperly installed draft stop penetrations and shear walls are not covered under the Policy.

c. *Rip and Tear*

In their post-trial brief, Plaintiffs, for the first time, appear to argue that repair of the draft stop defects and shear wall defects is covered as "rip and tear" damages. (Doc. No. 539 at 88–89). For example, Horst testified that there would be "rip and tear" damage involved in the fix of the draft stop defects because they would have to "basically open up the bottom of the ceiling" and then install fire caulking around the penetrations. (Doc. No. 537, Day 5-AM Trial Tr. at 18:9–19:3). While UOB argues that "Texas law squarely holds that this type of 'rip-and-tear' work is covered when it is necessary to repair covered property damage," this contention is not supported by the law. (Doc. No. 539 at 89).

The costs to rip out otherwise non-defective work ("rip and tear" costs) in order to repair defects that are not (and did not cause) "property damage" are not covered as these "rip and tear" costs would not be incurred "because of . . . 'property damage,'" since these costs are sustained merely to repair the defective (uncovered) work itself, prevent future property damage and/or meet building codes. Instead, under Texas law, only the costs to rip out non-defective work in order to repair existing, covered "property damage" are considered damages Plaintiffs must pay "because of . . . 'property damage'" and are covered. *See Lennar Corp.*, 200 S.W.3d at 679 ("[W]e cannot conclude that it was necessary for [the insured] to remove and replace all the [construction defects] in order to repair the water damage, if any, to each home. Therefore, the costs incurred by [the insured] to remove and replace [the construction defects] as a preventative measure are not 'damages because of . . . property damage.'"); *Fid. & Deposit Co. of Maryland v. Hartford Cas. Ins. Co.*, 215 F. Supp. 2d 1171, 1184 (D. Kan. 2002) (finding that while the insured likely "made a good business decision to tear down and rebuild the project before other problems arose . . . and additional expenses had to be incurred to fix those problems, this does not mean that [the insured]

should be permitted to recover from [insurer] all of its expenditures."). As such, since the draft stop penetration defects and shear wall defects are not covered under the Policy, any "rip and tear" costs necessary to repair these defects would not be covered because these costs do not constitute "damages because of . . . 'property damage.'"

Additionally, Plaintiffs have introduced no evidence identifying how much it would cost to actually repair these defects. Under Texas law, the costs of fixing defective work alone are not covered because defective work alone is not "property damage." *See Lamar Homes, Inc.*, 242 S.W.3d at 10. Plaintiffs' "rip and tear" argument is essentially a "catch-all" argument that does not apply to these uncovered defects.

Accordingly, only the corner balcony defects, and perhaps some of the stucco flashing defects, water resistive barrier defects, and the roofing defects are property damage covered under the Policy. The draft stop penetration defects and the shear wall defects are not "property damage" as defined by the Policy. Plaintiffs may only recover under the Policy for damages related to the covered "property damage" defects. The Court further discusses this below. *See* discussion *infra* Section VI.

## IV. GENERAL INSURANCE PRINCIPLES

Importantly, Texas law applies to this case, contrary to Plaintiffs' belated assertions in its post-trial brief arguing that Florida law should apply. *See* (Doc. No. 539 at 12). First, this choice of law issue was already previously raised nearly five years before trial. *See* (Doc. Nos. 195, 205–11). In 2021, Magistrate Judge Bryan found Gemini's Motion for Choice of Law moot because "[a]s a federal court sitting in Texas exercising diversity jurisdiction, the Court assumes substantive Texas law is the same as the substantive law of other jurisdictions and applies Texas substantive law unless a party advocates for the application of another state's substantive law and

meets its burden to demonstrate a conflict between the two state's laws." (Doc. No. 217 at 4–5). Since all parties, other than Gemini, represented that no conflict existed between Texas and Florida law, Judge Bryan held that "the Court will apply Texas law with respect to the contract issues." (*Id.* at 5).

Second, all parties to this lawsuit, including Plaintiffs, have consistently cited this Court to Texas law. In fact, as noted earlier, UOB previously contended in 2017 that Gemini violated the Texas Prompt Payment Statute and, in their applicable Complaint in this case, Plaintiffs pleaded further violations of the Texas Insurance Code. It is also worth noting that the Policy itself was purchased in Houston, Texas through Hines' in-house staff and through its insurance broker located in Houston. After Plaintiffs filed a Renewed Motion for Summary Judgment as to the duty to indemnify in 2023, relying exclusively on Texas law, this Court found in its Order denying the motion that "Texas law applies to this dispute." (Doc. No. 436 at 8). In their February 2025 Renewed Motion for Summary Judgment as to the duty to indemnify, Plaintiffs again relied almost exclusively on Texas law. *See* (Doc. No. 463).

The Court does note one exception, however. Plaintiffs have throughout the trial cited the Court to *Duke v. Hoch*, 468 F.2d 973 (5th Cir. 1972) (applying Florida law) on the issue of allocation. *See* (Doc. No. 463 at 15). Nevertheless, even when Plaintiffs relied upon *Duke* in trial, they did not appear to do so because they claimed Florida law controlled or because there was a conflict between Florida and Texas law. Plaintiffs did so to support their contention that the Fifth Circuit has ruled that apportionment by the insured is not required in this case. As discussed above,

Plaintiffs had ample opportunity to raise a choice of law issue throughout this case but did not do so and is, therefore, estopped from seeking a different choice of law ruling after trial.

Having ruled that Texas law applies to this matter, the Court lays out the governing insurance principles under Texas law relevant to the remaining issues in this case. The duty to defend and the duty to indemnify are "distinct and separate duties." *D.R. Horton-Texas, Ltd. v. Markel Intern. Ins. Co., Ltd.*, 300 S.W.3d 740, 743 (Tex. 2009). "[O]ne duty may exist without the other. To that extent, the duties enjoy a degree of independence from each other." *Id.* at 743–44. Under Texas law, the duty to defend is generally determined under the "eight-corners rule" by comparing the allegations in the pleadings with the terms of the insurance policy. *Trinity Univ. Ins. Co. v. Emps. Mut. Cas. Co.*, 592 F.3d 687, 691 (5th Cir. 2010) (citing *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 490–91 (Tex. 2008)); *Liberty Mut. Ins. Co. v. Graham*, 473 F.3d 596, 599 (5th Cir. 2006).[21] An insurer must defend its insured if a plaintiff's factual allegations against the insured potentially implicate a covered claim. *Trinity Univ. Ins. Co.*, 592 F.3d at 691. The burden is on the insured to show that a claim is potentially within the scope of coverage, but the insurer has the burden to establish that an exclusion applies. *Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*, 197 F.3d 720, 723 (5th Cir. 1999).

The duty to indemnify under a liability policy, as a general rule, cannot be determined until the underlying litigation concludes because the duty depends on the actual facts established in the litigation. *Liberty Mut. Fire Ins. Co. v. Copart of Connecticut, Inc.*, 75 F.4th 522, 535 (5th Cir.

---

[21] The Supreme Court of Texas seemingly signaled an exception to the eight-corners rule when it held that if a factual gap in the plaintiff's pleading renders an insurer's duty to defend unclear under the eight-corners rule, extrinsic evidence may be considered provided that it (1) "goes solely to the issue of coverage and does not overlap with the merits of liability;" (2) "does not contradict facts alleged in the pleading"; and (3) "conclusively establishes the coverage fact to be proved." *Monroe Guar. Ins. Co. v. BITCO Gen. Ins. Corp.*, 640 S.W.3d 195, 197 (Tex. 2022). This change, if indeed it is one, has no application here.

2023). The "duty to indemnify depends on the facts proven and whether the damages caused by the actions or omissions proven are covered by the terms of the policy." *Discover Prop. & Cas. Ins. Co. v. Blue Bell Creameries USA, Inc.*, 73 F.4th 322, 327 (5th Cir. 2023) (quoting *D.R. Horton-Texas*, 300 S.W.3d at 744). "If a policy does not provide coverage for a claim made against an insured, the insurer has no duty to indemnify regarding that claim." *In re Farmers Tex. Cnty. Mut. Ins. Co.*, 621 S.W.3d 261, 272 (Tex. 2021). "On the other hand, if the insurer wrongly denies coverage, the insured is entitled under the policy to have the insurer pay the amount for which she is legally responsible." *Id.* "In sum, the duty to indemnify 'hinges on the facts established and the terms and conditions of the insurance policy.'" *Turner v. Cincinnati Ins. Co.*, 9 F.4th 300, 314 (5th Cir. 2021) (quoting *D.R. Horton-Texas*, 300 S.W.3d at 744).

## V. DUTY TO DEFEND

Plaintiffs generally assert that Gemini breached its duty to defend, and, therefore, Gemini is liable for Plaintiffs' defense costs incurred both in the Construction Defect Action (direct damages) and in the Bankruptcy Action (consequential damages). Gemini first argues that this case only involves a single occurrence under the Policy, and, therefore, Gemini exhausted its insurance limit when it paid $2,000,000 to UOB prior to Southstar's lawsuit. If that were true, Plaintiffs' claim for breach of the duty to defend would be non-existent. As this Court previously discussed above, *see supra* Section III.A.2.a., this case involves multiple occurrences. Since there are multiple occurrences, Gemini owes up to $4,000,000 under its policy. This Court finds that there were multiple occurrences and, consequently, Gemini wrongfully refused to defend UOB when UOB tendered the 2018 Florida lawsuit. That being the case, Gemini's first argument fails.

As an alternative, Gemini seeks to reduce Plaintiffs' requested defense costs under multiple legal theories, which the Court will discuss in turn.

**A. Notice of Suit**

First, Plaintiffs argue that Gemini is liable for the defense fees Plaintiffs incurred prior to the Construction Defect Action. This inquiry turns on the date on which Gemini's duty to defend originated, which the parties dispute.

Under Texas law, an insurer's duty to defend arises only after the insured forwards a lawsuit to the insurer and requests a defense. "Indeed, the Texas Supreme Court has consistently held that an insurer has no duty to defend or to indemnify an insured unless the insured forwards suit papers to the insurer and requests a defense in compliance with the policy's notice-of-suit conditions." *Moreno v. Sentinel Ins. Co., Ltd.*, 35 F.4th 965, 975 (5th Cir. 2022) (citing *Nat'l Union Fire Ins. Co. v. Crocker*, 246 S.W.3d 603, 606–10 (Tex. 2008); *Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 174–75 (Tex. 1995); *Weaver v. Hartford Accident & Indem. Co.*, 570 S.W.2d 367, 370 (Tex. 1978)). "The rule from *Weaver, Harwell*, and *Crocker* is clear: an insurer has no duty to defend and no liability under a policy unless and until the insured in question complies with the notice-of-suit conditions and demands a defense." *Moreno*, 35 F.4th at 975 (quoting *Jenkins v. State & Cty. Mut. Fire Ins. Co.*, 287 S.W.3d 891, 897 (Tex. App.—Fort Worth 2009, pet. denied)).

Under the Policy, Gemini has the "right and duty to defend the insured against any 'suit'" seeking damages to which the insurance applies. (Gemini's Trial Ex. 1 at 1). "If a claim is made or 'suit' is brought against any insured," the insured must: "(1) [i]mmediately record the specifics of the claim or 'suit' and the date received; and (2) [n]otify [the insurers] as soon as practicable." (*Id.* at 10–11). The insured "must see to it that [the insurers] receive written notice of the claim or

'suit' as soon as practicable." (*Id.*). The insured must also complete certain duties under the Policy, like sending copies of any legal papers related to the 'suit' to the insurers, authorizing the insurers to obtain records and other information, and generally cooperating with the insurers in the investigation or settlement of the suit. (*Id.*).

The Gemini Policy defines "suit" to mean: "a civil proceeding in which damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged." (Gemini's Trial Ex. 1 at 14–15) (emphasis added). "Suit" includes: "An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or [a]ny other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent." (*Id.*).

On or about February 17, 2017, Southstar notified UOB that there were some defects with the Project. On February 21, 2017, Gemini and Ironshore received notice of a claim from Santosh Saha at Hines' insurance agent, WTW. (Plaintiffs' Trial Ex. 14). A few days later, on February 27, 2017, WTW, on behalf of Hines and UOB, sent Gemini the below email:

> **Please be advised that Hines/Urban Oaks, LLC has a very long term business relationship with the well-known law firm of Baker Botts.**
>
> **The attorney that one or both of our Named Insureds would like to use is Joseph Colagiovanni of Baker Botts. Mr. Colagiovanni is in Houston and can be reached at (713) 229-1751**
>
> **By way of introduction, Mr. Colagiovanni is lead Construction Defect Counsel for all AIG companies nationally, to include Florida.**
>
> **I recognize this case is in its infancy, and, in fact, may not lead to litigation. However, I wanted to make you aware of this so you have enough time to get whatever approval may be necessary.**

(Plaintiffs' Trial Ex. 17).

On September 28, 2017, UOB received, what it treated as, the first written notice from Southstar under Florida's Chapter 558 "notice and opportunity to repair" process, even though the letter was not titled that way. *See* (Plaintiffs' Trial Ex. 34); (Doc. No. 537, Day 2-PM Trial Tr. at

9:25–10:6) (Joseph Colagiovanni, a former partner at Baker Botts, testified: "I'm going to call [it] the 558 Demand Letter, which you know, [it] is not titled that way, but we treated it that way."). On October 16, 2017, UOB and Hines sent the "558 notice letter" to Gemini. (Plaintiffs' Trial Ex. 45).

Contrary to Plaintiffs' assertion, at the time in question, Gemini's duty to defend was not triggered by Florida's Chapter 558 process. There are multiple reasons that this is the case. Since the 558 process is a creature of Florida law, the Court must look to that law solely on this issue. Under the law of Florida during the relevant time, a Chapter 558 process did not constitute a "civil proceeding" as required by the definition of "suit" in the Gemini Policy.[22] *See Altman Contractors, Inc. v. Crum & Forster Specialty Ins. Co.*, 124 F. Supp. 3d 1272, 1278–82 (S.D. Fla. 2015), *rev'd in part, vacated in part*, 880 F.3d 1300 (11th Cir. 2018) (in an issue of first impression, the district court concluded that "the Chapter 558 mechanism does not constitute a 'civil proceeding,'" and therefore "it is not a 'suit' under the [insurer's] policy."). When *Altman* was appealed to the Eleventh Circuit in 2016, the Eleventh Circuit sent a certified question to the Florida Supreme Court, asking whether the Chapter 558 notice and repair process was a "suit" within the meaning of the relevant policies. *Altman Contractors, Inc. v. Crum & Forster Spec. Ins. Co.*, 832 F.3d 1318, 1326 (11th Cir. 2016).

On December 14, 2017, the Florida Supreme Court held, for the first time, that the 558 process "is included in the policy's definition of 'suit' as an 'alternative dispute resolution proceeding' to which the insurer's consent is required to invoke the insurer's duty to defend the insured." *See Altman Contractors, Inc. v. Crum & Forster Specialty Ins. Co.*, 232 So. 3d 273, 279

[22] *Altman* involved a policy with a definition of "suit" identical to that in the Gemini Policy. *See* 124 F. Supp. 3d at 1279.

(Fla. 2017). Thus, prior to this Florida Supreme Court decision in December of 2017, Florida law held that a Chapter 558 process was not a "suit" under the Gemini Policy triggering the duty to defend. *See Altman*, 124 F. Supp. 3d at 1282 (district court decision on June 4, 2015). Accordingly, even if UOB considered the notice from Southstar in September of 2017 as the first written notice under the Chapter 558 process, this would not trigger Gemini's duty to defend.

Second, Southstar actually first notified UOB of problems at the Project by phone, not in writing as required under Chapter 558. *See* Fla. Stat. Ann. § 558.004 (West) ("[T]he claimant shall . . . serve written notice of claim on the contractor, subcontractor . . . which notice shall refer to this chapter.") (emphasis added); *see also* (Doc. No. 537, Day 2-PM Trial Tr. at 88:17–89:15) (Colagiovanni testified that Southstar called 1662 Multifamily LLC and then 1662 Multifamily LLC called UOB). UOB also provided no evidence that it responded in writing pursuant to § 558.004(5). *See* § 558.004(5) ("[T]he person who was served the notice under subsection (1) must serve a written response to the claimant."). Additionally, even if Plaintiffs had followed the Chapter 558 procedural process, Plaintiffs provided no evidence that Gemini consented to their submission to this alternative dispute process, as required under the Gemini Policy.

Further, on November 14, 2017, UOB entered into a Standstill Agreement with Southstar. (Plaintiffs' Trial Ex. 51). In the agreement, UOB and Southstar specifically agreed to "forego the formal process outlined in Chapter 558 of the Florida Statutes." (Plaintiffs' Trial Ex. 51 at 1). Thus, UOB itself agreed to forgo Florida's Chapter 558 process, and it cannot now assert that such process triggered Gemini's duty to defend. Therefore, the Chapter 558 process does not apply in this case and Gemini's duty to defend was not triggered by the alleged Chapter 558 notice.

Additionally, contrary to Plaintiffs' assertion, WTW's email to Gemini and Ironshore on February 21, 2017 merely constituted notice of an insurance claim, not notice of a "suit" under the

Policy, as there was no "civil proceeding" brought against the insured at that time. It did not, therefore, trigger the duty to defend. (Plaintiffs' Trial Ex. 14). Further, WTW's February 27, 2017 email to Gemini similarly did not constitute notice of a "suit" under the Gemini Policy as there was *still* no "civil proceeding" brought against Hines and UOB at that time. It, too, did not trigger Gemini's duty to defend.

Accordingly, the Court rejects Plaintiffs' first argument regarding Gemini's liability for Plaintiffs' defense fees incurred prior to the initiation of the Construction Defect Action. The Court finds that Gemini is not liable for Plaintiffs' defense fees dating back to February 2017 as Gemini's duty to defend was not triggered at that time.

**B. Gemini's Defense Counsel**

Plaintiffs further argue that Gemini's duty to defend began before the Construction Defect Action was filed because Gemini appointed defense counsel for Plaintiffs. Plaintiffs contend that "Gemini waived and consented to defense of the Plaintiffs when it appointed defense counsel and made payments before Florida's 558 notice and formal notice of the lawsuit." *See* (Doc. No. 539 at 22) (emphasis in original). Gemini disputes this, arguing that it only appointed defense counsel for itself.

Before the Construction Defect Action was filed, Gemini hired Maritza Peña of the law firm of Marlow, Adler, Abrams, Newman & Lewis ("the Marlow law firm") to investigate Plaintiffs' claim for coverage, prepare to defend it if needed, and help resolve it if possible. *See* (Doc. No. 537, Day 4-AM Trial Tr. at 45:1–11) (Testimony of Bettyann Canzone); (*Id.*, Day 2-PM Trial Tr. at 9:25–10:4) (Colagiovanni testified that Ms. Peña was working "before the lawsuit was filed" and before, what he called, "the 558 Demand Letter"); *see also* (Plaintiffs' Trial Ex. 33) (Marlow law firm invoice with fees starting on 4/21/17). Additionally, Gemini retained Engle

Martin, construction consultants, to make a site visit to the Project to assist with investigating the claim. *See* (Doc. No. 537, Day 4-AM Trial Tr. at 44:12–17). At this time, Plaintiffs were already represented by Hines' long-time counsel, Baker Botts.

Gemini never appointed defense counsel for Plaintiffs. Gemini hired Maritza Peña of the Marlow law firm as its *own* counsel to help investigate the potential coverage claims and hopefully avoid a lawsuit altogether. *See* (*id.*, Day 4-AM Trial Tr. at 45:1–9) (Canzone testified that Ms. Peña was hired by Gemini to help investigate the claim). Indeed, Joseph Colagiovanni, a then-partner at Baker Botts, testified that Gemini "expressly said [Ms. Peña] was not taking on . . . obligations to defend" and she was hired not as defense counsel, but rather to investigate whether coverage applied. (*Id.*, Day 2-PM Trial Tr. at 7:10–18, 52:9–19). Additionally, Canzone also testified that Gemini paid Engle Martin and the Marlow law firm "for the work they did *on behalf of Gemini*." *See* (*id.*, Day 4-AM Trial Tr. at 46:10–12) (emphasis added). Accordingly, the Court finds that Gemini did not consent to the defense of Plaintiffs before notice of the lawsuit.

**C. Gemini's Duty to Defend**

On February 13, 2018, Southstar filed suit against Plaintiffs in state court in Florida (the "Construction Defect Action"). On March 2, 2018, Plaintiffs tendered the lawsuit to Gemini and Ironshore. (Plaintiffs' Trial Ex. 72) ("Please find attached a copy of the complaint . . . . By this letter, we are tendering the defense of all defendants to Gemini Insurance Company and Ironshore Specialty Insurance Company."). All defendants (Hines and UOB) were insured under the CIP. In the letter, Plaintiffs stated:

> Due to potential conflicts, we request that each defendant be assigned separate counsel. With respect to UOB's defense, we request that Joseph Colagiovanni with Baker Botts be permitted to continue to serve as lead counsel and Jason Perkins with Carlton Fields serve as local counsel. As you know, Mr. Colagiovanni has served as UOB's lead counsel since the inception of this dispute with Southstar

> Capital Group, I, LLC. With respect to 1662 Multifamily LLC, we request that Joseph Rebak at Akerman be permitted to serve as lead counsel.

(*Id.* at 2).

The Court finds that Gemini's duty to defend, therefore, was triggered on March 2, 2018, when Plaintiffs tendered the lawsuit to Gemini and Ironshore. *See Travelers Indem. Co. v. Citgo Petroleum Corp.*, 166 F.3d 761, 768 (5th Cir. 1999) ("[A]n insurer's duty to defend an insured is only triggered by the actual service of process upon its insured and its relay to the insurer."); *see also* (Gemini's Trial Ex. 1 at 10–11) (policy section outlining the insured's duties in the event of suit).

**D. Gemini's Breach of its Duty to Defend**

On January 23, 2018, Gemini made what would be its final payment to UOB in the amount of $900,259.77. This payment meant that overall Gemini had paid Plaintiffs $2,000,000—which would satisfy its monetary obligation if there had only been one occurrence. Thus, on March 21, 2018, Gemini responded to Plaintiffs' Tender of Defense with the following:

> Gemini is in receipt of your request for a defense in the lawsuit against Hines and Urban Oaks, and their related entities, by Southstar Capital Group, I, LLC ("Southstar"), and its related entities. As you know, at your clients' adamant and consistent insistence, Gemini used up [already paid] the applicable limit of insurance by way of disbursing $2,000,000 in payments to Urban Oaks. The Gemini policy has been exhausted in connection with this claim.
>
> The purpose of this letter is to inform you that Gemini accordingly can have no duty to defend.

(Gemini's Trial Ex. 32).

Gemini's letter quoted above is wrong for two reasons. First, Gemini's disbursement of $2,000,000 included a payment of $2,565.00 for a Baker Botts invoice reflecting work as defense counsel against the Southstar claims. The parties agree that, under Gemini's policy, defense costs

do not reduce the limits of the Policy's applicable insurance coverage. *See* (Gemini's Trial Ex. 1 at 8). Therefore, Gemini had not yet exhausted its first two million dollar limit due to this Baker Botts payment.

Second, and more importantly, this Court has held that this claim involves multiple occurrences. *See* discussion *supra* Section III.A.2.a. When there are multiple occurrences, Gemini's coverage, and therefore its defense obligations, are not exhausted until Gemini has paid $4,000,000 in covered losses. Therefore, as the Court has previously held, when Gemini refused to defend Plaintiffs in the Construction Defect Action on March 21, 2018, Gemini breached its duty to defend. (Doc. No. 313, adopted by Doc. No. 328).

Gemini argues, however, that despite its breach, Plaintiffs' rejection of Ironshore's later offer of defense prevents Plaintiffs from seeking reimbursement of its defense costs because there was not a disqualifying conflict of interest warranting rejection of Ironshore's defense. On July 18, 2018, Ironshore sent correspondence to UOB agreeing to provide a defense to Plaintiffs in the Construction Defect Action. (Gemini's Trial Ex. 47). Ironshore, in fact, retained Peter Befera as defense counsel for Plaintiffs. (Gemini's Trial Ex. 48).

After Gemini denied UOB's tender of defense, UOB turned to Ironshore. On October 10, 2018, Ironshore sent correspondence to Plaintiffs as a follow-up to a telephone conversation between Ironshore's lawyers and Plaintiffs' lawyers regarding Befera serving as defense counsel. In the correspondence, Ironshore stated that Plaintiffs' response to its defense offer was "that while [Plaintiffs] understood Ironshore's offer to defend Urban Oaks and all the Hines entities, [Plaintiffs] would not agree to Ironshore's defense now until **all four insurance carriers** (Gemini, Ironshoe [sic], Navigators and Great American) agree to withdraw their reservations, and commit that they would be responsible for the full value of any judgment entered against those entities."

(Gemini's Trial Ex. 48) (emphasis in original). Since all of the insurers did not agree to waive their rights, Plaintiffs effectively rejected Ironshore's offer of defense.

Liability insurance policies confer on an insurer the right to exclusive control of the defense of claims against the insured. *Unauthorized Practice of Law Comm. v. Am. Home Assur. Co., Inc.*, 261 S.W.3d 24, 26 (Tex. 2008). This includes "the authority to select the attorney who will defend the claim and to make other decisions that would normally be vested in the insured as the named party in the case." *N. Cnty. Mut. Ins. Co. v. Davalos*, 140 S.W.3d 685, 688 (Tex. 2004). This control, however, gives way when a disqualifying conflict of interest exists. *Id.* A disqualifying conflict of interest exists where "the facts to be adjudicated in the liability lawsuit are the same facts upon which coverage depends." *Id.* at 689. The Supreme Court of Texas has held that if an insured "reject[s] the insurer's defense without a sufficient conflict, [it loses its] right to recover the costs of that defense." *Id.* at 690.

*Davalos*, and other cases cited by Gemini in support of its argument, are distinguishable from this case. *Id.* Gemini's cited cases involve *one* insurer offering a defense, the insured rejecting *that offer* due to an alleged conflict of interest, and the court ultimately finding that there was not a sufficient conflict warranting the rejection, meaning *that the insurer offering the defense* did not breach its duty to defend. Consequently, the insured could not recover its defense costs *from that insurer*. *See, e.g.*, *Davalos*, 140 S.W.3d at 690 (finding that the insured rejected the insurer's defense "without a sufficient conflict," meaning the insurer had not breached its duty to defend and the insured lost its right to recover the costs of that defense); *Partain v. Mid-Continent Specialty Ins. Services, Inc.*, 838 F. Supp. 2d 547, 566–72 (S.D. Tex. 2012), *aff'd sub nom. Graper v. Mid-Continent Cas. Co.*, 756 F.3d 388 (5th Cir. 2014) (finding that the insurer did not breach its duty to defend because there was no disqualifying conflict of interest warranting the insured's

rejection); *Downhole Navigator, L.L.C. v. Nautilus Ins. Co.*, 686 F.3d 325, 331 (5th Cir. 2012) (finding that "the potential conflict" in the case did not disqualify the insurer's offered defense, meaning the insured was not entitled to reimbursement for its defense costs).

This case, however, involves multiple insurers, and Plaintiffs (the insureds) only rejected an offer of defense from one insurer—Ironshore. Thus, Gemini's argument regarding Plaintiffs' rejection of Ironshore's offer of defense fails, as Gemini had already been given the chance to defend the case and wrongfully rejected that opportunity. Plaintiffs did, however, wrongfully reject (or wrongfully condition its acceptance of) Ironshore's defense without a sufficient conflict and such rejection relieved Ironshore of those duties and responsibilities.[23] Plaintiffs' rejection of Ironshore's defense does not excuse Gemini's independent failure to defend Plaintiffs (which occurred some months earlier) and it does not negate Plaintiffs' right to recover for those defense costs from Gemini.

**E. Direct Damages Caused by Gemini's Breach**

Since Gemini breached its duty to defend, Plaintiffs can recover attorneys' fees for the Construction Defect Action as direct damages, and that is what Plaintiffs seek here. Plaintiffs hired multiple law firms to defend themselves in the Construction Defect Action. UOB hired two main firms: Carlton Fields based in Orlando, Florida and Baker Botts based in Houston, Texas. Baker Botts later hired Matthew Okin, and his law firm, Okin Adams, as bankruptcy counsel to UOB.

[23] There could be a very strong argument that the rejection of Ironshore's offer also relieved the excess carriers above it of any obligation. Nevertheless, the resolution of this question is not required for the resolution of the matters before the Court.

*See* (Doc. No. 537, Day 3-AM Trial Tr. at 51:3–5). Hines also hired two law firms: Baker Botts and Akerman based in Miami, Florida.

Baker Botts was retained as the primary defense counsel for Plaintiffs in the Construction Defect Action. Hines has a historical relationship with Baker Botts dating back to Hines' formation. Baker Botts served as outside general counsel for all of the Hines-affiliated entities, including UOB. *See* (*id.*, Day 2-AM Trial Tr. at 81:9–17, 85:2–5). Joseph Colagiovanni, previously a partner at Baker Botts, assumed the role of "quarterback of all the related proceedings and discussions" between UOB and the Hines-affiliated entities. (*Id.*, Day 2-AM Trial Tr. at 85:19–23); *see also* Dep. Designations of Borchardt at 88:8–15 (testifying that Baker Botts was involved in "matters across the board" for UOB). Colagiovanni was head of the construction-related practice at Baker Botts and co-chair of the real estate and construction practice. *See* (*id.*, Day 2-AM Trial Tr. at 80:6–8, 22–24). In his role as "quarterback," Colagiovanni hired Jason Perkins, a shareholder and lawyer at Carlton Fields, as the local counsel in Florida. Colagiovanni testified that he retained Perkins so that UOB could "understand the nature and extent of what the obligations might be for UOB under Florida law." (*Id.*, Day 2-AM Trial Tr. at 86:18–20). Perkins testified that Carlton Fields "took the engagement in 2017 and started working on it in 2018." (*Id.*, Day 1-PM Trial Tr. at 61:7–8). Perkins has been with Carlton Fields for 21 years, practicing complex litigation and construction defect litigation. *See* (*id.*, Day 1-PM Trial Tr. at 58:15–16, 59:4–11).

Joseph Rebak, previously a partner at Akerman, was retained to represent the Hines-affiliated entities in the Construction Defect Action in Florida when it became apparent to Colagiovanni that Southstar believed the Hines entities, in particular the ownership entity, were liable for fraudulent concealment, or alternatively, liable under a theory of piercing the corporative

veil. *See* (*id.*, Day 2-AM Trial Tr. at 86:21–87:3). Rebak specialized in complex litigation. *See* (*id.*, Day 3-AM Trial Tr. at 10:21–11:2).

**1. Attorneys' Fees**

As previously stated, Plaintiffs seek attorneys' fees as direct damages for Gemini's breach of its duty to defend. Attorneys' fees sought to be recovered as damages for Gemini's breach must be reasonable and necessary. As this Court has previously held, the factors outlined in *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812 (Tex. 1997) control that determination. *See* (Doc. No. 437 at 16). The relevant factors are as follows:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Arthur Andersen*, 945 S.W.2d at 818.

"[E]vidence of each of the *Anderson* factors is not required to support an award of attorney's fees." *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 706 (Tex. App.—Dallas 2008, no pet.). "The court can also look at the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties." *Jarvis v. Rocanville Corp.*, 298 S.W.3d 305, 318 (Tex. App.—Dallas 2009, pet. denied). "To show the reasonableness and necessity of attorney's fees incurred, Texas courts have generally held that a party seeking such fees must offer the testimony of a witness who has been designated as an expert . . . or, at the very least, some

testimony by the claimant's attorney that the fees being sought as damages are reasonable." *Am. Home Assur. Co. v. United Space All., LLC*, 378 F.3d 482, 490 (5th Cir. 2004).

*a. Carlton Fields*

Perkins testified that UOB and Carlton Fields agreed to an hourly billing arrangement. He testified that Carlton Fields gave UOB a 10% discount off their standard rates, with Perkins' rate being $465/hour. *See* (Doc. No. 537, Day 1-PM Trial Tr. at 61:2–5). Carlton Fields employed several attorneys, and various legal staff, to assist in representing UOB. Perkins testified that Carlton Fields defended UOB in the Construction Defect Action and "everything that that involved, including the procedural issues associated with the bankruptcy and the motions to transfer and the motions to remand and things of that nature."[24] (*Id.*, Day 1-PM Trial Tr. at 63:1–8). Carlton Fields' first invoice was dated January 17, 2018. *See* (Plaintiffs' Trial Ex. 238). The firm sent UOB monthly invoices that had been reviewed and adjusted as Perkins deemed necessary.

At trial, Perkins confirmed that Plaintiffs' Trial Exhibits 238 through 265 encompassed Carlton Fields' invoices for its services. *See* (Doc. No. 537, Day 1-PM Trial Tr. at 68:15–21. Perkins testified that all of Carlton Fields' services were reasonable and necessary in the defense of UOB. (*Id.*, Day 1-PM Trial Tr. at 68:22–25). The Court finds this evidence credible. Gemini does not argue that Carlton Fields' attorneys' fee rates were unreasonable and/or their work was unnecessary. Gemini merely contends that Carlton Fields' attorneys' fees should be reduced for the fees Plaintiffs incurred prior to tender of the lawsuit to Gemini, *see infra* Section V.E.2.

[24] Despite Perkins' testimony asserting that Carlton Fields provided services in the bankruptcy proceeding, the Court notes here that Plaintiffs do not seek Carlton Fields' attorneys' fees in their request for consequential damages.

(reducing UOB's claim by $4,284 for Carlton Fields' pre-tender fees), and its non-defense fee billing entries (see below). Accordingly, the Court finds that the preponderance of the evidence supports that Carlton Fields' attorneys' fee rates were reasonable and necessary.

The Court, however, reduces UOB's claim for attorneys' fees for Carlton Fields' billing entries that are not related to defense costs in the Construction Defect Action ("non-defense fees"). Specifically, Carlton Fields' invoices included fees for work related to a small claims case filed by Lance Rhodes ($5,465), demands to the insurance carriers ($3,606.50), and core bankruptcy work ($14,842.50). Since this work is not related to defending UOB in the Construction Defect Action, UOB's Carlton Fields claim is reduced by $23,914 for these non-defense fees. In total, including the reduction for Carlton Fields' pre-tender fees ($4,284) (*see infra* Section V.E.2.), UOB's claim for Carlton Fields' attorneys' fees is reduced from $98,753.48 to $70,555.48 ($98,753.48 - $28,198 = $70,555.48). The Court finds by a preponderance of the evidence that UOB is entitled to $70,555.48 in reasonable and necessary attorneys' fees for Carlton Fields.

*b. Akerman*

Rebak, an Akerman firm attorney, defended Hines against the claims by Southstar in Florida. Rebak testified that Hines and Akerman agreed to an hourly billing arrangement. Rebak stated that his hourly rate was $775/hour at the time, but he gave Hines a reduced rate. *See* (Doc. No. 537, Day 3-AM Trial Tr. at 14:23–15:1). Akerman employed several attorneys to assist Rebak with the matter. Rebak identified Akerman's invoices as Plaintiffs' Trial Exhibits 183 through 185, 187 through 192, 196, 198, 201 through 205, 208 through 221, 223, 227, 230, and 237. (*Id.*, Day

3-AM Trial Tr. at 16:17–19:14). Akerman's first invoice was dated August 10, 2017. *See* (Plaintiffs' Trial Ex. 183).

Rebak testified that he exercised judgment as to what was billed for and the amount of hours for all of the Akerman invoices. *See* (Doc. No. 537, Day 3-AM Trial Tr. at 19:16–19). Again, Gemini does not contend that Akerman's attorneys' fee rates were unreasonable and/or the work it performed was unnecessary. Gemini does, however, argue that Akerman's attorneys' fees incurred in defending Hines in the Florida action should be barred by res judicata (and other related defenses) or denied for failure to disclose. *See* discussion *infra* Section V.F. Alternatively, Gemini contends that Akerman's attorneys' fees should be reduced for its fees incurred prior to tender of the lawsuit and its non-defense fee billing entries. *See infra* Section V.F; *see infra* Section V.E.2. Accordingly, the Court finds that Akerman's attorneys' fee rates were reasonable and necessary, but the Court reduces Hines' total request for Akerman's attorneys' fees based on Hines' settlement of Akerman's fees in the Florida action and Akerman's pre-tender and non-defense fees. *See infra* Section V.F; *see infra* Section V.E.2.

*c. Okin Adams*

Matthew Okin testified at trial regarding the attorneys' fees Okin Adams billed that were attributable to both UOB filing for bankruptcy and defense of UOB in the claim objection hearing. Okin Adams concentrated its practice in commercial bankruptcy, commercial litigation, and litigation in bankruptcy. *See* (Doc. No. 537, Day 3-AM Trial Tr. at 48:14–18). The total fees requested by Okin Adams in its fee applications in UOB's bankruptcy were $1,196,777.25. The

Court, however, finds that only $655,194 was for work attributable to the Construction Defect Action.

Okin testified at trial that only the ABA model task codes B190 and B310 listed in the fee applications entailed *some* Okin Adams work for the Construction Defect Action. *See* (*id.*, Day 3-AM Trial Tr. at 76:4–78:3, 78:7–84:16). Specifically, Okin testified: "the issues throughout the case that involved the dispute with Southstar covered more than just the B190, other contested matters code, depending on the timing in the case and what we were doing. And there are other contested matters that were not only related to Southstar. So . . . I can't say definitively that B190 is all and only Southstar, or the only Southstar part of it." (*Id.*, Day 3-AM Trial Tr. at 78:11–17). Okin, therefore, testified that while these task codes indicated *some* of Okin Adams' defense costs, they also included work unrelated to defense against Southstar's claims.

As such, the Court conducted its own review of Okin Adams' invoices and specific billing entries. After reviewing the invoices, the Court finds that the preponderance of the evidence supports that only $655,194 of Okin Adams' fees were attributable to defense costs in the Construction Defect Action. Plaintiffs' post-trial brief requests $1,093,604.97 in fees for Okin Adams. (Doc. No. 539 at 64). Accordingly, UOB's Okin Adams' claim is reduced from $1,093,604.97 to $655,194. The Court finds by a preponderance of the evidence that UOB is entitled to $655,194 in reasonable and necessary Okin Adams' fees recoverable from Gemini.

*d. Baker Botts*

While Gemini argues that Baker Botts' associate rates were excessive based on its expert witness, Matt Motes, comparing Baker Botts' associate rates with those of Andrews Myers—the firm of Plaintiffs' expert, William Andrews—the Court does not find the evidence supports a holding that the rates were unreasonable. *See* (Doc. No. 546 at 41). Colagiovanni testified that

Baker Botts' involvement essentially started right away in February 2017. *See* (Doc. No. 537, Day 2-AM Trial Tr. at 89:16–18). Baker Botts' first invoice was dated May 25, 2017, with an initial billing entry on April 4, 2017. *See* (Plaintiffs' Trial Ex. 266). Colagiovanni confirmed that Baker Botts and Plaintiffs agreed to an hourly billing arrangement. Colagiovanni testified that his hourly rate was discounted by at least 10% to 20% for Hines. *See* (Doc. No. 537, Day 2-AM Trial Tr. at 91:16–17). Baker Botts, similar to the other firms, employed several attorneys and legal staff to assist with the matter. Baker Botts ultimately opened seven billing matters related to representing UOB and two matters related to representing Hines. *See* (Doc. No. 539 at 30–33). Colagiovanni testified that he exercised billing judgment to evaluate what should be billed. *See* (Doc. No. 537, Day 2-PM Trial Tr. at 27:4–19). UOB seeks $1,555,987.86 for Baker Botts' fees. Hines seeks $13,168.70 for Baker Botts' fees.

Baker Botts' invoices, however, included non-defense fee billing entries. Baker Botts' invoices included entries for work related to demands to the insurance carriers ($49,276.90), core bankruptcy work completed *prior* to UOB filing for bankruptcy ($68,808.50), and core bankruptcy work completed *after* UOB filed for bankruptcy ($285,451.80).[25] Accordingly, Plaintiffs' claim for attorneys' fees is reduced by $403,537.20 for Baker Botts' non-defense fee invoices.[26] $400,510.20 of these non-defense fees are reduced from UOB's claim; $3,027 of these non-

---

[25] The Court notes that Gemini's briefing regarding reductions for this bankruptcy work includes some invoices that Plaintiffs list as consequential damages. *See* (Doc. No. 539 at 65) (listing Plaintiffs' Trial Exs. 393–400 as consequential damages). Since Plaintiffs request these attorneys' fees as consequential damages and the Court has determined that Plaintiffs cannot recover consequential damages, *see* discussion *infra* Section V.G., the Court does not include these invoices in its reduction for Plaintiffs recoverable direct damages.

[26] The Court acknowledges that its fee reductions for Carlton Fields, Akerman, and Baker Botts differ from those proposed by Gemini in its additional post-trial briefing. *See* (Doc. No. 558). While the Court understands how Gemini calculated its proposed reductions, after reviewing the invoices, the Court found that the calculations the Court used better represent the preponderance of the evidence and the requirements pursuant to Texas law.

defense fees are reduced from Hines' claim.[27] UOB's Baker Botts claim is, therefore, reduced from $1,555,987.86 to $773,386.69, including the reduction for Baker Botts' pre-tender fees ($382,090.97) ($1,555,987.86 - $782,601.17 = $773,386.69). *See infra* Section V.E.2. Hines' Baker Botts claim is reduced from $13,168.70 to $10,141.70 ($13,168.70 - $3,027 = $10,141.70). As such, the Court finds that Baker Botts' reasonable and necessary legal fees to defend UOB are $773,386.69 and its reasonable and necessary legal fees to defend Hines are $10,141.70.

**2. Pre-Tender Attorneys' Fees**

The Fifth Circuit holds that an insurer is generally not responsible for pre-tender defense costs because the duty to defend does not arise until a petition alleging a potentially covered claim is tendered to the insurer. *See Travelers Indem. Co.*, 166 F.3d at 768; *Protectors Ins. & Fin. Services, LLC v. Lexington Ins. Co.*, 2013 WL 5164630, at *3 (S.D. Tex. Sept. 12, 2013) ("Because an insurer's duty to defend is triggered by notice, the insurer has no duty to reimburse the insured for defense costs incurred before the insured gave the insurer notice of the lawsuit." (citing *Coastal Ref. & Mktg., Inc. v. U.S. Fid. & Guar. Co.*, 218 S.W.3d 279, 294 (Tex. App.—Houston [14th Dist.] 2007, pet. denied))). Therefore, Gemini is not responsible for any pre-tender "defense fees," meaning Gemini is not responsible for any fees incurred by the Plaintiffs before March 2, 2018 when Plaintiffs tendered the lawsuit to Gemini and Ironshore. *See U.S. Metals, Inc. v. Liberty Ins. Corp.*, 2017 WL 11634913, at *2 (S.D. Tex. Mar. 31, 2017) ("Under Texas law, Defendant is not required to reimburse attorney's fees incurred prior to Defendant's receipt of the complaint."

[27] Four of the Baker Botts' invoices with entries related to demands to the insurance carriers were included under Plaintiffs' claim for direct damages to Hines. *See* (Plaintiffs' Trial Exs. 226, 231, 233, 234). These entries totaled $3,027 and were subtracted from Hines' Baker Botts claim.

(citing *Crocker*, 246 S.W.3d at 608)); *15625 Ft. Bend Ltd. v. Sentry Select Ins. Co.*, 991 F. Supp. 2d 932, 941 (S.D. Tex. 2014) (holding the same).

At trial, Rebak testified that Akerman incurred pre-tender fees amounting to $25,652.[28] *See* (Doc. No. 537, Day 3-AM Trial Tr. at 25:11–26:8); *see also* (Plaintiffs' Trial Ex. 178) ($13,128.50); (Plaintiffs' Trial Ex. 183) ($968); (Plaintiffs' Trial Ex. 184) ($4,840); (Plaintiffs' Trial Ex. 185) ($6,715.50). He also admitted that while these fees were billed to Southeast Multifamily Strategies, LLC, this was a mistake. *See* (Doc. No. 537, Day 3-AM Trial Tr. at 24:13–25:3). Perkins at Carlton Fields testified that Carlton Fields also incurred pre-tender fees. *See* (*id.*, Day 1-PM Trial Tr. at 75:9–76:23). Carlton Fields' pre-tender fees amounted to $4,284. *See* (Plaintiffs' Trial Ex. 238) ($3,490.50); (Plaintiffs' Trial Ex. 239) ($793.50). Lastly, Colagiovanni at Baker Botts testified that Baker Botts had pre-tender fees amounting to $382,090.97.[29] *See* (Doc. No. 537, Day 2-PM Trial Tr. at 114:4–14,114:22–116:6); *see also* (Plaintiffs' Trial Ex. 266) ($4638); (Plaintiffs' Trial Ex. 267) ($945); (Plaintiffs' Trial Ex. 268) ($5,463.50); (Plaintiffs' Trial Ex. 269) ($8,145.39); (Plaintiffs' Trial Ex. 270) ($76,269.83), (Plaintiffs' Trial Ex. 271)

---

[28] The Court acknowledges that Gemini's post-trial brief stated that Akerman's pre-tender fees amounted to $26,320.00. After reviewing the invoices, however, the Court found that Gemini incorrectly referenced the total amount due to Akerman on September 21, 2017 in Plaintiffs' Trial Ex. 178, instead of the total amount due for that specific invoice. The invoice total was $13,128.50, not $14,096.50 (the total amount due at that time). This aligns with Gemini's calculations for Akerman's other pre-tender invoices, which show the total amount due for each specific invoice. As such, Akerman's total pre-tender fees are $25,652 not $26,320.

[29] Gemini's post-trial brief stated that Baker Botts' pre-tender fees amounted to $384,655.97. (Doc. No. 546 at 34). After adding up all the fees in the pre-tender invoices, however, the Court finds that Baker Botts' pre-tender fees amount to $382,090.97.

($70,313.47); (Plaintiffs' Trial Ex. 272) ($103,107.17); (Plaintiffs' Trial Ex. 273) ($62,251.76); (Plaintiffs' Trial Ex. 274) ($27,013.50); (Plaintiffs' Trial Ex. 275) ($23,943.35).

Accordingly, Plaintiffs' claims for attorneys' fees are reduced by $412,024.97—the amount claimed by Akerman ($25,652), Carlton Fields ($4,284), and Baker Botts ($382,090.97) for attorneys' fees incurred prior to the tender of the suit to Gemini. *See* (Doc. No. 546 at 34–35).

**3. Gemini's Proposed Percentage Reductions**

Gemini contends in its post-trial brief that since Plaintiffs' request for attorneys' fees includes fees for "unrecoverable work," the Court should "simply 'allocate as a percentage of total fees the amount that likely would have been incurred even if the unrecoverable claims were not in the case.'" *Transverse, L.L.C. v. Iowa Wireless Services, L.L.C.*, 992 F.3d 336, 346–47 (5th Cir. 2021). Generally, "[a] district court has discretion to consider new theories raised for the first time in a post-trial brief." *Quest Med., Inc. v. Apprill*, 90 F.3d 1080, 1087 (5th Cir. 1996) (citing *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 629 n.59 (5th Cir.1993)). Thus, the Court will consider Gemini's arguments regarding its proposed percentage reduction for Plaintiffs' attorneys' fees. In its initial post-trial briefing, Gemini proposed that the Court reduce Plaintiffs' alleged defense costs by "approximately 25%" to account for the entries not related to defense of the Construction Defect Action. (Doc. No. 546 at 41). At the Court's request, Gemini provided further briefing regarding its argument, specifically contending that the Court should reduce Baker Botts' invoices by a "blanket percentage" for both block billing and mass redactions contained in its invoices. (Doc. No. 558 at 9). Having reviewed both the evidence and the law, the Court is not convinced by either argument.

Gemini's cited cases are distinguishable from this case. First, all of Gemini's cited cases involve the award of attorneys' fees to a prevailing party or as sanctions, not as damages, such is

the case herein. *See Transverse*, 992 F.3d at 346–47 (awarding attorneys' fees to the prevailing party); *Giese v. TETRA Techs., Inc.*, 2022 WL 2392038, at *4 (S.D. Tex. July 1, 2022) (awarding attorneys' fees to the prevailing party); *Thermotek, Inc. v. Orthoflex, Inc.*, 2016 WL 6330429, at *11 (N.D. Tex. Oct. 27, 2016) (awarding attorneys' fees as sanctions). Thus, Gemini provides no support for its argument that a percentage reduction for attorneys' fees can apply in a case for attorneys' fees as damages.

Second, the facts leading those courts to a percentage reduction are distinct from those at hand. For example, while Gemini asserts that the court in *Giese* applied a 20% reduction "for block billing," the court *actually* concluded that a 20% reduction was appropriate considering the "block billing, excessive work, and inadequately documented time." 2022 WL 2392038, at *5. Similarly, while Gemini contends that the court in *Thermotek* applied a 10% reduction "because of overly redacted entries," Gemini fails to mention that, in that case, the defendants argued that the plaintiff "included overly redacted entries which prevent[ed] [d]efendants and the [c]ourt from determining the actual amount of time [plaintiff] spent addressing the sanctionable conduct." 2016 WL 6330429, at *7, 11. The defendants in *Thermotek* contended that the plaintiff's redactions rendered the original billing entries "vague" and the court applied a 10% reduction for "overly redacted entries and a lack of billing judgment." *Id.* at 10–11. In this case, while Plaintiffs' expert, Andrews,[30] may have relied on some redacted invoices in rendering his opinion about the reasonableness of the fees, Plaintiffs provided the Court (and the Defendants) with *unredacted* billing entries that allowed the Court to adequately review the attorneys' fees invoices. Further,

[30] Gemini's post-trial brief includes a re-urged motion to strike the trial testimony of Plaintiffs' expert, William K. Andrews. *See* (Doc. No. 546 at 100–10). The Court denies Gemini's motion to strike the trial testimony of Andrews, although some of Gemini's complaints in its motion may affect the Court's opinion of the accuracy and credibility of his testimony.

Plaintiffs' attorneys testified to exercising billing judgment. Thus, the redacted invoices provided to Andrews did not impact the Court's, or the Defendants', ability to determine the actual amount of time attorneys spent on tasks related to defense of the Construction Defect Action. The Court finds that the evidence does comply and the Court need not apply a percentage reduction for redacted invoices only seen by Plaintiffs' expert.

Lastly, Gemini contends that block billing issues largely contained in Baker Botts' invoices necessitate a percentage reduction for attorneys' fees. "The term 'block billing' refers to the disfavored 'time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks.'" *Giese*, 2022 WL 2392038, at *4 (citing *Castro v. Precision Demolition LLC*, 2017 WL 6381742, at *6 (N.D. Tex. Dec. 14, 2017)). "When time records are block billed, the court cannot accurately determine the number of hours spent on any particular task, and the court is thus hindered in determining whether the hours billed are reasonable." *Barrow v. Greenville Indep. Sch. Dist.*, 2005 WL 6789456, at *4 (N.D. Tex. Dec. 20, 2005) (collecting cases), *aff'd*, 2007 WL 3085028 (5th Cir. Oct. 23, 2007). Gemini points out 10 specific billing entries that it alleges contain block billing, highlighting other examples within the exhibits attached to its post-trial briefing regarding its proposed percentage reduction. *See* (Doc. No. 558 at 7); (Doc. Nos. 558-4, 558-5, 558-6).

"It is a common practice for courts to address only those potentially inadequate entries brought to the court's attention . . . . [T]he court is not obligated *sua sponte* to sift through fee records searching for vague entries or block billing." *Thermotek*, 2016 WL 6330429, at *9 (quoting *Hoffman v. L & M Arts*, 2015 WL 3999171, at *5 (N.D. Tex. July 1, 2015)). In looking at the invoices as a whole, neither Baker Botts' nor the other firms' entries are routinely block billed. In fact, as noted, Gemini only complains about 10 specific entries by various timekeepers.

While this Court is not a proponent of block billing, each entry in question provides detail on the attorney performing the work, the legal service being rendered, the amount of hours expended, and the date it was performed. Additionally, the identified block billing entries range from less than an hour to approximately six hours, but each provides detailed descriptions of the different types of work performed during the periods. Baker Botts' invoices are not so vague or made so opaque by the time being block billed so as to render them "impossible to conduct meaningful review and determine the precise number of hours that should be reduced." *Barrow*, 2005 WL 6789456, at *5. Further, Baker Botts' invoices are merely one firm's invoices out of the three firms addressed by Gemini. Having reviewed the entries highlighted by Gemini, the Court finds that these limited entries do not prevent it from accurately determining the time spent on a specific task. Thus, the few block billing entries identified by Gemini are not sufficient to warrant a percentage reduction for Plaintiffs' claim for attorneys' fees.

Overall, Plaintiffs' claims for direct damages are reduced pursuant to the multiple objections discussed above. UOB requests direct damages for its costs incurred for Carlton Fields, Baker Botts, Okin Adams, and "other defense expenses."[31] Based upon a preponderance of the evidence, the Court reduces UOB's direct damages claim in the following ways: (1) recoverable fees for Carlton Fields are reduced from $98,753.48 to $70,555.48; (2) recoverable fees for Baker Botts are reduced from $1,555,987.86 to $773,386.69; and (3) recoverable fees for Okin Adams are reduced from $1,093,604.97 to $655,194. Accordingly, the Court finds that UOB is entitled to $1,499,136.17 in attorneys' fees as direct damages from Gemini based upon its failure to defend. Hines also claims direct damages for its costs incurred for Akerman and Baker Botts in the Florida

[31] While UOB lists "other defense expenses" under its claim for direct damages in its post-trial briefing for some unexplained reason, the Court discusses them below under consequential damages.

litigation. The Court reduces Hines' claim for attorneys' fees as direct damages for Baker Botts from $13,168.70 to $10,141.70. The Court further discusses Hines' claim for Akerman's attorney fees below.

**F. Hines' Florida Fees**

While Southstar's claims against UOB were ultimately transferred to the Bankruptcy Court and incorporated into a Proof of Claim, Southstar's claims against Hines and "unknown John Does" remained pending in Florida state court. As previously mentioned, Joseph Rebak of Akerman law firm represented Hines in the then-ongoing Construction Defect Action in Florida. Apparently, Hines eventually prevailed at the trial court, entitling Hines to its attorneys' fees. According to Plaintiffs in this lawsuit, those fees totaled $604,435.19. *See* (Doc. No. 539 at 60). As it concerns fees, the Florida dispute was ultimately settled. On April 5, 2023, Southstar and Hines filed a "Joint Stipulation for Dismissal" which terminated what remained of the Construction Defect Action as between the two parties. (Gemini's Trial Ex. 37). The Joint Stipulation states that "[Hines'] claim against [Southstar] for attorney's fees and costs, having been amicably settled, should be dismissed, with prejudice." (*Id.*).

At the trial before this Court, Southstar and UOB/Hines cooperated in their attempt to prevail against the insurers. Despite the fact that both of them had to have knowledge of this settlement, it was not disclosed to the Defendants. Instead, Plaintiffs sought to recover the entirety of the Florida fees knowing that, at the very least, the Defendants were entitled to an offset for what had already been paid, or this Florida settlement might preclude any recovery for these fees.

On the fourth day of trial before this Court, during the cross-examination of Plaintiffs' expert, William Andrews, Gemini's counsel introduced Gemini's Trial Exhibit 37 – the Joint Stipulation of Dismissal between Hines and Southstar. *See* (Doc. No. 537, Day 4-PM Trial Tr. at

160:16–161:12). Andrews testified that he had seen the document before but otherwise did not know anything about it. He testified that he did not know anything about the amount of the settlement, nor did he know whether he had included these already reimbursed attorneys' fees in the total amounts of attorneys' fees that he opined were reasonable and necessary in his expert report. (*Id.*, Day 4-PM Trial Tr. at 162:2–15). The next day, the Court asked why Plaintiffs were entitled to receive any attorneys' fees out of the Florida case when the Joint Stipulation stated that the Hines entities' claim for attorneys' fees was settled and dismissed with prejudice. *See* (*id.*, Day 5-AM Trial Tr. at 38:11–16). The Court questioned whether this settlement would either constitute a bar or otherwise limit or reduce the sought after recovery. (*Id.*, Day 5-AM Trial Tr. at 38:11–16).

Over the weekend, Plaintiffs apparently disclosed to Gemini for the first time the details of the settlement. Hines had received a total of $125,000 from Southstar for attorneys' fees in the Florida action as part of the settlement. *See* (*id.*, Day 6-AM Trial Tr. at 6:15–18). The settlement funds were divided as follows: a sum of $82,500 was attributed to Akerman for its attorneys' fees, and a sum of $42,500 was attributed to the law firm of Butler, Weihmuller, Katz and Craig for its attorneys' fees (counsel hired by Navigators). Plaintiffs offered to stipulate to these amounts to the Court. (*Id.*, Day 6-AM Trial Tr. at 6:15–18); (Gemini's Trial Ex. 158) (December 13, 2025 email from UOB's counsel to Gemini's Counsel). Gemini, however, refused. Gemini's counsel, instead, made an oral motion to exclude or strike the Florida fees. (Doc. No. 537, Day 6-AM Trial Tr. at 6:7–7:13). Gemini argued that Plaintiffs never disclosed the settlement, produced settlement documents, or produced any of the payment information stemming from the settlement prior to trial. (*Id.*, Day 6-AM Trial Tr. at 6:7–7:13). The Court carried the motion with the case and analyzes the arguments below.

First, the Court addresses its own prior questions regarding the applicability of res judicata or some other form of legal bar (collateral estoppel, one recovery rule, etc.) given the Florida fee settlement. There are two principal categories of preclusion: (1) claim preclusion (or res judicata); and (2) issue preclusion (or collateral estoppel). "Res judicata precludes relitigation of claims that have been finally adjudicated, or that arise out of the same subject matter and that could have been litigated in the prior action." *Hernandez v. Del Ray Chem. Intern., Inc.*, 56 S.W.3d 112, 115 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (citing *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996)). "To establish application of res judicata, a party must show the following elements: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action." *Id.* Hines' claim for attorneys' fees arising out of the Construction Defect Action in Florida with Southstar is, therefore, not barred by res judicata. The Construction Defect Action in Florida did not involve the same parties—the insurers were not parties to the prior action nor are they in privity with Southstar.

Under Texas law, the elements of collateral estoppel are: "(1) the facts sought to be litigated in the second action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *Hammervold v. Blank*, 3 F.4th 803, 810 (5th Cir. 2021). To determine whether facts in the current case were "fully and fairly litigated" in the prior case, courts consider: "(1) whether the parties were fully heard, (2) that the court supported its decision with a reasoned opinion, and (3) that the decision was subject to appeal or was in fact reviewed on appeal." *First Sabrepoint Capital Mgmt., L.P. v. Farmland Partners Inc.*, 712 S.W.3d 75, 85–86 (Tex. 2025) (citing *Mower v. Boyer*, 811 S.W.2d 560, 562 (Tex. 1991)). Regarding the third element, mutuality of parties is no longer

necessary. It is only required "that the party against whom the plea of collateral estoppel is being asserted be a party or in privity with a party in the prior litigation." *Id.* Further, "collateral estoppel requires that the issue decided in the first action be identical to the issue in the pending action." *Hammervold*, 3 F.4th at 810. For issues to be identical, "both the facts and 'legal standard used to assess them' must be identical." *Id.*

Hines' claim for attorneys' fees arising out of the Construction Defect Action in Florida is also, therefore, not barred by collateral estoppel. The facts litigated here in relation to Gemini's coverage for Hines' attorneys' fees were not fully and fairly litigated in Hines' prior action against Southstar nor were they "essential" to its judgment. Since Hines and Southstar settled Hines' claim against Southstar for attorneys' fees and costs, the parties were certainly not fully heard by the court on that issue, and the court did not issue an appealable decision regarding this claim. *See First Sabrepoint Capital Mgmt.*, 712 S.W.3d at 85–86. Additionally, the issue presented in this action—insurance coverage for attorneys' fees resulting from Gemini's breach of its duty to defend—is not "identical" to the issue decided in the prior Florida action, where Hines recovered fees through a settlement with Southstar. Accordingly, collateral estoppel does not apply.

Importantly, however, as highlighted by Gemini's counsel in its motion to exclude, Plaintiffs did not disclose the Florida settlement until Gemini pointed it out during trial. Thus, Plaintiffs disclosed to Gemini for the first time at trial that Hines had compromised its Florida fees claim and had received $125,000 from Southstar for those fees. This settlement was obviously known to the Hines entities and their attorneys (but not necessarily those representing Hines in this case) since April of 2023. Nevertheless, Hines sought in this lawsuit these same fees for which it

had already been partially paid.[32] Plaintiffs did not disclose this settlement and receipt of funds to Gemini before trial, despite Gemini requesting during discovery "[a]ll documents in your possession, custody or control relating to any attorney's fees or expenses that Plaintiffs are claiming they are entitled to recover in this lawsuit." *See* (Doc. No. 537, Day 6-AM Trial Tr. at 6:22–7:2). Further, Plaintiffs did not disclose this settlement during their case in chief to this Court even though they presented evidence regarding the total Akerman fees paid by Hines which included these Florida fees for which they had already been paid in a separate settlement and for which they had settled for a much lesser amount.

Accordingly, Plaintiffs cannot now recover Hines' total claim for attorneys' fees in this case. Hines' claim for Florida attorneys' fees both in the Florida case and in this case invokes principles against double recovery under Texas law. "Under the common-law one-satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered." *Bay, Ltd. v. Mulvey*, 686 S.W.3d 401, 406 (Tex. 2024). "The fundamental consideration in applying the one-satisfaction rule is whether the plaintiff has suffered a single, indivisible injury—not the causes of action the plaintiff asserts." *Id.* (quoting *Sky View at Las Palmas, LLC v. Mendez*, 555 S.W.3d 101, 107 (Tex. 2018)). Here, Hines suffered a single, indivisible injury of having to pay for attorneys' fees in the Florida action. Since Hines recovered a portion of its attorneys' fees in its settlement with Southstar, the insurers here are entitled to, at least, a settlement credit offsetting the previously recovered settlement proceeds from their judgment. *See id.* ("Where a party seeking recovery has previously settled, the one-satisfaction rule manifests itself in the form of a settlement credit. We

[32] Quite frankly, this Court would be considering sanctions on Plaintiffs' counsel, but for the fact that at the time this situation was revealed at trial, the Court was convinced and remains convinced that they were unaware of the situation.

apply these credits to prevent windfalls and collusive settlements."). As such, the Court offsets from Hines' claim for Florida attorneys' fees the amount Hines received in settlement: $125,500 (minus the $42,500 that went to Navigators that it subsequently credited to Gemini, *see* (Doc. No. 540-1)).

Additionally, the Court further reduces Hines' claim for Akerman's attorneys' fees based on its fees incurred prior to tender of the lawsuit to Gemini and its fees incurred that are not related to defense costs in the Construction Defect Action. First, as mentioned above, Hines' claim for Akerman's attorneys' fees is reduced by $25,652 as these fees were incurred prior to tender of the lawsuit to Gemini. *See supra* Section V.E.2. Second, Akerman's invoices included non-defense fee billing entries that are not covered under the Policy. For example, Akerman's invoices included entries for work related to demands to the insurance carriers ($28,715.50) and core bankruptcy work ($77,605). Thus, Hines' claim for Akerman's attorneys' fees is further reduced by $106,320.50 for these non-defense fees. In total, Hines' claim for Akerman's attorneys' fees incurred in the Florida state court action is reduced by $214,472.50, including the offset for the amount Hines received in settlement ($82,500). Hines' request for direct damages for Akerman is, therefore, reduced from $604,435.19 to $389,962.69. As such, the Court finds by a preponderance of the evidence that Hines is entitled to $400,104.39 in direct damages from Gemini ($389,962.69 attributable to Akerman; $10,141.70 attributable to Baker Botts).

**G. Consequential Damages**

Plaintiffs also argue that they are owed consequential damages for Gemini's breach of its duty to defend. These damages are primarily related to the costs of their attorneys' fees related to UOB's bankruptcy. The Court denies this request for consequential damages for multiple reasons.[33]

"Consequential damages, unlike direct damages, are not presumed to have been foreseen or to be the necessary and usual result of the wrong. Plaintiff must plead and prove them separately, and they must be premised on a finding that they proximately resulted from the wrongful conduct of the defendant." *Lesikar v. Rappeport*, 33 S.W.3d 282, 305 (Tex. App.—Texarkana 2000, pet. denied). Under Texas law, consequential damages must be specifically pled. *See* Tex. R. Civ. P. 56 ("When items of special damage are claimed, they shall be specifically stated."). The Federal Rules of Civil Procedure confirm that when "an item of special damage is claimed, it must be specifically stated." Fed. R. Civ. P. 9(g). Courts use the terms "special damages" and "consequential damages" interchangeably. *See Lesikar*, 33 S.W.3d at 305; *Hycel, Inc. v. Am. Airlines, Inc.*, 328 F. Supp. 190, 193 (S.D. Tex. 1971) ("[C]onsequential damages are synonymous with special damages."); *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007) (defining "special damages" and "consequential damages" the same). Thus, when consequential damages have not been specifically pled, they should be excluded.

---

[33] Months before trial, Gemini filed a Motion to Exclude this evidence under Federal Rule of Civil Procedure 37 for failure to disclose. *See* (Doc. No. 496). On the first day of trial, Gemini reurged this motion to the Court, as well as a motion to exclude consequential damages as being unpleaded, and the Court carried both motions with the case. *See* (Doc. No. 537, Day 1-AM Trial Tr. at 11:2–21:17). The Court chose to allow this evidence into trial seeing as it was a bench trial and the Court preferred to hear all potentially relevant evidence so that any appellate court would have a complete record.

### 1. Failure to Plead

First, Gemini argues that Plaintiffs failed to plead for consequential damages. Thus, Gemini contends, Plaintiffs are entitled to receive none. In response, Plaintiffs' post-trial brief argues that Plaintiffs pleaded consequential damages by (1) stating that "Plaintiffs have suffered actual damages due to the Carriers' breaches, including expenses Plaintiffs have incurred thus far in defending themselves" and (2) including "actual damages" and "supplemental relief" in their Prayer for Relief. (Doc. No. 539 at 39). This argument fails. In this case, Plaintiffs' live Complaint does not plead for consequential damages. *See* (Doc. No. 78).

First, Plaintiffs only plead for "actual damages" which could be a reference to either direct damages or consequential damages. *See Arthur Andersen*, 945 S.W.2d at 816 ("At common law, actual damages are either 'direct' or 'consequential.'"). This is the opposite of "specifically" pleading for consequential damages. Second, in citing this passage from their Complaint to the Court, Plaintiffs conveniently omitted the end of their first quote. It concludes with "expenses Plaintiffs have incurred thus far in defending themselves in the Southstar Lawsuit and failure to pay the Judgment." (Doc. No. 78 at 28) (emphasis added). Thus, Plaintiffs specifically pled for direct damages resulting from the alleged breach of the duty to defend (defense fees incurred in the Southstar Lawsuit a/k/a the Construction Defect Action) and the alleged breach of the duty to indemnify (payment of the Southstar judgment). Plaintiffs, therefore, did not generally plead for consequential damages resulting from breach of the duty to defend and did not specifically plead for, or even mention, the bankruptcy fees which they now seek.

That being said, Plaintiffs first argued that their bankruptcy fees should be recoverable as consequential damages for Gemini's breach of the duty to defend in October 2023 in their response in opposition to Gemini's Motion for Partial Summary Judgment on Bankruptcy Legal Fees, Costs,

and Expenses. *See* (Doc. No. 389) ("Because Gemini breached its duty to defend, UOB is entitled to all of its costs – both as actual defense costs and consequential."). Subsequently, the Court confirmed in a July 2024 order that the "core" bankruptcy fees may be recoverable as consequential damages. (Doc. No. 437). Later, in an Amended Scheduling Order, the Court set the non-dispositive motions and dispositive motions (limited to motions related to coverage for the construction defects) deadlines for December 30, 2024. (Doc. No. 441). Thus, Plaintiffs were aware of, and argued for, consequential damages as early as October 2023, and the Court confirmed the possibility of recovering such damages in July 2024, yet Plaintiffs did not seek to amend their complaint to include consequential damages despite having over a year to do so. Even knowing the bankruptcy costs were only recoverable as consequential damages and with significant time to amend their complaint, Plaintiffs failed to specifically plead for consequential damages.

While the Court finds that Plaintiffs failed to properly plead for consequential damages and, therefore, their pleadings were procedurally defective, this failure did not prevent the parties from having notice of Plaintiffs' request for their bankruptcy fees. Indeed, the facts above indicate that the parties were on notice of Plaintiffs' claim as early as October 2023. Further, the parties listed Plaintiffs' request for core bankruptcy fees as consequential damages as a contested proposition of law in their Joint Pretrial Order. *See* (Doc. No. 487 at 19). As such, Plaintiffs' failure to properly plead for consequential damages did not prejudice the insurers and the Court does not deny Plaintiffs' claim for this reason. *See HWY 67 Dealership JV v. Depositors Ins. Co.*, 2024 WL 5166651, at *7 (N.D. Tex. Mar. 15, 2024) (allowing plaintiff to amend its complaint to include consequential damages after defendant filed for summary judgment with respect to consequential damages based on, among other things, plaintiffs' failure to specifically plead for them because

defendant already had notice of the damages and allowing amendment "would not unduly prejudice [d]efendant.").

**2. Failure to Disclose**

Second, Federal Rule of Civil Procedure 26 provides that "a party must, without awaiting a discovery request, provide . . . *a computation of each category of damages* . . . [and] the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based." Fed. R. Civ. P. 26(a)(1)(A)(iii) (emphasis added). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The Fifth Circuit has previously held that it is appropriate to exclude evidence under Rule 37 when the plaintiff fails to properly disclose the "computations" for the various "categories" of damages. *See CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 279–80 (5th Cir. 2009).

In this case, Plaintiffs formally disclosed, for the first time, certain new categories of damages in their Proposed Findings of Fact and Conclusions of Law on March 24, 2025, including: $1,402,489.26 "in costs arising from the defense and investigation of the claim against it" for UOB; $1,627,392.31 in "consequential fees and costs" for UOB; and an additional $22,228.67 in consequential damages for Hines. *See* (Doc. No. 487-1 at 81, 82, 84). Additionally, Plaintiffs provided two new exhibits entitled "Chart Summary of all Invoices and Costs Incurred by Hines as Damages" and "Chart Summary of all Invoices and Costs Incurred by UOB as Damages." (Doc. No. 487-1 at 57). Gemini alleges that these exhibits were the "first time Plaintiffs disclosed a computation of each category of damages." (Doc. No. 546 at 111) (emphasis removed). Notably, these new categories that Plaintiffs listed for UOB in their Proposed Findings of Fact and

Conclusion of Law ("costs arising from the defense and investigation of the claim against it" and "consequential fees and costs") are no longer present in Plaintiffs' post-trial briefing. Plaintiffs appear to have reframed these categories as "Other Defense Expenses" and "Bankruptcy Costs," requesting $525,030.29 in "Other Defense Expenses" for UOB, and $208,628.79 in "Bankruptcy Costs" (or "Bankruptcy Expenses") for UOB. (Doc. No. 539 at 71,73).

Regardless of how the categories are labeled in the post-trial briefing, Plaintiffs did not disclose a categorization of the damages prior to the chart summary exhibits produced in their Proposed Findings right before trial. Similar to their live Complaint, Plaintiffs' most recent "initial" disclosures do not even mention these categories (in their prior framing or new framing) for consequential damages. *See* (Doc. No. 496-1 at 12) ("As to the duty to defend, Plaintiffs seek reimbursement of attorneys' fees, legal assistant fees and costs. Said documents to this effect are in possession of counsel for Plaintiffs."). Despite extensive time to do so considering the duration of this case, Plaintiffs failed to amend their disclosures or otherwise provide computation for their categories of damages prior to their Proposed Findings.

Even considering Plaintiffs provided chart summaries, these charts do not provide computations for *each category* of damages. Instead, they merely list all invoices for damages requested by UOB and Hines, some of which are invoices for things like "[s]tate renewals for 1662 Multifamily LLC," *see* (Plaintiffs' Trial Ex. 180 at 2), and "HILP 7/17 Working Capital," *see* (Plaintiffs' Trial Ex. 181 at 5). Thus, the chart summaries clearly include unrelated invoices. This is plainly prejudicial to Defendants. As such, since Plaintiffs failed to disclose their damages as required by the Federal Rules of Civil Procedure, the Court denies Plaintiffs' claim for consequential damages.

### 3. Consequential Damages Must Be Foreseeable at the Time of Contracting

While Plaintiffs' claim for consequential damages is denied for their failure to disclose, as discussed above, Plaintiffs' claim is also denied on substantive grounds because no party contemplated bankruptcy-related damages at the time of executing the insurance agreements.

In Texas, "consequential damages are those that result naturally, but not necessarily, from the defendant's breach [of contract], and are not the usual result of the wrong." *TotalEnergies Petrochemicals & Ref USA, Inc. v. Kinder Morgan Petcoke, LP*, 658 S.W.3d 647, 679 (Tex. App.—Houston [14th Dist.] 2022, pet. denied). "Consequential damages are not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach." *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998). To be recoverable, "consequential damages must be foreseeable and directly traceable to the wrongful act and result from it." *Id.* "A foreseeable loss may either follow predictably from the breach 'in the ordinary course of events' or arise from 'special circumstances' that the party in breach 'had reason to know.'" *Signature Indus. Services, LLC v. Int'l Paper Co.*, 638 S.W.3d 179, 186 (Tex. 2022). "Foreseeability is an independent element of any claim for consequential damages. Even if caused by the breach, damages are not recoverable if they were not within the breaching party's reasonable contemplation at the time of contracting." *Id.* at 187.

The preponderance of the evidence proves that UOB's bankruptcy (and its related costs) was not foreseeable to Gemini, or any other insurer, at the time the policies were issued. Leah Dominy, the vice president of underwriting at Vela Insurance Services,[34] testified at trial that Gemini had no information indicating that if Gemini breached its duty to defend, Plaintiffs would

[34] Dominy testified that "Vela writes on Gemini paper," meaning Vela backs the risks or manages the policies that Gemini issues. (Doc. No. 537, Day 6-PM Trial Tr. at 64:24).

have to file for bankruptcy. *See* (Doc. No. 537, Day 6-PM Trial Tr. at 115:15–120:18). She further testified that (1) underwriters do not foresee or evaluate whether a failure to defend might result in an insured filing for bankruptcy; and (2) in her 24 years in underwriting, she has never foreseen bankruptcy as the likely result of the insurer breaching its duty to defend. (*Id.*, Day 6-PM Trial Tr. at 119:10–20). Additionally, Richard Vance, Hines' insurance risk manager during the relevant period, testified that he did not foresee that UOB would have to file for bankruptcy if it were sued and the insurer did not provide a defense nor did he have any reason to believe that anyone at WTW (insurance broker) or RT Specialty (surplus lines broker) would have relayed such information to Gemini. *See* (Doc. No. 523-9, Dep. Designations of Richard Vance at 76:7–77:6). Richard Mercer, the former president of UOB, testified that no one expressed any concerns that UOB was "overextending itself" when it began work on the Project and he did not have any concerns regarding UOB's "financial status." *See* (Doc. No. 523-5, Dep. Designations of Richard Mercer at 91:14–23).

In fact, as late as June 29, 2017, UOB confirmed to Southstar that "to the extent not recovered from insurance, Urban Oaks Builders LLC *has the financial capacity to*, and will, pay those costs for which Urban Oaks Builders LLC has responsibility, which includes all invoices submitted by Southstar Management, LLC through 6/29/17." (Gemini's Trial Ex. 65) (emphasis added). It was over a year later—August 21, 2018—that UOB filed for Chapter 11 bankruptcy relief in the United States Bankruptcy Court for the Southern District of Texas.

Further, UOB's bankruptcy did not "result naturally" from Gemini's breach of its duty to defend. *TotalEnergies Petrochemicals*, 658 S.W.3d at 679. Former Bankruptcy Judge, Leif Clark, who the Court found quite credible, testified that "the bankruptcy was not the natural consequence of [Gemini's] failure to defend [and] that it was attributable to lots of other things." (Doc. No. 537,

Day 7-AM Trial Tr. at 29:3–13). Clark testified that it was not defense costs that drove UOB to file for bankruptcy. (*Id.*, Day 7-AM Trial Tr. at 61:8–10). Indeed, he noted that UOB's bankruptcy allowed a Hines affiliate to "get first dollars" with priority over Southstar's claim against the bankruptcy estate. (*Id.*, Day 7-AM Trial Tr. at 33:11–35:18). Clark testified that when UOB filed for bankruptcy, it utilized provisions of the bankruptcy code that allowed it to continue borrowing money on a post-petition basis from POC Holdings 2, Inc., "which, essentially, was Jeffrey Hines," one of UOB's two managing members and its secured creditor. *See* (*id.*, Day 7-AM Trial Tr. at 33:17–34:4). He stated that in UOB's post-petition financing order, it added additional protections that allowed UOB's payment to POC Holdings 2 to "come in front of anyone else, including any of the bankruptcy professionals who were then working for the company." (*Id.*, Day 7-AM Trial Tr. at 34:13–17). As a result, "to the extent that the collateral was insufficient to cover the creditor's claim, and . . . there's any proceeds that are available that aren't otherwise encumbered by the security interest, the lender will still be the first in front of all these other expenses." (*Id.*, Day 7-AM Trial Tr. at 35:7–12). Thus, through the bankruptcy filing, the evidence proves that POC Holdings 2 was able to tie up its claim priority "in a neat little bow." (*Id.*, Day 7-AM Trial Tr. at 35:18).[35]

Additionally, Perkins, a shareholder and lawyer at Carlton Fields, testified that he did not recall timely payment from UOB being an issue and, at the time of trial, UOB had no outstanding account receivable due to Carlton Fields. *See* (*id.*, Day 1-PM Trial Tr. at 73:5–17). Rebak, an attorney at Akerman, testified that Hines paid its bills "promptly," and he did not believe any money was owed when the matter concluded. *See* (*id.*, Day 3-AM Trial Tr. at 24:1–10). Further,

[35] The bankruptcy also allowed UOB, a Hines entity, to maneuver the litigation concerning the Project's defects out of Florida to Houston – Hines' home base.

Colagiovanni, a former partner at Baker Botts, testified that as of the date of the bankruptcy filing, Baker Botts was not owed anything by UOB. (*Id.*, Day 2-PM Trial Tr. at 97:5–9). It is important to remember that while the Court has found Gemini breached its duty to defend UOB, Gemini still paid sums in excess of two million dollars and there was $35 million dollars in excess insurance sitting above it. The Court finds that Gemini's failure to provide a defense to UOB and Hines did not cause the bankruptcy filing.

Most importantly, even if UOB's bankruptcy was caused, in small part, by Gemini's breach, as some witnesses testified, "damages are not recoverable if they were not within the breaching party's reasonable contemplation at the time of contracting." *Signature Indus. Servs., LLC*, 638 S.W.3d at 187 (emphasis added). As discussed above, UOB's bankruptcy was not reasonably contemplated by any party at the time the policies were issued.

Further, UOB's bankruptcy was not "directly traceable to" Gemini's breach of the duty to defend. *Stuart*, 964 S.W.2d at 921. Before UOB's bankruptcy filing, Ironshore offered to defend Plaintiffs in the Construction Defect Action, (Gemini's Trial Ex. 46), but Plaintiffs rejected the offer, demanding that "all four insurance carriers . . . agree to withdraw their reservations, and commit that they would be responsible for the full value of any judgment entered against those entities." (Gemini's Trial Ex. 48) (emphasis removed). This demand was not a reasonable one and it was certainly not based upon any contractual/insurance provision; and, more importantly, it was not contemplated at the time the policies were issued. Clearly, if the defense costs contributed to UOB's bankruptcy, it was more attributable to UOB's own conduct than that of the insurers. (It is important to note that Navigators ultimately ended up paying some of these defense costs but only after UOB dropped this waiver demand.) (Gemini's Trial Ex. 36).

The Court finds that Plaintiffs' "core bankruptcy fees" are, therefore, not recoverable as consequential damages for Gemini's breach of the duty to defend. This includes Plaintiffs requested "bankruptcy expenses"/"bankruptcy costs" and the attorneys' fees paid for core bankruptcy work completed by Baker Botts and Okin Adams. *See* (Doc. No. 539 at 65–72).

**4. Other Defense Costs**

As mentioned above, while Plaintiffs' claim for "Other Defense Expenses" is denied for failing to disclose the claim properly, it is also denied on substantive grounds.[36] These expenses, per Plaintiffs' post-trial briefing, include (1) personnel expenses of Richard Mercer (former UOB president); (2) Ellinwood + Machado ("Ellinwood") invoices; and (3) WJE invoices. *See* (Doc. No. 539 at 37–38). UOB's corporate representative, Keith Borchardt, testified that Mercer was designated to investigate the Project because, at the start of building the Project, he had served as the president of UOB and he, thus, had "intimate knowledge of the project." (Doc. No. 537, Day 3-PM Trial Tr. at 46:6–14). Mercer later went to work at HILP, a different Hines entity, and so the relevant personnel invoices are invoices incurred by Mercer and his contract administration assistant at HILP, Shandy Bosnak, for their time spent investigating the Project for UOB. (*Id.*, Day 3-PM Trial Tr. at 46:15–47:6). These invoices are, therefore, invoices by HILP sent to UOB. It is one Hines entity billing another. As for the Ellinwood invoices, Borchardt testified that Ellinwood was an engineering firm hired to investigate the Project, specifically investigating the inflections on the corner balconies. (*Id.*, Day 3-PM Trial Tr. at 48:9–10, 48:21–49:8). Lastly, Borchardt

[36] Gemini notes in its post-trial brief that these damages were also previously referred to as "additional damages." *See* (Doc. No. 546 at 53).

testified that the WJE invoices concerned invoices from WJE for its services in investigating the construction defects and the necessary repairs. (*Id.*, Day 3-PM Trial Tr. at 55:17–21).

As established above, all expenses pre-dating the tender of the lawsuit to Gemini on March 2, 2018 do not qualify as defense costs covered by the Policy. *See Protectors Ins. & Fin. Services*, 2013 WL 5164630, at *3 ("[T]he insurer has no duty to reimburse the insured for defense costs incurred before the insured gave the insurer notice of the lawsuit."). The invoices listed in Plaintiffs' post-trial brief for "Other Defense Expenses" include 17 invoices predating March 2, 2018 for services by Mercer, Ellinwood, and WJE. *See* (Doc. No. 539 at 58–59). None of these invoices are recoverable by Plaintiffs. Accordingly, only 7 invoices for work performed by Mercer and WJE after March 2, 2018 remain.

Gemini is only obligated to pay under the Supplementary Payments provision of the Policy "[a]ll expenses [Gemini] incurs" "with respect to any claim [it] investigate[s] or settle[s], or any 'suit' against an insured [it] defend[s]." (Gemini's Trial Ex. 1 at 18). If Plaintiffs "make a payment, assume any obligation, or incur any expense . . . without [Gemini's] consent" in the event of a lawsuit, Plaintiffs assume the cost. (Gemini's Trial Ex. 1 at 10–11). Plaintiffs provided no evidence that Gemini itself incurred or otherwise consented to these remaining "Other Defense Expenses" and, therefore, Plaintiffs assume the cost.

Additionally, Plaintiffs' counsel stipulated at trial that the admission of the summaries of the invoices for "Other Defense Expenses" was not "to prove causation [or] reasonableness." (Doc. No. 537, Day 2-PM Trial Tr. at 25:2–5). Instead, they asked the Court to admit these invoices and summaries for the limited purpose of showing that they were payments made either by UOB or on its behalf. (*Id.*, Day 2-PM Trial Tr. at 25:7–10, 47:16–48:4). Plaintiffs, therefore, did not provide evidence that these expenses were due and owing under the Gemini Policy.

## H. Navigators' Subrogation Claim

As explained above, Gemini's duty to defend was triggered on March 2, 2018 when Plaintiffs tendered the lawsuit to Gemini. On March 21, 2018, however, Gemini took the position that it had exhausted its Policy limits and, therefore, it did not have a duty to defend Plaintiffs. As explained previously, this position was incorrect. Next, on July 18, 2018, Ironshore offered to provide a defense to Plaintiffs in the Construction Defect Action. Plaintiffs, however, responded that they would not agree to the defense until all four insurance carriers agreed to withdraw their reservations and commit to being responsible for the full value of any judgment entered against Plaintiffs. This position is not supported by the policies or the law. Not surprisingly, no insurer agreed to this demand and, therefore, Ironshore's offer was rejected.

As a result, on October 24, 2019, Plaintiffs' second level excess carrier, Navigators, sent correspondence to UOB and Hines. (Gemini's Trial Ex. 36). In that correspondence, Navigators agreed to defend Plaintiffs in "the Construction Defect Lawsuit, Proof of Claim Hearing and any additional litigation as further defined in the Appointed Defense Agreement" under a reservation of rights. (*Id.*).[37] Since that time, Navigators has paid $742,069.38 in attorneys' fees to defend UOB and Hines in those actions.

With that background in mind, the Court previously ruled that Navigators is entitled to seek reimbursement for its defense costs from Gemini. *See* (Doc. No. 438 at 10) ("[P]ursuant to clear Fifth Circuit precedent in *Continental Casualty Co.* and the language of the Subrogation Provision [in the Gemini Policy], the Court finds that Navigators is entitled to seek reimbursement for its defense costs from Gemini." (citing *Contl. Cas. Co. v. N. Am. Capacity Ins. Co.*, 683 F.3d 79 (5th

[37] While there is no testimony directly on the issue as to why, apparently UOB decided not to continue its demand that the carriers waive all their reservations of rights.

Cir. 2012))). Navigators and Gemini submitted a Joint Stipulation that "the sum of $742,069.38 represents the reasonable and necessary defense costs advanced by Navigators to defend" UOB and Hines. (Doc. No. 457).

As discussed below, however, Gemini discovered at trial that Hines settled its claim for attorneys' fees against Southstar in its Construction Defect Action in Florida. (Gemini's Trial Ex. 37). In that settlement, Navigators received $42,500.00 to compensate it for paying attorneys' fees to the law firm it appointed to represent Hines: Butler, Weihmuller, Katz and Craig. (*Id.*). As such, Gemini and Navigators then filed an Amended Joint Stipulation wherein "Navigators and Gemini stipulate[d] that the sum of $699,569.38 represents the reasonable and necessary defense costs paid by Navigators to defend [UOB and Hines]. This amount represents the previously stipulated $742,069.38 less a credit of $42,500.00 that Navigators received as part of the settlement referenced in Gemini Trial Ex. 37." (Doc. No. 540-1).

Accordingly, the Court finds that Navigators is entitled to judgment in its favor with respect to Count II of its crossclaim for subrogation against Gemini in the amount of $699,569.38, per the Amended Joint Stipulation of the parties. *See* (Doc. No. 540-1).

## VI. DUTY TO INDEMNIFY

Under Texas law, an insurer's duty to indemnify is determined by whether "any damages caused by the insured and later proven at trial are covered by the terms of the policy." *Colony Ins. Co. v. Peachtree Const., Ltd.*, 647 F.3d 248, 253 (5th Cir. 2011). Damages in a judgment "must be apportioned between claims covered by the policy and those that are not." *Willcox v. Am. Home Assur. Co.*, 900 F. Supp. 850, 856 (S.D. Tex. 1995) (citing *Enserch Corp. v. Shand Morahan & Co.*, 952 F.2d 1485, 1495 (5th Cir. 1992)). Ultimately, an insurer is not bound to pay any part of a

judgment beyond that covered by the relevant policy. *Hartford Cas. Co. v. Cruse*, 938 F.2d 601, 605 (5th Cir. 1991).

**A. The Bankruptcy Judgment**

UOB's construction defects described above, *see supra* Section II., ultimately led to Southstar selling the Project at a loss and filing a lawsuit against UOB and Hines in an endeavor to recover that loss of value. When UOB filed for bankruptcy, Southstar's claims against UOB eventually wound up before the Bankruptcy Court in the Southern District of Texas. While Southstar sought a recovery of $45,925,786, primarily fueled by its argument that it should recover under a loss of value theory, it alternatively made a lesser claim based upon loss of profits/rents, repair costs, and other related losses. After a four-day claim objection hearing between Southstar and UOB, the Bankruptcy Court rejected Southstar's loss of value claim but nonetheless issued a final judgment in Southstar's favor for: "(i) $8,226,243.00 in lost profits; plus (ii) non-legal professional fees and costs in the amount of $732,262.00; plus (iii) restoration costs of $18,439,945.46; minus (iv) the Debtor's prepetition payments in the amount of $2,251,263.33," plus prejudgment interest in the amount of $956,530.25. (Plaintiffs' Trial Ex. 134).

UOB, in this case, argues that the insurers have a duty to indemnify them for the entire Bankruptcy Judgment because the judgment should be a covered loss under the insurance policies. Specifically, Plaintiffs contend that the Policy requires insurers to "pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage.'" (Gemini's Trial Ex. 1 at 1). Plaintiffs argue that this applies to the entirety of the Bankruptcy Judgment.

The insurers contend that, at the very least, the shear wall and draft stop penetration defects are *not* covered under the Policy because they merely constitute "occurrences" that did not result in any "property damage." They contend that the Gemini Policy, and the excess policies (because

they follow form), do not cover such defective work—the insurers "will [only] pay those sums that the insured becomes legally obligated to pay as damages *because of . . . 'property damage.'"* (Gemini's Trial Ex. 1 at 1); *see, e.g., Lennar Corp.*, 200 S.W.3d at 673–74 ("[A]lthough defective construction may constitute an 'occurrence,' the insurer indemnifies the insured only for resulting 'property damage' arising after the project is completed.").

The insurers further contend that the Bankruptcy Judgment does not separate its damage figures as to any specific cost being caused by any specific defect. Therefore, the ultimate damage award includes damages that are covered by the Policy and damages that are not. They conclude that since the underlying judgment did not segregate the covered damages from those that are not covered and the Plaintiffs did not provide evidence for apportionment in this trial, Plaintiffs cannot recover anything.

Texas law is clear. Since the Bankruptcy Judgment includes damages for both covered and uncovered property damage, damages in the judgment "must be apportioned between claims covered by the policy and those that are not." *Willcox*, 900 F.Supp. at 856. An insurer is not bound to pay any part of a judgment beyond that covered by the relevant policy. *Hartford Cas.*, 938 F.2d at 605. The burden of proof on apportionment in Texas is on the insured. *See Great Am. Ins. Co. v. Emps. Mut. Cas. Co.*, 18 F.4th 486, 492 (5th Cir. 2021) (citing *Travelers Indem. Co. v. McKillip*, 469 S.W.2d 160, 163 (Tex. 1971)). Thus, an insured's failure to provide "evidence upon which a jury or court can allocate damages between those that resulted from covered perils and those that did not is fatal to an insured party's claim." *Nat'l Union Fire Ins. of Pittsburgh, Pennsylvania v. Puget Plastics Corp.*, 735 F.Supp.2d 650, 669 (S.D. Tex. 2010). The allocation evidence "must afford a reasonable basis for estimating the amount of damage or the proportionate part of damage

caused by a risk covered by the insurance policy." *Id.* at 677 (citing *Travelers Indemnity Co.*, 469 S.W.2d at 163).

UOB has known it has had this burden for years. Notably, at the claim objection hearing in 2020, UOB requested that the Bankruptcy Court provide details to allocate the damages:

> Urban Oaks requests that the Court make the following specific findings. Should the Court find a building code violation or negligence, or both, that it determine, one, the correct measure of damages, diminution versus cost of repair, that it determine what specific damages are the responsibility of Urban Oaks for each, whether the damage is a code violation or negligence, and if the damages are based on a cost of repair, what items was UOB required under the law to repair, and which categories those repairs would fall under; structural, water damage, or repair of other property. And we would further ask the Court to identify for each element the testimony and evidence that's the basis for the Court's finding.

(Plaintiffs' Trial Ex. 131 at 860–861) (55:22–56:10). Southstar has also known about the need to allocate for years. Its counsel objected to UOB's allocation request: "The notion that this Court should conduct a finding of fact mission on subjects that really weren't tried before the Court, and distinguishing between negligence, building code violation, damages flowing from each, we don't think is proper. <u>That's really for another court at another time</u>." *Id.* at 861 (56:19–23) (emphasis added). Ultimately, Judge Jones in the Bankruptcy Court declined UOB's request to allocate the damages: "I'm going to decline the invitation to go into all of the detail that was requested by the Debtor. I don't think that I am required to." *Id.* at 870 (65:8–11).

### 1. Is the Bankruptcy Judgment "self-allocating"?

UOB now argues that allocation or apportionment is not needed since *all* of the Bankruptcy Judgment is covered under the Policy because the judgment is "self-allocating." *See* (Doc. No. 539 at 94). The insurers, however, maintain that the categories found by the Bankruptcy Court do not provide the Court with evidence of which categories were awarded as "damages because of . . .

'property damage'" as required by the Policy. (Gemini's Trial Ex. 1 at 1).[38] The Court addresses each category in turn.

*a. Lost Profits*

First, Plaintiffs contend that the "lost profits" of $8,226,243 are covered because they were given for Southstar's "loss of use" of the Project, which they allege is covered "property damage" caused by the construction defects. (Doc. No. 539 at 91–92). The Bankruptcy Judgment, however, provides no further detail on what specifically caused Southstar's "loss of use" of the Project, and ultimately, its "lost profits." This "lost profits" category provided by the Bankruptcy Court, therefore, does not provide this Court with the necessary detail to determine whether this category was awarded for covered or uncovered property damage. Indeed, Southstar could have "lost profits" from the Project from both covered defects (like the corner balcony defects and their corresponding ancillary damages) and uncovered defects (like the draft stop penetrations).

Accordingly, the "lost profits" category of the Bankruptcy Judgment is not "self-allocating."

*b. Non-Legal Professional Fees*

Plaintiffs similarly argue that the non-legal professional fees and costs in the amount of $732,262 are covered because "Southstar sustained these damages 'because of property damage.'"

[38] Gemini also notes that this Court has already disagreed with Plaintiffs' argument that the Bankruptcy Judgment is "self allocating" in a pre-trial ruling. (Doc. No. 546 at 17); *see* (Doc. No. 436 at 8) ("[T]he Bankruptcy Court did not allocate between covered and uncovered claims when it issued its estimation judgment."). The Bankruptcy Judgment is divided into loss categories, but those categories are not tethered to any particular defect.

(*Id.* at 92). Plaintiffs also contend that this amount is "covered under the Supplementary Payment provision and does not reduce the limits of liability under the Policies." (*Id.* at 93).

Plaintiffs seemingly argue that the "non-legal professional fees" are covered under both indemnity liability and defense liability. First, it is important to note that these "non-legal professional fees" are fees incurred by Southstar, not UOB and Hines, the insureds. Van Meter testified that the Bankruptcy Court awarded these fees for the "non-legal professional costs related to engineering and other costs *incurred by the Southstar entities*." (Doc. No. 537, Day 5-AM Trial Tr. at 23:21–23) (emphasis added). The Southstar entities are not insureds under the Policy. As such, their fees are not directly covered under the Policy, nor are they covered by the Supplementary Payments provision.

At best, Plaintiffs may recover as insureds under the Policy for Southstar's non-legal professional fees because they were awarded to Southstar as damages against Plaintiffs. Thus, Plaintiffs could be entitled to recover these fees from the insurers as damages if they are the result of "property damage." Since the Bankruptcy Judgment does not allocate the non-legal professional fees by specific defects, this Court cannot discern which fees were paid for covered defects under the Policy and which fees were not. The Bankruptcy Judgment does not provide this Court with information allowing it to discern what the non-legal professional fees were caused by or spent on. As such, this category of the Bankruptcy Judgment is not "self-allocating."

*c. Restoration Costs*

Plaintiffs contend that the "restoration costs" in the amount of $18,439,945.46 are covered. Essentially, Plaintiffs maintain that the "restoration costs" category of the Bankruptcy Judgment is "self allocating" because all of the restoration costs are attributed to "physical damage to all the buildings" at the Project, and all of this physical damage is covered because removal of the "Your

Work" exclusion means the Policy covers *all* property damage: "physical damage, resulting damage, costs to repair defective work, 'rip and tear,' and loss of use." (Doc. No. 539 at 85, 87).

This Court, however, has already found that the mere removal of the "Your Work" exclusion does *not* create coverage for construction defects or physical damage at the Project that are not otherwise covered. *See supra* Section III.A.1. Accordingly, the "restoration costs" category is not solely attributed to covered property damage—it includes both covered and uncovered construction defects. Once again, the Bankruptcy Judgment does not provide this Court with detail by which it can determine what "restoration costs" were awarded for covered damages and what restoration costs were not. Therefore, the "restoration costs" category of the Bankruptcy Judgment is not "self allocating."

In conclusion, this Court finds that the Bankruptcy Judgment as a whole is not "self-allocating."[39] While the judgment is broken down into several categories, these categories do not address what damages are the result of covered or uncovered events, nor does it include information by which coverage for the amount awarded can be determined. The Bankruptcy Judgment categories do not provide "evidence upon which a jury or court can allocate damages between those that resulted from covered perils and those that did not." *Nat'l Union Fire Ins. of Pitt.*, 735 F.Supp.2d at 669.

**B. The Allocation Burden**

Since the Bankruptcy Court's judgment did not allocate the damages and Texas law requires allocation, this Court warned all parties over a year before the trial that allocation was going to be an issue. The Court previously indicated in a July 2024 Order that the Bankruptcy

---

[39] Plaintiffs also argue that they are entitled to prejudgment and post-judgment interest on the Bankruptcy Judgment. The Court addresses this argument below. *See* discussion *infra* Section VI.D.

Judgment did not sufficiently allocate the damages to resolve the coverage dispute. *See* (Doc. No. 436 at 8) ("In the estimation judgment, the Bankruptcy Court identified general categories of damages it was allowing Southstar to recover against UOB and *left the coverage issues for determination by this Court*.") (emphasis added). The Court emphasized that "it is clear to the Court that several fact issues remain," including "whether any portion of the estimation judgment was awarded as damages 'because of' that property damage." (*Id.* at 12). Evidently, all parties understood this because, in the Joint Pretrial Order, the parties stipulated that one of the unresolved issues of fact and law that remained was allocation. *See* (Doc. No. 487 at 13, 18–19).

According to Texas law, this Court must be provided with evidence by which it can allocate the judgment between covered and uncovered events in order for Plaintiffs to recover. The burden of proof on apportionment is on the insured. *See Great Am. Ins.*, 18 F.4th at 492. The allocation evidence "must afford a reasonable basis for estimating the amount of damage or the proportionate part of damage caused by a risk covered by the insurance policy." *Nat'l Union Fire Ins. of Pitt.*, 735 F.Supp.2d at 677. Failure to provide this evidence "is fatal to an insured party's claim." *Id.* at 669.

Plaintiffs basically have two opposing positions. UOB first argues that it does not have to allocate the judgment because any duty to allocate the Bankruptcy Judgment was on the insurers. (Doc. No. 539 at 94). Alternatively, UOB argues that, even if the duty to allocate was on UOB, it satisfied its burden. *See* discussion *infra* Section VI.C.

Citing *Duke v. Hoch*, UOB argues that while the default rule is that it is the insured's duty to allocate, this duty shifts when, "during the merits case giving rise to the coverage action, the insurer shirks its obligation to advise the policyholder on allocation." 468 F.2d 973, 979 (5th Cir. 1972). UOB contends that "the burden of notifying the insured of the need to obtain a special

verdict form has always belonged to the carrier because it is part of its duty to defend, and failing to meet this obligation shifts the burden of allocation in the coverage action to the insurer so as not to allow the 'insurer to profit from its wrongful refusal to defend.'" (Doc. No. 539 at 96) (citing *Triple U Enters. v. New Hampshire Ins.*, 576 F. Supp. 798, 811 (D.S.D. 1983), *aff'd and remanded*, 766 F.2d 1278 (8th Cir. 1985)).

As noted, UOB primarily relies on *Duke*, a pre-1981 decision applying Florida law. 468 F.2d 973. In its post-trial brief, UOB argues, for the first time, that Florida law should apply to this dispute. (Doc. No. 539 at 12). Since 2017, however, the parties have argued for and relied upon Texas law. Furthermore, this Court, as well as the Magistrate Judge, have already relied on those representations in determining that Texas law applies. *See* discussion *supra* Section IV. As such, the Florida cases UOB cites are merely informative.

Nevertheless, even assuming hypothetically that Florida law applied, *Duke* is not applicable here. In *Duke*, the court considered "to what extent . . . *counsel supplied by the insurer* [is] obligated to make available to the insured-defendant a verdict [form] designating the respective portions of the total damages representing covered and noncovered damages." 468 F.2d at 974 (emphasis added). Critically, *Duke* is, in effect, a case dealing with the possible conflicts that sometimes exist between an insurer and its insured and the lawyer who represents the insured, but was hired and paid for by the insurer. It further involved the failure of the insurer or the lawyer it provided to notify the insured of its options and the effect of using a verdict form that was insurer, but not insured, friendly. *Duke* ultimately held that when an insurer *had* undertaken to defend the insured, the insurer had to provide notice to the insured of the availability/need for an allocated verdict so that the insured would be entitled to make its own decision on whether to seek one. *Id.*

at 979. Otherwise, an "impossible burden of proof" would be placed on the insured in the coverage action. *Id.* at 980.[40]

This entire insured versus insurer dichotomy is totally inapplicable here. Obviously, since Gemini did *not* undertake defense of UOB in the Construction Defect Action, Gemini did not control UOB's defense and, therefore, there was no conflict of interest in the underlying litigation between the insurer and the insured. From the instigation of the construction defect problems to October of 2019, Plaintiffs had their own lawyers who represented their interests. Ironshore never paid for or controlled the litigation—its offer was refused. When Navigators agreed to defend Plaintiffs in October 2019, Navigators retained the law firm of Rembold Hirschman to represent UOB and the law firm of Butler, Weihmuller, Katz and Craig to represent Hines. *See* (Plaintiffs' Trial Ex. 127). Per an Appointed Defense Agreement, Navigators agreed to compensate Plaintiffs' previous counsel, Baker Botts and Akerman, for the time necessary to transition the case to counsel retained by Navigators.

More importantly, the law firm of Baker Botts—Hines' long-time counsel and UOB's law firm of choice—continued to be active in the representation. A Baker Botts lawyer even served as counsel in the bankruptcy claim objection hearing, helping to defend UOB. Importantly, UOB actually requested that the Bankruptcy Court make "specific findings" regarding allocation in its judgment, but the Bankruptcy Court declined the request, *see*(Plaintiffs' Trial Ex. 131 at 860–61,

[40] Other cases UOB cites in support of this argument also address the possible conflict when the insurer controls the defense of the underlying litigation. *See Magnum Foods, Inc. v. Cont'l Cas. Co.*, 36 F.3d 1491, 1498 (10th Cir. 1994) ("[A]n insurer who undertakes the defense of a suit against its insured must meet a high standard of conduct."); *QBE Specialty Ins. Co. v. Scrap Inc.*, 806 Fed. Appx. 692, 694 (11th Cir. 2020) ("QBE agreed to defend Scrap in the underlying lawsuit" and successfully notified plaintiffs of the advisability of a special verdict); *Tri-State Ins. Co. of Minnesota v. Fitzgerald*, 593 So. 2d 1118, 1119 (Fla. Dist. Ct. App. 1992) (affirming determination granting entire underlying judgment to insured where insurer provided a defense to the underlying action but only agreed to pay a portion of the resulting judgment).

870),[41] making it obvious that this Court would be the more appropriate forum to perform the allocation. Consequently, this was not a case where the insurer tried to slip an unallocated verdict form (which would benefit it) past an unsuspecting insured. The issue of a possible conflict was, and is, non-existent. There was certainly no question about the defense lawyers in the bankruptcy case favoring the interest of the insurer over the interests of the insured. As such, UOB's cited cases are distinguishable because they do not apply Texas law, and they involve underlying lawsuits with completely different fact situations.

UOB's "lack-of-notice" argument is even further undermined by the fact that Navigators specifically advised UOB of the allocation issue in an October 24, 2019 letter: "UOB and Hines may have to allocate between covered and non-covered damages in any verdict or award that may be entered against UOB and/or Hines in order to establish the covered portion, if any, of such an award." (Plaintiffs' Trial Ex. 127 at 9–11). As explained above, in Navigators' letter agreeing to defend Plaintiffs, Navigators notified Plaintiffs of the advisability of an allocated verdict. Additionally, Navigators referenced allocation in its previous reservation of rights letters. *See* (*id.*) (July 3, 2018 "Supplemental Reservation of Rights" letter) (mentioning "the right to apportion between covered and noncovered damages"); (January 19, 2018 "Reservation of Rights" letter) (mentioning the same).

---

[41] Southstar was also clearly aware of the allocation issue as its counsel objected to UOB's request in Bankruptcy Court. When it was apparent that the Bankruptcy Court was not awarding damages pursuant to Southstar's loss of value theory, Southstar actually opposed such an allocation: "The notion that this Court should conduct a finding of fact mission on subjects that really weren't tried before the Court, and distinguishing between negligence, building code violation, damages flowing from each, we don't think is proper. That's really for another court at another time." *See* (Plaintiffs' Trial Ex. 131 at 861) (56:19–23). This Court's trial was the appropriate time and place. At the time, Southstar was seeking recovery on its loss of value claim, which, if upheld, might have resulted in a larger judgment.

Finally, this Court also discussed the burden to allocate in a pre-trial ruling in July 2024: "the Bankruptcy Court did not allocate between covered and uncovered claims . . . . 'The insured has the initial burden of establishing coverage under the terms of the policy.'" (Doc. No. 436 at 8) (citing *Crownover v. Mid-Continent Cas. Co.*,772 F.3d 197, 201 (5th Cir. 2014)). That was one of the main purposes of the trial before this Court. *See* (*id.*) ("In the estimation judgment, the Bankruptcy Court identified general categories of damages it was allowing Southstar to recover against UOB and *left the coverage issues for determination by this Court*.") (emphasis added). Lastly, as noted, in the Joint Pretrial Order, the parties stipulated that unresolved issues of fact and law remained regarding allocation. *See* (Doc. No. 487 at 13, 18–19).

Accordingly, UOB's argument that the burden to allocate shifted to the insurers fails. There was no insured versus insurer conflict. UOB, thus, had the burden to allocate the damages awarded in the Bankruptcy Judgment. There was certainly no lack of notice of the need to allocate, and it was Plaintiffs' choice to forgo the opportunity to provide this Court with credible evidence by which it could allocate.

**C. Did Plaintiffs Meet Their Burden to Allocate?**

Plaintiffs contend that even if the duty to allocate was on UOB, UOB met this burden. UOB contends that it met its burden "under both Texas and Florida law during the two-week trial with testimonies of Mr. Del Vecchio, Mr. Horst, Mr. Van Meter, and Mr. Rimoldi's stipulation and other evidence." (Doc. No. 539 at 99). It argues that "each of the damage categories [in the Bankruptcy Judgment] is a covered damage under the Policies" and, during this Court's trial,

"UOB presented significant factual information establishing what went into each of the Judgment's categories of damages." (*Id.*).

Plaintiffs argue, in part, that this Court should review and analyze evidence presented to the Bankruptcy Court. First, they do not refer this Court to any particular testimony or exhibit where such evidence exists. As such, Plaintiffs have waived this point. Moreover, this Court has reviewed not only this trial's transcript but also the entire four days of bankruptcy testimony and cannot find sufficient evidence upon which it could allocate these damages.[42] The Court notes that at the trial before this Court, transcripts and exhibits from the Bankruptcy Court proceeding were objected to and admitted only for the limited purpose to show what was before the Bankruptcy Court when it rendered its judgment. *See* (Doc. No. 537, Day 1-AM Trial Tr. at 38:13–14, 46:14–21, 47:1–5). Thus, the bankruptcy transcripts and exhibits were not admitted for all purposes, especially not for the purpose for which Plaintiffs are attempting to use them for here.

One must remember that the Defendants here were not parties to the claim objection hearing, and no one represented their interests; thus, that entire proceeding is effectively hearsay to them. They did not get to cross examine any witnesses. They did not get to present evidence or present any legal or factual arguments. They cannot be bound by that proceeding. As the Court stated to the parties at trial when admitting the exhibits, "you're going to have to convince me that the sun rose in the west, that it's usable by me," and UOB did not do so. (*Id.*, Day 1-AM Trial Tr.

[42] The Court notes that the claim objection hearing transcript was introduced by Plaintiffs and admitted for the limited purpose noted in the text. It should also be noted that, based on the Court's review of the testimony in that court, there were deposition transcripts given to Judge Jones that were not attached to the exhibits admitted by this Court. Consequently, they were not available for this Court to review.

at 38:9–12). Accordingly, the Court cannot use the Bankruptcy Court transcripts and exhibits to determine whether UOB met its allocation burden in this case.[43]

Plaintiffs had the opportunity, however, to "present evidence . . . regarding facts necessary to determine coverage that were not adjudicated in the underlying case" at this Court's trial. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Puget Plastics Corp.*, 532 F.3d 398, 404 (5th Circ. 2008). "The underlying case often does not resolve all the factual issues necessary to determine coverage because issues relevant to the question of coverage can be irrelevant to the question of the insured's liability." *Id.* Indeed, most of the parties and this Court expected such testimony. The Court previously explained to Plaintiffs in July of 2024 what may be necessary to prove their claim: "At trial, some expertise will in all likelihood be needed to explain and/or describe the construction defects in question to the eventual finder of fact . . . . Expert testimony may be needed to explain the defects and damage and subsequent repairs so the finder of fact can determine the amount of the covered and uncovered claims." (Doc. No. 433 at 5–6).

In the trial before this Court, instead of providing that expert testimony, Plaintiffs' primary position at trial was that it was not required to allocate. This Court, based upon the law (and the lack of evidence), rejects that argument. In an effort to be thorough, the Court reviews what little evidence was provided on allocation at trial. Ultimately, Plaintiffs' contention that they provided sufficient testimony to meet their allocation burden fails. There is no credible evidence by any

[43] Plaintiffs' attempt to use the bankruptcy claim objection hearing transcript as evidence here for this Court is somewhat puzzling in any event because Plaintiffs and Southstar have admitted that the Bankruptcy Court did not allocate damages. *See* (Doc. No. 538 at 4) (Southstar asserted: "[The Bankruptcy Court] did not allocate damages into insurance categories, and it was not required to do so."); (Doc. No. 539 at 93) ("UOB requested the bankruptcy court provide detail to allocate the damages. It was declined."). Having reviewed the Bankruptcy Court testimony itself, the Court indeed found no helpful, credible evidence from which it could effectuate allocation.

witness or exhibit, or any combination thereof, that satisfies the burden of proof on the issue of allocation. Nevertheless, the Court will address each damage award separately.

**1. Lost Profits**

Plaintiffs maintain in their post-trial brief that Kenneth Scott Van Meter, Southstar's expert from the claim objection hearing, testified at this trial that the Project was "yellow-tagged" by Osceola County Building Department due to the severe issues with the corner balconies. (Doc. No. 539 at 92). Thus, Plaintiffs argue, Southstar had to vacate the apartments, and ultimately "lost profits" from the apartments, due to the corner balcony defects.

Van Meter is a partner at the global consultancy firm, HKA Global. *See* (Doc. No. 537, Day 5-AM Trial Tr. at 15:13). He testified that his current practice is "split between two areas" with "bankruptcy and restructuring" on the one side and "a dispute practice" on the other where he provides analyses regarding economic damages, financial issues, and other types of matters that lend themselves to his experience in accounting and financial forensics. (*Id.*, Day 5-AM Trial Tr. at 17:6–11). Van Meter was engaged by Southstar in the claim objection hearing to "provide opinions on lost profits, on additional professional fees and costs that were incurred as a result of the underlying dispute, as well as diminution of value of the property with regard to the difference between what it was sold for versus what they had paid for it." (*Id.*, Day 5-AM Trial Tr. at 20:8–12).

First, Van Meter testified at this Court's trial that the Bankruptcy Court based this "lost profits" category on his expert report created for the claim objection hearing. He testified here that he came up with the "lost profits" number through analysis of the "rent rolls" and "the difference between what was being generated and what was projected to be generated, as opposed to . . . either a diminished amount of rents being generated by the properties, followed by no rents being

generated by the properties." (*Id.*, Day 5-AM Trial Tr. at 25:6–14).[44] Van Meter explained that his estimate of "lost profits" was created by looking at four different time periods: (1) the time period prior to February of 2017 "when the defects were first manifesting and becoming noticeable" and "there were no damages because there was no impact;" (2) the time period between February and May of 2017 where there were reduced rents due to "construction-related vacancies;" (3) the time period after May of 2017, "which became a larger impact . . . [and] resulted in a much bigger difference" due to construction-related vacancies and collection losses; and (4) the time period from September of 2017 "when the property was shut down" through February of 2019 when it was sold. (*Id.*, Day 5-AM Trial Tr. at 28:10–31:6).

As Van Meter explained, the "lost profits" category represents the variances in profit from the "construction-related vacancies" during the initial months of discovering the defects, the "collection losses" related to residents refusing to pay their rent, and then ultimately the vacancies throughout the Project due to the property being "shut down" (or "yellow tagged"). (*Id.*, Day 5-AM Trial Tr. at 29:1–31:1). As such, the provided evidence supports the conclusion that the "lost profits" are not merely calculated from the lost rental income *after* the property was "yellow tagged." Instead, it is based on Southstar's increasing "lost profits" from prior to UOB's first notice to the insurers concerning the construction defects to Southstar's sale of the Project. Indeed, three out of the four time periods involved in estimating the "lost profits" precede the posting of the "yellow tag."

Further, even if the "lost profits" were calculated merely from the time period after the Project was "yellow-tagged," Van Meter actually testified that the property was "condemned" (or

[44] Van Meter also testified that he deducted operating costs associated with the Project to determine his "lost profits" calculation. *See* (Doc. No. 537, Day 5-AM Trial Tr. at 26:6–11).

"yellow tagged") "as a result of the beginnings of the issues on the construction." (*Id.*, Day 5-AM Trial Tr. at 24:2–9). Van Meter, thus, did not testify that the Project was "yellow-tagged" as a result of the corner balcony defects, as Plaintiffs contend. In fact, Plaintiffs, in their post-trial briefing, do not cite anywhere in the record where Van Meter testified to this. Instead, they cite to the exact testimony quoted above where Van Meter testified that the "yellow tag" was due to multiple issues with the construction.[45] Plaintiffs did not provide any other convincing testimony that the Project was "yellow tagged" solely because of the corner balcony defects and they certainly did not prove it by a preponderance of the evidence.

Even assuming that by the "beginnings" Van Meter meant the "balcony problems," Plaintiffs did not provide this Court with credible evidence by which the Court could determine which of the occurrences led to Southstar's "lost profits." Indeed, *several* construction defects could have contributed to residents vacating the property or refusing to pay—all of which contributed to the total "lost profits." The Court cannot ascertain by a preponderance of the evidence whether the "lost profits" sum is a sum "that the insured [became] legally obligated to pay as damages because of . . . [covered] 'property damage.'" (Gemini's Trial Ex. 1 at 1).

[45] Van Meter's full testimony cited by Plaintiffs states: "So it was basically an apartment complex, and the underlying revenues were based on the rents, which are generated through the use of the property. And as a result of the beginnings of the issues on the construction, they had to relocate or terminate leases, and then eventually the property was condemned and they had to completely abandon the property. So the lost profits are based on that continuing loss of use of the property until the time the property was sold." (Doc. No. 537, Day 5-AM Trial Tr. at 24:2–9). Obviously, all of the defects were related to construction issues so all of them would present at the "beginnings of the issues on the construction."

Ultimately, Van Meter may have given the Court a means to allocate damages between different periods of time, but his evidence does not allocate costs between covered and uncovered defects.

**2. Non-Legal Professional Fees**

In support of their claim for coverage of the non-legal professional fees, Plaintiffs highlight Van Meter's testimony that the Bankruptcy Court awarded these fees for the "non-legal professional costs related to engineering and other costs incurred by the Southstar entities." (Doc. No. 537, Day 5-AM Trial Tr. at 23:21–23). Van Meter testified that this included Southstar's "expenses that were incurred for engineers and other consultants that were working on identifying the problems, trying to identify fixes to the problems, and then doing the work to try and remediate the property." (*Id.*, Day 5-AM Trial Tr. at 32:2–5).[46] This testimony, however, does not indicate on which, if any, defects the non-legal professional costs were spent or, stated another way, which defect caused what fees to be expended. Plaintiffs, thus, did not provide any evidence allowing this Court to allocate these unspecified fees between those which resulted from covered damages and those which resulted from uncovered damages.

**3. Restoration Costs**

Lastly, Plaintiffs point to the trial testimony of Del Vecchio and Horst, as well as the declaration provided by Rimoldi, and argue that "all experts in this case agreed that the restoration work [was] necessitated by structural movement, water intrusion, and deterioration across the project." (Doc. No. 539 at 91). Horst, a structural engineer, testified to the structural causes of the defects and any resulting damage to the Project. He did not provide any testimony concerning the

[46] Van Meter's testimony in this regard may have been a little more generous to Plaintiffs when he suggests these fees included remediation, *see* (Doc. No. 537, Day 5-AM Trial Tr. at 32:2–5), as the evidence proves that most of the repair work actually occurred post-sale of the Project to CGI.

projected (or incurred) costs associated with the repairs for the various defects and the resulting property damage.

Del Vecchio, a construction and real estate development professional, testified primarily in a manner that followed his 2019 report concerning the scope and estimated cost of restoring the Project. Notably, Del Vecchio testified regarding his estimates of what it would cost to restore the Project; he did not, and perhaps could not, testify regarding the actual costs to repair each defect nor did he testify as to the projected cost to repair each of the defects/occurrences. *See* (Doc. No. 537, Day 6-PM Trial Tr. at 19:16–25) (confirming his report was an "estimated cost" and he had "no knowledge or information on costs spent").[47] Moreover, with respect to allocating costs per a specific defect, he testified that the remediation scope he prepared included removal and replacement of "nonconforming work," meaning work that merely did not comply with the design documents but was not physically damaged. *See* (*id.*, Day 6-PM Trial Tr. at 20:7–21). He confirmed that part of the basis for his repair estimate for the Project included the cost to rebuild the Project so that it complied with the original, approved design documents. (*Id.*, Day 6-PM Trial Tr. at 20:18–21). This estimate necessarily includes the shear wall and draft stop penetration occurrences. Thus, Del Vecchio's repair estimate included estimates for both covered and uncovered damages. He did not provide more specific testimony regarding the estimated costs allocated to certain defects.

Lastly, Rimoldi, a former Florida building code inspector, opined that the repair work necessary to remove the "yellow tag" from the Project, and allow re-occupancy, would require

[47] According to the evidence, Southstar itself did not do any major repairs. Instead, it sold the Project to its new owner, CGI, with the unrepaired defects. CGI eventually hired TLC to repair the complex. None of the parties in this case provided the Court with testimony about what defects TLC actually fixed and what its actual costs for the repairs were. While not a necessity, this evidence could have been probative.

certain permits and inspections from the Osceola County Building Department. *See* (Doc. No. 529). Rimoldi merely testified to the general procedural requirements under the Florida Building Code for addressing a "yellow tag" and reoccupying a building. He did not provide any evidence regarding the repairs and their costs. Neither Horst, Del Vecchio, nor Rimoldi (nor any other witness) offered testimony by which the Court could allocate between covered and uncovered restoration costs for the construction defects in the Bankruptcy Judgment.[48]

Accordingly, Plaintiffs did not present allocation evidence "afford[ing] a reasonable basis for estimating the amount of damage or the proportionate part of damage caused by a risk covered by the insurance policy." *Nat'l Union Fire Ins. of Pitt.*, 735 F.Supp.2d at 677. Plaintiffs presented no allocation evidence at trial despite clear notice of their burden under Texas law, ample notice from the Court, and significant time to develop such evidence. Plaintiffs' failure to prove by a preponderance of the evidence an allocation of the loss categories awarded or provide persuasive evidence by which the Court could do so is fatal to their indemnity claim. Plaintiffs cannot recover under their duty to indemnify claim.

### D. Supplementary Payments

Lastly, Plaintiffs and Southstar argue that the insurers are obligated to pay prejudgment ($956,530.25) and post-judgment interest on the Bankruptcy Judgment under the Policy's Supplementary Payments provision. *See* (Doc. No. 539 at 93); (Doc. No. 538 at 17). First, the

---

[48] Ironshore's post-trial brief also highlighted that UOB had WJE consultants ready to testify to a detailed allocation of the Bankruptcy Judgment before the present suit was filed but apparently UOB elected not to call them. *See* (Doc. No. 537, Day 2-PM Trial Tr. at 147:3–148:6) (Colagiovanni testified that UOB had hired a "Wiss-Janney team", and they were "prepared to talk about each individual item."). While this testimony might have been sufficient, it was not presented at trial. Consequently, the Court has no way to evaluate it. If Ironshore is accurate, Plaintiffs apparently made the strategic decision not to present the evidence that might have allowed this Court to allocate and instead chose to take the position that allocation was not necessary.

Court notes that the Bankruptcy Judgment only awarded prejudgment interest in the amount of $956,530.25. The Bankruptcy Judgment does not award or even mention post-judgment interest. Further, Judge Jones stated at the bankruptcy claim objection hearing that prejudgment interest "obviously . . . would end August the 31st of 2018," the date UOB filed for bankruptcy. (Plaintiffs' Trial Ex. 131 at 838) (34:8–9). Judge Jones also stated that "[g]iven the nature of this claim, it would be [his] belief that the interest number would stop the accrual on the petition date of August 31st." (*Id.* at 842) (38:12–14).

Regarding Plaintiffs' claim for prejudgment interest, the Supplementary Payments provision provides:

> **1.** We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:
>
> * * *
>
> **f.** Prejudgment interest awarded against the insured <u>on that part of the judgment we pay</u>.

(Gemini's Trial Ex. 1 at 8) (emphasis added). Since the Court finds that Gemini (and the other insurers) are not obligated to pay *any* part of the Bankruptcy Judgment due to Plaintiffs' failure to allocate, the insurers are correspondingly not obligated to pay any prejudgment interest on the judgment. *See, e.g.*, *Travelers Indem. Co. v. Edwards*, 462 S.W.2d 533, 536 (Tex. 1970) (holding that since no judgment was entered against the insured, "[the insurer] owes [the insured] nothing under the Supplementary Payments Clause . . . [and] it was error to hold that [the insurer] owes interest on the entire judgment.").

As for Plaintiffs' request for post-judgment interest, the Supplementary Payments provision states that Gemini will pay "[a]ll interest on the full amount of any judgment that accrues after entry of the judgment and before [Gemini has] paid, offered to pay, or deposited in court <u>the part</u>

of the judgment that is within the applicable limit of insurance." (Gemini's Trial Ex. 1 at 8) (emphasis added). Again, this Court finds that *none* of the Bankruptcy Judgment is within the "applicable limit of insurance" because Plaintiffs have failed to prove by a preponderance of the evidence the costs associated with the covered versus uncovered defects, meaning the Court cannot determine what portions of the damages in the judgment are covered under the insurance policies. The insurers, therefore, are not obligated to pay post-judgment interest on a judgment that is not covered by their policies.[49]

Since the indemnity claim for the Bankruptcy Judgment fails, the associated claims for pre- and post-judgment interest also fail. *See John M. O'Quinn, P.C. v. Lexington Ins. Co.*, 906 F.3d 363, 372 (5th Cir. 2018) (finding that the insurer was not liable for any post-judgment interest because it was not liable for any portion of the judgment) ("Under [the insured's] reading of the policy, even if the [insurer] is not required to pay any of 'such judgment amount covered by the terms of the policy,' it is liable virtually in perpetuity for interest on the judgment. This construction of the policy borders on the absurd."); *Standard Acc. Ins. Co. of Detroit, Mich. v. Winget*, 197 F.2d 97, 107 (9th Cir. 1952) ("Courts do not resort to forced construction in order to fasten liability upon an insurer which, by the terms of the policy, it has not assumed.").

## VII. RESOLUTION OF THE ISSUES

The Court orders counsel for Ironshore and Navigators to jointly prepare a judgment and circulate it to all parties for approval. Obviously, any party who feels the need to do so may approve

---

[49] The Court also notes that the Bankruptcy Judgment itself does not award or mention post-judgment interest. In fact, the Bankruptcy Judgment states that "[a]ll other claims against the Debtor are disallowed." (Plaintiffs' Trial Ex. 134).

said judgment "in form only." Having considered the parties' arguments, the testimony of all of the witnesses, and the exhibits, the Court hereby finds the following:

1. Texas law applies to this dispute.
2. There were multiple occurrences—some of which led to "property damage" as that term is defined in the Gemini Policy and some of which did not. Nevertheless, these multiple occurrences triggered the application of Gemini's duty to defend until its aggregate coverage was exhausted.
3. Gemini had a duty to defend Plaintiffs, and it breached its duty to defend. Ironshore and Navigators did not have a duty to defend Plaintiffs since Gemini's duty to defend never ended.
4. Gemini is liable for Plaintiffs' direct damages as a result of its breach of its duty to defend. Plaintiffs are entitled to direct damages for Gemini's breach of its duty to defend in the following amounts:

| UOB DEFENSE DAMAGES | |
|---|---|
| Carlton Fields | $70,555.48 |
| Baker Botts | $773,386.69 |
| Okin Adams | $655,194.00 |
| Other Defense Expenses | $0 |
| **TOTAL TO UOB:** | $1,499,136.17 |
| HINES DEFENSE DAMAGES | |
| Akerman | $389,962.69 |
| Baker Botts | $10,141.70 |
| **TOTAL TO HINES:** | $400,104.39 |
| **GRAND TOTAL:** | $1,899,240.56 |

5. Plaintiffs are entitled to prejudgment interest on the grand total amount.
6. Plaintiffs are not entitled to recover consequential damages for Gemini's breach of its duty to defend. This includes Plaintiffs' claims for "Other Defense Expenses" and "Bankruptcy Costs."
7. Navigators is entitled to final judgment on Count II of its cross-claim for subrogation against Gemini in the amount of $699,569.38 plus applicable pre- and post-judgment interest.
8. Plaintiffs failed to carry their burden to allocate between covered and uncovered damages in the Bankruptcy Judgment. Therefore, Plaintiffs claims for breach of the duty to indemnify are denied. Gemini, Ironshore, and Navigators have no duty to pay for any damages based upon their duty to indemnify Plaintiffs.
9. Under Texas law, Plaintiffs are entitled to its attorneys' fees from Gemini for this action due to Gemini's failure to comply with its contractual duties to UOB. *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8).
10. As to Gemini, Plaintiffs are entitled to prejudgment interest on the damages (detailed in paragraph 4 above) this Court has awarded and post-judgment interest which will begin on the date the Court signs the judgment as per federal law.
11. The Plaintiffs take nothing as to Ironshore and Navigators.

The parties are **ORDERED** to provide this Court with an agreed (or as close as they can get) final judgment based on this order by **October 1, 2026**. Gemini and Plaintiffs are **ORDERED** to confer regarding prejudgment interest on Plaintiffs' award and provide the parties and the Court with their agreement by **September 15, 2026**. Additionally, Gemini and Navigators are **ORDERED** to confer regarding prejudgment interest on Navigators' award and provide the parties

and the Court with their agreement by **September 15, 2026**. Gemini and Plaintiffs are **ORDERED** to confer and agree regarding the amount of attorneys' fees incurred in this action and provide the parties and the Court with their agreement by **September 15, 2026**. If the issues regarding interest and/or attorneys' fees cannot be resolved by agreement, the parties should inform the Court at the same time the judgment is presented.

Signed on this 15th day of August 2026.

Andrew S. Hanen
United States District Judge